## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **TALAL AL-ZAHRANI;** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **ALI ABDULLAH AHMED AL-SALAMI;** | ) | |
| | ) | |
| **In their individual capacities;** | ) | |
| | ) | |
| **and** | ) | |
| | ) | **Civil Action No.** |
| **TALAL AL-ZAHRANI,** | ) | |
| | ) | |
| **As the representative of YASSER AL-ZAHRANI's estate;** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **ALI ABDULLAH AHMED AL-SALAMI,** | ) | |
| | ) | |
| **As the representative of SALAH ALI ABDULLAH AHMED AL-SALAMI's estate,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DONALD RUMSFELD** | ) | |
| **Fmr. Secretary of Defense** | ) | |
| **Department of Defense** | ) | |
| **1000 Defense Pentagon** | ) | |
| **Washington D.C. 20301-1000;** | ) | |
| | ) | |
| **GEN. RICHARD MYERS** | ) | |
| **Fmr. Chairman, Joint Chiefs of Staff** | ) | |
| **9999 Joint Chiefs of Staff Pentagon** | ) | |
| **Washington, D.C. 20318;** | | |
| | | |
| **MARINE GENERAL PETER PACE** | ) | |
| **Chairman of the Joint Chiefs of Staff** | ) | |
| | | |
| **GEN. JAMES T. HILL** | ) | |

Dockets.Justia.com

**Fmr. Commander, United States Southern** )
**Command** )
**c/o United States Army** )
**Army Pentagon** )
**Washington, D.C. 20310-0200;** )
  )
**GEN. BANTZ CRADDOCK** )
**Fmr. Commander, United States Southern** )
**Command** )
**c/o United States Army** )
**Army Pentagon** )
**Washington, D.C. 20310-0200;** )
  )
**MAJ. GEN. MICHAEL LEHNERT** )
**Fmr. Commander Joint Task Force-160** )
**Guantánamo Bay Naval Base, Cuba** )
**c/o United States Marines** )
**Marine Pentagon** )
**Washington, D.C.;** )
  )
**MAJ. GEN. MICHAEL E. DUNLAVEY** )
**Fmr. Commander, Joint Task Force-GTMO** )
**Fmr. Commander, Joint Task Force-170** )
**Guantánamo Bay Naval Base, Cuba** )
**c/o United States Army** )
**Army Pentagon** )
**Washington, D.C. 20310-0200;** )
  )
**MAJ. GEN. GEOFFREY MILLER** )
**Fmr. Commander, Joint Task Force-GTMO** )
**Guantánamo Bay Naval Base, Cuba,** )
**c/o United States Army** )
**Army Pentagon** )
**Washington, D.C. 20310-0200;** )
  )
**BRIG. GEN. JAY HOOD** )
**Fmr. Commander, Joint Task Force, GTMO** )
**Guantánamo Bay Naval Base, Cuba** )
**c/o United States Army** )
**Army Pentagon** )
**Washington, D.C. 20310-0200;** )
  )
**REAR ADM. HARRY B. HARRIS, JR.** )
**Commander, Joint Task Force-GTMO** )
**Guantánamo Bay Naval Base, Cuba** )
**c/o United States Navy** )

Navy Pentagon )
Washington, DC 20350-2000; )
)
COL. TERRY CARRICO )
Fmr. Commander, Camp X-Ray )
Guantánamo Bay Naval Base, Cuba, )
c/o United States Army )
Army Pentagon )
Washington, D.C. 20310-0200; )
)
COL. ADOLPH MCQUEEN )
Fmr. Commander, Joint Detention Operations )
Group (JDOG) )
Guantánamo Bay Naval Base, Cuba )
c/o United States Army )
Army Pentagon )
Washington, D.C. 20310-0200; )
)
BRIG. GEN. NELSON J. CANNON )
Fmr. Commander, Joint Detention Operations )
Group (JDOG) )
Guantánamo Bay Naval Base, Cuba, )
c/o United States Army )
Army Pentagon )
Washington, D.C. 20310-0200; )
)
COL. MIKE BUMGARNER )
Fmr. Commander, Joint Detention Operations )
Group (JDOG) )
Guantánamo Bay Naval Base, Cuba )
c/o United States Army )
Army Pentagon )
Washington, D.C. 20310-0200; )
)
COL. WADE DENNIS )
Commander, Joint Detention Operations Group )
Guantánamo Bay Naval Base, Cuba )
c/o United States Army )
Army Pentagon )
Washington, D.C. 20310-0200; )
)
ESTEBAN RODRIGUEZ )
Director, Joint Intelligence Group )
Guantánamo Bay Naval Base, Cuba )
c/o Department of Defense )
Defense Pentagon )

**Washington, D.C. 20301-1000;**	)
	)
**WILLIAM WINKENWERDER, JR., M.D.**	)
**Assistant Secretary of Defense for Health**	)
**Department of Defense**	)
	)
**DAVID TORNBERG, M.D.**	)
**Deputy Assistant Secretary of Defense for Health**	)
**Department of Defense**	)
	)
**VICE ADMIRAL (RET.) MICHAEL COWAN**	)
**U.S. Navy Surgeon General**	)
**Chief of Navy's Bureau of Medicine and Surgery**	)

**DONALD ARTHUR**	)
**Navy Surgeon General**	)
**U.S. Navy**	)
	)
**CAPTAIN JOHN EDMONDSON**	)
**Head of U.S. Naval Hospital at Guantanamo**	)
**Chief Medical Officer, Guantanamo Navy Hospital**	)
**Task Force Surgeon, Joint Task Force-Guantánamo**	)

**CAPTAIN RONALD L. SOLLOCK**	)
**Chief Medical Officer, Guantanamo Navy Hospital**	)
**Task Force Surgeon, Joint Task Force-Guantánamo**	)

**REAR ADMIRAL THOMAS K. BURKHARD**	)
**Commander of Navy Medicine East**	)
**Naval Hospital Guantanamo**	)

**REAR ADMIRAL THOMAS R. CULLISON**	)
**Commander of Navy Medicine East,**	)
**Naval Hospital Guantanamo**	)
	)
**and**	)
	)
**JOHN DOES 1-100, military, medical and**	)
**civilian personnel involved in abuses and**	)
**handling of Yasser Al-Zahrani and**	)
**Salah Ali Abdullah Al-Salami at Guantánamo**	)
	)
**All in their individual capacities;**	)
	)
**and**	)
	)

4

| United States | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## COMPLAINT

Plaintiffs Talal Al-Zahrani ("Mr. Al-Zahrani, Sr."), Ali Abdullah Ahmed Al-Salami ("Mr. Al-Salami, Sr.") (collectively "Plaintiffs"), by and through their counsel, respectfully allege the following:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action on behalf of themselves and the estates of their deceased sons, Yasser Al-Zahrani and Salah Ali Abdullah Al-Salami.

2.      Yasser Al-Zahrani and Salah Al-Salami were prisoners in the exclusive custody of the United States at the U.S. Naval Base at Guantanamo Bay, Cuba ("Guantanamo") when they died on June 10, 2006.  Mr. Al-Zahrani was 17 when he was transferred to Guantanamo and 22 when he died.  Mr. Al-Salami died at age 37.

3.      At the time of their deaths, both men had been detained for over four years without charge, without notice of the reasons why they were being held or a fair chance to defend themselves, and without knowing whether or when their imprisonment would end.  They were held in conditions and subjected to techniques that were designed and intended to break them down physically and emotionally, and which caused them to suffer severely.  To protest their conditions and illegal detention and demand their rights, they along with dozens of other detainees went on hunger strike for months at a time.  Rather than bring their conditions and detention into compliance with basic humane standards and the rule of law, the government's

response was to restrain them in chairs, force tubes down their noses and throats, and pump food into their stomachs.

4.     On June 10, Mr. Al-Zahrani and Mr. Al-Salami were reportedly found dead in their cells.  A third detainee, Mani Al-Utaybi, was found dead the same night.  The day of the deaths, prior to conducting autopsies or an investigation, the government made a public statement describing the deaths as suicides by hanging.  Certain high-level government and military officials had a different choice of words, calling the suicides "asymmetrical warfare" and "a good PR move."  The deceased's families and the public had no further information as to the cause and circumstances of the deaths apart from the government's initial public statements for two years, until the Naval Criminal Investigative Service ("NCIS"), the military agency charged with investigating the deaths, released its final report in June 2008.  The military concluded that the deaths were suicides by hanging.  Plaintiffs note at the outset that because of the circumstances of this case and the inherent constraints on their ability to investigate, they are limited in this complaint to the conclusions and evidence as set forth by the government, including as to the manner and cause of their son's deaths.  Yet they assert liability even accepting the government's conclusions as true.

5.     Plaintiffs seek compensation on behalf of their sons for the prolonged arbitrary detention, torture and cruel treatment Yasser Al-Zahrani and Salah Ali Abdullah Al-Salami suffered in the custody of the United States and its agents at Guantanamo, and to hold responsible those officials charged with the custody and care of their sons for their sons' injuries and ultimate deaths.  Plaintiffs also bring this action to seek compensation for the emotional suffering they experienced as a result of Defendants' arbitrary detention of their sons and callous and cruel response following their deaths.

6.     Plaintiffs bring this action for declaratory relief, and for compensatory and punitive damages against Defendants Donald Rumsfeld, Gen. Richard Myers, Gen. James T. Hill, Gen. Bantz Craddock, Maj. Gen. Michael Lehnert, Marine Gen. Peter Pace , Maj. Gen. Michael Dunlavey, Maj. Gen. Geoffrey Miller, Brig. Gen. Jay Hood, Rear Adm. Harry B. Harris, Jr., Col. Terry Carrico, Col. Adolph McQueen, Brig. Gen. Nelson Cannon, Col. Mike Bumgarner, Col. Wade Dennis, Esteban Rodriguez, Rear Admiral Thomas R. Cullison, Rear Admiral Thomas K. Burkhard, Captain Ronald L. Sollock, Captain John S. Edmondson, Rear Admiral (Ret.) Donald C. Arthur, Vice Admiral (Ret.) Michael L. Cowan, and Dr. David N. Tornberg, Dr. William Winkenwerder, Jr. for their role in abusing Plaintiffs and their sons in violation of international and domestic law.  Defendants exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in the commission of the abusive and illegal practices alleged herein, including prolonged arbitrary detention, torture, cruel, inhuman or degrading treatment, denial of due process, and negligent medical care of Messrs. Al-Zahrani and Al-Salami at Guantánamo.  Plaintiffs additionally bring this action against Does 1-100, who exercised command responsibility over, conspired with, aided or abetted subordinates, and/or directly or indirectly participated in Messrs. Al-Zahrani and Al-Salami's detention, interrogation, torture, abusive treatment, and negligent care.  Finally, Plaintiffs institute this action against the United States for the negligent and intentional acts and omissions of its agents acting under color of law and their authority as federal officers. Defendants are liable under domestic and international law for the injuries, pain and suffering of Plaintiffs in their individual capacities and as representatives of their sons' estates.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331(federal question jurisdiction), 28 U.S.C. §1332 (diversity jurisdiction), 28 U.S.C. § 1346 and §2674 (Federal Tort Claims Act), and 28 U.S.C. §1350 (Alien Tort Claims Act).

8.      This action is brought pursuant to the Alien Tort Claims Act and the Federal Tort Claims Act.  It is also brought directly under the Fifth and Eighth Amendments to the United States Constitution.

9.      Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(a)(3), 28 U.S.C. § 1391(b)(2), and 28 U.S.C. § 1391(e)(2), in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.  *See Smith v. Dalton,* 927 F. Supp. 1, 6 (D.D.C. 1996).  The acts alleged below are "inextricably bound up with the District of Columbia in its role as the nation's capital." *Mundy v. Weinberger,* 554 F. Supp. 811, 818 (D.D.C. 1982).

### JURY DEMAND

10.      Plaintiffs demand trial by jury with respect to all claims in this action, with the exception of Federal Tort Claims Act claims.

### PARTIES

**Plaintiffs**

11.      Yasser Al-Zahrani, a citizen of Saudi Arabia, was a prisoner in the exclusive custody of the United States at Guantanamo from January 2002 until his death on June 10, 2006. He was 17 years old when he was transferred to Guantanamo and 22 years old when he died.

12.      Plaintiff Talal Al-Zahrani, a citizen of Saudi Arabia, is the father of Yasser Al-Zahrani and the representative of his son's estate.  Mr. Al-Zahrani, Sr. resides with his family in Saudi Arabia.

13.     Salah Ali Abdullah Al-Salami, a citizen of Yemen, was a prisoner in the exclusive custody of the United States at Guantanamo from approximately June 2002 until his death on June 10, 2006.

14.     Plaintiff Ali Abdullah Ahmed Al Salami, a citizen of Yemen, is the father of Salah Ali Abdullah Al-Salami and the representative of his son's estate.  Mr. Al-Salami, Sr. resides in Taezz, Yemen with his family.

