**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TALAL AL-ZAHRANI;**<br>**AlKuwaitiyah neighborhood**<br>**Eastern side of Al Horah**<br>**Al-Madinah Al-Munawwarah**<br>**Jeddah, Saudi Arabia**<br><br>**and**<br><br>**ALI ABDULLAH AHMED AL-SALAMI;**<br>**Alambra Village**<br>**Al Huban Region of Al-Taziah District**<br>**Taiz Province, Republic of Yemen**<br><br>**In their individual capacities;**<br><br>**and**<br><br>**TALAL AL-ZAHRANI,**<br>**AlKuwaitiyah neighborhood**<br>**Eastern side of Al Horah**<br>**Al-Madinah Al-Munawwarah**<br>**Jeddah, Saudi Arabia**<br><br>**As the representative of YASSER**<br>**AL-ZAHRANI's estate;**<br><br>**and**<br><br>**ALI ABDULLAH AHMED AL-SALAMI,**<br>**Alambra Village**<br>**Al Huban Region of Al-Taziah District**<br>**Taiz Province, Republic of Yemen**<br><br>**As the representative of SALAH ALI**<br>**ABDULLAH AHMED AL-SALAMI's estate,**<br><br>                    **Plaintiffs,**<br><br>**v.** | **Civil Action No. 09-cv-00028 (ESH)** |

**DONALD RUMSFELD**
**Fmr. Secretary of Defense**
**Department of Defense**
**1000 Defense Pentagon**
**Washington D.C. 20301-1000;**

**GEN. RICHARD MYERS**
**Fmr. Chairman, Joint Chiefs of Staff**
**9999 Joint Chiefs of Staff Pentagon**
**Washington, D.C. 20318;**

**GEN. PETER PACE**
**Fmr. Chairman, Joint Chiefs of Staff**
**9999 Joint Chiefs of Staff Pentagon**
**Washington, D.C. 20318;**

**GEN. JAMES T. HILL**
**Fmr. Commander, United States Southern**
**Command**
**c/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**GEN. BANTZ CRADDOCK**
**Fmr. Commander, United States Southern**
**Command**
**c/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**MAJ. GEN. MICHAEL LEHNERT**
**Fmr. Commander Joint Task Force-160**
**Guantanamo Bay Naval Base, Cuba**
**c/o United States Marines**
**Marine Pentagon**
**Washington, D.C.;**

**MAJ. GEN. MICHAEL E. DUNLAVEY**
**Fmr. Commander, Joint Task Force-Guantanamo**
**Fmr. Commander, Joint Task Force-170**
**Guantanamo Bay Naval Base, Cuba**
**c/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**MAJ. GEN. GEOFFREY MILLER**
**Fmr. Commander, Joint Task Force-Guantanamo**
**Guantanamo Bay Naval Base, Cuba,**
**c/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**BRIG. GEN. JAY HOOD**
**Fmr. Commander, Joint Task Force-Guantanamo**
**Guantanamo Bay Naval Base, Cuba**
**c/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**REAR ADM. HARRY B. HARRIS, JR.**
**Fmr. Commander, Joint Task Force-Guantanamo**
**Guantanamo Bay Naval Base, Cuba**
**c/o United States Navy**
**Navy Pentagon**
**Washington, DC 20350-2000;**

**COL. TERRY CARRICO**
**Fmr. Commander, Camp X-Ray**
**Guantanamo Bay Naval Base, Cuba,**
**c/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**COL. ADOLPH MCQUEEN**
**Fmr. Commander, Joint Detention Operations**
**Group**
**Guantanamo Bay Naval Base, Cuba**
**c/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**BRIG. GEN. NELSON J. CANNON**
**Fmr. Commander, Joint Detention Operations**
**Group**
**Guantanamo Bay Naval Base, Cuba,**
**c/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**COL. MIKE BUMGARNER**
**Fmr. Commander, Joint Detention Operations**
**Group**
**Guantanamo Bay Naval Base, Cuba**
**c/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**COL. WADE DENNIS**
**Fmr. Commander, Joint Detention Operations**
**Group**
**Guantanamo Bay Naval Base, Cuba**
**c/o United States Army**
**Army Pentagon**
**Washington, D.C. 20310-0200;**

**ESTEBAN RODRIGUEZ**
**Fmr. Director, Joint Intelligence Group**
**Guantanamo Bay Naval Base, Cuba**
**c/o Department of Defense**
**Defense Pentagon**
**Washington, D.C. 20301-1000;**

**WILLIAM WINKENWERDER, JR., M.D.**
**Fmr. Assistant Secretary of Defense for Health**
**Affairs**
**Department of Defense;**

**DAVID N. TORNBERG, M.D.**
**Fmr. Deputy Assistant Secretary of Defense for**
**Clinical and Program Policy**
**Department of Defense;**

**VICE ADM. (RET.) MICHAEL L. COWAN, M.D.**
**Fmr. Surgeon General of the U.S. Navy;**

**VICE ADM. DONALD C. ARTHUR, M.D.**
**Fmr. Surgeon General of the U.S. Navy;**

**CAPTAIN JOHN S. EDMONDSON, M.D.**
**Fmr. Commander, U.S. Navy Hospital**
**Fmr. Task Force Surgeon, Joint Task Force-**
**Guantanamo**
**Guantanamo Bay Naval Base, Cuba;**

**CAPTAIN RONALD L. SOLLOCK, M.D.**
**Fmr. Commander, U.S. Navy Hospital**
**Fmr. Task Force Surgeon, Joint Task Force-**
**Guantanamo**
**Guantanamo Bay Naval Base, Cuba;**

**REAR ADM. THOMAS K. BURKHARD, M.D.**
**Fmr. Commander, Navy Medicine East**
**U.S. Navy;**

**REAR ADM. THOMAS R. CULLISON, M.D.**
**Fmr. Commander, Navy Medicine East,**
**U.S. Navy;**

**and**

**JOHN DOES 1-100, military, medical and**
**civilian personnel involved in the abuses of**
**Plaintiffs and Yasser Al-Zahrani and**
**Salah Ali Abdullah Ahmed Al-Salami;**

**All in their individual capacities;**

**and**

**United States;**

**Defendants.**

## AMENDED COMPLAINT

Plaintiffs Talal Al-Zahrani ("Mr. Al-Zahrani, Sr."), Ali Abdullah Ahmed Al-Salami ("Mr. Al-Salami, Sr.") (collectively "Plaintiffs"), by and through their counsel, respectfully submit this Amended Complaint, which supercedes the prior pleading of Plaintiffs in its entirety.

### PRELIMINARY STATEMENT

1.      Plaintiffs bring this action on behalf of themselves and the estates of their deceased sons, Yasser Al-Zahrani and Salah Ali Abdullah Ahmed Al-Salami.

2.      Yasser Al-Zahrani and Salah Ali Abdullah Ahmed Al-Salami were prisoners in the exclusive custody, care and control of the United States at the U.S. Naval Base at Guantanamo Bay, Cuba ("Guantanamo") when they died on June 10, 2006. Mr. Al-Zahrani was 17 years old when he was transferred to Guantanamo and 22 when he died. Mr. Al-Salami died at the age of 37.

3.      At the time of their deaths, both men had been detained for over four years without charge, without notice of the reasons why they were being held or a fair chance to defend themselves, and without knowing whether or when their imprisonment would end. They were held in conditions and subjected to techniques that were designed and intended to break them down physically and emotionally, and which caused them to suffer severely. To protest their conditions and illegal detention and demand their rights, they along with dozens of other detainees went on hunger strike for months at a time. Rather than bring their conditions and detention into compliance with basic standards for humane treatment and the rule of law, the government's response was to restrain the men in chairs, force tubes down their noses and throats, and pump food into their stomachs.

4.      On June 10, Mr. Al-Zahrani and Mr. Al-Salami were reportedly found dead in their cells. A third detainee, Mani Al-Utaybi, was found dead the same night. The day of the deaths, prior to conducting autopsies or an investigation, the government made a public statement describing the deaths as suicides by hanging. Certain high-level government and military officials had a different choice of words, calling the suicides "asymmetrical warfare" and "a good PR move." The deceased's families and the public had no further information as to the cause and circumstances of the deaths apart from the government's initial public statements for two years, until the Naval Criminal Investigative Service ("NCIS"), the military agency charged with investigating the deaths, released its final report in June 2008. The military concluded that the deaths were suicides by hanging. Plaintiffs note at the outset that because of the circumstances of this case and the inherent

constraints on their ability to investigate, they are limited in this complaint to the conclusions and evidence as set forth by the government, including as to the manner and cause of their son's deaths, which they question. Yet they assert liability even accepting the government's conclusions as true.

5. Plaintiffs seek compensation on behalf of their sons for the prolonged arbitrary detention, torture and cruel treatment Yasser Al-Zahrani and Salah Ali Abdullah Ahmed Al-Salami suffered in the custody of the United States and its agents at Guantanamo, and to hold responsible those officials charged with the custody and care of their sons for their sons' injuries and ultimate deaths. Plaintiffs also bring this action to seek compensation for the emotional suffering they experienced as a result of Defendants' arbitrary detention of their sons and callous and cruel response following their deaths.

6. Plaintiffs bring this action for declaratory relief, and for compensatory and punitive damages against Defendants Donald Rumsfeld, Gen. Richard Myers, Gen. Peter Pace, Gen. James T. Hill, Gen. Bantz Craddock, Maj. Gen. Michael Lehnert, Maj. Gen. Michael E. Dunlavey, Maj. Gen. Geoffrey Miller, Brig. Gen. Jay Hood, Rear Adm. Harry B. Harris, Jr., Col. Terry Carrico, Col. Adolph McQueen, Brig. Gen. Nelson Cannon, Col. Mike Bumgarner, Col. Wade Dennis, Esteban Rodriguez, William Winkenwerder, Jr., M.D., David N. Tornberg, M.D., Vice Adm. (Ret.) Michael L. Cowan, M.D., Vice Admiral (Ret.) Donald C. Arthur, M.D., Captain John S. Edmondson, M.D., Captain Ronald L. Sollock, M.D., Rear Adm. Thomas K. Burkhard, M.D., and Rear Adm. Thomas R. Cullison, M.D. for their role in the harms committed against Plaintiffs and their deceased sons in violation of international and domestic law. Defendants exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in the commission of the abusive and illegal practices alleged herein, including prolonged arbitrary detention, torture, cruel, inhuman or degrading treatment, due process violations, and inadequate medical and other care of Messrs. Al-Zahrani and Al-Salami at

Guantanamo, and in causing the emotional distress of Plaintiffs. Plaintiffs additionally bring this action against Does 1-100, who exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in the harms committed against Plaintiffs and their deceased sons. Finally, Plaintiffs institute this action against the United States for the intentional and negligent acts and omissions of its agents acting under color of law and their authority as federal officers. Accordingly, Defendants are liable under domestic and international law for the injuries, pain and suffering of Plaintiffs in their individual capacities and as representatives of their sons' estates.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331(federal question jurisdiction), 28 U.S.C. § 1332 (diversity jurisdiction), 28 U.S.C. § 1346 and § 2674 (Federal Tort Claims Act), and 28 U.S.C. § 1350 (Alien Tort Claims Act).

8.     This action is brought pursuant to the Alien Tort Claims Act and the Federal Tort Claims Act. It is also brought directly under the Fifth and Eighth Amendments to the United States Constitution.

9.     Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(a)(3), 28 U.S.C. § 1391(b)(2), and 28 U.S.C. § 1391(e)(2), in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district. *See Smith v. Dalton,* 927 F. Supp. 1, 6 (D.D.C. 1996). The acts alleged below are "inextricably bound up with the District of Columbia in its role as the nation's capital." *Mundy v. Weinberger,* 554 F. Supp. 811, 818 (D.D.C. 1982).

## JURY DEMAND

10.     Plaintiffs demand trial by jury with respect to all claims in this action except those brought under the Federal Tort Claims Act.

# PARTIES

## Plaintiffs

11.     Yasser Al-Zahrani, a citizen of Saudi Arabia, was a prisoner in the exclusive custody, care and control of the United States at Guantanamo from January 2002 until his death on June 10, 2006.  He was 17 years old when he was transferred to Guantanamo.  He was never charged with any wrongdoing, and was held for years without access to counsel or the courts.

12.     Plaintiff Talal Al-Zahrani, a citizen of Saudi Arabia, is the father of Yasser Al-Zahrani and the representative of his son's estate.  Mr. Al-Zahrani, Sr. resides with his family in Saudi Arabia.

13.     Salah Ali Abdullah Ahmed Al-Salami, a citizen of Yemen, was a prisoner in the exclusive custody, care and control of the United States at Guantanamo from approximately June 2002 until his death on June 10, 2006.  He was never charged with any wrongdoing, and was held for years without access to counsel or the courts.

14.     Plaintiff Ali Abdullah Ahmed Al Salami, a citizen of Yemen, is the father of Salah Ali Abdullah Ahmed Al-Salami and the representative of his son's estate.  Mr. Al-Salami, Sr. resides in Taiz, Yemen with his family.