**Defendants**

15.     Defendant Donald Rumsfeld is a U.S. citizen residing in Illinois. Defendant Rumsfeld was the United States Secretary of Defense from January 20, 2001 until December 18, 2006, including the entire period during which the events herein described occurred.  At all relevant times, Defendant Rumsfeld possessed and exercised command and control over the United States military and the U.S. detention facility at Guantanamo.  Defendant Rumsfeld is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

16.     Defendant Air Force Gen. Richard Myers is a U.S. citizen residing in Virginia. From October 1, 2001 until October 1, 2005, Defendant Myers was Chairman of the Joint Chiefs of Staff.  As the senior uniformed military officer in the chain of command during the relevant times November 2001 until October 1, 2005, Defendant Myers possessed and exercised command and control over the U.S. military and the U.S. detention facility at Guantanamo. Defendant Myers is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or

abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

17.    Defendant Marine Gen. Peter Pace is a U.S. citizen and resident of New Jersey. Defendant Myers has served as the Chairman of the Joint Chiefs of Staff since September 30, 2005. As the senior uniformed military officer in the chain of command during the relevant times September 30, 2005 until November 16, 2006, Defendant Myers possessed and exercised command and control over the U.S. military and the U.S. detention facility at Guantánamo. Defendant Myers is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

18.    Defendant Army Gen. James T. Hill is a U.S. citizen and resident of Florida. From August 18, 2002 until November 9, 2004, Defendant Hill was Commander of the United States Southern Command ("SouthCom").  During his tenure, Defendant Hill possessed and exercised command and control over subordinates at the detention facility at Guantanamo. Defendant Hill is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

19.    Defendant Army Gen. Bantz Craddock is a U.S. citizen and resident of West Virginia.  From November 9, 2004 until October 18, 2006, Defendant Craddock was Commander of the United States Southern Command ("SouthCom").  During his tenure, Defendant Craddock possessed and exercised command and control over subordinates at the

detention facility at Guantanamo. Defendant Craddock is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

20.     Defendant Marine Maj. Gen. Michael Lehnert is a U.S. citizen and resident of Florida. From January 11, 2002 until March 28, 2002, Defendant Lehnert was Commander of Joint Task Force-160. In this role, Defendant Lehnert was responsible for the construction and operation of Camp X-Ray and Camp Delta at Guantánamo and responsible for the care, custody and control of detainees. During his tenure, he possessed command and control over U.S. military stationed at the detention facility at Guantanamo. Defendant Lehnert is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

21.     Defendant Army Maj. Gen. Michael Dunlavey is a U.S. citizen and resident of Pennsylvania. Defendant Dunlavey was initially Commander of Joint Task Forces-170, responsible for the coordination and implementation of interrogation efforts at Guantanamo, and later Commander of its successor Joint Task Force-GTMO, formed from the merger of JTF-160 and JTF-170 in October 2002, and responsible for operating the detention facility and conducting operations at Guantánamo. From February until November 2002, Defendant Dunlavey possessed and exercised command and control over subordinates at the detention facility at Guantánamo. Defendant Dunlavey is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over,

conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

22.     Defendant Army Maj. Gen. Geoffrey Miller is a U.S. citizen and resident of Texas. From October 2002 until March 2004, Defendant Miller was Commander of Joint Task Force-GTMO, responsible for operating the detention facility and conducting operations at Guantánamo.  During his tenure, he possessed and exercised command and control over U.S. troops stationed at Guantánamo.  Defendant Miller is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

23.     Defendant Army Brig. Gen. Jay Hood is a U.S. citizen and resident of South Carolina.  From March 2004 until March 31, 2006, Defendant Hood was Commander of Joint Task Force-GTMO, responsible for operating the detention facility and conducting operations at Guantánamo.  During his tenure, he possessed and exercised command and control over subordinates at the U.S. detention facility at Guantánamo.  Defendant Hood is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

24.     Defendant Navy Rear Adm. Harry Harris is a U.S. citizen and a resident of Texas. From March 31, 2006 until the present, Defendant Harris has been the Commander of Joint Task Force-GTMO, responsible for operating the detention facility and conducting operations at Guantánamo.  Defendant Harris is responsible for the conduct of all interrogations at

Guantánamo.  During the relevant time period of March 31, 2006 until November 16, 2006, he possessed and exercised command and control over subordinate troops stationed at Guantánamo. Defendant Harris is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

25.     Defendant Army Col. Terry Carrico is a U.S. citizen and resident of Texas.  From January 11, 2002 to April 28, 2002, Defendant Carrico was Commander of Camp X-Ray, the initial temporary detention facility at Guantánamo Bay.  During his tenure, he possessed and exercised command and control over subordinate troops stationed at Guantánamo.  Defendant Carrico is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff Al-Zahrani and his son as hereinafter alleged.

26.     Defendant Army Col. Adolph McQueen is a U.S. citizen.  From November 2002 until August 2003, Defendant McQueen was the Commander of Joint Detention Operations Group (JDOG) at Guantánamo, responsible for guarding the prisoners and providing security. During his tenure, he possessed and exercised command and control over subordinate troops stationed at Guantánamo.  Defendant McQueen is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

27.     Defendant Army Brig. Gen. Nelson Cannon is a U.S. citizen and resident of Michigan.  From August 2003 to September 2004, Defendant Cannon was the Commander of Joint Detention Operations Group (JDOG) at Guantánamo, responsible for guarding the prisoners and providing security.  During his tenure, he possessed and exercised command and control over U.S. military at the detention facility at Camp Delta.  Defendant Cannon is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

28.     Defendant Army Col. Mike Bumgarner is a U.S. citizen and a resident of North Carolina.  From April 2005 until March 2006, Defendant Bumgarner was the Commander of the Joint Detention Group (JDOG) at Guantánamo, responsible for guarding the prisoners and providing security.  During his tenure, he possessed and exercised command and control over subordinate troops stationed at Guantánamo.  Defendant Bumgarner is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

29.     Defendant Army Col. Wade Dennis is a U.S. citizen.  From March 2006 until the present, Defendant Dennis was the Commander of the Joint Detention Group (JDOG) at Guantánamo, responsible for guarding the prisoners and providing security.  During the relevant time period of March 2006 until November 16, 2006, he possessed and exercised command and control over subordinate troops stationed at Guantánamo.  Defendant Dennis is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for,

exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

30.     Defendant Esteban Rodriguez is a U.S. citizen.  From July 2003 until 2006, Defendant Rodriguez was the civilian Director of the Joint Intelligence Group responsible for managing intelligence-gathering operations at Guantánamo and reporting to the Commander of JTF-GTMO.  During his tenure, he possessed and exercised command and control over subordinate troops stationed at Guantánamo Bay.  Defendant Rodriguez is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

31.     Defendant Dr. William Winkenwerder, Jr. is a U.S. citizen and resident of Virginia.  From October 2001 until 2007, Defendant Winkenwerder was the Assistant Secretary of Defense for Health Affairs (ASD/HA), principal staff assistant and advisor to the Secretary of Defense for all Department of Defense health policies, programs, and activities, and responsible for effectively executing the Defense Department's healthcare mission.  During this period, Defendant Winkenwerder possessed and exercised command and control over subordinates in the United States military and the U.S. detention facility at Guantanamo.  Defendant Winkenwerder is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

32.     Defendant Dr. David N. Tornberg is a U.S. citizen.  From March 2002 to March 2007, Defendant Tornberg served as Deputy Assistant Secretary of Defense for Clinical and Program Policy, senior advisor to the Assistant Secretary of Defense for Health Affairs, Defendant Winkenwerder, and responsible for directing all clinical policies and program implementation oversight for the Military Health System, including patient safety and advocacy, quality of care, professional standards, medical ethics, and mental health policy.  During this period, Defendant Tornberg possessed and exercised command and control over subordinates in the United States military and the U.S. detention facility at Guantanamo.  Defendant Tornberg is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

33.     Defendant Vice Admiral (Ret.) Michael L. Cowan is a U.S. citizen.  From August 2001 to August 2004, Defendant Cowan served as U.S. Navy Surgeon General, Chief of the Navy's Bureau of Medicine and Surgery and senior-most medical officer of the U.S. Navy.  During the relevant time period, Defendant Cowan possessed and exercised command and control over subordinates in the United States Navy and the U.S. detention facility at Guantanamo.  Defendant Cowan is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

34.     Defendant Rear Admiral (Ret.) Donald C. Arthur is a U.S. citizen.  From June 2004 to August 2007, Defendant Arthur served as U.S. Navy Surgeon General, Chief of the

Navy's Bureau of Medicine and Surgery and senior-most medical officer of the U.S. Navy. During this period, Defendant Arthur possessed and exercised command and control over subordinates in the United States Navy and the U.S. detention facility at Guantanamo. Defendant Arthur is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

35. Defendant Captain John S. Edmondson is a U.S. citizen and a resident of Washington D.C. From July 2003 to January 2006, Defendant Edmondson was the Chief Medical Officer at Guantanamo Navy Hospital, Task Force Surgeon for the Joint Task Force-Guantánamo (JTF-GTMO), and an Emergency Physician. During this period, he was responsible for, *inter alia*, overseeing the operation of the Guantánamo Navy Hospital that gave medical treatment to prisoners. During the relevant time period, Defendant Edmondson possessed and exercised command and control over subordinates in the U.S. detention facility at Guantanamo. Defendant Edmondson is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

36. Defendant Captain Ronald L. Sollock is a U.S. citizen. From January 2006 to July 2007, Defendant Sollock was the Chief Medical Officer at Guantanamo Navy Hospital and Task Force Surgeon for the Joint Task Force-Guantánamo (JTF-GTMO). During this period, he was responsible for, *inter alia*, overseeing the operation of the Guantánamo Navy Hospital that gave medical treatment to prisoners. During the relevant time period, Defendant Sollock

possessed and exercised command and control over subordinates in the U.S. detention facility at Guantanamo. Defendant Sollock is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

37.    Defendant Rear Admiral Thomas K. Burkhard is a U.S. citizen. From August 2005 until February 2006, Defendant Burkhard was the Commander of Navy Medicine East, responsible for overseeing subordinate command Naval Hospital Guantanamo. During the relevant time period, Defendant Burkhard possessed and exercised command and control over subordinates in the U.S. detention facility at Guantanamo. Defendant Burkhard is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

38.    Defendant Rear Admiral Thomas R. Cullison is a U.S. citizen. From either 2005 or 2006 until 2007, Defendant Cullison was the Commander of Navy Medicine East, responsible for overseeing subordinate command Naval Hospital Guantanamo. During the relevant time period, Defendant Cullison possessed and exercised command and control over subordinates in the U.S. detention facility at Guantanamo. Defendant Cullison is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

39. Plaintiffs do not know the true names and capacities of Defendants sued herein as Does 1-100 and therefore sue these defendants by fictitious names. Does 1-100 are the military, medical and civilian personnel who exercised command responsibility over, conspired with, aided or abetted subordinates, and/or directly or indirectly participated in Messrs. Al-Salami's and Al-Zahrani's detention, interrogation, torture, abusive treatment and negligent care as hereinafter alleged.

Defendant United States is sued under 28 U.S.C. § 2674 for the tortious acts of agents acting within the scope of their duties at Guantanamo.

## STATEMENT OF FACTS

**General Allegations**

**Prolonged Arbitrary Detention**

40. Yasser Al-Zahrani and Salah Ali Abdullah Al-Salami were detained in the exclusive custody, care and control of Defendants at Guantanamo from January and June 2002 until their deaths on June 10, 2006. They were never charged for any crime.

41. The United States occupies the territory of the U.S. Naval Base at Guantanamo Bay pursuant to a 1903 Lease Agreement executed with Cuba, which expressly provides for the United States' "complete jurisdiction and control" over the territory – control it may exercise permanently if it so chooses. As Justice Kennedy wrote in *Rasul v. Bush* (2004), "Guantanamo Bay is in every practical respect a United States territory" over which the United States has long exercised "unchallenged and indefinite control."

42. The first prisoners were transferred to Guantanamo on January 11, 2002. At its peak, the prison held more than 750 men from over 40 countries, ranging in age from 10 to 80.

43.     Defendants and their agents seized individuals from over 40 countries across the globe, often far from any zone of conflict, and transferred them to Guantanamo for indefinite and unreviewable detention on the basis of a unilateral determination by government officials that they were "enemy combatants."  Government officials chose Guantanamo as the site of its prison, and intended to hold prisoners there indefinitely without process, precisely because they believed foreign citizens detained there were beyond the reach of U.S. law, including U.S. international obligations under the Geneva Conventions.

44.     From January 2002 until July 2004, the United States held hundreds of detainees at Guantanamo incommunicado and without access to counsel, notice of the reasons for their detention or any review of their status.

45.     In June 2004, the U.S. Supreme Court ruled in *Rasul* that detainees have the right to access federal courts in the United States through petitions for the writ of habeas corpus. Hundreds of habeas petitions were filed in federal court in the aftermath of the decision, but it took several months, even years, for many prisoners to secure counsel, file their petitions and actually meet with their lawyers, including because of the government's refusal to disclose identifying information about the prisoners and the resulting difficulty of obtaining attorney authorizations from detainees or their families; the government's own difficulty in confirming detainees' identities once petitions were filed, despite having held the men for years;  and the government's opposition to the entry of protective orders required in detainees' cases before attorneys could meet with them at Guantanamo.  For these and other reasons for delay, Mr. Al-Salami was never able to meet with his attorney before he died, and Mr. Al-Zahrani did not have counsel or a habeas petition at the time he died.

46.     As a result of the government's continuous efforts over the years to deny and obstruct detainees' habeas rights, the first petitions, although filed in 2004, were not heard until November 2008.