## Defendants

15.     Defendant Donald Rumsfeld is a U.S. citizen.  Defendant Rumsfeld was the United States Secretary of Defense from January 20, 2001 until December 18, 2006, including the entire period during which the events described herein occurred.  At all relevant times, Defendant Rumsfeld possessed and exercised command and control over the United States military and the U.S. detention facility at Guantanamo.  Defendant Rumsfeld is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command

responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

16.     Defendant Air Force Gen. Richard B. Myers is a U.S. citizen.  From October 1, 2001 until October 1, 2005, Defendant Myers was Chairman of the Joint Chiefs of Staff.  As the senior uniformed military officer in the chain of command during the relevant times January 2002 until October 1, 2005, Defendant Myers possessed and exercised command and control over the U.S. military and the U.S. detention facility at Guantanamo.  Defendant Myers is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

17.     Defendant Marine Gen. Peter Pace is a U.S. citizen. Defendant Pace served as the Chairman of the Joint Chiefs of Staff from September 30, 2005 to October 1, 2007.  As the senior uniformed military officer in the chain of command during the relevant times September 30, 2005 to June 10, 2006, as well as during the investigation into the deaths of Messrs. Al-Zahrani and Al-Salami, Defendant Pace possessed and exercised command and control over the U.S. military and the U.S. detention facility at Guantanamo. Defendant Pace is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

18.     Defendant Army Gen. James T. Hill is a U.S. citizen.  From August 18, 2002 until November 9, 2004, Defendant Hill was Commander of the United States Southern Command.  As the senior commander with authority over the U.S. detention facility at Guantanamo, Defendant Hill possessed and exercised command and control over subordinates at Guantanamo during his tenure. Defendant Hill is sued in his individual capacity for ordering, authorizing, condoning, creating

methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

19.     Defendant Army Gen. Bantz Craddock is a U.S. citizen.  From November 9, 2004 until October 18, 2006, Defendant Craddock was Commander of the United States Southern Command.  As the senior commander with authority over the U.S. detention facility at Guantanamo, Defendant Craddock possessed and exercised command and control over subordinates at Guantanamo during his tenure.  Defendant Craddock is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding or abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

20.     Defendant Marine Maj. Gen. Michael Lehnert is a U.S. citizen.  From January 11, 2002 until March 28, 2002, Defendant Lehnert was Commander of Joint Task Force-160.  In this role, Defendant Lehnert was responsible for the construction and operation of Camp X-Ray and Camp Delta at Guantanamo and responsible for the custody, care and control of detainees.  During his tenure, he possessed command and control over subordinates at the U.S. detention facility at Guantanamo.  Defendant Lehnert is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

21.     Defendant Army Maj. Gen. Michael E. Dunlavey is a U.S. citizen.  Defendant Dunlavey was initially Commander of Joint Task Force-170, responsible for the coordination and implementation of interrogation efforts at Guantanamo.  He was later Commander of its successor Joint Task Force-Guantanamo, formed from the merger of JTF-160 and JTF-170 in October 2002,

and responsible for all operations at the detention facility at Guantanamo, including the conduct of all interrogations. From February until November 2002, Defendant Dunlavey possessed and exercised command and control over subordinates at the U.S. detention facility at Guantanamo. Defendant Dunlavey is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

22.     Defendant Army Maj. Gen. Geoffrey Miller is a U.S. citizen. From October 2002 until March 2004, Defendant Miller was Commander of Joint Task Force-Guantanamo, responsible for all operations at the detention facility at Guantanamo, including the conduct of all interrogations. During his tenure, he possessed and exercised command and control over subordinates at Guantanamo. Defendant Miller is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

23.     Defendant Army Brig. Gen. Jay Hood is a U.S. citizen. From March 2004 to March 2006, Defendant Hood was Commander of Joint Task Force-Guantanamo, responsible for all operations at the detention facility at Guantanamo, including the conduct of all interrogations. During his tenure, he possessed and exercised command and control over subordinates at the U.S. detention facility at Guantanamo. Defendant Hood is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

24.     Defendant Navy Rear Adm. Harry B. Harris, Jr. is a U.S. citizen.  From March 2006 to May 2007, Defendant Harris was the Commander of Joint Task Force-Guantanamo, responsible for all operations at the detention facility at Guantanamo, including the conduct of all interrogations.  During the relevant time period of March 2006 to June 10, 2006, as well as during the investigation into the deaths of Messrs. Al-Zahrani and Al-Salami, he possessed and exercised command and control over subordinates stationed at Guantanamo.  Defendant Harris is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

25.     Defendant Army Col. Terry Carrico is a U.S. citizen.  From January 11, 2002 to April 28, 2002, Defendant Carrico was Commander of Camp X-Ray, the initial temporary detention facility at Guantanamo.  During his tenure, he possessed and exercised command and control over subordinates at Guantanamo.  Defendant Carrico is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiff Al-Zahrani and his deceased son as hereinafter alleged.

26.     Defendant Army Col. Adolph McQueen is a U.S. citizen.  From November 2002 to August 2003, Defendant McQueen was the Commander of Joint Detention Operations Group at the U.S. detention facility at Guantanamo, responsible for guarding the detainees and providing security.  During his tenure, he possessed and exercised command and control over subordinates at Guantanamo.  Defendant McQueen is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

27.     Defendant Army Brig. Gen. Nelson Cannon is a U.S. citizen.  From August 2003 to September 2004, Defendant Cannon was the Commander of Joint Detention Operations Group at the U.S. detention facility at Guantanamo, responsible for guarding the detainees and providing security.  During his tenure, he possessed and exercised command and control over subordinates at Guantanamo.  Defendant Cannon is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

28.     Defendant Army Col. Mike Bumgarner is a U.S. citizen.  From April 2005 to March 2006, Defendant Bumgarner was the Commander of the Joint Detention Group at the U.S. detention facility at Guantanamo, responsible for guarding the detainees and providing security.  During his tenure, he possessed and exercised command and control over subordinates at Guantanamo.  Defendant Bumgarner is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

29.     Defendant Army Col. Wade Dennis is a U.S. citizen.  From March 2006 to 2007, Defendant Dennis was the Commander of the Joint Detention Group at the U.S. detention facility at Guantanamo, responsible for guarding the detainees and providing security.  During the relevant times March 2006 to June 10, 2006, as well as during the investigation into the deaths of Messrs. Al-Zahrani and Al-Salami, he possessed and exercised command and control over subordinates at Guantanamo.  Defendant Dennis is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over,

conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

30.     Defendant Esteban Rodriguez is a U.S. citizen.  From July 2003 until October 2005, Defendant Rodriguez was the civilian Director of the Joint Intelligence Group responsible for managing intelligence-gathering operations at Guantanamo and reporting to the Commander of the Joint Task Force at Guantanamo.  During his tenure, he possessed and exercised command and control over subordinates at Guantanamo.  Defendant Rodriguez is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

31.     Defendant William Winkenwerder, Jr., M.D. is a U.S. citizen.  From October 2001 to April 2007, Defendant Winkenwerder was the Assistant Secretary of Defense for Health Affairs, principal medical advisor to the Secretary of Defense for all Department of Defense health policies, programs, and activities, and responsible for effectively executing the Defense Department's healthcare mission.  During the relevant times January 2002 to June 10, 2006, as well as during the investigation into the deaths of Messrs. Al-Zahrani and Al-Salami, Defendant Winkenwerder possessed and exercised command and control over subordinates in the United States military and the U.S. detention facility at Guantanamo.  Defendant Winkenwerder is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

32.     Defendant David N. Tornberg, M.D. is a U.S. citizen.  From March 2002 to March 2007, Defendant Tornberg served as Deputy Assistant Secretary of Defense for Clinical and Program Policy, senior advisor to the Assistant Secretary of Defense for Health Affairs, and

responsible for directing all clinical policies and program implementation oversight for the Military Health System, including patient safety and advocacy, quality of care, professional standards, medical ethics, and mental health policy. During the relevant times March 2002 to June 10, 2006, as well as during the investigation into the deaths of Messrs. Al-Zahrani and Al-Salami, Defendant Tornberg possessed and exercised command and control over subordinates in the United States military and the U.S. detention facility at Guantanamo. Defendant Tornberg is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

33. Defendant Vice Admiral (Ret.) Michael L. Cowan, M.D. is a U.S. citizen. From August 2001 to August 2004, Defendant Cowan served as the Surgeon General of the U.S. Navy and Chief of the Navy's Bureau of Medicine and Surgery. As the senior medical officer of the U.S. Navy during the relevant times January 2002 to August 2004, Defendant Cowan possessed and exercised command and control over subordinates in the United States Navy and the U.S. detention facility at Guantanamo. Defendant Cowan is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

34. Defendant Rear Admiral (Ret.) Donald C. Arthur, M.D. is a U.S. citizen. From June 2004 to August 2007, Defendant Arthur served as the Surgeon General of the U.S. Navy and Chief of the Navy's Bureau of Medicine and Surgery. As the senior medical officer of the U.S. Navy during the relevant times June 2004 to June 10, 2006, as well as during the investigation into the deaths of Messrs. Al-Zahrani and Al-Salami, Defendant Arthur possessed and exercised command and control over subordinates in the United States Navy and the U.S. detention facility at

Guantanamo.  Defendant Arthur is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

35.     Defendant Captain John S. Edmondson, M.D. is a U.S. citizen.  From July 2003 to January 2006, Defendant Edmondson was the Commander of the U.S. Navy Hospital at Guantanamo and the Task Force Surgeon of the Joint Task Force-Guantanamo.  During his tenure, he possessed and exercised command and control over subordinates in the U.S. detention facility at Guantanamo and was responsible for, *inter alia*, overseeing the operation of the hospital that gave medical treatment to Guantanamo detainees.  Defendant Edmondson is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

36.     Defendant Captain Ronald L. Sollock is a U.S. citizen.  From January 2006 to July 2007, Defendant Sollock was the Commander of the U.S. Navy Hospital at Guantanamo and the Task Force Surgeon of the Joint Task Force-Guantanamo.  During the relevant times January 2006 to June 10, 2006, as well as during the investigation into the deaths of Messrs. Al-Zahrani and Al-Salami, he possessed and exercised command and control over subordinates in the U.S. detention facility at Guantanamo and was responsible for, *inter alia*, overseeing the operation of the hospital that gave medical treatment to Guantanamo detainees.  Defendant Sollock is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

37.     Defendant Rear Admiral Thomas K. Burkhard, M.D. is a U.S. citizen.  From August 2005 to February 2006, Defendant Burkhard was the Commander of Navy Medicine East and, on information and belief, responsible for the delivery of healthcare operations by the Joint Task Force-Guantanamo.  During his tenure, he possessed and exercised command and control over subordinates at Guantanamo.  Defendant Burkhard is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

38.     Defendant Rear Admiral Thomas R. Cullison, M.D. is a U.S. citizen.  From 2005 to 2007, Defendant Cullison was the Commander of Navy Medicine East and, on information and belief, responsible for the delivery of healthcare operations by the Joint Task Force-Guantanamo.  During his tenure, he possessed and exercised command and control over subordinates at Guantanamo.  Defendant Cullison is sued in his individual capacity for ordering, authorizing, condoning, creating methods and procedures for, exercising command responsibility over, conspiring with, aiding and abetting subordinates, and/or directly or indirectly participating in the abuses of Plaintiffs and the deceased as hereinafter alleged.

39.     Plaintiffs do not know the true names and capacities of Defendants sued herein as Does 1-100 and therefore sue these Defendants by fictitious names. Does 1-100 are the military, medical and civilian personnel who exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in the illegal detention, interrogation, torture, abuse, and negligent care of Messrs. Al-Zahrani and Al-Salami at Guantanamo, and who caused or contributed to the resulting emotional suffering of Plaintiffs, as hereinafter alleged.

40.     Defendant United States is sued under 28 U.S.C. § 2674 for the tortuous acts of agents acting under color of law and their authority as federal officers at Guantanamo.

## STATEMENT OF FACTS

**General Allegations**

**Prolonged Arbitrary Detention**

41.     Yasser Al-Zahrani and Salah Ali Abdullah Ahmed Al-Salami were detained in the exclusive custody, care and control of Defendants at Guantanamo from January and June 2002 until their deaths on June 10, 2006.  They were never charged for any crime.

42.     The United States occupies the territory of the U.S. Naval Base at Guantanamo Bay pursuant to a 1903 Lease Agreement executed with Cuba, which expressly provides for the United States' "complete jurisdiction and control" over the territory – control it may exercise permanently if it so chooses.  As Justice Kennedy wrote in *Rasul v. Bush* (2004), "Guantanamo Bay is in every practical respect a United States territory" over which the United States has long exercised "unchallenged and indefinite control."

43.     The first prisoners were transferred to Guantanamo on January 11, 2002.  At its peak, the prison held more than 780 men, ranging in age from 10 to 80, from over 40 countries.

44.     Under the command of Defendant Rumsfeld, government agents seized Messrs. Al-Zahrani and Al-Salami and other individuals in countries across the globe, often far from any zone of conflict, and transferred them to Guantanamo for indefinite and unreviewable detention on the basis of a unilateral determination by government officials that they were "enemy combatants." Defendant Rumsfeld and other government officials selected Guantanamo as the site of the U.S. prison, and intended to hold prisoners there indefinitely without process, precisely because they believed foreign citizens detained there were beyond the reach of U.S. law, including U.S. international obligations under the Geneva Conventions.

45.     From January 2002 until July 2004, the U.S. authorities held hundreds of detainees at Guantanamo incommunicado and without access to counsel, notice of the reasons for their detention or any review of their status.

46.     In June 2004, the U.S. Supreme Court ruled in *Rasul* that detainees have the right to access federal courts in the United States through petitions for the writ of habeas corpus.  Hundreds of habeas petitions were filed in federal court in the aftermath of the decision, but it took several months, even years, for many prisoners to secure counsel, file their petitions and meet with their lawyers, *inter alia*, because of the government's refusal to disclose identifying information about the prisoners and the resulting difficulty of obtaining attorney authorizations from detainees or their families; because of the government's own difficulty in confirming detainees' identities once petitions were filed, despite having held the men for years;  and because of the government's opposition to the entry of protective orders required in detainees' cases before attorneys could meet with their clients at Guantanamo.  For these and other reasons, Mr. Al-Salami was never able to meet with his attorney, and Mr. Al-Zahrani did not have an attorney or a habeas petition at the time he died.

47.     As a result of the government's continuous efforts over the years to deny and obstruct detainees' habeas rights, the first petitions, while filed in 2004, were not heard until November 2008.

48.     In July 2004, just days after the Supreme Court ruled in *Rasul*, the Deputy Secretary of Defense, pursuant to authority delegated to him by Defendant Rumsfeld, issued procedures for administrative review of detainees' "enemy combatant" status by Combatant Status Review Tribunals ("CSRT").  The procedures presumed detainees to be "enemy combatants" and limited the CSRTs to reviewing prior enemy combatant determinations by the executive and confirming or reversing those determinations.  The tribunals were staffed by mid-level officers who had no

institutional safeguards for independence in reviewing their superiors' determinations, and were conducted in a context where for years prior to the CSRTs, Defendants and other high-ranking officials had repeatedly declared the detainees at Guantanamo to be dangerous terrorists. Compounding the limited review and inherent bias of the CSRTs, detainees had no right under the rules to see or rebut any classified information, even though the tribunals relied substantially on classified information in making their determinations; no effective right to call witnesses or present documentary evidence; and no right to counsel, but rather a non-lawyer military officer who had no duty of confidentiality and an obligation, in fact, to disclose to the tribunal any inculpatory information learned from the detainee in the course of "assisting" him. In addition, in an environment where torture had been approved and used against detainees in interrogations for at least two years, both at Guantanamo and in U.S.-controlled sites where detainees had been held prior to being transferred to Guantanamo, the rules for the CSRTs allowed evidence obtained through torture to be used as a basis for continued detention.

49.     During the span of a few months in 2004, CSRTs were convened for all detainees at Guantanamo. Not surprisingly, the tribunals determined that most detainees were "enemy combatants" and should continue to be detained. In the rare instances where the tribunals reached a different outcome, re-hearings were ordered. Believing that the tribunals lacked any semblance of fairness, many detainees refused to participate in their proceedings, which proceeded in their absence.

50.     Despite detaining and vilifying Guantanamo prisoners for years as "enemy combatants" and dangerous terrorists, U.S. officials themselves have acknowledged that many or most of the prisoners at Guantanamo did not belong there. More than two years after the first prisoners were brought to Guantanamo, Defendant Hood, Commander of the prison from 2004 to 2006, acknowledged that "[t]here are significant numbers of men here, who once their cases are

heard will probably be given over to their government or released." The numbers speak for themselves: of more than 780 detainees ever held at Guantanamo, the government has released approximately 500 men to date and, in seven years, it has charged no more than 21.