47.     In July 2004, just days after the Supreme Court handed down its decision in *Rasul*, the government issued hastily-created procedures for administrative review of detainees' "enemy combatant" status by Combatant Status Review Tribunals ("CSRT").  The procedures presumed detainees to be "enemy combatants" and charged the tribunals solely with reviewing prior enemy combatant determinations by the executive and confirming or reversing those determinations.  The tribunals' reviews were conducted by mid-level officers who were essentially tasked with deciding, with no institutional safeguards for independence in place, whether the prior determinations of their superiors were right or wrong.  These determinations were to take place in a context where for years prior to the CSRTS, Defendants and other high-ranking officials had repeatedly declared the detainees at Guantanamo dangerous terrorists.  Compounding the limitations and inherent bias of the CSRT process, detainees had no right under the rules to see or rebut any classified information, even though the tribunals relied substantially on classified information; no effective right to call witnesses or present documentary evidence; and no right to counsel, but only a non-lawyer military officer who had no duty of confidentiality and an obligation, in fact, to disclose to the tribunal any inculpatory information learned from the detainee in the course of "assisting" him.  In addition, in an environment where torture had been sanctioned and used against detainees in interrogations for at least two years, both at Guantanamo and in U.S.-controlled facilities where detainees had been held prior to being transferred to Guantanamo, the rules permitted evidence obtained through torture to be used as a basis for detention.

48.     During the course of a few months in 2004, CSRTs were convened for all detainees at Guantanamo.  Not surprisingly, the tribunals determined that most detainees were "enemy combatants."  In the rare instances where the tribunals reached a different outcome, re-hearings were ordered.  Believing that the tribunals lacked any semblance of fairness, many detainees refused to participate in their proceedings, which proceeded in their absence.

49.     Despite detaining and vilifying Guantanamo prisoners for years as "enemy combatants" and dangerous terrorists, U.S. officials themselves have acknowledged that many or most of the men did not belong at Guantanamo.  The numbers speak for themselves: of the over 780 detainees held at Guantanamo, the government has released approximately 500 men to date and, in seven years, it has charged no more than 21.

50.     **Inhumane Conditions, Torture and Abuse**

51.     The International Red Cross has charged that the detention and interrogation system at Guantanamo, "…whose stated purpose is the production of intelligence, cannot be considered other than an intentional system of cruel, unusual and degrading treatment and a form of torture."

52.     Guantanamo prisoners were detained in one of 6 long-term facilities during the period of the deceased's detention.  On information and belief, Messrs. Al-Zahrani and Al-Salami and other detainees were moved between various camps, including between greater or lesser restrictive camps, depending on "good behavior" and "cooperation" with the interrogation process.

53.     The first detainees transferred to Guantanamo in January 2002, like Mr. Al-Zahrani, were held for the first few months of their detention in Camp X-Ray, the interim detention camp for new arrivals while more permanent facilities were being constructed.  In

Camp X-Ray, detainees were held in six-by-six foot wire-mesh cells resembling cages, with a cement slab floor and a make-shift roof of metal sheets, where detainees had no reprieve from the heat, humidity or the elements of the outdoors.

54.     In April 2002, prisoners were moved to Camp Delta, a large prison complex containing several separate detention camps, including Camp 1, where Messrs. Al-Zahrani and Al-Salami were detained when they died.  The cells in most of the camps were identical – six-by-eight feet, made of steel with steel-mesh walls, with a steel sink next to a "squat" toilet in the floor, next to the bed.  In Camp 1, florescent lights were on 24-hours a day and there was no air-conditioning, only exhaust fans.

55.     The newest facility constructed before Messrs. Al-Zahrani and Al-Salami died was Camp 5, which was modeled on super-max prison designs in the United States and more restrictive than any of the prior camps.  Operational in May 2004, Camp 5 is a 100-bed maximum-security facility where detainees were confined in sealed, concrete cells, with only a small opaque window slit, another one-way "window" allowing guards on the block to look in and keep watch, and two slots near the middle and foot of the solid steel cell door, through which meals were passed and detainees' arms and legs were shackled before they were extracted from their cells, and which ensured that even these basic interactions involved a minimum of human contact.  Cameras monitored each cell 24-hours a day.  Florescent lights were on continuously day and night.

56.     Pursuant to standard procedures, detainees were issued certain basic items for personal use in their cells: a blanket, a thin rubber mat to cover the solid and sometimes metal beds, flip flops, an orange detainee uniform, shorts, a towel, and a Qur'an.  These were the only items the authorities considered essential for detainees' personal care.  All other items – soap,

toilet paper, a toothbrush, toothpaste, a t-shirt, a sheet – were considered "comfort" items, and had to be earned by detainees by demonstrating "good behavior," such as cooperating with interrogations, and could be taken away for any infraction, such as talking to another detainee across the block or keeping leftover food from a meal in the cell.

57. Detainees spent most of each day, every day, confined alone in their cells in the deadening and demoralizing conditions described, effectively cut off from the rest of the world. Particularly before mid-2004, when attorneys were first permitted to visit the base, detainees had virtually no human contact with anyone outside of prison personnel and interrogators, and were largely prohibited even from speaking with other detainees at the risk of being punished for breaking the rules. They also had numbingly little activity or stimuli. A few times a week, they were shuffled out of their cells in shackles to small outdoor pens for 30 minutes of exercise and a five-minute shower. They had no educational, vocational or rehabilitative outlets or activities. Even access to reading materials was limited to just one book at a time.

58. Detainees were also effectively deprived of virtually all communication with their families. Family visits and even phone calls were prohibited. Letters, while permitted through the International Red Cross, were screened and censored by the government and took several months or more to reach family members.

59. In addition to these conditions, detainees were subjected to specific methods and acts of physical and psychological torture and abuse, many of which were sanctioned by Defendants for use in connection with interrogations at Guantanamo. Guantanamo detainees were, *inter alia*, held in solitary confinement for periods exceeding a year; deprived of sleep for days, weeks and even months; exposed to prolonged temperature extremes; beaten; routinely "short-shackled" (wrists and ankles bound together and to the floor) for hours and even days;

threatened with transfer to a foreign country for torture; sexually harassed, humiliated, and raped or threatened with rape; deprived of medical treatment for serious conditions or allowed treatment only on the condition that they "cooperate" with interrogators; and subjected to religious and cultural abuse, including desecration of the Qur'an and forced shaving.

60. Some of the most brutal physical abuse reported at Guantanamo is attributed to the Immediate Reaction Force (IRF). Comparable to a riot squad, the IRF functions as a disciplinary force within the camps. IRF squads, comprised of military police, wear riot gear, carry Plexiglas shields and frequently use tear gas or pepper spray.

**Hunger Strikes and Force-Feeding**

61. To protest their conditions and illegal detention, hundreds of detainees, including Messrs. Al-Zahrani and Al-Salami, went on hunger strike for weeks or months at a time throughout their detention. For the period of the deceased's detention from 2002 until June 2006, there were at least six known long-term and large-scale hunger strikes, beginning as early as February 2002. The strikes generally continued for one to two months at a time, although individual hunger strikes often continued for much longer periods, and involved as many as 200 or more prisoners from across the camps. They were often sparked by an individual act of abuse – in 2002, the removal of a prisoner's turban during prayer or, in 2005, the beatings of several prisoners by military guards – and grew into large-scale protests for fair trials, respect for their religion, and improvements in their conditions, including effective medical treatment, access to sunlight, and the ability to contact their families.

62. Military authorities generally denied or downplayed the existence or scale of the hunger strikes to the public, and refused to disclose information about the conditions of striking prisoners. From June to July 2005, during one of the longest and most organized strikes

involving approximately 200 prisoners from every camp, and at a time when the authorities at Guantanamo had approximately 50 hunger strikers hooked to IVs, a Pentagon spokesperson stated that he was unaware of any hunger strike taking place on the base. While the Defense Department was eventually forced to admit that the strike was occurring, it has only acknowledged that 52 prisoners took part. The strike resumed the following month, in August, again involving hundreds of prisoners, some of whom eventually had to be hospitalized. Defense officials refused to provide information on the condition of detainees, and attempted even to obstruct hunger strikers' lawyers from visiting them at the base.

63. Force-feeding has been standard policy at Guantanamo since hunger strikes began in early 2002. Beginning in December 2005, "restraint chairs" were introduced in force-feeding detainees. Prisoners subjected to the process describe a tortious experience, where detainees are strapped into chairs and restrained at the legs, arms, shoulders, and head. A tube, which detainees describe as the thickness of a finger, is forcibly inserted up their noses and down into their stomachs and as much as 1.5 liters of formula is pumped through the tube, which in the case of hunger strikers, can be more than their stomachs can comfortably hold. The effect can be an uncomfortable, sometimes painful bout of nausea, vomiting, bloating, diarrhea, and shortness of breath. No sedatives or anesthesia are given during the procedure. The tubes were inserted and withdrawn twice a day, and the same tubes, covered in blood and stomach bile, were used from one patient to another without sanitization. Detainees also describe verbal, religious, and sexual abuse during the process by military personnel standing watch. Medical personnel either actively participated in these forms of additional abuse or witnessed them without intervening.

**Impact on Detainees**

64.     On information and belief, Defendants intended, were aware, and were made aware from the beginning, and continuously, of the debilitating effects of the circumstances, conditions and treatment at Guantanamo on detainees' health and well-being.  The express purpose of a "Behavioral Management Plan" for incoming detainees, for example, to which the deceased were subjected on information and belief, was "to enhance and exploit the disorientation and disorganization" felt by detainees upon arrival.  On information and belief, the ICRC, which had exclusive unfettered access to detainees, also put Defendants on notice.  A Department of Defense memo from 2003, for example, indicates concerns expressed by the ICRC to Defendants that interrogations, treatment, indefinite detention and lack of legal recourse were leading to a deterioration of the detainees' mental health.  The same year, Guantanamo medical staff reported that depression was the most common ailment among detainees, and that over one-fifth of Camp Delta prisoners were taking antidepressants.

65.     On information and belief, these effects were even more damaging for juveniles being held at Guantanamo.

66.     Their circumstances at Guantanamo have pushed some detainees to try to take their lives.  The first reported suicide attempts were in August 2003, when during an eight-day period nearly two dozen prisoners tried to hang themselves in their cells with clothing or other items.  The medical staff at Guantanamo characterized only 2 of the 23 attempts as "genuine suicide attempts" and called the rest "manipulative, self-injurious behavior," a new classification created by the Defense Department after the August 2003 attempts to designate self-harm conduct that, in the military's opinion, did not reflect the prisoner's "sincere" desire to end his life, but rather was designed to get attention or release.  A forensic psychiatrist hired by the

Pentagon to assess detainees' mental health and treatment said that such a designation is dangerous and has no basis in psychiatry.

67. By 2006, Defendants had acknowledged a total of 41 suicide attempts at Guantanamo. Defendants reported that prisoners attempted to harm themselves 460 times in 2003 and 2004 alone. These acts included 120 "hanging gestures" in 2003. Drawing yet another unscientific and callous distinction, Defendants differentiated between a "suicide attempt in which a detainee could have died without intervention, and a 'gesture' aimed at getting attention."

68. On information and belief, Defendants failed to improve detainees' conditions or treatment and in fact implemented greater restrictions on detainees.

**Yasser Al-Zahrani**

**Prolonged Arbitrary Detention**

69. At the time of his death, Yasser Al-Zahrani had been held at Guantanamo for four and a half years without charge, access to a lawyer or any fair review of the lawfulness of his detention.

70. While the government has disclosed virtually no information about the circumstances of Mr. Al-Zahrani's arrest, public sources indicate that he was apprehended in Afghanistan in late 2001 and transferred to Guantanamo in January 2002, where he was among the first prisoners to arrive. He was 17 years old at the time.

71. On information and belief, Mr. Al-Zahrani, like other Guantanamo detainees, was seized and detained on the basis of a unilateral and unsupported determination by government officials that he was an "enemy combatant." More than two years into his detention, he had no

notice at all of the reasons why he was being held and no opportunity to challenge those purported reasons.

72. In September 2004, a CSRT was convened for Mr. Al-Zahrani. After a flawed proceeding during which he was presumed to be an enemy combatant, denied the right to an attorney, denied the right to see all the government's evidence against him, effectively denied the right to present his own witnesses and evidence, and during which evidence obtained through torture was permitted, three-mid level officers lacking any institutional protections for independence confirmed the prior determinations of their superiors and determined that Mr. Al-Zahrani was an "enemy combatant." Years later, in *Boumediene v. Bush* (2008), the Supreme Court ruled that the CSRTs were an inadequate review process for Guantanamo detainees to challenge their detention.

73. In 2005, an ARB with similarly flawed procedures was convened to review Mr. Al-Zahrani's detention.

74. On information and belief, there was never any reliable evidence on which to classify Mr. Al-Zahrani as an "enemy combatant."

75. Mr. Al-Zahrani's CSRT and ARB were the only tribunals to review his detention in his more than four years at Guantanamo. While Guantanamo prisoners had the right to access U.S. courts through the writ of habeas corpus following the Supreme Court's decision in *Rasul* in June 2004, Mr. Al-Zahrani died without a habeas case or legal representation.

**Inhumane Conditions and Abuse**

76. At the time of his death, Mr. Al-Zahrani had been detained in conditions of crushing isolation for more than four years at Guantanamo, where he was cut off from the outside world and his family and largely isolated even from other detainees. He spent most of

each day confined alone in a small cell, with breaks only for a short period of exercise and a five-minute shower a few times a week, and for his interrogations.

77.     On information and belief, as one of the first prisoners to arrive at Guantanamo, Mr. Al-Zahrani was initially held in Camp X-Ray in a small wire-mesh cage for approximately three months.

78.     At the time of his death, Mr. Al-Zahrani was detained in Camp 1, in a steel cell no more than six-by-eight feet, where he ate his meals, used the toilet, slept, and spent most of his waking hours.

79.     On information and belief, Mr. Al-Zahrani was moved between different camps at Guantanamo during the four and a half years of his detention.