**Inhumane Conditions, Torture and Abuse**

51.     The International Committee of the Red Cross (ICRC) has maintained that the detention and interrogation system at Guantanamo, "…whose stated purpose is the production of intelligence, cannot be considered other than an intentional system of cruel, unusual and degrading treatment and a form of torture."

52.     Guantanamo prisoners were detained in one of six long-term facilities during the period of Messrs. Al-Zahrani and Al-Salami's detention. On information and belief, Messrs. Al-Zahrani and Al-Salami and other detainees were moved between various camps of greater or fewer restrictions depending on their "good behavior" and "cooperation" in interrogations.

53.     The first detainees transferred to Guantanamo in January 2002, like Mr. Al-Zahrani, were held for the first few months of their detention in the temporary holding cells of Camp X-Ray while more permanent facilities were being constructed. In Camp X-Ray, detainees were held in six-by-six foot wire-mesh cages, with a cement slab floor and a roof of metal sheets, where detainees had no reprieve from the heat, humidity or the elements of the outdoors. The Muslim chaplain at Guantanamo in 2002 compared the camp to "an outdoor cattle stable."

54.     In April 2002, prisoners were moved to Camp Delta, a large prison complex containing several separate detention facilities, including Camp 1, where Messrs. Al-Zahrani and Al-Salami were detained when they died. The cells in most of the facilities are identical – six-by-eight feet, made of steel with steel-mesh walls, with a steel sink next to a "squat" toilet in the floor, next to the bed. In Camp 1, florescent lights are on 24-hours a day and there is no air-conditioning, but only exhaust fans.

55.     The construction of Camp X-Ray and Camp Delta, and the custody, care and control of detainees during their initial months of imprisonment were led by Defendant Lenhert, the first commander at Guantanamo.  On information and belief, Defendant Lenhert was told by individuals higher up the chain of command, including Defendant Rumsfeld and Joint Chiefs of Staff Chairman Defendant Myers, that the Geneva Conventions would technically not apply to the regime being established at Guantanamo.  On information and belief, the office of Defendant Rumsfeld also opposed the involvement of the ICRC in the early period at Guantanamo.

56.     The newest facility constructed before Messrs. Al-Zahrani and Al-Salami died was Camp 5, which was modeled on super-max prison designs in the United States and more restrictive than any of the existing facilities at Guantanamo at the time.  Camp 5, which became operational in May 2004, is a 100-bed maximum-security facility where detainees are confined in sealed, concrete cells that have only an opaque slit for a window, another one-way "window" facing the interior of the prison that allows guards to look in and keep watch, and two slots near the middle and foot of the solid steel cell door, through which meals are passed and detainees' arms and legs are shackled before they are removed from their cells, and which ensure that even these basic interactions involve a minimum of human contact.  Cameras monitor each cell 24-hours a day.  Florescent lights are on continuously day and night.

57.     Pursuant to standard operating procedures at Guantanamo at the time of Messrs. Al-Zahrani and Al-Salami's detention and that continue today, detainees are issued certain basic items for personal use in their cells: a blanket, a thin rubber mat to cover the solid and sometimes metal beds, flip flops, an orange detainee uniform, shorts, a towel, and a Qur'an.  These are the only items deemed essential for detainees' personal care.  All other items – soap, toilet paper, a toothbrush, toothpaste, a t-shirt, a sheet – are considered "comfort" items and must be earned by detainees by demonstrating "good behavior," such as cooperating with interrogators, and can be taken away for

any "infraction," such as talking to another detainee across the block or keeping leftover food from a meal in the cell.

58.     During the period of their detention, the deceased and other detainees spent most of each day, every day, confined alone in their cells in the conditions described, effectively cut off from the rest of the world.  Particularly before mid-2004, when attorneys were first permitted to visit the base, detainees had virtually no human contact with anyone outside of prison personnel and interrogators, and were largely prohibited even from speaking with other detainees at the risk of being punished for breaking the rules.  They also had numbingly little activity or stimuli.  A few times a week, they were shuffled out of their cells in shackles to small outdoor pens for 30 minutes of exercise and a five-minute shower.  They had no educational, vocational or rehabilitative outlets or activities.  Even access to reading materials was limited to just one book at a time.  On information and belief, these conditions have not changed in significant respects today.

59.     Detainees were also effectively deprived of virtually all communication with their families.  Family visits and even phone calls were prohibited.  Letters, while permitted through the International Red Cross, were screened and censored by the government and took several months or longer to reach family members.  On information and belief, these conditions also remain largely unchanged, with the exception of family phone calls that are now permitted under certain restrictions through the ICRC once or twice per year.

60.     On information and belief, standard operating procedures governing various aspects of detainees' day-to-day security, treatment and care are issued and updated by the commanders of the Joint Task Force and the Joint Detention Operations Group at Guantanamo, which during the period of Messrs. Al-Zahrani and Al-Salami's detention included Defendants Lenhert, Dunlavey, Miller, Hood, Harris, McQueen, Cannon, Bumgarner, and Dennis.  The most recent fully revised

version of the procedures before Messrs. Al-Zahrani and Al-Salami's death was published in December 2005 by order of Defendant Hood.

61.     In addition to their inhumane conditions, detainees were subjected to specific methods and acts of physical and psychological torture and abuse, many of which were devised, recommended, approved, sanctioned, and/or implemented by Defendants, either directly or indirectly, for use in connection with interrogations at Guantanamo.  Detainees were, *inter alia*, held in solitary confinement for periods exceeding a year; deprived of sleep for days, weeks and even months; exposed to prolonged temperature extremes; beaten; routinely "short-shackled," with their wrists and ankles bound together and to the floor for hours and even days; threatened with transfer to a foreign country for torture; sexually harassed, humiliated, and raped or threatened with rape; deprived of adequate and confidential medical treatment, or offered treatment on the condition that they "cooperate" with interrogators; and subjected to religious and cultural abuse, including desecration of the Qur'an and forced shaving.

62.     On or about December 2, 2002, following a request by Defendant Dunlavey for permission to make interrogations at Guantanamo more aggressive that went up the chain of command to Defendants Hill and Myers, Defendant Rumsfeld signed a memorandum approving numerous illegal interrogation methods, including putting detainees in "stress positions" for up to four hours; forcing detainees to strip naked, intimidating detainees with dogs, interrogating them for 20 hours at a time, forcing them to wear hoods, shaving their heads and beards, keeping them in total darkness and silence, and using what was euphemistically called "mild, non-injurious physical contact." As Defendant Rumsfeld and other Defendants knew or should have known, these and other methods were in violation of the United States Constitution, federal statutory law, the Geneva Conventions, and customary international law as reflected in, *inter alia*, the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

Defendant Miller, who assumed command from Defendant Dunlavey, also pushed for the use of more aggressive interrogation techniques at Guantanamo.

63.     In April 2003, following receipt of a "Working Group Report," Defendant Rumsfeld authorized a new set of interrogation techniques. The authorizing memorandum specifically recognized that certain of the approved techniques violated the Geneva Conventions and customary international law, including the removal of religious items, threats, intimidation, manipulation of temperatures and other environmental factors, and isolation.  While the memorandum does not include approval for unlawful actions that had been ongoing for months, including hooding, forced nudity, shaving, stress positions, use of dogs and "mild, non-injurious physical contact," on information and belief these practices continued to be employed against detainees at Guantanamo. Defendant Rumsfeld and other Defendants intended, or knew or should have known that these illegal practices were occurring, and failed in their command obligations to prevent the abuses and punish those responsible.

64.     In confidential reports to Defendant Hood and other government officials in July 2004, the ICRC charged that the military was intentionally using psychological and physical coercion "tantamount to torture" on prisoners at Guantanamo.

65.     Some of the most brutal physical abuse reported by Guantanamo detainees is attributed to the Immediate Reaction Force (IRF) (also known as the "Emergency Reaction Force" (ERF)).  IRF squads, which are comprised of military police, function as a disciplinary force within the camps.  Squad members wear riot gear, carry Plexiglas shields and frequently use tear gas or pepper spray.  Video footage taken by the military at Guantanamo shows five-member IRF teams punching detainees, kneeing them in the head, tying one to a gurney for interrogation, and forcing a dozen to strip from the waist down.  All-female IRF squads have also been formed, on information and belief as part of a conscious policy aimed at taunting and traumatizing Muslim detainees.

**Hunger Strikes and Force-Feeding**

66.     During the period of Messrs. Al-Zahrani and Al-Salami's detention, hundreds of detainees including the deceased went on hunger strike for weeks or months at a time to protest their conditions and illegal detention. From 2002 until June 2006, there were at least six long-term, large-scale hunger strikes, with the first beginning as early as February 2002. The strikes involved as many as 200 or more prisoners from across the camps and continued for one to two months each time, although individual detainees carried out their strikes for much longer periods. The strikes were reportedly often sparked by an individual act of abuse – in 2002, the forced removal of a prisoner's turban during prayer by a military police officer or, in 2005, the beatings of several prisoners by military guards – and grew into large-scale protests by detainees for fair trials, respect for their religion and improvements in their conditions, including effective medical treatment, access to sunlight, and the ability to contact their families.

67.     Military authorities generally denied or downplayed the existence or scale of the hunger strikes to the public and refused to disclose information about the conditions of striking prisoners. In June and July 2005, during one of the longest and most organized strikes involving approximately 200 prisoners from every camp, a Pentagon spokesperson stated that he was unaware of any hunger strike taking place at the base. While the Defense Department was eventually forced to admit the existence of the strike, its records only acknowledge that about 50 prisoners took part. On information and belief, detainees ended their strike at the end of July 2005 after Defendants Hood, Bumgarner and other authorities at Guantanamo promised to bring the prison into compliance with the Geneva Conventions, but began striking again in August 2005 after Defendants reneged on their promise. As one detainee said, "[w]e ask only for justice; treat us, as promised under the rules of the Geneva Conventions for Civilian Prisoners while we are held, and either try us fairly for a valid criminal charge or set us free." The August strike once again involved hundreds

of prisoners, some of whom eventually had to be hospitalized and dozens of whom were force-fed with nasal tubes. Defendants refused to provide information on the condition of detainees, and even attempted to obstruct hunger strikers' lawyers from visiting them at the base.

68. On information and belief, since hunger strikes began in early 2002 force-feeding has been standard policy at Guantanamo, as designed, approved and implemented by Defendants.

69. In December 2005, Defendants Craddock, Winkenwerder, Hood and others introduced and approved the use of "restraint chairs" in force-feeding detainees. Prisoners subjected to the process describe a tortuous experience, where detainees are strapped into the chairs – marketed by their manufacturer as a "padded cell on wheels" – and restrained at the legs, arms, shoulders, and head. A tube described by detainees as the thickness of a finger is forcibly inserted up their noses and down into their stomachs and as much as 1.5 liters of formula is pumped through the tube. In the case of hunger strikers, this amount can be more than their stomachs can comfortably hold and the effect can be an uncomfortable, sometimes painful bout of nausea, vomiting, bloating, diarrhea, and shortness of breath. Detainees are kept strapped to the chairs for an hour after "feeding" to prevent them from purging the formula. No sedatives or anesthesia are given during the procedure. The tubes are generally inserted and withdrawn twice a day, and the same tubes, covered in blood and stomach bile, are reportedly used from one patient to another without sanitization. Detainees have also reported verbal, religious and sexual abuse during the process by military personnel standing watch. Medical personnel have either actively participated in these forms of additional abuse or witnessed them without intervening.

70. Defendants Edmondson and Sollock supervised and implemented force-feeding of detainees at Guantanamo, including of Messrs. Al-Zahrani and Al-Salami on information and belief, by nasal tubes and restraint chairs. By his own admission, Defendant Edmondson personally inserted the nasal tubes in some hunger striking detainees.

28

**Impact on Detainees**

71.     On information and belief, Defendants intended, were aware, and were made aware from the beginning, and continuously, of the debilitating effects of detainees' circumstances, conditions and treatment at Guantanamo on their health and well-being.

72.     On information and belief, Defendant Rumsfeld and other Defendants created and approved a system of detention and interrogation at Guantanamo that was designed to increase detainees' physical and psychological duress, and ultimately to break them down as a means to obtaining intelligence.

73.     For example, standard operating procedures at Guantanamo at the time of the deceased's detention provided for a "Behavior Management Plan" for incoming detainees, the express purpose of which was to "enhance and exploit the disorientation and disorganization felt by a newly arrived detainee in the interrogation process."  The four-week "plan" focused on isolating the detainee and "fostering dependence" on his interrogator by holding the individual in complete isolation away from the general detainee population, prohibiting contact with the ICRC and the camp Chaplain, denying "privileges" such as books and mail, and providing the detainee with only a mat, a blanket, a towel, a Qur'an, and other basic items.

74.     In addition, the ICRC, which had exclusive unfettered access to detainees, consistently put Defendants on notice that Guantanamo detainees' treatment and conditions amounted to cruel treatment and even torture, and warned of the damaging effects on detainees.  On information and belief, during their visits ICRC representatives would meet with commanders at Guantanamo once a week to discuss their findings.  At the end of every visit they would also provide an "out-brief" to the commander at Guantanamo and a report of their findings to the Deputy Assistant Secretary of Defense for Detainee Affairs.  In 2003, the ICRC said publicly and to Defendants that the system of holding detainees indefinitely without allowing them to know their

fates was unacceptable and would lead to mental health problems. In confidential reports to Defendants in 2004, the committee described the physical and psychological treatment of detainees as amounting to torture.

75.     Guantanamo medical personnel themselves have reported the deleterious effects of detainees' circumstances. In 2003, military medial staff reported that depression was the most common ailment among detainees, and that over one-fifth of Camp Delta prisoners were taking antidepressants.

76.     On information and belief, the impact of detainees' conditions and treatment at Guantanamo was even more severe for juveniles being held at the prison, such as Mr. Al-Zahrani.

77.     Defendants were also aware at the time of Messrs. Al-Zahrani and Al-Salami's detention that the circumstances at Guantanamo had pushed some detainees to try to take their own lives. The first reported suicide attempts were in August 2003, when during an eight-day period nearly two dozen prisoners tried to hang themselves in their cells with clothing or other items. The medical staff at Guantanamo characterized only two of the attempts as "genuine suicide attempts" and called the rest "manipulative, self-injurious behavior," a classification created by Defendants to designate self-harm conduct that in the military's opinion did not reflect the prisoner's "sincere" desire to end his life, but rather was designed to get attention or release. During the investigation into the deaths of Messrs. Al-Zahrani and Al-Salami, Defendant commanders at Guantanamo acknowledged that there had been numerous suicide attempts, but that the "real attempts" had been made by those who were "depressed or mentally disturbed."

78.     Also during the investigation, the Deputy Commander of the Joint Detention Group at Guantanamo said that "there was always a general level of the threat of suicide in the camp [but] the weeks before the Alpha block incident [the deaths of Messrs. Al-Zahrani and Al-Salami] the

threat level was HIGH. This was due to intelligence leading the command to believe that an incident of mass self-harm was imminent."