80.     On information and belief, Mr. Al-Zahrani was brutally mistreated by military and other government agents charged with his custody and care.  In letters retrieved by the government after his death, Mr. Al-Zahrani describes multiple forms of physical and psychological abuse he and other detainees suffered, including beatings by the ERF unit; sleep deprivation for up to 30 days; exposure to extreme temperatures of hot and cold; invasive and degrading body searches; acts of religious interference and humiliation by guards, who prohibited detainees from sounding the Muslim call to prayer and praying communally according to custom, desecrated the Qur'an, and forcibly shaved detainees' heads and beards; the withholding of necessary medication; and what he described in general as the "continuous oppression" of being isolated in a small, confined steel cell day in and day out and prohibited from human contact with other detainees.

81.     On information and belief, Mr. Al-Zahrani suffered these and other acts of torture and abuse in connection with his interrogations and detention by U.S. authorities.

82.     At the time of his death, Mr. Al-Zahrani had been subjected to the conditions and treatment described above for over four years not knowing why he was being detained, or whether or when he would be released.  As he wrote in one of his letters, "…the years are passing day after day, month after month, year after year, and our hands are still chained and our bodies are inside the cages without wrongdoing or crime…."

**Hunger Strikes**

83.     As a form of protest against his and other detainees' conditions and years of unlawful detention, Mr. Al-Zahrani went on hunger strike at least once for a period of six months.  While publicly available records do not indicate whether Mr. Al-Zahrani was on hunger strike after the use of restraint chairs were introduced in force-feeding detainees in January 2006, he describes "large feeding tubes that tore apart the stomach and noses of those were on hunger strike because of the insertion by force on the 'chairs of torture,' and by placing them in a very cold climate and dragging them on the steel, and by leaving them chained for long hours in cloth stained by blood, vomit, urine, and more…. This is after the American government had ordered the administration of the camp to stop the strike by any means …."  On information and belief, Mr. Al-Zahrani was subjected to abusive forced-feeding with or without the use of a restraint chair.

**Impact on Well-Being**

84.     On information and belief, the unlawful and indefinite nature of Mr. Al-Zahrani's detention and the inhumane conditions of his confinement resulted in damaging effects on his physical and psychological health.  On information and belief, Defendants intended, knew about or should have anticipated those effects.

85.     On information and belief, Defendants were on notice of actual and potential harm to Mr. Al-Zahrani and failed to adequately protect him.

86.     On information and belief, Defendants continued to confine Mr. Al-Zahrani in conditions that failed to satisfy basic standards of humane treatment. He continued to be detained in isolation, separated from other detainees, deprived of any regular communication with his family, cut off from the outside world, without charge, without notice of the basis for his detention, without a fair process by which to challenge his detention, and without any notion of whether or when he would be released.

87.     On information and belief, medical and psychiatric services at Guantanamo failed to provide adequate care to address Mr. Al-Zahrani's psychological and other health needs.

**Yasser Al-Zahrani's Death**

88.     Mr. Al-Zahrani was reportedly found dead in his cell in the early hours of June 10, 2006. While the exact timing of events is not clear from the NCIS records, he was discovered sometime between approximately 12:28 and 12:39 a.m. He was the first of the three prisoners to be discovered that night by on-duty guards in Camp 1.

89.     According to multiple NCIS interviews with on-duty guards on the scene, medical personnel failed to respond to Mr. Al-Zahrani's cell according to standard procedure for medical emergencies. All personnel present during the discovery of Mr. Al-Zahrani and the subsequent two prisoners corroborate that "at no time during these events[] did any member of the medical staff report to the situation at Camp 1." This issue was later raised during staff debriefing about the deaths.

90.     Given the absence of medical staff at the cell, guards decided to take Mr. Al-Zahrani to the clinic themselves.  According to an on-duty guard, "I thought we had a chance to save him so I instructed guards to take him to the clinic rather than wait for medical on the tier."

91.     In preparing Mr. Al-Zahrani for transport to the clinic, guards restrained him with arm and leg shackles pursuant to policy, despite the fact that they described finding him "lifeless," and strapped him to a backboard.  Later, at the medical clinic, medical staff would try with difficulty to insert an IV in Mr. Al-Zahrani's arm with the handcuffs still on, advising the guards only after several unsuccessful attempts that they would need to remove the handcuffs in order to insert the IV properly.  Even then, with Mr. Al-Zahrani dead or near death on the medical table, a corpsman wrapped a sheet around Mr. Al-Zahrani's left and right wrists as a make-shift restraint after the iron cuffs were removed.

92.     When guards arrived at the medical clinic with Mr. Al-Zahrani, they reported having to pound on the door to get someone to answer and described medical staff as appearing "unprepared" and "just standing around at first," unsure what to do.  According to one guard's account, "[p]eople were casually walking out of random rooms and slowly putting on their stab vests and blouses.  They didn't even know what room to put him [Al-Zahrani] in. They appeared more interested in just looking at him than trying to help."  The lack of preparedness cost precious minutes of treatment: one guard reported that medical staff "did not administer care to [Al-Zahrani] for approximately 2-3 minutes due to the fact that they were getting dressed … I felt the doctors and corpsmen should have been more alert than they were."

93.     There was no doctor or Senior Medical Officer present at the clinic when Mr. Al-Zahrani was brought in.  A corpsman trying to contact the on-call doctor apparently could not

find the doctor's telephone number.  There was still no doctor on the scene by the time all three detainees had been discovered in their cells and brought to the clinic.

94.     At the clinic, two junior corpsmen, later joined by a night shift team leader who had been on dinner break, began administering CPR and chest compressions on Mr. Al-Zahrani without realizing that his throat cavity was blocked with a large wad of cloth, despite noticing a "pronounced bulge" on the front of Mr. Al-Zahrani's neck.  It was only after the Senior Medical Officer arrived at the clinic and pried Mr. Al-Zahrani's mouth open that they realized that a "big piece of cloth" was lodged in the back of his mouth.  Some accounts of the scene indicate that the corpsmen and night shift team leader had been performing CPR and chest compressions on Mr. Al-Zahrani for at least 15 minutes before the Senior Medical Officer arrived and pulled the cloth out of Mr. Al-Zahrani's mouth.

95.     At some point after Mr. Al-Zahrani was brought to the clinic, medical staff called the naval hospital on the base for help.  While the timing of events is not clear from the NCIS records, a hospital ambulance arrived at the clinic approximately 20 to 30 minutes after Mr. Al-Zahrani was brought to the clinic.  EMT paramedics recalled that there were no doctors present at the clinic when they arrived.  They started doing chest compressions on Mr. Al-Zahrani "because medical was not doing it."  After several minutes of administering care, the paramedics indicated that they needed a doctor and that Mr. Al-Zahrani had to be taken to the hospital "so that a doctor could help."

96.     At some point during Mr. Al-Zahrani's transport to the hospital, the transport team noticed that Mr. Al-Zahrani had some type of material "wrapped tightly 3 or 4 times around his neck" that still had not been removed.  After cutting through part of the material and loosening the most taut strand, they reported that "it appeared that they had a tachy rhythm on

their equipment for Al-Zahrani …[and] as if some color returned to the patient after the material was removed from the patient's neck."

97.     The Staff Judge Advocate (SJA) riding in the ambulance with the EMT paramedics and Mr. Al-Zahrani recalled that "[w]hen the corpsman checked the first set of vitals in the ambulance, he said the detainee's heart was beating, and I observed this on the monitor. [] I am not sure if his heart was beating on its own or if we were doing it.  The heart was beating up and down the whole way to the hospital."

98.     According to an ambulance report, the ambulance carrying Mr. Al-Zahrani arrived at the hospital at approximately 1:15 a.m.  At that point, about 35 to 45 minutes had passed since Mr. Al-Zahrani was first discovered in his cell.  The SJA recalled that a Commander called the hospital several times "wanting to know if 093 was still alive." According to the SJA, Mr. Al-Zahrani's status was "uncertain" at that point.  He recalled that one of the hospital staff working on Mr. Al-Zahrani "looked at me and held his thumb and index finger about an inch apart and said, 'He's that close to death.'"

99.     At 1:50 a.m., Mr. Al-Zahrani was pronounced dead at the naval hospital.  The medical record of his time of death does not include the name of the doctor who made the pronouncement.

**Plaintiff Talal Al-Zahrani**

100.     Mr. Al-Zahrani, Sr. never received notice from U.S. authorities that his son was being detained at Guantanamo.  The first and only word he received was from his own government, which informed him approximately eight months after he had last spoken with his son that Yasser was being held at Guantanamo.

101.    During the period of his son's detention from 2002 to 2006, there were painful stretches of time when Mr. Al-Zahrani, Sr. received no news from his son because of the restrictive policies and conditions on Guantanamo detainees' family communications.  Apart from a few letters in 2002 and 2003, he received nothing at all until a final letter in 2006, in which his son expressed some hope of being released soon.  In June 2006, his son was dead.

102.    The government did not notify Mr. Al-Zahrani, Sr. of his son's death.  Rather, extended family members heard the name "Zahrani" as one of the deceased at Guantanamo on television and notified his immediate family.  Mr. Al-Zahrani, Sr. called the Saudi Ministry of the Interior on June 10 and on June 11 his own government confirmed that his son was one of the men who had died.  On information and belief, Mr. Al-Zahrani, Sr. has never been contacted directly by the government with any information concerning his son's death.

103.    The government did not return Yasser Al-Zahrani's body to Saudi Arabia until June 16, six days after his death.  Islamic law requires that bodies be buried within 24 hours of death where possible.  Mr. Al-Zahrani, Sr. was not able to view his son's body until June 17 and could not bury him until June 24, two weeks after his death.  Defendants thus denied Mr. Al-Zahrani the opportunity to give his son a proper Islamic burial.

104.    Mr. Al-Zahrani's body was returned with apparent injuries to his upper chest, signs of trauma on his face and a missing larynx.  Despite Mr. Al-Zahrani, Sr.'s repeated requests to the government for an explanation for the condition in which his son's body was returned, U.S. authorities failed to respond.

105.    U.S. authorities performed an autopsy on Yasser Al-Zahrani without giving notice to his family or seeking their consent.

106.    While Mr. Al-Zahrani, Sr. sought a second autopsy of his son after his remains had been returned to Saudi Arabia, the government has refused to respond to questions posed by the independent physician who conducted the autopsy.  Without these answers, the second autopsy is inconclusive.

107.    Government spokespersons and military officials, including Defendants, made a number of derisive comments about Yasser Al-Zahrani and the other two deceased prisoners following their deaths.  A Pentagon official stated that the deaths were "not an act of desperation, but an act of asymmetric warfare aimed at us here in Guantánamo."  Another official referred to the deaths as "a good PR move to draw attention."  In a press conference following the deaths, the Deputy Assistant Secretary of Defense Cully Stimson repeatedly compared all Guantánamo detainees to Nazis during World War II and made multiple unfounded statements that such detainees are all terrorists.  Col. Mike Bumgarner stated in reaction to the deaths, "They [Guantánamo detainees] have shown time and time again that we can't trust them any farther than we can throw them. There is not a trustworthy son of a … in the entire bunch."

108.    While the government announced on or about June 10, 2006 that the NCIS would commence an investigation into the deaths, the NCIS' report was not released until June 2008, a full two years after the men had died.  Even with the release of the report, there are significant gaps, inconsistencies and inaccuracies in the record.

109.    Mr. Al-Zahrani, Sr. has suffered extreme emotional distress as a result of these and other acts of the United States in arbitrarily detaining his son and in its callous response to his death.

**Salah Ali Abdullah Al-Salami**

**Prolonged Arbitrary Detention**

110. At the time of his death, Salah Ali Abdullah Al-Salami had been held at Guantanamo for over four years without charge, access to a lawyer or any fair review of the lawfulness of his detention.

111. Mr. Al-Salami was arrested by local forces in Pakistan in March 2002, at a time when the United States was offering cash bounties of up to $25,000 for the arrest of individuals suspected of ties to the Taliban or Al Qaeda. He was held in Pakistani custody for over one month and on or about May 2002 was turned over to U.S. authorities, who held him in one or more U.S.-controlled detention sites in Afghanistan before ultimately transferring him to Guantanamo on or about June 2002.

112. Government records of his interrogations indicate that Mr. Al-Salami protested his innocence and told his captors that he had traveled from his home in Yemen to Pakistan to study the Qur'an. He told them his detention was a mistake and that if released he would return to his family in Yemen. In fact, years later, a Department of Defense document from January 2006 would note, "there is no credible information to suggest that [Al-Salami] received terrorist training or is a member of the al Qaida network….This preliminary case file evaluation has failed to disclose any chargeable offenses within the Military Commission Instruction No. 2 under which [Al-Salami] could be tried before a military commission."

113. On information and belief, Mr. Al-Salami, like other Guantanamo detainees, was brought to Guantanamo on the basis of a unilateral and unsupported determination by government officials that he was an "enemy combatant." For more than two years into his detention, he had no notice at all of the reasons why he was being held and no opportunity to challenge the purported basis for his detention.

114.     In November 2004, a CSRT was convened for Mr. Al-Salami.  After a flawed proceeding during which he was presumed to be an enemy combatant, denied the right to an attorney, denied the right to see all the government's evidence against him, effectively denied the right to present his own witnesses and evidence, and during which evidence obtained through torture was permitted, three-mid level officers lacking any institutional protections for independence confirmed the prior determinations of their superiors and determined that Mr. Al-Salami was an "enemy combatant."  Years later, in *Boumediene v. Bush* (2008), the Supreme Court ruled that the CSRTs were an inadequate review process for Guantanamo detainees to challenge their detention.