79. By 2006, Defendants had acknowledged a total of 41 suicide attempts at Guantanamo. Defendants also reported that prisoners attempted to harm themselves 460 times in 2003 and 2004 alone, including 120 "hanging gestures" in 2003. Drawing yet another unscientific and callous distinction, Defendants differentiated between a "suicide attempt in which a detainee could have died without intervention, and a 'gesture' aimed at getting attention."

80. On information and belief, Defendants failed to improve detainees' conditions and treatment despite their knowledge of detainees' deteriorating mental state, their suicide attempts, and their continuous hunger strikes for basic rights and improved conditions. Defendants' response was in fact to implement greater restrictions at Guantanamo. Following a series of hunger strikes, a riot in May 2006, and the deaths of Messrs. Al-Zahrani, Al-Salami and Al-Utaybi in June 2006, the military tightened security procedures, scaled back group activities, and began taking steps to move the majority of detainees to maximum security cells under the command of Defendant Harris and others. According to Defendant Harris, the harsher approach was additionally necessary because of his conviction that all those still held at Guantanamo by 2006 were dangerous men: "They're all terrorists; they're all enemy combatants."

81. Since the time Defendant Harris made those remarks at the end of 2006, approximately 100 detainees have been returned to their home countries and families.

**Yasser Al-Zahrani**

**Prolonged Arbitrary Detention**

82. At the time of his death, Yasser Al-Zahrani had been held at Guantanamo for four and a half years without charge, access to a lawyer or any fair review of the lawfulness of his detention.

83.     While the government has disclosed virtually no information about the circumstances of Mr. Al-Zahrani's arrest, public sources indicate that he was apprehended in Afghanistan in late 2001 and transferred to Guantanamo in January 2002, where he was among the first prisoners to arrive.  He was 17 years old at the time.

84.     On information and belief, Mr. Al-Zahrani, like other Guantanamo detainees, was seized and detained on the basis of a unilateral and unsupported determination by government officials that he was an "enemy combatant."  More than two years into his detention, he had no notice at all of the reasons why he was being held and no opportunity to challenge those purported reasons.

85.     In September 2004, a CSRT was convened for Mr. Al-Zahrani pursuant to authority delegated by Defendant Rumsfeld.  After a flawed proceeding during which Mr. Al-Zahrani was presumed to be an enemy combatant, denied the right to an attorney, denied the right to see all the government's evidence against him, effectively denied the right to present his own witnesses and evidence, and during which evidence obtained through torture was permitted, three mid-level officers lacking any institutional protections for independence confirmed the prior determinations of their superiors that Mr. Al-Zahrani was an "enemy combatant."  Years later, in *Boumediene v. Bush* (2008), the Supreme Court ruled that the CSRTs were an inadequate review process for Guantanamo detainees to challenge their detention.

86.     In 2005, an ARB with similarly flawed procedures was convened to review Mr. Al-Zahrani's detention.

87.     On information and belief, government officials never possessed any reliable evidence on the basis of which to classify Mr. Al-Zahrani as an "enemy combatant."

88.     Mr. Al-Zahrani's CSRT and ARB were the only tribunals to review his detention in his more than four years at Guantanamo.  While Guantanamo prisoners had the right to access U.S.

courts through the writ of habeas corpus following the Supreme Court's decision in *Rasul* in June 2004, Mr. Al-Zahrani died without a habeas case or legal representation.

**Inhumane Conditions and Abuse**

89.     At the time of his death, Mr. Al-Zahrani had been detained at Guantanamo in conditions of crushing isolation for more than four years, cut off from the outside world and his family and largely isolated even from other detainees.  He spent most of each day confined alone in a small cell, with breaks only for a short period of exercise and a five-minute shower a few times a week, and for his interrogations.

90.     On information and belief, as one of the first prisoners to arrive at Guantanamo, Mr. Al-Zahrani was initially held for approximately three months in Camp X-Ray in a small wire-mesh cage.

91.     At the time of his death, Mr. Al-Zahrani was detained in Camp 1, in a steel cell no more than six-by-eight feet, where he ate his meals, used the toilet, slept, and spent most of his waking hours.

92.     On information and belief, Mr. Al-Zahrani was moved between different camps at Guantanamo during his four and a half years of detention.

93.     On information and belief, Mr. Al-Zahrani was brutally mistreated by military and other government agents charged with his custody and care.  In letters retrieved by the government after his death, Mr. Al-Zahrani describes multiple forms of physical and psychological abuse he and other detainees suffered, including beatings by the ERF unit; sleep deprivation for up to 30 days; exposure to extreme temperatures of hot and cold; invasive and degrading body searches; acts of religious interference and humiliation by guards, who prohibited detainees from sounding the Muslim call to prayer and praying communally according to custom, desecrated the Qur'an, and forcibly shaved detainees' heads and beards; the withholding of necessary medication; and what he

described in general as the "continuous oppression" of being isolated in a small, confined steel cell day in and day out and prohibited from human contact with other detainees.

94.     On information and belief, Mr. Al-Zahrani suffered these and other acts of torture and abuse in connection with his interrogations and detention by Defendants.

95.     At the time of his death, Mr. Al-Zahrani had been subjected to the conditions and treatment described above for over four years without knowing why he was being detained, or whether or when he would be released.  As he wrote in one of his letters, "…the years are passing day after day, month after month, year after year, and our hands are still chained and our bodies are inside the cages without wrongdoing or crime…."

**Hunger Strikes**

96.     As a form of protest against his and other detainees' conditions and years of unlawful detention, Mr. Al-Zahrani went on hunger strike at least once for a period of six months. While publicly available records do not indicate whether Mr. Al-Zahrani was on hunger strike after the use of restraint chairs were introduced in force-feeding detainees in January 2006, in his letters he described "large feeding tubes that tore apart the stomach and noses of those who were on hunger strike because of the insertion by force on the 'chairs of torture,' and by placing them in a very cold climate and dragging them on the steel, and by leaving them chained for long hours in cloth stained by blood, vomit, urine, and more…. This is after the American government had ordered the administration of the camp to stop the strike by any means …."  On information and belief, Mr. Al-Zahrani was subjected to abusive force-feeding with or without the use of a restraint chair.

**Impact on Well-Being**

97.     On information and belief, the unlawful and indefinite nature of Mr. Al-Zahrani's detention and the inhumane conditions of his confinement had damaging effects on his physical and

psychological health.  On information and belief, Defendants intended, knew of or should have anticipated those effects.

98.     On information and belief, Defendants were on notice of actual and potential harm to Mr. Al-Zahrani and failed to adequately protect him.

99.     On information and belief, Defendants continued to confine Mr. Al-Zahrani in conditions that failed to satisfy basic standards of humane treatment.  He continued to be detained in isolation, separated from other detainees, deprived of any regular communication with his family, cut off from the outside world, without charge, without notice of the basis for his detention, without a fair process by which to challenge his detention, and without any notion of whether or when he would be released.

100.    On information and belief, Defendants failed to provide adequate medical and psychiatric care to address Mr. Al-Zahrani's psychological and other health needs.

**Yasser Al-Zahrani's Death**

101.    Mr. Al-Zahrani was reportedly found dead in his cell in the early hours of June 10, 2006.  While the exact timing of events is not clear from the NCIS records, he was discovered sometime between approximately 12:28 and 12:39 a.m.  He was the first of the three prisoners to be discovered that night by on-duty guards in Camp 1.

102.    According to multiple NCIS interviews with on-duty guards on the scene, medical personnel failed to respond to Mr. Al-Zahrani's cell according to standard operating procedures at Guantanamo for medical emergencies.  All personnel present during the discovery of Mr. Al-Zahrani and the subsequent two prisoners corroborate that "at no time during these events[] did any member of the medical staff report to the situation at Camp 1."  This issue was later raised during staff debriefing about the deaths.

103.     Given the absence of medical staff at the cell, guards decided to take Mr. Al-Zahrani to the clinic themselves.  According to an on-duty guard, "I thought we had a chance to save him so I instructed guards to take him to the clinic rather than wait for medical on the tier."

104.     In preparing Mr. Al-Zahrani for transport to the clinic, guards restrained him with arm and leg shackles pursuant to policy, despite the fact that they described finding him "lifeless," and strapped him to a backboard.  Later, at the medical clinic, medical staff would try with difficulty to insert an IV in Mr. Al-Zahrani's arm with the handcuffs still on, advising the guards only after several unsuccessful attempts that they would need to remove the handcuffs in order to insert the IV properly.  Even then, with Mr. Al-Zahrani dead or near death on the medical table, a corpsman wrapped a sheet around Mr. Al-Zahrani's left and right wrists as a make-shift restraint after the iron cuffs were removed.

105.     When guards arrived at the medical clinic with Mr. Al-Zahrani, they reported having to pound on the door to get someone to answer and described medical staff as appearing "unprepared" and "just standing around at first," unsure what to do.  According to one guard's account, "[p]eople were casually walking out of random rooms and slowly putting on their stab vests and blouses.  They didn't even know what room to put him [Al-Zahrani] in. They appeared more interested in just looking at him than trying to help."  The lack of preparedness cost critical minutes of treatment: one guard reported that medical staff "did not administer care to [Al-Zahrani] for approximately 2-3 minutes due to the fact that they were getting dressed … I felt the doctors and corpsmen should have been more alert than they were."

106.     There was no doctor or Senior Medical Officer present at the clinic when Mr. Al-Zahrani was brought in.  A corpsman trying to contact the on-call doctor apparently could not find the doctor's telephone number.  There was still no doctor on the scene by the time all three detainees had been discovered in their cells and brought to the clinic.

107.    At the clinic, two junior corpsmen, later joined by a night shift team leader who had been on dinner break, began administering CPR and chest compressions on Mr. Al-Zahrani without realizing that his throat cavity was blocked with a large wad of cloth, despite noticing a "pronounced bulge" on the front of Mr. Al-Zahrani's neck.  It was only after the Senior Medical Officer arrived at the clinic and pried Mr. Al-Zahrani's mouth open that they realized that a "big piece of cloth" was lodged in the back of his mouth.  Some accounts of the scene indicate that the corpsmen and night shift team leader had been performing CPR and chest compressions on Mr. Al-Zahrani for at least 15 minutes before the Senior Medical Officer arrived and pulled the cloth out of Mr. Al-Zahrani's mouth.

108.    At some point after Mr. Al-Zahrani was brought to the clinic, medical staff called the naval hospital on the base for help.  While the timing of events is not clear from the NCIS records, a hospital ambulance arrived at the clinic approximately 20 to 30 minutes after Mr. Al-Zahrani was brought to the clinic.  EMT paramedics recalled that there were no doctors present at the clinic when they arrived.  They started doing chest compressions on Mr. Al-Zahrani "because medical was not doing it."  After several minutes of administering care, the paramedics indicated that they needed a doctor and that Mr. Al-Zahrani had to be taken to the hospital "so that a doctor could help."

109.    At some point during Mr. Al-Zahrani's transport to the hospital, the transport team noticed that Mr. Al-Zahrani had some type of material "wrapped tightly 3 or 4 times around his neck" that still had not been removed.  After cutting through part of the material and loosening the most taut strand, they reported that "it appeared that they had a tachy rhythm on their equipment for Al-Zahrani …[and] as if some color returned to the patient after the material was removed from the patient's neck."

110.     The Staff Judge Advocate (SJA) riding in the ambulance with the EMT paramedics and Mr. Al-Zahrani recalled that "[w]hen the corpsman checked the first set of vitals in the ambulance, he said the detainee's heart was beating, and I observed this on the monitor. [] I am not sure if his heart was beating on its own or if we were doing it. The heart was beating up and down the whole way to the hospital."

111.     According to an ambulance report, the ambulance carrying Mr. Al-Zahrani arrived at the hospital at approximately 1:15 a.m. At that point, about 35 to 45 minutes had passed since Mr. Al-Zahrani was first discovered in his cell. The SJA recalled that a Commander called the hospital several times "wanting to know if 093 [Mr. Al-Zahrani] was still alive." According to the SJA, Mr. Al-Zahrani's status was "uncertain" at that point. He recalled that one of the hospital staff working on Mr. Al-Zahrani "looked at me and held his thumb and index finger about an inch apart and said, 'He's that close to death.'"

112.     At 1:50 a.m., Mr. Al-Zahrani was pronounced dead at the naval hospital. The medical record of his time of death does not include the name of the doctor who made the pronouncement.

113.     Mr. Al-Zahrani's death occurred on the watch of Defendant Harris, commander at Guantanamo at the time. Defendant Harris ordered the military's investigation into Mr. Al-Zahrani's death.

**Plaintiff Talal Al-Zahrani**

114.     Mr. Al-Zahrani, Sr. never received notice from U.S. authorities that his son was being detained at Guantanamo. The first and only news he received was from his own government, which informed him approximately eight months after he had last spoken with his son that Yasser was being held at Guantanamo.

115.    During the period of his son's detention from 2002 to 2006, there were long stretches of time when Mr. Al-Zahrani, Sr. had no news from his son because of the restrictive policies and conditions on Guantanamo detainees' family communications.  He received only a few letters in 2002 and 2003 and a final letter in 2006, in which his son expressed hope of being released soon. In June 2006, his son was dead.

116.    U.S. officials did not notify Mr. Al-Zahrani, Sr. of his son's death.  Rather, extended family members heard the name "Al-Zahrani" on television news reports of the deaths at Guantanamo and notified his immediate family.  Mr. Al-Zahrani, Sr. called the Saudi Ministry of the Interior on June 10, and on June 11 his own government confirmed that his son was one of the men who had died.  On information and belief, Mr. Al-Zahrani, Sr. has never been contacted directly by the U.S. government with any information concerning his son's death.

117.    The U.S. government did not return Yasser Al-Zahrani's body to Saudi Arabia until June 16, six days after his death.  Mr. Al-Zahrani, Sr. was not able to view his son's body until June 17 and could not bury him until June 24, two weeks after his death.  Islamic law calls for bodies to be buried within 24 hours of death where possible.  Defendants thus denied Mr. Al-Zahrani the opportunity to give his son a proper Islamic burial.

118.    Mr. Al-Zahrani's body was returned with apparent injuries to his upper chest and signs of trauma on his face.  His larynx had also been removed.  Despite Mr. Al-Zahrani, Sr.'s repeated requests to the U.S. government for an explanation for the condition in which his son's body was returned, U.S. authorities did not respond.

119.    U.S. authorities performed an autopsy on Yasser Al-Zahrani without giving notice to his family or seeking their consent.

120.    While Mr. Al-Zahrani, Sr. sought a second autopsy of his son after his remains were returned to Saudi Arabia, the U.S. government has refused to respond to questions posed by the

independent physician who conducted the autopsy. Without these answers, the second autopsy is inconclusive.