115.     In 2005 and 2006, ARBs with similarly flawed procedures were convened to review his detention.  As "factors favor[ing] release or transfer," his ARBs noted that Mr. Al-Salami denied any involvement with the Taliban or Al Qaeda as well as any knowledge of 9/11 prior to the attacks or plans of future attacks on the United States.  Mr. Al-Salami's CSRT and ARBs were the only tribunals to review his detention in his more than four years at Guantanamo.

116.     On information and belief, there was never any reliable evidence on which to classify Mr. Al-Salami as an "enemy combatant

117.     Following the Supreme Court's ruling in *Rasul* giving prisoners the right to bring habeas corpus petitions in U.S. courts, Plaintiff Ali Abdullah Al-Salami retained lawyers for his son, who filed a habeas petition for Mr. Al-Salami in December 2005.  For two months, however, the government delayed Mr. Al-Salami's case from going forward because it said it could not verify Mr. Al-Salami's identity.  The government finally resolved the identity issue in February 2006, but disputed a "protective order" required for Mr. Al-Salami's lawyers to visit him at Guantanamo until April 2006.  At that point, four months after they had filed Mr. Al-

Salami's case, his lawyers were finally able to make arrangements to meet with him at Guantanamo. The Department of Defense scheduled the meeting for August 2006. At the meeting, Mr. Al-Salami's lawyers planned to show him a videotape prepared by his father telling him of the efforts being made on his behalf. The message never reached Mr. Al-Salami, who died on June 10 not knowing that he had a habeas case or legal representation, or of his lawyers' imminent visit.

**Inhumane Conditions and Abuse**

118. At the time of his death, Mr. Al-Salami had been detained in conditions of crushing isolation for more than four years at Guantanamo, where he was cut off from the outside world and his family and largely isolated even from other detainees. He spent most of each day confined alone in a small cell, with breaks only for a short period of "recreation" and a five-minute shower a few times a week, and for his interrogations.

119. While the authorities have not made information available concerning the camps in which Mr. Al-Salami was detained at Guantanamo, at the time of his death, Mr. Al-Salami was detained in Camp 1. His cell in Camp 1 was approximately six-by-eight feet and built of steel, with steel mesh walls. He ate his meals, used the toilet, slept, and spent most of his waking hours in the same small, enclosed space.

120. On information and belief, Mr. Al-Salami was moved between different camps at Guantanamo during his more than four years of his detention.

121. On information and belief, Mr. Al-Salami was brutally mistreated by military and other government agents charged with his custody and care. In letters discovered after his death, he wrote of being held in solitary confinement, "inside a very cold metal box," and that his

captors "used the ERF'ing units and burning gases on us, they desecrated our religion, our bodies … all of this is known to the world."

122.    Government records indicate that Mr. Al-Salami was subjected to multiple interrogations at Guantanamo and at Bagram, during which, on information and belief, he was subjected to torture and abuse.  On information and belief, Interrogation techniques constituting torture were sanctioned and used against detainees at Guantanamo and at Bagram.

123.    Government records indicate that Mr. Al-Salami was subjected to the "Immediate Reaction Force" team multiple times, including an occasion when they came to forcibly extract him from his cell.  On information and belief, Mr. Al-Salami was subjected to brutal beatings resulting in physical injuries by military police members of the IRF team.  Medical records from August 2005 indicate that he had been "IRF'd" four months before and had "banged [his] knees into wall" during the beating.  The records indicate that Mr. Al-Salami told the doctor that his level of knee pain from the injury was "10 out of 10" and that it felt "like [his] bones are rubbing together."  The records indicate that Mr. Al-Salami's severe knee pain persisted and that he repeatedly asked medical personnel for knee braces to no avail.

124.    Government records also indicate numerous instances when block guards requested disciplinary action for various "infractions" by Mr. Al-Salami, including talking to another detainee across the cell block, refusing to return a food plate, possessing "contraband" (a salt packet), and refusing to give back an uneaten apple left over from a meal.

125.    On information and belief, Mr. Al-Salami suffered these and additional forms and acts of torture and abuse in connection with his interrogations and punishment by or at the direction of U.S. authorities.

126.    At the time of his death, Mr. Al-Salami had been subjected to the conditions and treatment described above for over four years without knowing why he was being detained, or whether or when he would be released.

**Hunger Strikes**

127.    To protest his conditions and unlawful and indefinite detention – or "because he has been detained for 4 years and he wants to go home," as he said to medical personnel – Mr. Al-Salami went on hunger strike several times during his imprisonment: in July 2002, not long after he had been transferred to Guantanamo; from July to October 2005; and from December 2005 to just days before his death in June 2006, during which he was force-fed with the use of a restraint chair.

128.    Military officials described Mr. Al-Salami as "a long and dedicated striker, perhaps being tube fed longer than any other detainee in the camp."  In February 2006, when a group hunger strike dropped to its lowest number of participating prisoners, in part because of the threat of the restraint chairs, Mr. Al-Salami was one of just three prisoners who continued his strike.  Two months before, in December 2005, his weight had dropped so low that he had to be hospitalized.  While records of his weight do not appear to be available for December 2005, his medical records from January 2006 indicate that he weighed about 120 lbs, down from 172 lbs. when he first arrived at Guantanamo on or about June 2002.

129.    On information and belief, Mr. Al-Salami was physically and emotionally abused during his force-feedings.  His medical records indicate that the tube in his nose caused bleeding and severe inflammation and infection in his nasal passage to the point that his feedings were put on hold for a period of time.  In addition to the physical trauma of the experience, on information

and belief, Mr. Al-Salami was humiliated and degraded by guards who would mock him and make jokes about the tube in his nose while he was strapped to the restraint chair.

130.     Mr. Al-Salami's medical records indicate that he "voluntarily accepted oral food" on June 3, 2006, ending his final hunger strike after four years of protest.  It was just one week before his death.

**Impact on Well-Being**

131.     The unlawful and indefinite nature of Mr. Al-Salami's detention and the inhumane conditions of his confinement resulted in damaging effects on his physical and psychological health.  Defendants intended, knew about or should have anticipated those effects.

132.     As early as July 2002, medical staff were on notice that Mr. Al-Salami was experiencing certain physical and psychological difficulties, and that he had a health history that made him particularly vulnerable to his conditions at Guantanamo.

133.     A psychiatric record from July 1, 2002, after Mr. Al-Salami had refused ten consecutive meals in protest of his conditions, notes that he "complained of anxiety with accompanying shortness of breath related to being in 'tight spaces,' which he's had for 4 years … decreased duration and quality of sleep related to anxiety … nightmares of 'being in a box' … [and] suicidal ideations with no intent or plan and denies any previous ideation in the past."  The record also noted that Mr. Al-Salami's past medical and psychiatric history "was remarkable for … treatment for anxiety and 'internal problems' 2 years ago."

134.     A medical evaluation sheet from July 2, 2002 notes that Mr. Al-Salami was experiencing "dizziness, sleep/appetite disturbance, crying spells, depression" and that he had taken medication for depression in the past.  The medical staff indicated that Mr. Al-Salami did not have suicidal ideation, but further explained, "no plan, wants to live, but sadness."

135.     In a medical record from July 3, 2002, Mr. Al-Salami again expressed feeling "anxiety … A/V hallucinations of voices and the ceiling coming down … broken sleep due to nightmares … low appetite, but forces himself to eat … [and] low concentration."

136.     A nurse's note from July 4, 2002 reported that Mr. Al-Salami complained of difficulty sleeping, anxiety regarding his confinement, and dizziness.

137.     While the records are incomplete, medical records from December 2005, the same month Mr. Al-Salami was hospitalized at 120 lbs, indicate that medical personnel continued to be on notice of Mr. Al-Salami's difficulties.

138.     On December 24, 2005, a medical technician ordered a psychiatric visitation for Mr. Al-Salami, noting, "[t]he detainee has mood swings.  At one time he states he is well and appears to be well.  A few minutes later, he is observed to be acting differently."  In apparent contradiction with this description, however, the technician concludes, "[p]atient is stable."

139.     A medical record from December 28, 2005 notes that Mr. Al-Salami "intends to continue food refusal and accepts potential outcome of death or permanent physical damage as a result of food refusal."

140.     A medical progress note from December 31, 2005 reports, "[i]n discussions with pt, pt stated that he was a hunger striker. The pt stated that he wanted to commit suicide b/c he does not want to be a prisoner anymore and he lost hope."  The technician's assessment was "depression: pt with suicidal thoughts of ending his life with additional plan to include hunger striking."  The treatment plan was to start Mr. Al-Salami on Zoloft and consult with psychiatry [on Monday].  The technician emphasized, "Please note plan."

141.     In January 2006, a technician noted, "NEEDS Psych Eval.  Will contact today."

142.     On June 10, 2006, following Mr. Al-Salami's death, a Senior Medical Officer at the detention hospital at Guantanamo wrote a "Narrative Summary" of Mr. Al-Salami's medical history at Guantanamo. The summary makes no mention of the psychological issues indicated in the records above and reports that Mr. Al-Salami had "no known psychiatric history." The officer noted that Mr. Al-Salami was in good health in his most recent medical exam.

143.     Defendants were on notice of actual and potential harm to Mr. Al-Salami and failed to adequately protect him. During the NCIS investigation into the deaths on June 10, 2006, Defendant Dennis, the Commander of the Joint Detention Group at Guantanamo at the time, stated to an investigator, "As I look back on the events leading up to 10 June there were several events that took place that I now feel should have triggered me to think something was going on, on Alpha block. First, 693 [Mr. Al-Salami] had gone off hunger strike just a week or two prior. 693 had been a long and dedicated hunger striker, perhaps being tubed fed longer than any other detainee in the camp.

144.     Defendants continued to confine Mr. Al-Salami in conditions that failed to satisfy basic standards of humane treatment. He continued to be detained in isolation, separated from other detainees, deprived of any regular communication with his family, cut off from the outside world, without charge, without notice of the basis for his detention, without a fair process by which to challenge his detention, and without any notion of whether or when he would be released.

145.     Medical and psychiatric services at Guantanamo failed to provide adequate care to address Mr. Al-Salami's clear psychological and other health needs.

146.     Records of [weekly] visits to Mr. Al-Salami by Behavioral Health Services technicians reveal superficial or no assessments of his condition and little effectual follow-up

treatment.  In records from 2005 and 2006, technicians regularly noted Mr. Al-Salami's refusal to speak with them and their inability to assess his mental state, and prescribed a treatment plan of little more than returning the following week, despite having the option of recommending further levels of care such as referrals for complete medical or psychological evaluations.  On other occasions, despite the lack of interaction with Mr. Al-Salami, technicians made superficially positive assessments.  During a visit on December 23, 2005, after noting that an assessment was not possible because of Mr. Al-Salami's refusal to speak with the technician, and observing Mr. Al-Salami in a segregation room with a feeding tube in his nose and an IV in his arm, the technician wrote that Mr. Al-Salami "appeared to be in no emotional distress at the time of the interview."  The prescribed "treatment plan" was to visit again the following week.  On or about the same date, Mr. Al-Salami had been admitted to the naval hospital, weighing in at 120 lbs.

**Salah Ali Abdullah Al-Salami's Death**

147.     Mr. Al-Salami was the third prisoner to be discovered apparently lifeless in his cell on June 10, 2006.  NCIS records indicate that on-duty Camp 1 guards noticed Mr. Al-Salami in his cell sometime after 12:35 a.m., though nothing more precise is discernable from the records.

148.     Despite the fact that Mr. Al-Salami was the third detainee found and, on information and belief, that medical staff were on alert by that time that additional detainees had been discovered apparently dead in their cells, there were still no medical staff present on the cell block.  As on-duty guards on the scene recalled, "medical never showed up, it seemed like they didn't know what was going on."

149.     Guards were unable to transport Mr. Al-Salami to the medical clinic as soon as they discovered him because the one available backboard on the cell block had been used to transport Mr. Al-Zahrani to the medical clinic. While some guards waited on the cell block with Mr. Al-Salami's body, another guard ran to the medical clinic to get a backboard.

150.     While they waited for the backboard, the guards waiting with Mr. Al-Salami secured his arms and legs with shackles while he lay apparently lifeless on the floor. Once the backboard arrived, they shackled one of his arms to the board, as required by policy.

151.     As the guards prepared to transport Mr. Al-Salami to the medical clinic, one guard emphasized to the others to "make sure you hold the head." The backboard was missing a head brace, however, so Mr. Al-Salami's head "flopped around a lot" on the backboard as the guards transported him to the clinic.

152.     Once the team arrived at the medical clinic with Mr. Al-Salami, on-duty medical staff appeared unprepared. The guards had to wait holding Mr. Al-Salami on the backboard while a bed was found for him.

153.     There was no doctor present at the clinic when the guards arrived with Mr. Al-Salami. At some point after medical staff had been administering CPR and chest compressions for several minutes, a doctor on staff arrived. In attempting to intubate Mr. Al-Salami, the doctor discovered that something was stuck in the back of Mr. Al-Salami's throat, though there is no further indication in the record of what was stuck or whether it was removed. Accounts of the scene indicate only that Mr. Al-Salami was intubated and that CPR continued.

154.     At approximately 1:15 a.m., Mr. Al-Salami was pronounced dead at the medical clinic.

**Plaintiff Ali Abdullah Ali Al-Salami**

155.    U.S. authorities never gave Mr. Al-Salami, Sr. news of his son's death directly. Rather, sometime after June 10, Mr. Al-Salami, Sr. received the news from the Yemeni government.  Mr. Al-Salami, Sr. has never been contacted directly by the government with any information concerning his son's death.