121.    U.S. government spokespersons and military officials, including Defendants, made a number of derisive comments about Yasser Al-Zahrani and the other two deceased prisoners following their deaths. Defendant Harris stated that the deaths were "not an act of desperation, but an act of asymmetric warfare aimed at us here in Guantanamo." Another official referred to the deaths as "a good PR move to draw attention." In a press conference following the deaths, the Deputy Assistant Secretary of Defense repeatedly compared all Guantanamo detainees to Nazis during World War II and made multiple unfounded statements that such detainees are all terrorists. Defendant Bumgarner stated in reaction to the deaths, "They [Guantanamo detainees] have shown time and time again that we can't trust them any farther than we can throw them. There is not a trustworthy son of a … in the entire bunch." Defendant Craddock speculated to reporters that the deaths were deliberately timed to influence the U.S. Supreme Court's decision in *Hamdan v. Rumsfeld*, which was decided a few weeks after the deaths.

122.    While the government announced on or about June 10, 2006 that the NCIS would commence an investigation into the deaths, the NCIS report was not released until June 2008, a full two years after the men had died. Even with the release of the report, there are significant gaps, inconsistencies and inaccuracies in the record.

123.    Mr. Al-Zahrani, Sr. has suffered extreme emotional distress as a result of these and other acts of government officials in arbitrarily detaining his son and in their callous response to his death.

**Salah Ali Abdullah Ahmed Al-Salami**

**Prolonged Arbitrary Detention**

124.    At the time of his death, Salah Ali Abdullah Ahmed Al-Salami had been held at Guantanamo for over four years without charge, access to a lawyer or any fair review of the lawfulness of his detention.

125.    Mr. Al-Salami was arrested by local forces in Pakistan in March 2002, at a time when the United States was offering cash bounties of up to $25,000 for the arrest of individuals suspected of ties to the Taliban or Al Qaeda. He was held in Pakistani custody for over one month and on or about May 2002 was turned over to U.S. authorities, who on information and belief held him in one or more U.S.-controlled detention sites in Afghanistan before ultimately transferring him to Guantanamo on or about June 2002.

126.    Government records of his interrogations indicate that Mr. Al-Salami protested his innocence and told his captors that he had traveled from his home in Yemen to Pakistan to study the Qur'an. He told them his detention was a mistake and that if released he would return to his family in Yemen. In fact, years later, a Department of Defense document from January 2006 would note, "there is no credible information to suggest that [Mr. Al-Salami] received terrorist training or is a member of the al Qaida network….This preliminary case file evaluation has failed to disclose any chargeable offenses within the Military Commission Instruction No. 2 under which [Mr. Al-Salami] could be tried before a military commission."

127.    On information and belief, Mr. Al-Salami, like other Guantanamo detainees, was brought to Guantanamo on the basis of a unilateral and unsupported determination by government officials that he was an "enemy combatant." For more than two years into his detention, he had no notice at all of the reasons why he was being held and no opportunity to challenge the purported basis for his detention.

128.    In November 2004, a CSRT was convened for Mr. Al-Salami pursuant to authority

delegated by Defendant Rumsfeld.  After a flawed proceeding during which he was presumed to be

an enemy combatant, denied the right to an attorney, denied the right to see all the government's

evidence against him, effectively denied the right to present his own witnesses and evidence, and

during which evidence obtained through torture was permitted, three mid-level officers lacking any

institutional protections for independence confirmed the prior determinations of their superiors and

determined that Mr. Al-Salami was an "enemy combatant."  Years later, in *Boumediene v. Bush*

(2008), the Supreme Court ruled that the CSRTs were an inadequate review process for

Guantanamo detainees to challenge their detention.

129.    In 2005 and 2006, ARBs with similarly flawed procedures were convened to review

Mr. Al-Salami's detention.  As "factors favor[ing] release or transfer," his ARBs noted that Mr. Al-

Salami denied any involvement with the Taliban or Al Qaeda as well as any knowledge of 9/11

prior to the attacks or plans of future attacks on the United States.

130.    On information and belief, government officials never possessed any reliable

evidence on the basis of which to classify Mr. Al-Salami as an "enemy combatant."

131.    Mr. Al-Salami's CSRT and ARBs were the only tribunals to review his detention in

his more than four years at Guantanamo.

132.    Following the Supreme Court's ruling in *Rasul* giving prisoners the right to bring

habeas corpus petitions in U.S. courts, Plaintiff Ali Abdullah Al-Salami retained lawyers for his

son, who filed a habeas petition for Mr. Al-Salami in December 2005.  For two months, however,

the government delayed Mr. Al-Salami's case from going forward because it said it could not verify

his identity.  The government finally resolved the identity issue in February 2006, but disputed a

"protective order" required for Mr. Al-Salami's lawyers to visit him at Guantanamo until April

2006.  At that point, four months after they had filed Mr. Al-Salami's case, his lawyers were finally

able to make arrangements to meet with him at Guantanamo. The Department of Defense scheduled the meeting for August 2006. At the meeting, Mr. Al-Salami's lawyers planned to show him a videotape prepared by his father telling him of the efforts being made on his behalf. The message never reached Mr. Al-Salami, who died on June 10 not knowing that he had a habeas case or legal representation, or of his lawyers' imminent visit.

**Inhumane Conditions and Abuse**

133.    At the time of his death, Mr. Al-Salami had been detained incommunicado at Guantanamo for more than four years. He spent most of each day confined alone in a small cell, with short breaks only for a period of exercise and a shower a few times a week, and for his interrogations.

134.    While the authorities have not made information available concerning the specific facilities in which Mr. Al-Salami was detained at Guantanamo, he was detained in Camp 1 at the time of his death. His cell in Camp 1 was approximately six-by-eight feet and built of steel, with steel mesh walls. He ate his meals, used the toilet, slept, and spent most of his waking hours in the same small, enclosed space.

135.    On information and belief, Mr. Al-Salami was moved between different facilities at Guantanamo during his more than four years of detention.

136.    On information and belief, Mr. Al-Salami was brutally mistreated by military and other government agents charged with his custody and care. In letters discovered after his death, he wrote of being held in solitary confinement, "inside a very cold metal box," and that his captors "used the ERF'ing units and burning gases on us, they desecrated our religion, our bodies … all of this is known to the world."

137.    Government records indicate that Mr. Al-Salami had multiple interrogations at Guantanamo and at Bagram, during which, on information and belief he was subjected to torture

and abuse. On information and belief, interrogation techniques constituting torture were sanctioned and used against detainees at Guantanamo and at Bagram.

138.     Government records indicate that Mr. Al-Salami was subjected to IRF teams multiple times. On information and belief, Mr. Al-Salami was brutally beaten and sustained physical injuries by military police members of the IRF teams. Available medical records from August 2005, for example, indicate that he had been "IRF'd" four months prior and had "banged [his] knees into wall" during the beating. The records indicate that Mr. Al-Salami told the doctor that his level of knee pain from the injury was "10 out of 10" and that it felt "like [his] bones are rubbing together." The records indicate that Mr. Al-Salami's severe knee pain persisted and that he repeatedly asked medical personnel for knee braces to no avail.

139.     Government records also indicate numerous instances when block guards requested disciplinary action for various alleged "infractions" by Mr. Al-Salami, including talking to another detainee across the cell block, refusing to return a food plate, possessing "contraband" (a salt packet), and refusing to return an uneaten apple left over from a meal.

140.     On information and belief, Mr. Al-Salami suffered multiple forms and acts of torture and abuse by or at the direction of U.S. authorities in connection with his interrogations and detention.

141.     At the time of his death, Mr. Al-Salami had been subjected to the conditions and treatment described above for over four years without knowing why he was being detained, or whether or when he would be released.

**Hunger Strikes**

142.     To protest his conditions and unlawful and indefinite detention – or "because he has been detained for 4 years and he wants to go home," as he stated to medical personnel – Mr. Al-Salami went on hunger strike several times during his imprisonment: in July 2002, not long after he

had been transferred to Guantanamo; from July to October 2005; and from December 2005 until just days before his death in June 2006, during which he was force-fed with the use of a restraint chair.

143.     Military officials described Mr. Al-Salami as "a long and dedicated striker, perhaps being tube fed longer than any other detainee in the camp."  In February 2006, when a group hunger strike dropped to its lowest number of participating prisoners, in part because of the threat of being subjected to restraint chairs, Mr. Al-Salami was one of just three prisoners who continued his strike. Two months before, in December 2005, his weight had dropped so low that he had to be hospitalized.  While records of his weight are not publicly available for December 2005, his medical records from January 2006 indicate that he weighed about 120 lbs., down from 172 lbs. when he first arrived at Guantanamo on or about June 2002.

144.     On information and belief, Mr. Al-Salami was physically and emotionally abused during his force-feedings.  His medical records indicate that the tube in his nose caused bleeding and severe inflammation and infection in his nasal passage to the point that his feedings were put on hold for a period of time.  In addition to the physical trauma of the experience, on information and belief, Mr. Al-Salami was humiliated and degraded by guards who would mock him and make jokes about the tube in his nose while he was strapped to the restraint chair.

145.     Mr. Al-Salami's medical records indicate that he "voluntarily accepted oral food" on June 3, 2006, thus ending his final hunger strike after four years of protest.  It was just one week before his death.

**Impact on Well-Being**

146.     The unlawful and indefinite nature of Mr. Al-Salami's detention and the inhumane conditions of his confinement had severely damaging effects on his physical and psychological health.  Defendants intended, knew of or should have anticipated those effects.

147.     As early as July 2002, medical staff were on notice that Mr. Al-Salami was experiencing certain physical and psychological difficulties, and that he had a health history that made him particularly vulnerable to his conditions at Guantanamo.

148.     A psychiatric record from July 1, 2002, after Mr. Al-Salami had refused ten consecutive meals in protest of his conditions, notes that he "complained of anxiety with accompanying shortness of breath related to being in 'tight spaces,' which he's had for 4 years … decreased duration and quality of sleep related to anxiety … nightmares of 'being in a box' … [and] suicidal ideations with no intent or plan and denies any previous ideation in the past." The record also noted that Mr. Al-Salami's past medical and psychiatric history "was remarkable for … treatment for anxiety and 'internal problems' 2 years ago."

149.     A medical evaluation sheet from July 2, 2002 notes that Mr. Al-Salami was experiencing "dizziness, sleep/appetite disturbance, crying spells, depression" and that he had taken medication for depression in the past. The medical staff indicated that Mr. Al-Salami did not have suicidal ideation, but further explained, "no plan, wants to live, but sadness."

150.     In a medical record from July 3, 2002, Mr. Al-Salami again expressed feeling "anxiety … A/V hallucinations of voices and the ceiling coming down … broken sleep due to nightmares … low appetite, but forces himself to eat … [and] low concentration."

151.     A nurse's note from July 4, 2002 reported that Mr. Al-Salami complained of difficulty sleeping, anxiety regarding his confinement, and dizziness.

152.     While the records are incomplete, medical records from December 2005, the same month Mr. Al-Salami was hospitalized at 120 lbs., indicate that medical personnel continued to be on notice of Mr. Al-Salami's difficulties.

153.     On December 24, 2005, a medical technician ordered a psychiatric visitation for Mr. Al-Salami, noting, "[t]he detainee has mood swings. At one time he states he is well and appears to

be well. A few minutes later, he is observed to be acting differently." In apparent contradiction with this description, however, the technician concludes, "[p]atient is stable."

154. A medical record from December 28, 2005 notes that Mr. Al-Salami "intends to continue food refusal and accepts potential outcome of death or permanent physical damage as a result of food refusal."

155. A medical progress note from December 31, 2005 reports, "[i]n discussions with pt, pt stated that he was a hunger striker. The pt stated that he wanted to commit suicide b/c he does not want to be a prisoner anymore and he lost hope." The technician's assessment was "depression: pt with suicidal thoughts of ending his life with additional plan to include hunger striking." The treatment plan was to start Mr. Al-Salami on Zoloft and consult with psychiatry [on Monday]. The technician emphasized, "Please note plan."

156. In January 2006, a technician noted, "NEEDS Psych Eval. Will contact today."

157. On June 10, 2006, following Mr. Al-Salami's death, a Senior Medical Officer at the detention hospital at Guantanamo wrote a "Narrative Summary" of Mr. Al-Salami's medical history at Guantanamo. The summary makes no mention of the psychological issues indicated in the records above and reports that Mr. Al-Salami had "no known psychiatric history." The officer noted that Mr. Al-Salami was in good health in his most recent medical exam.

158. Defendant William Winkenwerder, in public statements following the three deaths, stated that none of the men had ongoing psychological illness.

159. Defendants were on notice of actual and potential harm to Mr. Al-Salami and failed to adequately protect him. During the NCIS investigation into the deaths, Defendant Dennis, the Commander of the Joint Detention Group at Guantanamo at the time, stated to an investigator, "As I look back on the events leading up to 10 June there were several events that took place that I now feel should have triggered me to think something was going on, on Alpha block. First, 693 [Mr. Al-

47

Salami] had gone off hunger strike just a week or two prior. 693 had been a long and dedicated hunger striker, perhaps being tubed fed longer than any other detainee in the camp."

160.     Defendants continued to confine Mr. Al-Salami in conditions that failed to satisfy basic standards of humane treatment. He continued to be detained in isolation, separated from other detainees, deprived of any regular communication with his family, cut off from the outside world, without charge, without notice of the basis for his detention, without a fair process by which to challenge his detention, and without any notion of whether or when he would be released.

161.     Medical and psychiatric services at Guantanamo failed to provide adequate care to address Mr. Al-Salami's clear psychological and other health needs.

162.     Records of weekly visits to Mr. Al-Salami by Behavioral Healthcare Services (BHS) technicians reveal superficial or no assessment of his condition and little effectual follow-up treatment. In records from 2005 and 2006, technicians regularly noted Mr. Al-Salami's refusal to speak with them and their inability to assess his mental state, and repeatedly prescribed a treatment plan of little more than returning the following week, despite having the option of recommending further levels of care such as referrals for complete medical or psychological evaluations. On other occasions, despite the lack of interaction with Mr. Al-Salami, technicians made superficially positive assessments. During a visit on December 23, 2005, after noting that an assessment was not possible because of Mr. Al-Salami's refusal to speak with the technician, and observing Mr. Al-Salami in a segregation room with a feeding tube in his nose and an IV in his arm, the technician wrote that Mr. Al-Salami "appeared to be in no emotional distress at the time of the interview." The prescribed "treatment plan" was only to visit again the following week. On or about the same date, Mr. Al-Salami had been admitted to the naval hospital, weighing in at 120 lbs.

163.     According to available information on standard operating procedures at Guantanamo, the commander of the Joint Detention Group is accountable for the operations of the

BHS.  Defendants Col. Adolph McQueen, Gen. Nelson Cannon, Col. Mike Bumgarner, and Col. Wade Dennis were commanders of the Joint Detention Group at Guantanamo during the period of Messrs. Al-Salami and Al-Zahrani's detention.

164.    On information and belief, the BHS provides services to detainees who have psychological issues and have attempted suicide or harm.  The weeks before the deaths of Messrs. Al-Salami and Al-Zahrani, the BHS had cleared two of the three deceased and noted that "they were in good spirits."

**Salah Ali Abdullah Ahmed Al-Salami's Death**

165.    Mr. Al-Salami was the third prisoner to be discovered apparently lifeless in his cell on June 10, 2006.  NCIS records indicate that on-duty Camp 1 guards noticed Mr. Al-Salami in his cell sometime after 12:35 a.m., although a more precise time is not discernable from the records.