156.    Although Mr. Al-Salami, Sr. and his wife asked for their son's body to be returned to Yemen for a proper Islamic burial, they were deprived of their request.  Islamic law prefers that the body be prepared for burial within 24 hours of death, but Mr. Al-Salami's remains were not returned home until five days after his death, on June 15.  Mr. Al-Salami, Sr. was not allowed to view his son until June 18, and Mr. Al-Salami was not buried until June 20, some ten days after his death.

157.    According to Mr. Al-Salami, Sr., his son's body was returned badly bruised and with marks resembling chemical burns, and his organs had been removed.  U.S. authorities have failed to provide any explanation for the condition of Mr. Al-Salami's body.

158.    U.S. authorities performed an autopsy on Salah Al-Salami without seeking the consent of his family.  The non-consensual autopsy and the fact of Mr. Al-Salami's missing organs was deeply offensive to Mr. Al-Salami, Sr. and his family.

159.    While Mr. Al-Salami, Sr. sought a second autopsy of his son after his remains had been returned to Yemen, the government has refused to respond to questions posed by the independent physician who conducted the autopsy.  Without these answers, the second autopsy is inconclusive.

160.    Government spokespersons and military officials, including Defendants, made a number of derisive public comments about Yasser Al-Zahrani following his death, including numerous baseless statements that he was a "high-level Al Qaeda operative."  Months before,

Defendants' agents themselves had determined that there was "no credible evidence" to suggest that Mr. Al-Salami was associated with Al Qaeda.

161.    While Defendants announced on or about June 10, 2006 that the NCIS would commence an investigation into the deaths, the NCIS' report was not released until June 2008, a full two years after the men had died.  Even with the release of the report, there are significant gaps, inconsistencies and inaccuracies in the record.

162.    Mr. Al-Salami, Sr. has suffered extreme emotional distress as a result of these and other acts of the United States in arbitrarily detaining his son and in its cruel and callous response to his death.

## GENERAL ALLEGATIONS

163.    The acts described herein were carried out under the actual or apparent authority or color of law of Defendant United States.

164.    At all relevant times, Defendants possessed and exercised command and control over their subordinates at the detention facility at Guantanamo in which Messrs. Al-Salami and Al-Zahrani were held.   Defendants also acquiesced in and / or permitted persons or groups to act in concert with U.S. officials to commit the abuses described herein.

165.    At all relevant times, Defendants had the legal authority and practical ability to exert control over subordinates who participated in the prolonged arbitrary detention, torture, cruel, inhuman and degrading treatment, deprivations of due process, and negligent medical and other care of Messrs. Al-Salami and Al-Zahrani.  Defendants' command over subordinate forces included the authority and responsibility to give orders to, set policy for, and manage the affairs of forces under their control, and to remove and discipline personnel who were violating the rights of Messrs. Al-Salami and Al-Zahrani.

166.     At all relevant times, the Defendants also had full control and custody over Messrs. Al-Salami and Al-Zahrani.

167.     Defendants intended, knew, or should have known, that Messrs. Al-Salami and Al-Zahrani were being subjected to prolonged arbitrary detention, torture, cruel, inhuman or degrading treatment, deprivations of due process, and negligent medical and other care while imprisoned at Guantánamo.  Defendants took no steps to prevent the infliction of torture or other forms of mistreatment on Messrs. Al-Zahrani and Al-Salami, nor did Defendants investigate and punish the perpetrators of these abuses.  By their omissions, Defendants failed in their legal obligations as commanders, under domestic and international law, to ensure that subordinates never perpetrate abuses against detainees in the custody of the U.S. military.

168.     Defendants authorized, mandated, implemented, encouraged, condoned, and acquiesced in the infliction of the aforementioned abuses of Messrs. Al-Salami and Al-Zahrani. Defendants took no steps to protect Messrs. Al-Salami and Al-Zahrani from the infliction of torture or other forms of mistreatment, nor did Defendants take steps to protect Messrs. Al-Salami and Al-Zahrani from the foreseeable harmful consequences of their torture and mistreatment.

169.     Defendant Rumsfeld and other Defendants in the chain of command intended, knew, or should have known of the forms and methods of physical and psychological torture and abuse inflicted on Messrs. Al-Salami and Al-Zahrani.  While in Defendants' custody, Messrs. Al-Salami and Al-Zahrani suffered, *inter alia*, to sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, forced feeding, abuse of their religion, denial of adequate medical care, and mockery and humiliation.  Defendants failed to take all necessary measures to investigate and

prevent these abuses, and to punish personnel under their commands for committing these abuses.

170.     Defendants knew, or should have known that prolonged arbitrary detention at Guantanamo violated U.S. law, including the U.S. constitution, customary international law and international treaties to which the United States is a party.  Defendants authorized, carried out, condoned, and/or directly or indirectly implemented the prolonged arbitrary detention of Messrs. Al-Zahrani and Al-Salami and others.

171.     Defendants intended, were aware, or should have been aware, that torture, cruel, inhuman, or degrading treatment of detainees at Guantanamo was occurring in violation of clearly established domestic and international law.  Defendants failed to take all necessary measures to investigate and prevent these abuses, and to punish personnel under their commands for committing these abuses.

172.     Defendants knew, or should have known that the adequate medical care was being denied to detainees at Guantanamo in violation of clearly established domestic and international law.  Defendants failed to take all necessary measures to prevent and punish personnel under their commands from breaching their professional duty of care to Messrs. Al-Zahrani and Al-Salami in failing to recognize and treat their significant psychological risks, conditions and needs while alive, and in failing to respond adequately with emergency medical care the night of their deaths.

173.     Defendants, acting through their agents, in establishing, monitoring and implementing the policies at Guantanamo where Messrs. Al-Zahrani and Al-Salami were held, intended to create a stress and pain-inducing environment for the purposes of coercing and breaking down the physical and mental resistance of detainees.

174.    Defendants were aware or should have been aware that their policies and practices of torture and cruel, inhuman or degrading treatment, prolonged arbitrary, detention, deprivations of due process, and denial of adequate medical care at Guantanamo had driven detainees to the point of attempting to take their own lives, but nevertheless maintained those same policies and practices throughout the detention of Messrs. Al-Zahrani and Al-Salami and after their deaths.

175.    Decisions and acts by Defendants ordering, authorizing, implementing, facilitating, encouraging, condoning, turning a blind eye to, acquiescing in and/or committing the alleged acts reached from the highest levels of the government down the military chain of command.  On information and belief, approval for prolonged arbitrary detention, acts of torture, cruel, inhuman or degrading treatment, deprivations of due process, and denial of adequate medical care emanated under color of law from orders, approvals, and omissions occurring in the Pentagon, numerous government agencies headquartered in the District of Columbia, and the offices of Defendant Rumsfeld.

176.    Defendants intended, knew, or should have known that the practices that they ordered, authorized, mandated, implemented, encouraged, condoned, acquiesced in, turned a blind eye to, for which they had command responsibility, and/or directly or indirectly implemented violated clearly established international and domestic law.  Further, Defendants failed in their duties to investigate, prevent, and punish violations of international and domestic law committed by members of the U.S. military, and/or persons or groups acting in concert with them.  These acts and omissions were outside the scope of their lawful authority.  Through Defendants' actions, omissions, and failures of command, they created a climate of impunity in which subordinate soldiers and other agents were given a green light to terrorize detainees and

carry out atrocious acts of torture and cruel, inhuman or degrading treatment, deprivations of due process, and denials of adequate medical care.

177.     Co-Defendant Does 1-100 implemented the prolonged arbitrary detention, torture, cruel, inhuman or degrading treatment, deprivations of due process, and denial of adequate medical care at Guantanamo.

178.     At all relevant times, the named Defendants and the Doe Defendants did act in concert with the intent to punish and/or disadvantage Messrs. Al-Zahrani and Al-Salami by subjecting them to prolonged arbitrary detention, torture, cruel, inhuman or degrading treatment, deprivations of due process, and denial of adequate medical care,.

179.     Defendants are liable for their alleged conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted, and/or conspired together in bringing about the prolonged arbitrary detention, physical and psychological torture and abuse, and other mistreatment of Messrs. Al-Zahrani and Al-Salami as described above.

## INJURIES

180.     Because of the wrongful acts of the Defendants, as set forth above and herein, Mr. Al-Salami and Mr. Al-Zahrani, their estates, and/or their families were caused the following injuries, among others:

    a.   Physical injuries;

    b.   Death;

    c.   Emotional and psychological injuries;

    d.   Loss of earnings and earning capacity;

    e.   Loss of interfamilial relations;

f.   Medical expenses, past and future.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

**(Alien Tort Claims Act: Prolonged Arbitrary Detention against
"U.S. officials" in their individual capacity)**

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of
the estates of Messrs. Al-Salami and Al-Zahrani*

181.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through INSERT of this Complaint as if fully set forth herein.

182.    The acts described herein constitute prolonged arbitrary detention of Messrs. Al-Salami and Al-Zahrani in violation of the law of nations and are actionable under the Alien Tort Claims Act 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

183.    Defendants are liable for said conduct in that they, acting under color of law and their authority as federal officers and/or in concert with U.S. officials, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to and/or directly or indirectly participated in bringing about the prolonged arbitrary detention of Messrs. Al-Salami and Al-Zahrani.  Defendants intended, knew or should have known, that the prolonged arbitrary detention was being enforced by their subordinates and failed to prevent those abuses or punish those responsible.

184.    As a matter of state policy, Defendants practiced, encouraged, and condoned prolonged arbitrary detention of Messrs. Al-Salami and Al-Zahrani in Guantánamo for over four

years until they died.  Plaintiffs were detained for over two years before their status was first reviewed by a flawed CSRT.  After their CSRTs were held, and despite the fact that no charges were pursued against them, Plaintiffs continued to be detained by Defendants without any basis. Furthermore, Plaintiffs did not have access to counsel or an impartial tribunal throughout the entire duration of their detention.

185.    The civilized world accepts as binding customary international law a principle against prolonged arbitrary detention, as recognized by the U.S. Supreme Court. *Sosa v. Alvarez-Machain,* 542 U.S. 692, 737 U.S. (2004) (holding that a claim of arbitrary detention as a violation of customary international law requires a factual basis beyond relatively brief detention in excess of positive authority).

186.    As a result of the Defendants' unlawful conduct, Messrs. Al-Salami and Al-Zahrani were deprived of their freedom, separated from their families, and forced to suffer severe physical and mental abuse, all of which contributed to their deaths.

187.    The Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Alien Tort Claims Act: Torture against "U.S. officials" in their individual capacity)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

188.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through INSERT of this Complaint as if fully set forth herein.

189.    The acts described herein constitute torture in violation of the law of nations and are actionable under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting torture as reflected, expressed, and defined in

multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

190.    Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, committed, ordered, acquiesced, confirmed, ratified, had command responsibility for, aided and abetted and/or conspired together to bring about the torture of Plaintiffs. The defendants intended, knew or should have known, that the torture was being committed by their subordinates and failed to prevent those abuses or punish those responsible.

191.    As described herein, upon information and belief, the Defendants intentionally inflicted severe mental and physical pain and suffering on Messrs. Al-Salami and Al-Zahrani for purposes which included, among others, obtaining third person information and/or confessions, punishing them for acts they were suspected of having committed, and intimidating them.

192.    These acts include, *inter alia*, sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, forced feeding, desecration of their religion, denial of adequate medical care, and being subjected to mockery and degrading comments during other acts of torture.

193.    Torture is universally condemned as a violation of customary international law, as reflected in various international human rights instruments such as the Universal Declaration of Human Rights, Art. 5; the International Covenant on Civil and Political Rights, Art. 7; the European Convention, Art. 3; the American Convention, Art. 5(2); the African Convention, Art. 5; and the Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), U.N.Doc. A/39/708, Art.3.

194.    The United States is a party to the International Covenant on Civil and Political

Rights (signed on October 5, 1977 and ratified on June 8, 1992) and the Convention Against

Torture and other Cruel, Inhuman or Degrading Treatment or Punishment (signed on April 18,

1988 and ratified on October 21, 1994).

195.    Defendants' unlawful conduct was intended to and had the effect of grossly

humiliating and debasing Messrs. Al-Salami and Al-Zahrani and forcing them to act against their

will and conscience, inciting fear and anguish, and breaking their physical and psychological

resistance.  Over time, the government's repeated infliction of such treatment on Messrs. Al-

Salami and Al-Zahrani contributed to their complete physical, mental and emotional

breakdowns, and ultimate deaths.

196.    The Plaintiffs are entitled to monetary damages and other relief to be determined

at trial.

### THIRD CLAIM FOR RELIEF

**(Alien Tort Claims Act: Cruel, Inhuman or Degrading Treatment or Punishment against
"U.S. officials" in their individual capacity**

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of
the estates of Messrs. Al-Salami and Al-Zahrani*

197.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through

INSERT of this Complaint as if fully set forth herein.

198.    The acts described herein constitute cruel, inhuman or degrading treatment or

punishment in violation of the law of nations and are actionable under the Alien Tort Claims Act,

28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel,

inhuman or degrading treatment or punishment as reflected, expressed, and defined in

multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

199.     Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, committed, ordered, acquiesced, confirmed, ratified, had command responsibility for, aided and abetted and/or conspired together in bringing about the cruel, inhuman and degrading treatment of Messrs. Al-Salami and Al-Zahrani. Defendants intended, knew or should have known, that these abuses were being committed by their subordinates and failed to prevent those abuses or punish those responsible..