166.    Despite the fact that Mr. Al-Salami was the third detainee found and, on information and belief, medical staff were on alert by that time that additional detainees had been discovered apparently dead in their cells, there were still no medical staff present on the cell block, as required by standard operating procedures at Guantanamo.  As on-duty guards on the scene recalled, "medical never showed up, it seemed like they didn't know what was going on."

167.    Guards were unable to transport Mr. Al-Salami to the medical clinic as soon as they discovered him because the only available backboard on the cell block had been used to transport Mr. Al-Zahrani to the medical clinic.  While some guards waited on the cell block with Mr. Al-Salami's body, another guard ran to the medical clinic to get a backboard.

168.    While they waited for the backboard, the guards waiting with Mr. Al-Salami secured his arms and legs with shackles while he lay apparently lifeless on the floor.  Once the backboard arrived, they shackled one of his arms to the board, as required by policy.

169.     As the guards prepared to transport Mr. Al-Salami to the medical clinic, one guard emphasized to the others to "make sure you hold the head."  The backboard was missing a head brace, however, so Mr. Al-Salami's head "flopped around a lot" on the backboard as the guards transported him to the clinic.

170.     Once the team arrived at the medical clinic with Mr. Al-Salami, on-duty medical staff appeared unprepared.  The guards had to wait holding Mr. Al-Salami on the backboard while a bed was found for him.

171.     There was no doctor present at the clinic when the guards arrived with Mr. Al-Salami.  At some point after medical staff had been administering CPR and chest compressions for several minutes, a doctor on staff arrived.  In attempting to intubate Mr. Al-Salami, the doctor discovered that something was stuck in the back of Mr. Al-Salami's throat, although there is no further indication in the record of what was stuck or whether it was removed.  Accounts of the scene indicate only that Mr. Al-Salami was intubated and that CPR continued.

172.     At approximately 1:15 a.m., Mr. Al-Salami was pronounced dead at the medical clinic.

173.     Mr. Al-Salami's death occurred on the watch of Defendant Harris, commander at Guantanamo at the time.  Defendant Harris ordered the military's investigation into Mr. Al-Salami's death.

**Plaintiff Ali Abdullah Ahmed Al-Salami**

174.     U.S. authorities never gave Mr. Al-Salami, Sr. news of his son's death directly.  Rather, sometime after June 10, he was notified by the Yemeni government.  Mr. Al-Salami, Sr. has never been contacted directly by the U.S. government with any information concerning his son's death.

175.    Although Mr. Al-Salami, Sr. and his wife asked for their son's body to be returned to Yemen for a proper Islamic burial, they were deprived of their request.  Islamic law calls for the body to be prepared for burial within 24 hours of death, but Mr. Al-Salami's remains were not returned home until five days after his death, on June 15.  Mr. Al-Salami, Sr. was not allowed to view his son until June 18, and Mr. Al-Salami was not buried until June 20, some ten days after his death.

176.    According to Mr. Al-Salami, Sr., his son's body was returned badly bruised and with marks resembling chemical burns, and his organs had been removed.  U.S. authorities have failed to provide any explanation for the condition of the body despite Mr. Al-Salami, Sr.'s repeated requests.

177.    U.S. authorities performed an autopsy on Salah Al-Salami without seeking the consent of his family.  The non-consensual autopsy and the fact of Mr. Al-Salami's missing organs were deeply offensive to Mr. Al-Salami, Sr. and his family.

178.    While Mr. Al-Salami, Sr. sought a second autopsy of his son after his remains had been returned to Yemen, the U.S. government has refused to respond to questions posed by the independent physician who conducted the autopsy.  Without these answers, the second autopsy is inconclusive.

179.    U.S. government spokespersons and military officials, including Defendants, made a number of derisive public comments about Salah Al-Salami following his death, including baseless statements that he was a "high-level Al Qaeda operative."  Months before, Defendants' agents themselves had determined that there was "no credible evidence" to suggest that Mr. Al-Salami was associated with Al Qaeda.

180.    While Defendants announced on or about June 10, 2006 that the NCIS would commence an investigation into the deaths, the NCIS report was not released until June 2008, a full

two years after the men had died. Even with the release of the report, there are significant gaps, inconsistencies and inaccuracies in the record.

181.    Mr. Al-Salami, Sr. has suffered extreme emotional distress as a result of these and other acts of government officials in arbitrarily detaining his son and in their cruel and callous response to his death.

## GENERAL ALLEGATIONS

182.    The acts described herein were carried out under the actual or apparent authority or color of law of Defendant United States.

183.    At all relevant times, Defendant Rumsfeld and other Defendants possessed and exercised command and control over their subordinates at the U.S. detention facility at Guantanamo where Messrs. Al-Salami and Al-Zahrani were held. Defendants also acquiesced in and/or permitted persons or groups to act in concert with U.S. officials to commit the abuses described herein.

184.    At all relevant times, Defendants had the legal authority and practical ability to exert control over subordinates who participated in the prolonged arbitrary detention, torture, cruel, inhuman and degrading treatment, deprivations of due process, and inadequate medical and other care of Messrs. Al-Salami and Al-Zahrani. Defendants' command over subordinate forces included the authority and responsibility to give orders to, set policy for, and manage the affairs of forces under their control, and to remove and discipline personnel who were violating the rights of Messrs. Al-Salami and Al-Zahrani.

185.    At all relevant times, the Defendants also had full control and custody over Messrs. Al-Salami and Al-Zahrani.

186.    Defendants intended, knew, or should have known, that Messrs. Al-Salami and Al-Zahrani were being subjected to prolonged arbitrary detention, torture, cruel, inhuman or degrading

treatment, deprivations of due process, and inadequate medical and other care while imprisoned at Guantanamo. Defendants authorized, mandated, implemented, encouraged, condoned, and/or acquiesced in the infliction of those abuses. Defendants took no steps to prevent the infliction of torture or other forms of mistreatment on Messrs. Al-Zahrani and Al-Salami, to improve their conditions or circumstances, to protect them from the foreseeable harmful consequences of their torture, mistreatment and conditions, or to investigate and punish the perpetrators of the aforementioned abuses. By their omissions, Defendants failed in their legal obligations as commanders, under domestic and international law, to ensure that subordinates never perpetrate abuses against detainees in the custody of the U.S. military.

187.    Defendants knew, or should have known that prolonged arbitrary detention at Guantanamo violated U.S. law, including the U.S. constitution, customary international law and international treaties to which the United States is a party, and in fact selected Guantanamo as the site for their prison in order to evade U.S. law. Defendants authorized, carried out, condoned, and/or directly or indirectly implemented the prolonged arbitrary detention of Messrs. Al-Zahrani and Al-Salami and others.

188.    Defendants Rumsfeld, Myers, Hill, Dunlavey, Miller, and others in the chain of command intended, were aware, or should have been aware, that torture and cruel, inhuman, or degrading treatment of detainees at Guantanamo was occurring in violation of clearly established domestic and international law, and in fact ignored warnings of the illegality of the interrogation techniques they authorized and implemented. On information and belief, Defendants also intended, knew, or should have known that physical and psychological torture and abuse was being inflicted on Messrs. Al-Salami and Al-Zahrani during the period of their detention. Defendants failed to take all necessary measures to investigate and prevent the abuses and to punish the responsible personnel

under their commands, and in fact obstructed efforts for disciplinary action against certain responsible individuals.

189.     Defendant Rumsfeld's authorization of aggressive interrogation techniques for use at Guantanamo was a direct cause of detainee abuse there.

190.     Defendant Winkenwerder and other Defendants intended, knew, or should have known that confidential, adequate and non-coercive medical care, including psychiatric care, was being denied to detainees at Guantanamo in violation of clearly established domestic and international law.  Defendants failed to take all necessary measures to provide adequate medical care in compliance with ethical and legal standards, and to prevent and punish personnel under their commands from breaching their professional duty of care to Messrs. Al-Zahrani and Al-Salami and other detainees.

191.     Defendants and their agents, in establishing, monitoring and implementing the policies at Guantanamo where Messrs. Al-Zahrani and Al-Salami were held, intended to create a stress and pain-inducing environment for the purposes of breaking down the physical and mental resistance of detainees.

192.     Defendants were aware or should have been aware that their policies and practices of torture and cruel, inhuman or degrading treatment, prolonged arbitrary detention, and deprivations of due process at Guantanamo had driven detainees to the point of attempting to take their own lives.  Defendants nevertheless maintained those same policies and practices throughout the detention of Messrs. Al-Zahrani and Al-Salami and after their deaths, and in fact introduced still more restrictive policies.

193.     Decisions and acts by Defendants ordering, authorizing, implementing, facilitating, encouraging, condoning, turning a blind eye to, acquiescing in, and/or committing the alleged acts reached from the highest levels of the government down the military chain of command.  On

information and belief, approval for prolonged arbitrary detention, acts of torture, cruel, inhuman or degrading treatment, deprivations of due process, and denial of adequate medical care emanated under color of law from orders, approvals, and omissions occurring in the Pentagon, numerous government agencies headquartered in the District of Columbia, and the offices of Defendant Rumsfeld.

194.    Defendants intended, knew, or should have known that the practices they ordered, authorized, mandated, implemented, encouraged, condoned, acquiesced in, turned a blind eye to, had command responsibility for, and/or directly or indirectly implemented violated clearly established international and domestic law.  Further, Defendants failed in their duties to investigate, prevent, and punish violations of international and domestic law committed by members of the U.S. military, and/or persons or groups acting in concert with them.  These acts and omissions were outside the scope of their lawful authority.  Through Defendants' actions, omissions, and failures of command, they created a climate of impunity in which subordinate soldiers and other agents were given a green light to terrorize detainees and carry out atrocious acts of torture, cruel, inhuman or degrading treatment, and deprivations of due process.

195.    Co-Defendant Does 1-100 implemented the prolonged arbitrary detention, torture, cruel, inhuman or degrading treatment, and deprivations of due process, and failed to act according to appropriate standards of medical care.

196.    At all relevant times, the named Defendants and the Doe Defendants did act in concert with the intent to punish and/or disadvantage Messrs. Al-Zahrani and Al-Salami by subjecting them to prolonged arbitrary detention, torture, cruel, inhuman or degrading treatment, deprivations of due process, and denial of adequate medical care.

197.    Defendants are liable for their alleged conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided

and abetted, and/or conspired together in bringing about the prolonged arbitrary detention, physical and psychological torture and abuse, and other mistreatment of Messrs. Al-Zahrani and Al-Salami as described above.

## INJURIES

198.     Because of the wrongful acts of the Defendants, as set forth above and herein, Mr. Al-Salami and Mr. Al-Zahrani, their estates, and/or their families were caused the following injuries, among others:

a.   Physical injuries;

b.   Emotional and psychological injuries;

c.   Death;

d.   Loss of earnings and earning capacity;

e.   Loss of interfamilial relations;

f.   Medical expenses, past and future.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### (Alien Tort Claims Act: Prolonged Arbitrary Detention against "U.S. officials" in their individual capacity)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

199.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

200.    The acts described herein constitute prolonged arbitrary detention of Messrs. Al-Salami and Al-Zahrani in violation of the law of nations and are actionable under the Alien Tort Claims Act 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

201.    Defendants are liable for said conduct in that they, acting under color of law and their authority as federal officers and/or in concert with U.S. officials, committed, directed, ordered, confirmed, ratified, had command responsibility for, aided and abetted, conspired to, and/or directly or indirectly participated in bringing about the prolonged arbitrary detention of Messrs. Al-Salami and Al-Zahrani.  Defendants intended, knew or should have known, that prolonged arbitrary detention was being enforced by their subordinates and failed to prevent those abuses or punish those responsible.

202.    As a matter of state policy, Defendants practiced, encouraged, and condoned prolonged arbitrary detention of Messrs. Al-Salami and Al-Zahrani in Guantanamo for over four years until they died.  The deceased were detained for over two years before their status was first reviewed by a flawed CSRT.  After their CSRTs were held, and despite the fact that no charges were pursued against them, the deceased continued to be detained by Defendants without any basis.

57

Furthermore, the deceased did not have access to counsel or an impartial tribunal throughout the entire duration of their detention.

203.     The civilized world accepts as binding customary international law a principle against prolonged arbitrary detention, as recognized by the U.S. Supreme Court. *Sosa v. Alvarez-Machain,* 542 U.S. 692, 737 U.S. (2004) (holding that a claim of arbitrary detention as a violation of customary international law requires a factual basis beyond relatively brief detention in excess of positive authority).

204.     As a result of the Defendants' unlawful conduct, Messrs. Al-Salami and Al-Zahrani were deprived of their freedom, separated from their families, and forced to suffer severe physical and mental abuse, all of which contributed to their deaths.

205.     Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## SECOND CLAIM FOR RELIEF

**(Alien Tort Claims Act: Torture against "U.S. officials" in their individual capacity)**

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

206.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

207.     The acts described herein constitute torture in violation of the law of nations and are actionable under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

208.     Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, committed, ordered, acquiesced, confirmed, ratified, had command responsibility for, aided and abetted, and/or conspired together to bring about the torture of Messrs.

Al-Zahrani and Al-Salami. The defendants intended, knew or should have known, that the torture was being committed by their subordinates and failed to prevent those abuses or punish those responsible.

209.    As described herein, upon information and belief, the Defendants intentionally inflicted severe mental and physical pain and suffering on Messrs. Al-Salami and Al-Zahrani for purposes which included, among others, obtaining third person information and/or confessions, punishing them for acts they were suspected of having committed, and intimidating them.

210.    These acts include, *inter alia*, sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, force-feeding, desecration of their religion, denial of adequate medical care, and being subjected to mockery and degrading comments.

211.    Torture is universally condemned as a violation of customary international law, as reflected in various international human rights instruments such as the Universal Declaration of Human Rights, Art. 5; the International Covenant on Civil and Political Rights, Art. 7; the European Convention on Human Rights, Art. 3; the American Convention on Human Rights, Art. 5(2); the African Charter on Human and People's Rights, Art. 5; and the Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment, Art.3.

212.    The United States is a party to the International Covenant on Civil and Political Rights (signed on October 5, 1977 and ratified on June 8, 1992) and the Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment (signed on April 18, 1988 and ratified on October 21, 1994).

213.    Defendants' unlawful conduct was intended to and had the effect of grossly humiliating and debasing Messrs. Al-Salami and Al-Zahrani and forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and psychological

59

resistance. Over time, Defendants' repeated infliction of such treatment on Messrs. Al-Salami and Al-Zahrani contributed to their complete physical, mental and emotional breakdowns, and ultimate deaths.