200.     As described herein, upon information and belief, the Defendants intentionally inflicted severe mental and physical pain and suffering on Messrs. Al-Salami and Al-Zahrani for purposes which included, among others, obtaining third person information and/or confessions, punishing them for acts they were suspected of having committed, and intimidating them.

201.     These acts include, *inter alia*, sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, forced feeding, desecration of their religion, denial of adequate medical care, and being subjected to mockery and degrading comments during other acts of torture.

202.     The infliction by state actors of cruel, inhuman or degrading treatment is considered a violation of customary international law and is widely prohibited in a variety of international human rights instruments, including the Universal Declaration of Human Rights (Art.5), the International Covenant on Civil and Political Rights (Art.7), as well as under the Convention Against Torture and other Cruel, Inhuman or Degrading Punishment (Art.16).

203.     The United States is a party to the International Covenant on Civil and Political Rights (signed on October 5, 1977 and ratified on June 8, 1992) and the Convention Against

Torture and other Cruel, Inhuman or Degrading Treatment or Punishment (signed on April 18, 1988 and ratified on October 21, 1994).

204.     Defendants' unlawful conduct was intended to and had the effect of grossly humiliating and debasing Messrs. Al-Salami and Al-Zahrani and forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and psychological resistance.  Over time, the government's repeated infliction of such treatment on Messrs. Al-Salami and Al-Zahrani contributed to their complete physical, mental and emotional breakdowns, and ultimate deaths.

205.     Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### FOURTH CLAIM FOR RELIEF

**(Alien Tort Claims Act: Violation of Geneva Conventions against "U.S. officials" in their individual capacity)**

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

206.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through INSERT of this Complaint as if fully set forth herein.

207.     The acts described herein constitute torture, cruel, humiliating and degrading treatment, and prolonged arbitrary detention in violation of the law of nations and are actionable under the Alien Tort Claims Act, 28 U.S.C. § 1350 in that the acts violated customary international law prohibiting torture, cruel, humiliating and degrading treatment, and prolonged arbitrary detention as reflected, expressed, and defined in the Geneva Conventions, in particular Common Article 3 of the Third and Fourth Geneva Conventions.

208.     Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, committed, ordered, acquiesced, confirmed, ratified, had command responsibility for, aided and abetted and/or conspired together to commit violations of the Geneva Conventions and customary international law. Defendants intended, knew or should have known, that these abuses were being committed by their subordinates and failed to prevent those abuses or punish those responsible.

209.     The Defendants intentionally inflicted both physical and mental torture, cruel, humiliating and degrading treatment, and prolonged arbitrary detention on Messrs. Al-Salami and Al-Zahrani throughout their four years of detention in Guantánamo, all of which were direct violations of the Geneva Conventions and violations of customary international law.

210.     As described in preceding paragraphs, these acts include, *inter alia*, sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, forced feeding, desecration of their religion, denial of adequate medical care, and being subjected to mockery and degrading comments during other acts of torture.  Messrs. Al-Salami and Al-Zahrani were also subjected to more than four years of arbitrary detention without access to counsel or impartial tribunals or notice of the basis for their detention.  Mr. Al-Salami was continuously held in Guantánamo for years even after a determination that he would not be prosecuted.

211.     Torture, cruel treatment, arbitrary detention, and humiliating and degrading treatment are prohibited by Common Article 3 of the Third and Fourth Geneva Conventions.

212.     The United States is a party to the Geneva Conventions (signed on August 12, 1949 and ratified on February 8, 1955).

213. Common Article 3 provides the minimum protections that must be adhered to by all individuals within a signatory's territory during an armed conflict not of an international character regardless of citizenship and even in the absence of being classified as a prisoner of war.

214. Messrs. Al-Salami and Al-Zahrani were entitled to the basic and fundamental protections of Common Article 3 for humane treatment during their detention.

215. As a result of Defendants' unlawful conduct in violation of the Geneva Conventions and customary international law, Messrs. Al-Salami and Al-Zahrani suffered complete physical, mental and emotional breakdowns, and ultimately death.

216. Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (U.S. Constitution, Eighth Amendment: Cruel and Unusual Punishment against "U.S. officials" in their individual capacity)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

217. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

218. Defendants' actions, as alleged herein, constitute cruel and unusual punishment of Messrs. Al-Zahrani and Al-Salami in violation of the Eighth Amendment of the United States Constitution.

219. As described in preceding paragraphs, Defendants subjected Messrs. Al-Salami and Al-Zahrani for over four years to a continuous regime of prolonged arbitrary and inhumane detention, torture, and physical and psychological abuse. The men were subjected to, *inter alia*,

sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, forced-feeding, desecration of their religion, denial of adequate medical care, and mockery and humiliation. They were held without charge, without notice of the basis for their detention, without access to counsel or impartial tribunals, and without knowing whether or when their detention would end. None of this treatment was imposed for any legitimate penological purpose.

220.    On information and belief, as alleged herein, Defendants subjectively knew that detainees at Guantanamo suffered a substantial risk of serious harm and self-harm, and that Messrs. Al-Salami and Al-Zahrani were at risk of committing acts of self-harm that rose to the level of being fatal. Indeed, Defendants specifically designed, planned and intended for the system of indefinite detention and torture at Guantanamo to break detainees physically and psychologically and to result in serious harm. Despite being subjectively aware of the life-threatening risk of self-harm to which Messrs. Al-Salami and Al-Zahrani were exposed, Defendants failed to take reasonable steps to abate the risk. Instead, they knowingly and unreasonably disregarded an objectively intolerable risk of harm to Messrs. Al-Salami and Al-Zahrani's safety. *See Farmer v. Brennan,* 511 U.S. 825 (1994).

221.    Defendants were acting under color of law of the United States at all times pertinent to the allegations set forth above.

222.     Defendants are liable for their alleged conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted and/or conspired together in bringing about the prolonged arbitrary detention, physical and psychological torture and abuse, and other mistreatment of Plaintiffs as described above.

223. Defendants are further liable for their conscious disregard of the excessive risk of serious harm to the health and safety of Messrs. Al-Salami and Al-Zahrani that existed at Guantánamo.

224. As a result of Defendants' unconstitutional conduct, Messrs. Al-Zahrani and Al-Salami suffered complete physical, mental and emotional breakdowns, and ultimately death.

225. Plaintiffs are entitled to compensatory and punitive damages and other relief to be determined at trial.

**SIXTH CLAIM FOR RELIEF**

**(U.S. Constitution, Fifth Amendment: Substantive and Procedural Due Process against "U.S. Officials" in their individual capacity**

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

226. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

227. Defendants' actions alleged herein deprived Messrs. Al-Zahrani and Al-Salami of their protected life and liberty interests in violation of the Fifth Amendment of the United States Constitution.

228. As described above, Defendants subjected Messrs. Al-Salami and Al-Zahrani to prolonged arbitrary and baseless detention without charge for more than four years, with no reasonably foreseeable end. Defendants prohibited Messrs. Al-Salami and Al-Zahrani from consultation with counsel and access to impartial tribunals to challenge the fact and conditions of their confinement. Throughout this time, Defendants subjected Messrs. Al-Salami and Al-Zahrani to physical and psychological torture and abuse, including sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures,

continued solitary confinement, forced-feeding, desecration of their religion, denial of adequate medical care, and mockery and degrading comments.

229. Despite the fact that Mssrs. Al-Salami and Al-Zahrani had not been adjudicated guilty of any crime in accordance with due process of law and therefore were not subject to punishment, their conditions of confinement amounted to punishment by the government. *Bell v. Wolfish*, 441 U.S. 520 (1979).

230. Defendants' treatment of Messrs. Al-Salami and Al-Zahrani was without legitimate penological purpose, but rather imposed as punishment to overcome their will in aid of interrogation.

231. Defendants' actions deprived Messrs. Al-Salami and Al-Zahrani of their liberty in direct violation of their substantive and procedural due process rights under the Fifth Amendment.

232. Defendants were acting under color of law of the United States at all times pertinent to the allegations set forth above.

233. Defendants are liable for said conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted and/or conspired together in bringing about the prolonged arbitrary detention, physical and psychological torture and abuse and other mistreatment of Messrs. Al-Salami and Al-Zahrani as described above.

234. Messrs. Al-Salami and Al-Zahrani suffered severe physical and mental injuries as a result of Defendants' violations of the Fifth Amendment, all of which contributed to their deaths. They have also suffered economic injuries.

235.    Plaintiffs are entitled to compensatory and punitive damages and other relief to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### (Federal Tort Claims Act: Negligence – Failure to protect from self-inflicted harm against Defendant United States) (Non-jury claim)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

236.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

237.    Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

238.    Upon information and belief, from 2002 until their deaths on June 10, 2006, Messrs. Al-Salami and Al-Zahrani were in the exclusive custody of the Defendant United States and its agents, who were acting under color of law and their authority as federal officers.

239.    Defendant's agents, by virtue of holding Messrs. Al-Salami and Al-Zahrani in their exclusive custody, had a special relationship to the men and a duty of reasonable care to protect them from harm, including self-inflicted harm.

240.    Defendant's agents, in establishing, monitoring and implementing the policies for the Guantanamo Bay detention facility where Messrs. Al-Salami and Al-Zahrani were held, intended to create a stress and pain-inducing environment for the purposes of coercing and breaking down the physical and mental resistance of detainees.

241.    Self-harm and suicide attempts by detainees at Guantanamo were numerous, well-documented and expressly noted by prison officials prior to the deaths of Messrs. Al-Salami and

Al-Zahrani, and put Defendant's agents on notice that detainees were at serious risk of committing acts of self harm. Defendant's agents further knew or should have known that Messrs. Al-Salami and Al-Zahrani were specifically at risk based on health evaluations and documented incidents and indications of self-harming tendencies throughout Messrs. Al-Salami and Al-Zahrani's detention, as alleged herein.

242.    Defendant's agents breached their duty to protect Messrs. Al-Salami and Al-Zahrani from self-harm by failing to act with ordinary diligence or take reasonable precautions in response to numerous and specific warning signs, as alleged herein.

243.    Defendant's agents, aware that their policies and practices of torture and prolonged arbitrary, indefinite and incommunicado detention at Guantanamo had driven detainees to the point of attempting to take their own lives, maintained those same policies and practices throughout the detention of Messrs. Al-Salami and Al-Zahrani and after their deaths and, on information and belief, continue to maintain such policies and practices to the present day.

244.    As a direct and proximate cause of the Defendant agents' negligent failure to keep Messrs. Al-Salami and Al-Zahrani safe and free from harm, including self-inflicted harm, at Guantanamo, Messrs. Al-Salami and Al-Zahrani ultimately lost their lives.

245.    The actions of Defendant's agents, as alleged herein, constitute negligence under the applicable law of the place where the relevant acts took place.

246.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**

**(Federal Tort Claims Act: Negligence – Medical Negligence against Defendant United States) (Non-jury claim)**

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

247. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

248. Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

249. Upon information and belief, from 2002 until their deaths on June 10, 2006, Messrs. Al-Salami and Al-Zahrani were in the exclusive custody the United States and its agents, who were acting under color of law and their authority as federal officers.

250. Defendant's agents, by virtue of holding Messrs. Al-Salami and Al-Zahrani in their exclusive custody, as well as undertaking to provide physical and mental health services necessary for the men's protection, including emergency medical services, had a special relationship to the men and a duty of reasonable care in administering their medical care.

251. Defendant breached its duty of care to Messrs. Al-Salami and Al-Zahrani by failing to provide effective medical care necessary for their physical and psychological well-being while they were alive, and by failing to respond with competent emergency medical care the night the men died, as alleged herein.

252. As a direct and proximate result of Defendants' negligent acts and omissions, Messrs. Al-Salami and Al-Zahrani suffered severe mental and physical injuries and ultimately died.

253. The actions of Defendant's agents, as alleged herein, constitute negligence under the applicable law of the place where the relevant acts took place.

254. Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## NINTH CLAIM FOR RELIEF

### (Federal Tort Claims Act: Negligence – Medical Malpractice against Defendant United States) (Non-jury claim)

*Messrs. Al-Zahrani, Sr. and Al-Salami, Sr. in their capacities as representatives of the estates of Messrs. Al-Zahrani and Al-Salami*

255. Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

256. Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

257. Upon information and belief, from 2002 until their deaths on June 10, 2006, Messrs. Al-Zahrani and. Al-Salami were in the exclusive custody the United States and its agents, who were acting under color of law and their authority as federal officers.

258. At all times herein, Defendant's agents did owe to Messrs. Al-Zahrani and Al-Salami the following duties and obligations, as mandated by the acknowledged and recognized standard of care that prevailed in the psychiatric and psychological professions:

1) Knowing or being under a duty to know that Messrs. Al-Zahrani and Al-Salami were at significant risk for self-harm, to order and maintain a constant observation and watch over the men so as to prevent self-harm attempts and/or immediately intervene in the event of their occurrence;

2) Knowing or being under a duty to know that Messrs. Al-Zahrani and Al-Salami were at significant risk of self-harm, to adequately train and supervise correctional and custodial personnel to be vigilant and highly observant so as to prevent all self-harm attempts, and to intervene immediately in the event of any such attempt so as to minimize all physical injury and prevent death;

3) Knowing or being under a duty to know that Messrs. Al-Zahrani and Al-Salami were at significant risk of self-harm, to ensure that there were professional medical personnel, trained in emergency medicine, so as to treat the men in the event of any medical emergency, in particular an attempted suicide; and

4) Knowing or being under a duty to know that Messrs. Al-Zahrani and Al-Salami were at considerable risk of self-harm, to ensure that the necessary medical equipment was ready, available and accessible at all times for custodial and emergency medical personnel to treat the men in the event of a suicide attempt.