214.     Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### THIRD CLAIM FOR RELIEF

### (Alien Tort Claims Act: Cruel, Inhuman or Degrading Treatment or Punishment against "U.S. officials" in their individual capacity

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

215.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

216.     The acts described herein constitute cruel, inhuman or degrading treatment or punishment in violation of the law of nations and are actionable under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment or punishment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

217.     Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, committed, ordered, acquiesced, confirmed, ratified, had command responsibility for, aided and abetted, and/or conspired together in bringing about the cruel, inhuman and degrading treatment of Messrs. Al-Salami and Al-Zahrani. Defendants intended, knew or should have known, that these abuses were being committed by their subordinates and failed to prevent those abuses or punish those responsible.

218.     As described herein, upon information and belief, the Defendants intentionally inflicted severe mental and physical pain and suffering on Messrs. Al-Salami and Al-Zahrani for

purposes which included, among others, obtaining third person information and/or confessions, punishing them for acts they were suspected of having committed, and intimidating them.

219.    These acts include, *inter alia*, sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, forced feeding, desecration of their religion, denial of adequate medical care, and being subjected to mockery and degrading comments.

220.    The infliction by state actors of cruel, inhuman or degrading treatment is considered a violation of customary international law and is widely prohibited in a variety of international human rights instruments, including the Universal Declaration of Human Rights (Art.5), the International Covenant on Civil and Political Rights (Art.7), as well as under the Convention Against Torture and other Cruel, Inhuman or Degrading Punishment (Art.16).

221.    The United States is a party to the International Covenant on Civil and Political Rights (signed on October 5, 1977 and ratified on June 8, 1992) and the Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment (signed on April 18, 1988 and ratified on October 21, 1994).

222.    Defendants' unlawful conduct was intended to and had the effect of grossly humiliating and debasing Messrs. Al-Salami and Al-Zahrani and forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and psychological resistance.  Over time, the government's repeated infliction of such treatment on Messrs. Al-Salami and Al-Zahrani contributed to their complete physical, mental and emotional breakdowns, and ultimate deaths.

223.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

# FOURTH CLAIM FOR RELIEF

## (Alien Tort Claims Act: Violation of Geneva Conventions against "U.S. officials" in their individual capacity)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

224.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

225.     The acts described herein constitute torture, cruel, humiliating and degrading treatment, and prolonged arbitrary detention in violation of the law of nations and are actionable under the Alien Tort Claims Act, 28 U.S.C. § 1350 in that the acts violated customary international law prohibiting torture, cruel, humiliating and degrading treatment, and prolonged arbitrary detention as reflected, expressed, and defined in the Geneva Conventions, in particular Common Article 3 of the Third and Fourth Geneva Conventions.

226.     Defendants are liable for said conduct in that Defendants set the conditions, directly and/or indirectly facilitated, committed, ordered, acquiesced, confirmed, ratified, had command responsibility for, aided and abetted, and/or conspired together to commit violations of the Geneva Conventions and customary international law. Defendants intended, knew or should have known, that these abuses were being committed by their subordinates and failed to prevent those abuses or punish those responsible.

227.     Defendants intentionally inflicted both physical and mental torture, cruel, humiliating and degrading treatment, and prolonged arbitrary detention on Messrs. Al-Salami and Al-Zahrani throughout their four years of detention in Guantanamo, all of which were direct violations of the Geneva Conventions and violations of customary international law.

228.     As described in preceding paragraphs, these acts include, *inter alia*, sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold

temperatures, continued solitary confinement, forced feeding, desecration of their religion, denial of adequate medical care, and being subjected to mockery and degrading comments. Messrs. Al-Salami and Al-Zahrani were also subjected to more than four years of arbitrary detention without access to counsel or impartial tribunals or notice of the basis for their detention. Mr. Al-Salami was continuously held at Guantanamo for years even after a determination that he would not be prosecuted.

229. Torture, cruel treatment, arbitrary detention, and humiliating and degrading treatment are prohibited by Common Article 3 of the Third and Fourth Geneva Conventions.

230. The United States is a party to the Geneva Conventions (signed on August 12, 1949 and ratified on February 8, 1955).

231. Common Article 3 provides the minimum protections that must be respected by all individuals within a signatory's territory during an armed conflict not of an international character, regardless of a prisoner's citizenship and even in the absence of being classified as a prisoner of war.

232. Messrs. Al-Salami and Al-Zahrani were entitled to the basic and fundamental protections of Common Article 3 for humane treatment during their detention.

233. As a result of Defendants' unlawful conduct in violation of the Geneva Conventions and customary international law, Messrs. Al-Salami and Al-Zahrani suffered complete physical, mental and emotional breakdowns, and ultimately death.

234. Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

# FIFTH CLAIM FOR RELIEF

## (U.S. Constitution, Eighth Amendment: Cruel and Unusual Punishment against "U.S. officials" in their individual capacity)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

235. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

236. Defendants' actions, as alleged herein, constitute cruel and unusual punishment of Messrs. Al-Zahrani and Al-Salami in violation of the Eighth Amendment of the United States Constitution.

237. As described in preceding paragraphs, Defendants subjected Messrs. Al-Salami and Al-Zahrani for over four years to a continuous regime of prolonged arbitrary and inhumane detention, torture, and physical and psychological abuse. The men were subjected to, *inter alia*, sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, forced-feeding, desecration of their religion, denial of adequate medical care, and mockery and humiliation. They were held without charge, without notice of the basis for their detention, without access to counsel or impartial tribunals, and without knowing whether or when their detention would end. None of this treatment was imposed for any legitimate penological purpose.

238. On information and belief, as alleged herein, Defendants subjectively knew that detainees at Guantanamo suffered a substantial risk of serious harm and self-harm, and that Messrs. Al-Salami and Al-Zahrani were at risk of committing acts of self-harm that rose to the level of being fatal. Indeed, Defendants specifically designed, planned and intended for the system of indefinite detention and torture at Guantanamo to break detainees physically and psychologically and to result in serious harm. Despite being subjectively aware of the life-threatening risk of self-

harm to which Messrs. Al-Salami and Al-Zahrani were exposed, Defendants failed to take reasonable steps to abate the risk. Instead, they knowingly and unreasonably disregarded an objectively intolerable risk of harm to Messrs. Al-Salami and Al-Zahrani's safety. *See Farmer v. Brennan,* 511 U.S. 825 (1994).

239.    Defendants were acting under color of law of the United States at all times pertinent to the allegations set forth above.

240.    Defendants are liable for their alleged conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted, and/or conspired together in bringing about the prolonged arbitrary detention, physical and psychological torture and abuse, and other mistreatment of Messrs. Al-Zahrani and Al-Salami as described above.

241.    Defendants are further liable for their conscious disregard of the excessive risk of serious harm to the health and safety of Messrs. Al-Salami and Al-Zahrani that existed at Guantanamo.

242.    As a result of Defendants' unconstitutional conduct, Messrs. Al-Zahrani and Al-Salami suffered complete physical, mental and emotional breakdowns, and ultimately death.

243.    Plaintiffs are entitled to compensatory and punitive damages and other relief to be determined at trial.

### SIXTH CLAIM FOR RELIEF

### (U.S. Constitution, Fifth Amendment: Due Process against "U.S. Officials" in their individual capacity

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

244.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

245.     Defendants' actions alleged herein deprived Messrs. Al-Zahrani and Al-Salami of their protected life and liberty interests in violation of the Fifth Amendment of the United States Constitution.

246.     As described above, Defendants subjected Messrs. Al-Salami and Al-Zahrani to prolonged arbitrary and baseless detention without charge for more than four years, with no reasonably foreseeable end.  Defendants prohibited Messrs. Al-Salami and Al-Zahrani from consultation with counsel and access to impartial tribunals to challenge the fact and conditions of their confinement.  Throughout this time, Defendants subjected Messrs. Al-Salami and Al-Zahrani to physical and psychological torture and abuse, including sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, forced-feeding, desecration of their religion, denial of adequate medical care, and mockery and degrading comments.

247.     Despite the fact that Mssrs. Al-Salami and Al-Zahrani had not been adjudicated guilty of any crime in accordance with due process of law and therefore were not subject to punishment, their conditions of confinement amounted to punishment by the government.  *Bell v. Wolfish*, 441 U.S. 520 (1979).

248.     Defendants' treatment of Messrs. Al-Salami and Al-Zahrani was without legitimate penological purpose, but rather imposed as punishment to overcome their will in aid of interrogation.

249.     Defendants' actions deprived Messrs. Al-Salami and Al-Zahrani of their liberty in direct violation of their substantive and procedural due process rights under the Fifth Amendment.

250.     Defendants were acting under color of law of the United States at all times pertinent to the allegations set forth above.

251.    Defendants are liable for said conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted, and/or conspired together in bringing about the prolonged arbitrary detention, physical and psychological torture and abuse and other mistreatment of Messrs. Al-Salami and Al-Zahrani as described above.

252.    Messrs. Al-Salami and Al-Zahrani suffered severe physical and mental injuries as a result of Defendants' violations of the Fifth Amendment, all of which contributed to their deaths. They have also suffered economic injuries.

253.    Plaintiffs are entitled to compensatory and punitive damages and other relief to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### (Federal Tort Claims Act: Negligence – Failure to Protect from Harm against Defendant United States) (Non-jury claim)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

254.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

255.    Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

256.    Upon information and belief, from 2002 until their deaths on June 10, 2006, Messrs. Al-Salami and Al-Zahrani were in the exclusive custody of Defendant United States and its agents, who were acting under color of law and their authority as federal officers.

257.    Defendant's agents, by virtue of holding Messrs. Al-Salami and Al-Zahrani in their exclusive custody, had a special relationship to the men and a duty of reasonable care to protect them from harm, including self-inflicted harm.

258.     Defendant's agents, in establishing, monitoring and implementing the policies for the Guantanamo Bay detention facility where Messrs. Al-Salami and Al-Zahrani were held, intended to create a stress and pain-inducing environment for the purposes of coercing and breaking down the physical and mental resistance of detainees.

259.     Self-harm and suicide attempts by detainees at Guantanamo were numerous, well-documented and expressly noted by prison officials prior to the deaths of Messrs. Al-Salami and Al-Zahrani, and put Defendant's agents on notice that detainees were at serious risk of committing acts of self harm.  Defendant's agents further knew or should have known that Messrs. Al-Salami and Al-Zahrani were specifically at risk based on health evaluations and documented incidents and indications of self-harming tendencies throughout Messrs. Al-Salami and Al-Zahrani's detention, as alleged herein.

260.     Defendant's agents breached their duty to protect Messrs. Al-Salami and Al-Zahrani from self-harm by failing to act with ordinary diligence or take reasonable precautions in response to numerous and specific warning signs, as alleged herein.

261.     Defendant's agents, aware that their policies and practices of torture and prolonged arbitrary, indefinite and incommunicado detention at Guantanamo had driven detainees to the point of attempting to take their own lives, maintained those same policies and practices throughout the detention of Messrs. Al-Salami and Al-Zahrani and after their deaths and, on information and belief, continue to maintain such policies and practices to the present day.

262.     As a direct and proximate cause of the Defendant's agents' negligent failure to keep Messrs. Al-Salami and Al-Zahrani safe and free from harm at Guantanamo, including self-inflicted harm, Messrs. Al-Salami and Al-Zahrani ultimately lost their lives.

263.     The actions of Defendant's agents, as alleged herein, constitute negligence under the applicable law of the place where the relevant acts took place.

264. Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

### (Federal Tort Claims Act: Negligence – Medical Negligence against Defendant United States) (Non-jury claim)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

265. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

266. Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

267. Upon information and belief, from 2002 until their deaths on June 10, 2006, Messrs. Al-Salami and Al-Zahrani were in the exclusive custody the United States and its agents, who were acting under color of law and their authority as federal officers.

268. Defendant's agents, by virtue of holding Messrs. Al-Salami and Al-Zahrani in their exclusive custody, as well as undertaking to provide physical and mental health services necessary for the men's protection, including emergency medical services, had a special relationship to the men and a duty of reasonable care in administering their medical care.

269. Defendant's agents breached their duty of care to Messrs. Al-Salami and Al-Zahrani by failing to provide effective medical care necessary for their physical and psychological well-being while they were alive, and by failing to respond with competent emergency medical care the night the men died, as alleged herein.

270. As a direct and proximate result of Defendant's agents' negligent acts and omissions, Messrs. Al-Salami and Al-Zahrani suffered severe mental and physical injuries and ultimately died.

271. The actions of Defendant's agents, as alleged herein, constitute negligence under the applicable law of the place where the relevant acts took place.

272.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## NINTH CLAIM FOR RELIEF

### (Federal Tort Claims Act: Negligence – Medical Malpractice against Defendant United States) (Non-jury claim)

*Messrs. Al-Zahrani, Sr. and Al-Salami, Sr. in their capacities as representatives of the estates of Messrs. Al-Zahrani and Al-Salami*

273.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

274.    Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

275.    Upon information and belief, from 2002 until their deaths on June 10, 2006, Messrs. Al-Zahrani and. Al-Salami were in the exclusive custody the United States and its agents, who were acting under color of law and their authority as federal officers.

276.    At all times herein, Defendant's agents did owe to Messrs. Al-Zahrani and Al-Salami the following duties and obligations, as mandated by the acknowledged and recognized standard of care that prevailed in the psychiatric and psychological professions:

1) Knowing or being under a duty to know that Messrs. Al-Zahrani and Al-Salami were at significant risk for self-harm, to order and maintain a constant observation and watch over the men so as to prevent self-harm attempts and/or immediately intervene in the event of their occurrence;

2) Knowing or being under a duty to know that Messrs. Al-Zahrani and Al-Salami were at significant risk of self-harm, to adequately train and supervise correctional and custodial personnel to be vigilant and highly observant so as to prevent all self-harm attempts, and to intervene immediately in the event of any such attempt so as to minimize all physical injury and prevent death;

3) Knowing or being under a duty to know that Messrs. Al-Zahrani and Al-Salami were at significant risk of self-harm, to ensure that there were professional medical personnel, trained in emergency medicine, so as to treat the men in the event of any medical emergency, in particular an attempted suicide; and

4) Knowing or being under a duty to know that Messrs. Al-Zahrani and Al-Salami were at considerable risk of self-harm, to ensure that the necessary medical equipment was ready, available and accessible at all times for custodial and emergency medical personnel to treat the men in the event of a suicide attempt.