259.    At all times herein,  Defendant's agents did owe to Messrs. Al-Zahrani and Al-Salami the following duties and obligations, as mandated by the acknowledged and recognized standard of care that prevailed in the psychiatric and psychological professions:

1) Knowing that Messrs. Al-Zahrani and Al-Salami had been subjected to indefinite detention without any authentic provision of due process, and knowing that the men were also subjected to physical and psychological torture and abuse not limited to sleep deprivation, continued solitary confinement, stress positions, extremes of temperature, religious interference and abuse, forced-feeding, and abusive interrogations, to recognize and address the enormous risk for severe depression and/or other affective and psychiatric disorders in the men, as posed by the aforementioned circumstances;

2) Knowing that Messrs. Al-Zahrani and Al-Salami had been subjected to indefinite detention without any authentic provision of due process, and knowing that the men were also subjected to physical and psychological torture and abuse not limited to sleep deprivation, continued solitary confinement, stress positions, extremes of temperature, religious interference and abuse, forced-feeding, and abusive interrogations, to recognize and diagnose the actual signs and symptoms of severe depression and/or other affective and psychiatric disorders in the men, as caused by the aforementioned circumstances;

3) Knowing that Messrs. Al-Zahrani and Al-Salami had been subjected to indefinite detention without any authentic provision of due process, and knowing that they were also subjected to physical and psychological torture and abuse not limited to sleep deprivation, continued solitary confinement, stress positions, extremes of temperature, religious interference and abuse, forced-feeding, and abusive interrogations, to treat the actual signs and symptoms of severe depression and/or other affective and psychiatric disorders in the men, as caused by the aforementioned circumstances;

4) Knowing that Messrs. Al-Zahrani and Al-Salami had been subjected to indefinite detention without any authentic provision of due process, and knowing that they were also subjected to physical and psychological torture and abuse not limited to

sleep deprivation, continued solitary confinement, stress positions, extremes of temperature, religious interference and abuse, forced-feeding, and abusive interrogations, to demand that the aforementioned treatment cease immediately due to the fact that it posed a severe danger and risk to the men of severe depression and/or other affective and psychiatric disorders likely to result in serious self-harm attempts; and

5) Knowing that Messrs. Al-Zahrani and Al-Salami had been subjected to indefinite detention without any authentic provision of due process, and knowing that they were also subjected to physical and psychological torture and abuse not limited to sleep deprivation, continued solitary confinement, stress positions, extremes of temperature, religious interference and abuse, forced-feeding, and abusive interrogations, to undertake the measures set forth in Paragraph 270, above, in light of the signs and symptoms of severe depression and/or other affective and psychiatric disorders, and/or the diagnosis thereof, in the men, as caused by the aforementioned circumstances.

260. As alleged herein, Defendant's agents breached their professional duty of care to Messrs. Al-Zahrani and Al-Salami by failing to recognize and treat the men's psychological risks, conditions and needs while they were alive, and by failing to respond adequately with emergency medical care the night they died.

261. As a direct and proximate result of the failures and omissions of Defendant's agents as medical professionals, Messrs. Al-Zahrani and Al-Salami suffered serious psychological and physical injuries and ultimately died.

262. The actions of Defendant's agents, as alleged herein, constitute negligence under the applicable law of the place where the relevant acts took place.

263. Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

**TENTH CLAIM FOR RELIEF**

**(Federal Tort Claims: Intentional infliction of emotional distress against Defendant United States) (Non-jury claim)**

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

264.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

265.     Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

266.     Defendant United States' agents deliberately subjected Messrs. Al-Salami and Al-Zahrani to a continuous regime of prolonged arbitrary and inhuman detention at Guantanamo for over four years.  The men were subjected, *inter alia*, to sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, forced feeding, abuse of their religion, denial of adequate medical care, and mockery and degrading comments.  They were held without charge, without notice of the basis for their detention, without access to counsel or impartial tribunals, and without knowing whether or when their detention would end.

267.     The actions of Defendant's agents against Messrs. Al-Salami and Al-Zahrani, as alleged herein, rise to the level of extreme and outrageous conduct.

268.     As stated above, Defendant's agents engaged in this conduct intentionally or with reckless disregard for the consequences of their actions on Messrs. Al-Salami's and Al-Zahrani's health and well-being.

269.     As a direct and proximate result of the foregoing, Messrs. Al-Salami and Al-Zahrani suffered severe emotional distress, as ultimately confirmed by their deaths.  They have also suffered damages in an amount to be established according to proof.

270.     The actions of Defendant's agents, as alleged herein, constitute intentional emotional distress under the applicable law of the place where the relevant acts took place.

271.     Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF

**(Federal Tort Claims Act: Battery – Forced-feeding against Defendant United States) (Non-jury claim)**

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

272.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

273.     Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

274.     Upon information and belief, from 2002 until their deaths on June 10, 2006, Messrs. Al-Salami and Al-Zahrani were in the exclusive custody of the United States and its agents, who were acting under color of law and their authority as federal officers.

275.     Defendant United States and its agents intentionally engaged in conduct that amounted to violent and offensive contact with the persons of Messrs. Al-Salami and Al-Zahrani by forcibly inserting tubes in their nostrils and down their throats, restraining their arms and legs, and pumping liquid food substances into their stomachs while they were on hunger strike.

276.     The actions of Defendant's agents were against the will and consent of Messrs. Al-Salami and Al-Zahrani, as illustrated by the fact that, in order to "feed" the men and prevent them from inducing vomiting of the administered liquid substances, Defendant's agents had to forcibly strap them in chairs and restrain their arms and legs.

277.     The conduct of Defendant's agents was not otherwise privileged.

278.    As a direct and proximate result of the conduct of Defendant's agents, Messrs. Al-Salami and Al-Zahrani suffered severe physical and emotional injuries, including internal inflammation, infection and bleeding, and mockery and humiliation.

279.    The actions of Defendant's agents, as alleged herein, constitute battery under the applicable law of the place where the relevant acts took place.

280.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## TWELFTH CLAIM FOR RELIEF

### (Federal Tort Claims Act:  Intentional Infliction of Emotional Distress against Defendant United States) (Non-jury claim)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their individual capacities*

281.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

282.    Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

283.    Defendant United States and its agents, in their treatment of the deceased and their callous response to their deaths as alleged herein, intentionally, recklessly and with deliberate disregard for the effects of their actions caused severe emotional distress to Plaintiffs, including by, *inter alia*, arbitrarily detaining Plaintiffs' sons for over four years and depriving them of regular communication with their families; returning the bodies of the deceased to Plaintiffs in a shocking and unexplained state, including with bruising, burns and missing body parts; ignoring Plaintiffs' repeated requests for an explanation for the condition in which their sons' bodies were returned; refusing to return certain body parts of the deceased or to answer

73

questions posed by independent medical examiners, thereby preventing Plaintiffs from seeking independent autopsies; failing to return the bodies of the deceased to Plaintiffs in time for proper Islamic burials; publicly defaming Plaintiffs' sons after their deaths; failing to provide any official findings or confirmation of the cause and circumstances of the deaths until two years after they occurred; and failing to provide a complete and accurate report when the government's conclusions regarding the deaths were finally issued.

284.    As a result of the conduct of Defendant's agents as alleged herein, on information and belief, Plaintiffs have suffered and continue to suffer severe emotional distress, as manifested by serious physical and emotional difficulties.

285.    As a further result of the conduct of Defendant's agents as alleged herein, on information and belief, Plaintiffs have incurred and continue to incur medical expenses, past and future for the treatment of their severe emotional distress

286.    The actions of Defendant's agents, as alleged herein, constitute intentional emotional distress under the applicable law of the place where the relevant acts took place.

287.    Plaintiffs are accordingly entitled to monetary damages and other relief to be determined at trial.

## THIRTEENTH CLAIM FOR RELIEF

### (Federal Tort Claims Act:  Negligent Infliction of Emotional Distress against Defendant United States) (Non-jury claim)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their individual capacities*

288.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

289.     Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

290.     Upon information and belief, from 2002 until their deaths on June 10, 2006, Messrs. Al-Salami and Al-Zahrani were in the exclusive custody of the United States and its agents, who were acting under color of law and their authority as federal officers.

291.     Upon the deaths of Messrs. Al-Salami and Al-Zahrani, Defendant United States and its agents had a duty to honor the requests of Plaintiffs for the timely return of their sons' bodies, and to use reasonable care in handling the bodies.

292.     Plaintiffs, as the next of kin of the deceased, had the right to have their son's bodies returned to them in the condition in which they were left at death and to bury them without interference.

293.     Defendant's agents' treatment of the bodies of Messrs. Al-Salami and Al-Zahrani, and their callous response to the men's deaths fell below the standard of reasonable care they were under a duty to provide.  Defendant's agents breached their duty of care by, *inter alia*, conducting autopsies on the deceased without Plaintiffs' authorization; failing to provide any explanation for the injuries apparent on the bodies of the deceased when they were returned; ignoring the repeated requests of Plaintiffs for an explanation regarding the condition in which their sons' bodies were returned; refusing to return certain body parts of the deceased or to answer questions posed by independent medical examiners, thereby preventing Plaintiffs from seeking independent autopsies; and failing to return the bodies of the deceased to Plaintiffs in time for proper Islamic burials.

294.     Defendant United States and its agents, further breached their duties by, *inter alia*, failing to inform Plaintiffs of their sons' deaths despite knowing that news of the deaths would be circulated by international media; publicly defaming Plaintiffs' sons after their deaths; failing to provide any official findings or confirmation of the cause and circumstances of the deaths until two years after they occurred; failing to provide a complete and accurate report when the government's conclusions regarding the deaths were finally issued.

295.     Defendant United States' agents knew or should have known that their conduct, as alleged herein, created an unreasonable risk of causing distress to Plaintiffs, and that such distress might further result in physical or emotional harm.

296.     As a direct and proximate result of the negligent acts and omissions of Defendant's agents as alleged herein, on information and belief, Plaintiffs have suffered and continue to suffer severe emotional distress, as manifested by serious physical and emotional difficulties.

297.     As a further direct and proximate result of the conduct of Defendant's agents as alleged herein, on information and belief, Plaintiffs have incurred and continue to incur medical expenses, past and future for the treatment of their severe emotional distress.

298.     The actions of Defendant's agents, as alleged herein, constitute negligent infliction of emotional distress under the applicable law of the place where the relevant acts took place.

299.     Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

**FOURTEENTH CLAIM FOR RELIEF**

**(Federal Tort Claims Act – Wrongful Death against Defendant United States) (Non-jury claim)**

*Mr. Al-Salami, Sr. and Al-Zahrani, Sr., in their capacity as representatives of
the estates of Messrs. Al-Salami and Al-Zahrani, and in their individual capacities as
beneficiaries of the estates of their sons*

300.     Plaintiffs repeat and re-allege the allegations contained in the preceding

paragraphs of this Complaint as if fully set forth herein.

301.     Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims

were timely presented to the Department of Defense on June 10, 2008, and were denied on July

8, 2008.

302.     On information and belief, Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. are the

proper administrators of the estates of their sons.

303.     From 2002 and until their deaths on June 10, 2006, Messrs. Al-Salami and Al-

Zahrani were detained in the exclusive control of Defendant United States and its agents.

304.     The deaths of Mssrs. Al-Salami and Al-Zahrani were proximately caused by the

failures of the United States in providing them adequate adequate care and protection during

their detention at Guantanamo.  .

305.     The negligence of Defendant's agents, as alleged herein, is actionable under the

applicable law of the place where the relevant acts took place.

306.     Messrs. Al-Salami and Al-Zahrani are survived by their fathers, Plaintiffs Al-

Salami, Sr. and Al-Zahrani, Sr., who were dependent on their sons for support, guidance,

comfort, solace, advice, protection and, in the case of Mr. Al-Salami, Sr., the maintenance of his

business.

307.     By reason of the deaths of Messrs. Al-Salami and Al-Zahrani, Plaintiffs and

decedents' next of kin have sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiffs respectfully request that the Court enter a judgment:

1.  Declaring that Defendants' actions, practices, customs, and policies, and those of all of their agents, employees and persons acting on their behalf, were illegal and violated the rights of Plaintiffs and Messrs. Al-Zahrani and Al-Salami as to each applicable count;

2.  Declaring that Messrs. Al-Salami and Al-Zahrani's detention, treatment and conditions of confinement at Guantánamo, as well as Defendants' response to their deaths, were unjustified, unlawful and in violation of the rights of Messrs. Al-Salami and Al-Zahrani, and of Plaintiffs' rights;

3.  Awarding compensatory damages in an amount that is fair, just and reasonable, including reasonable attorneys' fees;

4.  Awarding exemplary and punitive damages as to all Defendants except Defendant United States;

5.  Ordering such further relief as the Court considers just and proper.


Dated:        Washington D.C.
              January 7, 2009


                              Respectfully submitted,


                              _____
                              Pardiss Kebraei (Bar No. 4344438)
                              Shayana Kadilal
                              CENTER FOR CONSTITUTIONAL RIGHTS
                              666 Broadway, 7th Floor
                              New York, NY 10012
                              Tel: (212) 614-6452
                              Fax: (212) 614-6499

_____

Meetali Jain (Bar No. 214237)
Jan Collatz, Law Student
Dorothy Hwang, Law Student
International Human Rights Law Clinic
American University
WASHINGTON COLLEGE OF LAW
4801 Massachusetts Ave. NW
Washington D.C. 20016
Tel: (202) 274-4147
Fax: (202) 274-0659

*Counsel for Plaintiffs*