277. At all times herein, Defendant's agents did owe to Messrs. Al-Zahrani and Al-Salami the following duties and obligations, as mandated by the acknowledged and recognized standard of care that prevailed in the psychiatric and psychological professions:

1) Knowing that Messrs. Al-Zahrani and Al-Salami had been subjected to indefinite detention without any authentic provision of due process, and knowing that the men were also subjected to physical and psychological torture and abuse not limited to sleep deprivation, continued solitary confinement, stress positions, extremes of temperature, religious interference and abuse, forced-feeding, and abusive interrogations, to recognize and address the enormous risk for severe depression and/or other affective and psychiatric disorders in the men, as posed by the aforementioned circumstances;

2) Knowing that Messrs. Al-Zahrani and Al-Salami had been subjected to indefinite detention without any authentic provision of due process, and knowing that the men were also subjected to physical and psychological torture and abuse not limited to sleep deprivation, continued solitary confinement, stress positions, extremes of temperature, religious interference and abuse, forced-feeding, and abusive interrogations, to recognize and diagnose the actual signs and symptoms of severe depression and/or other affective and psychiatric disorders in the men, as caused by the aforementioned circumstances;

3) Knowing that Messrs. Al-Zahrani and Al-Salami had been subjected to indefinite detention without any authentic provision of due process, and knowing that they were also subjected to physical and psychological torture and abuse not limited to sleep deprivation, continued solitary confinement, stress positions, extremes of temperature, religious interference and abuse, forced-feeding, and abusive interrogations, to treat the actual signs and symptoms of severe depression and/or other affective and psychiatric disorders in the men, as caused by the aforementioned circumstances;

4) Knowing that Messrs. Al-Zahrani and Al-Salami had been subjected to indefinite detention without any authentic provision of due process, and knowing that they were also subjected to physical and psychological torture and abuse not limited to sleep deprivation, continued solitary confinement, stress positions, extremes of temperature, religious interference and abuse, forced-feeding, and abusive interrogations, to demand that the aforementioned treatment cease immediately due to the fact that it posed a severe danger and risk to the men of severe depression and/or other affective and psychiatric disorders likely to result in serious self-harm attempts; and

5) Knowing that Messrs. Al-Zahrani and Al-Salami had been subjected to indefinite detention without any authentic provision of due process, and knowing that they were also subjected to physical and psychological torture and abuse not limited to sleep deprivation, continued solitary confinement, stress positions, extremes of temperature, religious interference and abuse, forced-feeding, and abusive interrogations, to undertake the measures set forth in Paragraph 276, above, in light of the signs and symptoms of severe depression and/or other affective and psychiatric disorders, and/or the diagnosis thereof, in the men, as caused by the aforementioned circumstances.

278.    As alleged herein, Defendant's agents breached their professional duty of care to Messrs. Al-Zahrani and Al-Salami by failing to recognize and treat the men's psychological risks, conditions and needs while they were alive, and by failing to respond adequately with emergency medical care the night they died.

279.    As a direct and proximate result of the failures and omissions of Defendant's agents as medical professionals, Messrs. Al-Zahrani and Al-Salami suffered serious psychological and physical injuries and ultimately died.

280.    The actions of Defendant's agents, as alleged herein, constitute negligence under the applicable law of the place where the relevant acts took place.

281.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## TENTH CLAIM FOR RELIEF

### (Federal Tort Claims: Intentional Infliction of Emotional Distress against Defendant United States) (Non-jury claim)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani*

282.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

283.    Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

284. Defendant United States' agents deliberately subjected Messrs. Al-Salami and Al-Zahrani to a continuous regime of prolonged arbitrary and inhuman detention at Guantanamo for over four years. The men were subjected, *inter alia*, to sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, forced feeding, abuse of their religion, denial of adequate medical care, and mockery and degrading comments. They were held without charge, without notice of the basis for their detention, without access to counsel or impartial tribunals, and without knowing whether or when their detention would end.

285. The actions of Defendant's agents against Messrs. Al-Salami and Al-Zahrani, as alleged herein, rise to the level of extreme and outrageous conduct.

286. As stated above, Defendant's agents engaged in this conduct intentionally or with reckless disregard for the consequences of their actions on Messrs. Al-Salami's and Al-Zahrani's health and well-being.

287. As a direct and proximate result of the foregoing, Messrs. Al-Salami and Al-Zahrani suffered severe emotional distress, as ultimately confirmed by their deaths. They have also suffered damages in an amount to be established according to proof.

288. The actions of Defendant's agents, as alleged herein, constitute intentional emotional distress under the applicable law of the place where the relevant acts took place.

289. Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

# ELEVENTH CLAIM FOR RELIEF

## (Federal Tort Claims Act: Battery – Forced-feeding against
## Defendant United States) (Non-jury claim)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their capacity as representatives of
the estates of Messrs. Al-Salami and Al-Zahrani*

290.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs
of this Complaint as if fully set forth herein.

291.    Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were
timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

292.    Upon information and belief, from 2002 until their deaths on June 10, 2006, Messrs.
Al-Salami and Al-Zahrani were in the exclusive custody of the United States and its agents, who
were acting under color of law and their authority as federal officers.

293.    Defendant United States and its agents intentionally engaged in conduct that
amounted to violent and offensive contact with the persons of Messrs. Al-Salami and Al-Zahrani by
forcibly inserting tubes in their nostrils and down their throats, restraining their arms and legs, and
pumping liquid food substances into their stomachs while they were on hunger strike.

294.    The actions of Defendant's agents were against the will and consent of Messrs. Al-
Salami and Al-Zahrani, as illustrated by the fact that, in order to "feed" the men and prevent them
from inducing vomiting of the administered liquid substances, Defendant's agents had to forcibly
strap them in chairs and restrain their arms and legs.

295.    The conduct of Defendant's agents was not otherwise privileged.

296.    As a direct and proximate result of the conduct of Defendant's agents, Messrs. Al-
Salami and Al-Zahrani suffered severe physical and emotional injuries, including internal
inflammation, infection and bleeding, and mockery and humiliation.

297.    The actions of Defendant's agents, as alleged herein, constitute battery under the

applicable law of the place where the relevant acts took place.

298.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## TWELFTH CLAIM FOR RELIEF

### (Federal Tort Claims Act:  Intentional Infliction of Emotional Distress against Defendant United States) (Non-jury claim)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their individual capacities*

299.    Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

300.    Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

301.    Defendant United States and its agents, in their treatment of the deceased and their callous response to their deaths as alleged herein, intentionally, recklessly and with deliberate disregard for the effects of their actions caused severe emotional distress to Plaintiffs, including by, *inter alia*, arbitrarily detaining Plaintiffs' sons for over four years and depriving them of regular communication with their families; returning the bodies of the deceased to Plaintiffs in a shocking and unexplained state, including with bruising, burns and missing body parts; ignoring Plaintiffs' repeated requests for an explanation for the condition in which their sons' bodies were returned; refusing to return certain body parts of the deceased or to answer questions posed by independent medical examiners, thereby preventing Plaintiffs from seeking independent autopsies; failing to return the bodies of the deceased to Plaintiffs in time for proper Islamic burials; publicly defaming Plaintiffs' sons after their deaths; failing to provide any official findings or confirmation of the cause and circumstances of the deaths until two years after they occurred; and failing to provide a complete and accurate report when the U.S. government's conclusions regarding the deaths were finally issued.

302.     As a result of the conduct of Defendant's agents as alleged herein, on information and belief, Plaintiffs have suffered and continue to suffer severe emotional distress, as manifested by serious physical and emotional difficulties.

303.     As a further result of the conduct of Defendant's agents as alleged herein, on information and belief, Plaintiffs have incurred and continue to incur medical expenses, past and future for the treatment of their severe emotional distress

304.     The actions of Defendant's agents, as alleged herein, constitute intentional emotional distress under the applicable law of the place where the relevant acts took place.

305.     Plaintiffs are accordingly entitled to monetary damages and other relief to be determined at trial.

## THIRTEENTH CLAIM FOR RELIEF

### (Federal Tort Claims Act: Negligent Infliction of Emotional Distress against Defendant United States) (Non-jury claim)

*Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. in their individual capacities*

306.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

307.     Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

308.     Upon information and belief, from 2002 until their deaths on June 10, 2006, Messrs. Al-Salami and Al-Zahrani were in the exclusive custody of the United States and its agents, who were acting under color of law and their authority as federal officers.

309.     Upon the deaths of Messrs. Al-Salami and Al-Zahrani, Defendant United States and its agents had a duty to honor the requests of Plaintiffs for the timely return of their sons' bodies, and to use reasonable care in handling the bodies.

310.     Plaintiffs, as the next of kin of the deceased, had the right to have their son's bodies returned to them in the condition in which they were left at death and to bury them without interference.

311.     Defendant's agents' treatment of the bodies of Messrs. Al-Salami and Al-Zahrani, and their callous response to the men's deaths fell below the standard of reasonable care they were under a duty to provide.  Defendant's agents breached their duty of care by, *inter alia*, conducting autopsies on the deceased without Plaintiffs' authorization; ignoring the repeated requests of Plaintiffs for an explanation regarding the condition in which their sons' bodies were returned; refusing to return certain body parts of the deceased or to answer questions posed by independent medical examiners, thereby preventing Plaintiffs from seeking independent autopsies; and failing to return the bodies of the deceased to Plaintiffs in time for proper Islamic burials.

312.     Defendant United States and its agents, further breached their duties by, *inter alia*, failing to inform Plaintiffs of their sons' deaths despite knowing that news of the deaths would be circulated by international media; publicly defaming Plaintiffs' sons after their deaths; failing to provide any official findings or confirmation of the cause and circumstances of the deaths until two years after they occurred; failing to provide a complete and accurate report when the U.S. government's conclusions regarding the deaths were finally issued.

313.     Defendant United States' agents knew or should have known that their conduct, as alleged herein, created an unreasonable risk of causing distress to Plaintiffs, and that such distress might further result in physical or emotional harm.

314.     As a direct and proximate result of the negligent acts and omissions of Defendant's agents as alleged herein, on information and belief, Plaintiffs have suffered and continue to suffer severe emotional distress, as manifested by serious physical and emotional difficulties.

315. As a further direct and proximate result of the conduct of Defendant's agents as alleged herein, on information and belief, Plaintiffs have incurred and continue to incur medical expenses, past and future for the treatment of their severe emotional distress.

316. The actions of Defendant's agents, as alleged herein, constitute negligent infliction of emotional distress under the applicable law of the place where the relevant acts took place.

317. Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

## FOURTEENTH CLAIM FOR RELIEF

### (Federal Tort Claims Act – Wrongful Death against Defendant United States) (Non-jury claim)

*Mr. Al-Salami, Sr. and Al-Zahrani, Sr., in their capacity as representatives of the estates of Messrs. Al-Salami and Al-Zahrani, and in their individual capacities as beneficiaries of the estates of their sons*

318. Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

319. Pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675(a), Plaintiffs' claims were timely presented to the Department of Defense on June 10, 2008, and were denied on July 8, 2008.

320. On information and belief, Messrs. Al-Salami, Sr. and Al-Zahrani, Sr. are the proper administrators of the estates of their sons.

321. From 2002 and until their deaths on June 10, 2006, Messrs. Al-Salami and Al-Zahrani were detained in the exclusive control of Defendant United States and its agents.

322. The deaths of Messrs. Al-Zahrani and Al-Salami were proximately caused by the United States in failing to provide the men with adequate care and protection during their detention at Guantanamo.

323. The negligence of Defendant's agents, as alleged herein, is actionable under the applicable law of the place where the relevant acts took place.

324. Messrs. Al-Salami and Al-Zahrani are survived by their fathers, Plaintiffs Al-Salami, Sr. and Al-Zahrani, Sr., who were dependent on their sons for support, guidance, comfort, solace, advice, protection and, in the case of Mr. Al-Salami, Sr., the maintenance of his business.

325. By reason of the deaths of Messrs. Al-Zahrani and Al-Salami, Plaintiffs and decedents' next of kin have sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that the Court enter a judgment:

1. Declaring that Defendants' actions, practices, customs, and policies, and those of all of their agents, employees and persons acting on their behalf were illegal and violated the rights of Plaintiffs and Messrs. Al-Zahrani and Al-Salami as to each applicable claim;

2. Declaring that Messrs. Al-Salami and Al-Zahrani's detention, treatment and conditions of confinement at Guantanamo, as well as Defendants' response to their deaths, were unjustified, unlawful and in violation of the rights of Messrs. Al-Salami and Al-Zahrani, and of Plaintiffs' rights;

3. Awarding compensatory damages in an amount that is fair, just and reasonable, including reasonable attorneys' fees;

4. Awarding exemplary and punitive damages as to all Defendants except Defendant United States;

5. Ordering such further relief as the Court considers just and proper.

Dated:      New York, New York
                 January 29, 2009

                               Respectfully submitted,

                               _____

Pardiss Kebriaei (Pursuant to LCvR 83.2(g))
Shayana Kadidal (D.C. Bar No. 454248)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6452
Fax: (212) 614-6499
pkebriaei@ccrjustice.org


                               _____

Meetali Jain (Pursuant to LCvR 83.2(g))
International Human Rights Law Clinic
American University
WASHINGTON COLLEGE OF LAW
4801 Massachusetts Ave. NW
Washington D.C. 20016
Tel: (202) 274-4147
Fax: (202) 274-0659
mjain@wcl.american.edu


*Counsel for Plaintiffs*

## VERIFICATION

Counsel for Plaintiffs declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge, information, and belief.

Executed:     January 29, 2009

Pardiss Kebriaei (Pursuant to LCvR 83.2(g))
Shayana Kadidal (D.C. Bar No. 454248)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6452
Fax: (212) 614-6499
pkebriaei@ccrjustice.org

Meetali Jain (Pursuant to LCvR 83.2(g))
International Human Rights Law Clinic
WASHINGTON COLLEGE OF LAW
4801 Massachusetts Ave, NW
Washington, DC 20016
Tel: (202) 274-4175
Fax: (202) 274-0659
mjain@wcl.american.edu

*Counsel for Plaintiffs*

## CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION

This certifies that I, PARDISS KEBRIAEI, staff attorney at the Center for Constitutional

Rights, am an attorney in good standing of the Bar of the State of New York (No. 4344438).  I am

providing representation without compensation to Plaintiffs, who are indigent, pursuant to LCvR

83.2(g) of the United States District Court of the District of Columbia.  I am familiar with the Local

Rules of this Court, the provisions of the Judicial Code (Title 28 U.S.C.) which pertain to the

jurisdiction of and practice in United States District Courts, the Federal Rules of Civil Procedure,

the Federal Rules of Evidence, the Rules of Professional Conduct, and the District of Columbia Bar

Voluntary Standards for Civility in Professional Conduct.

I certify under penalty of perjury that the foregoing is true and correct.

Executed:      January 29, 2009

Pardiss Kebriaei (Pursuant to LCvR 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6452
Fax: (212) 614-6499
pkebriaei@ccrjustice.org

# CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION

This certifies that I, MEETALI JAIN, Practitioner-In-Residence at the Washington College of Law, am an attorney in good standing of the Bar of the State of California (Bar No. 214237). I am providing representation without compensation for Plaintiffs, who are indigent, pursuant to LCvR 83.2(g) of the United States District Court of the District of Columbia. I am familiar with the Local Rules of this Court, the provisions of the Judicial Code (Title 28 U.S.C.) which pertain to the jurisdiction of and practice in United States District Courts, the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Rules of Professional Conduct, and the District of Columbia Bar Voluntary Standards for Civility in Professional Conduct.

I certify under penalty of perjury that the foregoing is true and correct.

Executed:      January 29, 2009

_____
Meetali Jain (Pursuant to LCvR 83.2(g))
International Human Rights Law Clinic
WASHINGTON COLLEGE OF LAW
4801 Massachusetts Ave, NW
Washington, DC 20016
Tel: (202) 274-4175
Fax: (202) 274-0659
mjain@wcl.american.edu