# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TALAL AL-ZAHRANI, *et al.*,

Plaintiffs,

v.

DONALD RUMSFELD, *et al.*
and

UNITED STATES,

Defendants.

Case No. 09-cv-00028 (ESH)

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO INDIVIDUAL DEFENDANTS' AND UNITED STATES' MOTIONS TO DISMISS AND UNITED STATES' MOTION TO SUBSTITUTE**

CENTER FOR CONSTITUTIONAL RIGHTS
Pardiss Kebriaei (pursuant to LCvR 83.2(g))
Shayana Kadidal (D.C. Bar No. 454248)
Josh Rosenthal (pursuant to LCvR 83.2(g))
Taina Gomez (law graduate)
Somil Trivedi (law graduate)
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6452
Fax: (212) 614-6499

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

FACTUAL BACKGROUND ...................................................................2

ARGUMENT .........................................................................................4

I.   MCA SECTION 7 DOES NOT DIVEST THIS COURT OF
     JURISDICTION .............................................................................4

     A.   Section 7 of the Military Commissions Act Has Already Been
          Voided by the Supreme Court as Unconstitutional .................4

     B.   The Only Determination of "Enemy Combatant" Status
          Was Facially Invalid ...............................................................7

     C.   The Text of Article III Prevents Congress from Foreclosing
          All Federal Jurisdiction over Federal Question Claims ...........10

     D.   The Due Process Clause Also Limits Congress' Power to
          Restrict Jurisdiction ...............................................................14

     E.   Application of MCA Section 7 Would Violate
          the Separation of Powers .........................................................18

     F.   Section 7 Is an Invalid Bill of Attainder ..................................20

II.  THE INDIVIDUAL DEFENDANTS DO NOT HAVE QUALIFIED
     IMMUNITY FROM SUIT .............................................................22

     A.   Decedents' Prolonged Arbitrary Detention, Torture and Cruel and
          Degrading Treatment Violated Their Fifth and Eighth
          Amendment Rights ...................................................................25

          1. Guantanamo Detainees Have Constitutional Rights ...........25

          2. The Conduct Alleged in the Complaint Violated the
             Fifth and Eighth Amendments..........................................29

     B.   Defendants Were on Notice of the Illegality of Their Conduct ......30

     C.   Defendants Were Personally Involved in the Violations of
          Decedents' Rights.....................................................................33

          1. The Twombly Plausibility Standard....................................34

Deleted: 5

Deleted: 9

Deleted: 3

Deleted: Plaintiffs'

Deleted: 1

Deleted: Plaintiffs'

Deleted: 4

2. Exclusive Government Control of Vital Evidence Militates against a Heightened Pleading Standard ...............................36

3. *Iqbal* Does Not Preclude the Liability of the Individual Defendants ...............................37

4. Plaintiffs Adequately Alleged the Personal Involvement of the Individual Defendants ...............................40

**III.  SPECIAL FACTORS DO NOT PRECLUDE THE COURT FROM RECOGNIZING PLAINTIFFS' BIVENS CLAIMS**...............................50

**IV.  PLAINTIFFS' INTERNATIONAL LAW CLAIMS ARE PROPERLY ASSERTED AGAINST THE INDIVIDUAL DEFENDANTS**...............................55

A. Defendants' Conduct Is Not within the Scope of Their Employment Even if State Law Applies ...............................57

B. Federal Common Law Applies to Scope of Employment Determinations ...............................60

C. Plaintiffs Are Entitled to Discovery Because the United States' Certification Raises a Factual Issue in Dispute ...............................63

D. Plaintiffs' ATS Claims Fall Squarely within the Statutory Exception to the Westfall Act ...............................64

**V.  THE GOVERNMENT'S MOTION TO DISMISS CLAIMS I TO IV AND VII TO XIV PURSUANT TO THE FTCA SHOULD BE DENIED** ...............................66

A. The United States Has Waived Sovereign Immunity with Respect to Plaintiffs' ATS Claims ...............................66

B. Claims I to IV and VII to XIV Are Not Barred by the Foreign Country Exception ...............................72

C. Venue in the District of Columbia is Proper ...............................78

D. Plaintiffs Have Properly Exhausted Their Remedies As Required by the FTCA ...............................79

**CONCLUSION**...............................81

Deleted: 8

Deleted: 1

Deleted: 6

Deleted: 5

Deleted: 7

Deleted: 3

Deleted: 2

# <u>INTRODUCTION</u>

This case is about accountability for the torture and arbitrary detention of two men who lost their lives in U.S. custody in Guantanamo Bay.  In 2009, nearly eight years after former Secretary of Defense Donald Rumsfeld and his advisors began planning for a site where they could indefinitely hold and test the limits of torture on men seized in the United States' global "war on terror," the current Administration is working to close Guantanamo.  But damage has been done, and not only to the credibility and standing of the United States.  Nearly 800 men were detained in Guantanamo at its peak, where they were held for years without any opportunity to know or challenge the reasons for their detention, in a system designed to break them physically and emotionally for the purpose of obtaining intelligence.  Their detention and treatment devastated their lives, their families and their communities, and violated the most fundamental laws and principles of this country and the international community.

The costs were especially high for the Plaintiffs in this case.  Yasser Al-Zahrani and Salah Al-Salami died in Guantanamo in June 2006, after being detained without charge or any fair review of their status, subjected to brutal acts of violence and held in conditions of numbing isolation for over four years.  Al-Zahrani was 17 years old when he was taken into U.S. custody and 22 when he died.  Mr. Al-Salami died at the age of 37.

The response of the 24 senior officials and military officers named as individual Defendants in this case has been to avoid and disclaim any and all responsibility for the deprivations Plaintiffs suffered.  Reduced to its essentials, the individual Defendants argue (1) with respect to Plaintiffs' constitutional claims, that Guantanamo continues to be a zone beyond the reach of federal courts and the constitutional protections Plaintiffs assert and, even if this Court does have jurisdiction to consider these claims, special "political" and "military" factors

counsel against a remedy, and Defendants are entitled to qualified immunity in any event; (2) with respect to Plaintiffs' claims under the Alien Tort Statute, that Defendants' participation in the torture and prolonged arbitrary detention of Plaintiffs was within the scope of Defendants' employment and, accordingly, they are absolutely immune from liability; and (3) with respect to Plaintiffs' claims under the Federal Tort Claims Act, as if the Supreme Court had not definitively held that Guantanamo is for all effective purposes U.S. territory, that Guantanamo is a foreign country not covered by the Act. As discussed below, none of these arguments provides grounds to dismiss Plaintiffs' Amended Complaint.

**FACTUAL BACKGROUND**

Yasser Al-Zahrani and Salah Al-Salami were detainees in the custody of the United States at the U.S. Naval Station in Guantanamo Bay, Cuba from early 2002 until their deaths on June 10, 2006. At the time of their deaths, they had been detained for over four years without charge or the most rudimentary aspects of process. Am. Compl. ¶ 82, 124. The only review they had ever received of their status was in 2004, more than two years after they were transferred to Guantanamo, by a Combatant Status Review Tribunal that was permitted to use secret evidence and evidence obtained through torture to determine whether they were properly detained. Am. Compl. ¶ 85, 128. While Al-Salami's family had retained lawyers for their son after *Rasul v. Bush*, 542 U.S. 466 (2004) established the right of detainees to challenge their detention in federal court, lengthy delays caused by the Department of Defense in confirming Al-Salami's identity prevented his lawyers from being able to meet with him prior to his death. Am. Compl. ¶ 132. Al-Salami died without knowing that he had a habeas case or legal representation. Am. Compl. ¶ 132. Al-Zahrani died without either as well. Am. Compl. ¶ 88.

During their detention, Al-Zahrani and Al-Salami were subjected to conditions and treatment the ICRC described as "tantamount to torture." Am. Compl. ¶ 74. In letters found after their deaths, they described, *inter alia*, being "ERF'd" by the military police squad in Guantanamo, sleep deprived for as long as 30 days, held in freezing cold or unbearably hot temperatures, subjected to humiliating and degrading body searches, prevented from practicing their religion without interference, forcibly shaved, and denied necessary medication. Am. Compl. ¶ 93, 136, 138.

At the time of their deaths, Al-Zahrani and Al-Salami had also been subjected to conditions of crushing isolation for four years, cut off from the outside world and their families, and separated even from other detainees. They spent the majority of each day confined alone in a small cell with numbingly little activity or stimuli and deprived of basic personal care items. Am. Compl. ¶ 57-59, 89, 91, 133-134 As one of the first detainees to arrive in Guantanamo, Al-Zahrani was held for the first few months of his detention in a small wire cage in Camp X-Ray. Am. Compl. ¶ 53, 90.

To protest their detention and conditions, both men participated in extended hunger strikes along with dozens of other detainees. Am. Compl. ¶ 96, 142-144. In response, individual Defendants developed a force-feeding policy intended to "deter" strikers, whereby detainees were strapped into "restraint chairs" – less euphemistically called by their manufacturer as "padded cells on wheels" – and had over a liter of formula pumped into their stomachs through a tube forced up their noses. Am. Compl. ¶ 69. Detainees including Al-Salami reported being mocked, humiliated and subjected to other forms of abuse during the "feeding" sessions. Am. Compl. ¶ 69, 96, 144.

The ICRC consistently put the individual Defendants on notice that detainees' circumstances and treatment amounted to torture and cruel treatment, and warned of the damaging effects on detainees. Am. Compl. ¶ 74. During their visits, the body regularly briefed individual Defendants about their findings and recommendations. Am. Compl. ¶ 74. In 2003, the ICRC reported that the system of holding detainees without allowing them to know their status was unacceptable and would lead to mental health problems. Am. Compl. ¶ 74. In 2004, they described the physical and psychological treatment of detainees as amounting to torture. Am. Compl. ¶ 74.

On June 10, 2006, Al-Zahrani and Al-Salami were reportedly found dead in their cells. Am. Compl. ¶ 101, 165. The same day, prior to conducting autopsies or an investigation, or contacting the families, the government announced the deaths as suicides by hanging. Certain individual Defendants called them "asymmetrical warfare" and "a good PR move."

## ARGUMENT

## I. MCA SECTION 7 DOES NOT DIVEST THIS COURT OF JURISDICTION

### A. Section 7 of the Military Commissions Act Has Already Been Voided by the Supreme Court as Unconstitutional

In *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), the Supreme Court invalidated Section 7 of the Military Commissions Act. Even if Plaintiffs' claims were properly determined to be covered by the terms of 28 U.S.C. § 2241(e)(2), the Supreme Court struck down § 2241(e) in full, without making any distinction between subsections (e)(1) and (e)(2). *See id*. at 2240 ("Therefore § 7 of the Military Commissions Act of 2006 (MCA), 28 U.S.C.A. § 2241(e) (Supp. 2007), operates as an unconstitutional suspension of the writ."); *id*. at 2275 ("The only law we identify as unconstitutional is MCA § 7, 28 U.S.C.A. § 2241(e) (Supp. 2007)."); *see also id*. at

2266. The Supreme Court stated plainly—and repeatedly—its intent to invalidate all of § 2241(e).

The Court's plain language is buttressed by the fact that § 2241(e)(2) could not withstand the invalidation of § 2241(e)(1). Section 2241(e)(1) is, by its own terms, not severable from § 2241(e)(2), as the Supreme Court recognized in noting that "[t]he phrase 'other action in §2241(e)(2) … cannot be understood without referring back to the paragraph that precedes it, § 2241(e)(1), which explicitly mentions the term 'writ of habeas corpus.'" *Boumediene*, 128 S. Ct. at 2243. Whether § 2241(e)(2) could be severed from the first portion of the statute is a question of whether the remaining portion "is fully operative as a law." *Alaska Airlines v. Brock*, 480 U.S. 678, 684 (1987) (internal citations omitted). As a simple textual matter, § 2241(e)(2), standing alone, is not fully operative as law.

In holding Section 7 unconstitutional in its entirety, the Supreme Court stated "In view of our holding we need not discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement." *Boumediene*, 128 S. Ct. 2274. This does not mean—as the government has asserted elsewhere—that the Court's holding left § 2241(e)(2) intact. Rather, the Supreme Court noted that its holding (striking down § 2241(e) without distinction) enabled it to *avoid* the difficult question of whether a conditions claim could be brought *under habeas*—an open question[1] that the Court would have only had to confront had § 2241(e)(2) been left intact, thereby requiring Guantanamo detainees to bring their conditions claims in habeas.[2] Even if the text of § 2241(e)(2) were comprehensible standing alone, the provision

---

[1]    Since *Bell v. Wolfish*, 441 U.S. 520, 527 n.6 (1979) ("we leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact … of the confinement itself."), a number of circuits have been split on this question.

[2]    In a number of conditions challenges in this district, other judges have ruled that § 2241(e)(2) remains in force. However, in none of those cases had petitioners argued that MCA § 7(a)(2) was unconstitutional. *See, e.g., In re Guantanamo Bay Detainee Litigation*, Civ. No. 08-1360, Mem. Op. at 2 (dkt. no. 32) (D.D.C. Sept. 22, 2008) (Hogan, J.) ("Rather than arguing that MCA § 7(a)(2) is unconstitutional, Petitioner contends his motion does not

would no longer fully serve as a bar to conditions actions—and thus would not function in the "*manner* consistent with the intent of Congress," *Alaska Airlines*, 480 U.S. at 685—given that in at least some jurisdictions, existing law allowed conditions claims—the same actions which Congress sought to bar with section (e)(2)—to be brought under habeas.[3]

Neither the DTA nor the MCA includes a severability clause specifying the intent of Congress in the event a portion of the statute was found unconstitutional, but the legislative history of the MCA offers further proof that § 2241(e)(1) is not severable from § 2241(e)(2). Indeed, in passing the MCA, Congress considered, and rejected, a section that would have made provisions of the statute expressly severable.[4] Congress's rejection of express severability language confirms that it intended § 2241(e) to operate as a complete bar on the ability of the covered category of "enemy combatants" to challenge any aspect of their detention in any court, based on the understanding that detainees held at Guantánamo Bay had no constitutional right to petition for redress and no substantive constitutional rights to enforce.[5] With that understanding

---

fall within § 7(a)(2)'s ambit …."). Likewise, the similar opinions from Judges Urbina and Bates were made without hearing from the petitioner at all on the question of jurisdiction. *In re Guantanamo Bay Detainee Litigation*, Civ. No. 05-1509, Mem. Op. at 6 (dkt. no. 151) (D.D.C. Aug. 7, 2008) (Urbina, J.); *Khadr v. Bush*, No. 04-1136, 2008 587 F. Supp. 2d 225, 228-230 (D.D.C. 2008)

[3] For example, at the time of the passage of the MCA, habeas petitions on behalf of aliens claimed to be enemy combatants by the executive were pending in courts in two circuits—the 4th and the D.C. circuits—in which the law differed as to whether conditions claims were cognizable in habeas. *Cf. Lee v. Winston*, 717 F.2d 888, 893 (4th Cir. 1983) (action contesting only conditions of confinement may not be brought by way of habeas corpus) and *Blair-Bey v. Quick*, 151 F.3d 1036, 1042 (D.C. Cir. 1998) ("habeas corpus might be available to challenge prison conditions in at least some situations.").

In Plaintiffs view, conditions and treatment claims *are* clearly cognizable in habeas and to the extent (e)(2) reaches such claims, it constitutes an unlawful suspension of the writ and is void for that reason as well.

[4] When S. 3930, 109th Cong. (2006), the bill that became the Military Commissions Act, was first introduced into the Senate, it included a proposed Section 10 providing for the severability of any provision of the Act. *See* 152 Cong. Rec. S10,033-44 (daily ed. Sept. 22, 2006). That provision was stricken from the bill by S. Amendment 5085, *see* 152 Cong. Rec. S10320-31 (daily ed. Sept. 27, 2006), which was adopted by unanimous consent. *See* 152 Cong. Rec. S10,242-43 (daily ed. Sept. 27, 2006). Not only did the Senate strike the severability clause from the bill, it also rejected, by roll call vote, a later amendment, S. Amendment 5086, *see* 152 Cong. Rec. S10,331-41 (daily ed. Sept. 27, 2006), that would have restored language including a severability clause. *See* 152 Cong. Rec. S10,246-63 (daily ed. Sept. 27, 2006). The House of Representatives then adopted S. 3930—shorn of the severability language—without amendment. *See* 152 Cong. Rec. H7959 (daily ed. Sept. 29, 2006).

[5] *See, e.g.*, 152 Cong. Rec. S.10,405 (statement of Sen. Sessions: "I am aware of no legal precedent that supports the proposition that foreign persons confronted by U.S. troops in the zone of battle have Fifth Amendment

explicitly rejected by the Supreme Court, it is clear that "the Legislature would not have enacted" § 2241(e) at all, let alone § 2241(e)(2) on its own. *Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984). In view of the fact that Congress saw § 2241(e) as a whole, this Court may not "use its remedial powers to circumvent the intent of the legislature" and preserve a statutory fragment that Congress itself believed was inseverable. *Ayotte v. Planned Parenthood*, 546 U.S. 320, 330 (2006) (quoting *Califano v. Westcott*, 443 U.S. 76, 94, (1979) (Powell, J., concurring in part and dissenting in part)).[6]

## B. The Only Determination of "Enemy Combatant" Status Was Facially Invalid

Section 7 applies only to an individual "determined by the United States to have been properly detained as an enemy combatant or [who] is awaiting such determination," 28 US.C. § 2241(e)(2).[7] The government assumes that the CSRT determinations for Yasser al-Zahrani and Salah al-Salami (hereinafter, "Decedents") suffice to trigger application of Section 7, and relies on this "determination" alone as the basis for its claim to preclusion. *See* Def's' Const. Mot. at 4 ("the United States determined through CSRTs that decedents were properly detained as enemy combatants."). Because the CSRT process lacked even the most rudimentary elements of due

---

rights that they can assert against the American troops. On the contrary, there are at least three reasons why the Fifth Amendment has no applicability to such a situation"); *id.* at 10406 (statement of Sen. Sessions: "The Supreme Court's decision in *Rasul v. Bush* does not undercut these long-standing principles. In *Rasul*, the Supreme Court addressed a far narrower question—whether the habeas statute applies extraterritorially").

[6] In dicta in *Kiyemba v. Obama*, 561 F.3d 509, 512-513 (D.C. Cir. 2009) ("*Kiyemba-II*"), the Court of Appeals addressed the government's argument that § 2241(e)(2) applied to bar what the government claimed was non-habeas relief: "an order barring [petitioners'] transfer to or from a place of incarceration." The Court found that the relief at issue in the appeal was, "based upon longstanding precedents," in fact properly cognizable within habeas, making (e)(2) irrelevant to the outcome. The Court did not need to decide whether (e)(2) continued to be valid in the face of the multiple pronouncements in *Boumediene* that it is not; the footnote opining otherwise is likewise dicta. *See* 561 F.3d at 512 n.*. (In any event, petitioners in *Kiyemba-II* plan to file a petition for writ of certiorari by October 26, 2009, and the opinion may well be vacated by mootness before then.)

[7] It bears remarking that the government can barely even bring itself to call Messrs. Al-Zahrani and Al-Salami "enemy combatants" in their brief—using the neologism "AUMF detainees" (Def's' Const. Mot. at 9) except in relation to MCA Section 7—which is perhaps unsurprising given that the administration claims to have abandoned the "enemy combatant" designation. *See Department of Justice Withdraws "Enemy Combatant" Definition for Guantanamo Detainees*, DOJ Press Release (Mar. 13, 2009), *available at* http://www.usdoj.gov/opa/pr/2009/March/09-ag-232.html.

process, it cannot form the basis for application of Section 7. To rely on the conclusions of these sham tribunals to preclude all further claims in the federal courts would violate the Due Process clause (which protects detainees at Guantanamo, *see* Part II.A.1, *infra*, and limits Congress' power to withdraw jurisdiction, *see* Part I.D, *infra*.).

The Supreme Court has amply documented the failings of the CSRT process in last year's *Boumediene* decision. *See Boumediene*, 128 S. Ct. at 2260, 2266-71. The Court found that the CSRTs provided no "means to [allow a detainee to] find or present evidence to challenge the government's case against him," *id*. at 2269; provided no right to see and respond to "the most critical allegations" against him (classified evidence constituting the bulk of the case against most of the detainees), *id*.; that detainees were denied access to counsel, *id*. at 2260, 2269; and that the right of confrontation was effectively minimal given the extensive reliance on hearsay, *id*. at 2269. Moreover, a declaration submitted by a CSRT panelist indicated that the evidence on which the tribunals were asked to rely "lacked even the most fundamental earmarks of objectively credible evidence." *See* Decl. of Stephen Abraham (Jun. 15, 2007) ¶ 22.

The CSRTs also were missing a fundamental component of due process under the constitution: the right to an appeal. No right of direct appeal from the CSRT panel's conclusions existed at the time of the initial "determinations" by Decedents' CSRTs.[8] Although the DTA allowed for a very limited recourse to the federal courts, it applied by its terms only to individuals who, "at the time a request for review by such court is filed, [are] detained by the Department of Defense at Guantanamo Bay, Cuba." DTA § 1005(e)(2)(b)(i) (later modified by

---

[8] Although panel determinations were subject to internal review by high-ranking Defense Department officials, this was review without any participation by the detainee, and scrutinized only decisions in his favor— "any time a CSRT panel determined that a detainee was not properly classified as an enemy combatant, the panel members would have to explain their finding to the OARDEC Deputy Director. There would be intensive scrutiny of the finding by Rear Admiral McGarrah who would, in turn, have to explain the finding to his superiors, including the Under Secretary of the Navy." Abraham Decl. ¶ 20. The sham review process confirms the sham nature of the entire CSRT process, one calculated to reach not the truth but rather a preordained outcome against the detainees.

MCA § 10 to read "detained by the United States"). After their deaths, Messrs. Al-Zahrani and Al-Salami could not have invoked this provision, and in any event the Court of Appeals has struck the DTA's review provisions from the books. *See Bismullah v. Gates*, 551 F.3d 1068, 1075 (D.C. Cir. 2009) ("*Bismullah-V*") ("we are confident the Congress would not have enacted DTA § 1005(e)(2) in the absence of the statutory provision banning the courts from exercising jurisdiction over a detainee's habeas petition. Because the latter provision has been held unconstitutional, the former must also fall.").

Congress did not specify that CSRT determinations would be conclusive for purposes of application of MCA Section 7. Even assuming *arguendo* that was Congress' intent, [9] it is evident that Congress did not know or intend that the CSRT process would be found to be so inadequate. *Cf. Bismullah-V*, 551 F.3d at 1072 ("Congress would not in the DTA have given this court jurisdiction to review CSRT determinations" had it known that would not constitute an adequate substitute for habeas); 152 Cong. Rec. S.10,405 (daily ed. Sep. 28, 2006) (Statement of Sen. Sessions) ("most of the guarantees embodied in the CSRT parallel and even surpass the rights guaranteed to American citizens who wish to challenge their classification as enemy combatants"). Nor, it is clear, did Congress anticipate that no federal court review of CSRT proceedings would be available. *Id.* at S.10,404 (statement of Sen. Sessions) ("The Government has provided a CSRT hearing to every detainee held at Guantanamo … all of those detainees will

---

[9]    Such an intent would be problematic. Fundamental to our system of justice is the principle that courts decide their own jurisdiction. *See Marbury v. Madison*, 5 U.S. (1 Cr.) 137, 173-75, 177 (1803). Closely related is the power to determine "jurisdictional facts," that is, factual determinations necessary to a court's conclusion that it does or does not have jurisdiction over an issue. The Supreme Court has held that due process and separation of powers principles mandate that courts make their own determinations of jurisdictional facts. *See, e.g., Crowell v. Benson*, 285 U.S. 22, 56, 64 (1932) (both "due process" and "appropriate maintenance of the federal judicial power" requires that court determine "an issue [of jurisdiction] upon its own record and the facts elicited before it."); *Zadvydas v. Davis*, 533 U.S. 678, 692 (2001) ("[T]he Constitution may well preclude granting 'an administrative body the unreviewable authority to make determinations implicating fundamental rights.' The Constitution demands greater procedural protection even for property."). The determination of a fact—"enemy combatant" status—which itself determines the right of access to the courts cannot be delegated to an administrative body like a CSRT.

now be allowed to seek DTA review in the DC Circuit."). This Court must assume that Congress did not intend to violate the Due Process Clause in interpreting Section 7. *See* Part I.D, *infra*. Doing so here means that this Court cannot accept the application of CSRT panel decisions as the trigger for preclusion of jurisdiction.

**C.     The Text of Article III Prevents Congress from Foreclosing All Federal Jurisdiction over Federal Question Claims**

Section 7 of the MCA purports to eliminate all jurisdiction (both original and appellate) in all courts (both federal and state) over various types of claims relating to abuse of "enemy combatants." Even assuming *arguendo* that Section 7 is properly applied to Decedents here, *but see* Part I.B, *supra*, the Constitution forbids such a broad elimination of all federal jurisdiction over federal question claims like those at issue here.

The text of Article III states:

> **Section 1.** The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

> **Section 2.** The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies [between six sets of governmental and/or diverse parties].

> In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

U.S. Const., Art. III, §§ 1-2. Section 2 uses imperative language ("shall extend") to make clear that the "judicial Power" must include "all Cases" involving federal questions (those "arising

under this Constitution, the Laws of the United States, and Treaties made … under their Authority").[10]  And the first sentence of Section 1 ensures that some federal court—whether the Supreme Court or some lower federal courts created by Congress—will exercise this judicial power, again using imperative language ("shall be vested").

The clause in Section 1 giving Congress discretion over the structure of the lower federal courts[11] and the clause in Paragraph 2 of Section 2 allowing Congress to make exceptions to the Supreme Court's appellate jurisdiction cannot be read in isolation from the sections mandating that "[t]he judicial Power … shall be vested" in federal courts and "shall extend to all cases… arising under" federal law.  Congress does not have the option to eliminate[12] all lower federal courts and simultaneously restrict the Supreme Court's appellate jurisdiction without limitation. Instead, read together, the first three paragraphs of Article III mandate that some federal court must have some form of jurisdiction (whether appellate or original) over "all Cases … arising under" federal law.[13]  This requirement can be satisfied by vesting original federal-question

---

[10]    Pursuant to the Judiciary Act of 1789, the "judicial Power" must also extend to "all cases" in the other two mandatory categories of Section 2—Ambassadors and Admiralty. Out of the nine categories of cases and controversies set forth in section 2, these three categories together—the "Cases" involving federal questions, ambassadors, and admiralty, comprise a "mandatory tier" of cases in which some form of federal jurisdiction must lie—in which "state courts were not permitted to be the final word." *See* Akhil R. Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U.L. Rev. 205, 261-62 (1985).
        Of course, as to Ambassador cases, original federal jurisdiction in the Supreme Court is guaranteed by Section 2 ¶ 2. That leaves only "Cases, in *Law and Equity*, arising under" federal law, and admiralty cases (which were considered to arise in neither law nor equity, *see* Akhil R. Amar, *Article III and the Judiciary Act of 1789*, 138 U. Pa. L. Rev. 1499, 1513 (1990). Thus, putting aside the Ambassador cases reserved for the original jurisdiction of the Supreme Court, and the state-vs.-state controversies that remain in the Supreme Court's original jurisdiction after the 11th Amendment, Article III reserves for mandatory federal court review only claims involving uniquely federal subject matter—cases "arising under" federal law and admiralty. Just such uniquely federal questions are at issue in the present case.
[11]    That clause vests federal judicial power conjunctively in <u>the Supreme Court and</u> "such inferior Courts as the Congress may from time to time ordain and establish."
[12]    Whether elimination of any or all existing courts would be constitutional (or whether, for that matter, Congress can avoid creating any lower federal courts in the first place, or withdraw their jurisdiction entirely) is, here, an academic question.
[13]    Whether that exercise is original or appellate, throughout the history of the Republic *some* federal court has always had power to review cases involving federal questions. The 1789 Judiciary Act, § 25, 1 Stat. 73, 85-87, granted the Supreme Court *appellate* jurisdiction over federal questions (more precisely, denials of federal claims or "exemptions") arising on appeal from state court systems, *see generally* Amar, *Article III and the Judiciary Act of*

jurisdiction in the district courts (as has existed consistently since 1875); or, if original jurisdiction is left to state courts,[14] by allowing an avenue for appeal to some federal court at some point in the life of the case (as has existed consistently since the founding, *see, e.g.*, § 25 of the first Judiciary Act, which expressly authorized appellate review of federal questions in the Supreme Court).[15] The history of the drafting of Article III and the confirmation debates confirms this view.[16] Section 7 of the MCA, by eliminating all federal (and state) jurisdiction

---

*1789*, 138 U. Pa. L. Rev. at 1515-1517, and the current *original* general federal question jurisdiction in district courts has been continuously available since 1875. *See* Act of March 3, 1875, § 1, 18 Stat. 470, now codified at 28 U.S.C. § 1331(a); *see also* Act of February 13, 1801, § 11, 2 Stat. 92 (first creating plenary federal question jurisdiction in district courts). Moreover, the Alien Tort Statute has conferred federal jurisdiction over claims cognizable under its terms since the founding. *See* 1 Stat. 77.

[14]      It is not entirely clear whether this would be constitutional, as state courts are not in fact courts of unlimited subject matter jurisdiction—for instance, they may not be empowered to direct injunctions and extraordinary writs such as habeas and mandamus to federal officers, or entertain (involuntarily) prosecutions under federal criminal statutes—but again, for present purposes the question is academic, as MCA Section 7 purports to eliminate all jurisdiction, not just all federal jurisdiction, over certain sorts of claims. (On the question generally of the historical understanding of Congress' power to force state courts to enforce federal law, *see* Sai Prakash, *Field Office Federalism*, 79 Va. L. Rev. 1957, 2007-32 (1993).)

[15]      Of course, Congress' choice as to where *original* jurisdiction of federal questions will lie may in turn affect its ability to make exceptions to the Supreme Court's *appellate* jurisdiction under Art. III § 2, cl. 2. *See* Amar, *A Neo-Federalist View of Article III*, 65 B.U.L. Rev. at 255-57:

> Congress may make exceptions to the Supreme Court's appellate jurisdiction in the mandatory categories, but only if it creates other Article III tribunals with the power to hear all the excepted cases. Congress need not create such courts in the first instance; plenary Supreme Court appellate jurisdiction of all federal question and admiralty cases decided by state courts would satisfy the requirement that the "judicial Power shall extend to all" these cases. But if Congress seeks to make exceptions to the Supreme Court's appellate jurisdiction in these cases, then it must create another federal court to fill the gap in mandatory federal jurisdiction. Such a court could be an original tribunal, or could sit in direct appellate review over state courts.

[16]      The first drafts of the "Virginia Plan" from which the final text of Article III was ultimately derived, mandated federal jurisdiction over "questions which involve the national peace and harmony" and was intended in part to preserve "the security of foreigners where treaties are in their favor." 1 Max Farrand, The Records of the Federal Convention of 1787 at 238 (Randolph; Yates' notes). The first draft of the Committee on Detail (the Randolph-Rutledge Draft) mandated federal jurisdiction over only issues arising from acts of Congress, and allowed Congress to decide which other cases "involving the national peace and harmony" the Supreme Court could hear. This discretion disappeared entirely from the next draft, the Wilson-Rutledge Draft, which made all such federal question jurisdiction mandatory in the federal courts, with Congress having discretion to assign original jurisdiction from the Supreme Court to lower federal tribunals. 2 Farrand 173, 186-87 ("The Legislature may (distribute) [assign any part of] th(is)e Jurisdiction … in the Manner and under the limitations which it shall think proper (among) [to] such (other) [inferior] Courts as it shall constitute from Time to Time."). And in one of the final major debates over what would become Article III, the delegates rejected by a vote of six states to two a provision that would have allowed Congress to make exceptions not to the appellate power of the Supreme Court, but rather to the "judicial power" itself. 2 Farrand 431 ("The following motion was disagreed to, to wit to insert 'In all the other cases before mentioned the Judicial power shall be exercised in such manner as the Legislature shall direct'"). Finally, the Committee on Style, appointed merely "to revise the style of, and arrange, the articles which have been

over a variety of claims relating to "enemy combatants," is inconsistent with the plain meaning of the text of Article III. Section 7 thus exceeds Congress' power and must be disregarded as "void." *Marbury*, 5 U.S. at 177, 180.[17]

Accordingly, though the academic debates detailing the precise scope of Congress' power to alter the jurisdiction of the federal courts are seemingly unending, [18] the Supreme Court has

---

agreed to by the House" (2 JOURNAL OF THE FEDERAL CONVENTION 691)—that is, to make "technical and syntactical, rather than substantive" changes to the draft referred to it, Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: A Guided Quest for the Original Understanding of Article III*, 132 U. Pa. L. Rev. 741, 794 (1984)—altered the Inferior Courts clause from "such Inferior Courts as *shall, when necessary*, from time to time, be constituted by the Legislature of the United States" to its final form, "such inferior courts as the Congress may from time to time ordain and establish," 2 FARRAND 600 (emphasis added); the original form acknowledges that other actions of Congress (pursuant to the Exceptions Clause) might make the creation of such lower federal courts obligatory.

The subsequent ratification debates in the several states "produced almost no suggestions by [the Constitution's advocates] that Congress could delimit the sphere of federal court jurisdiction," Clinton, 132 U. Pa. L. Rev. at 810; *id*. at 810-40, and Hamilton's famous defenses of the federal judiciary in Federalist 78-82 are consistent with the notion of mandatory federal jurisdiction over the three sets of "Cases" in Section 2. *See* Federalist 81 (power of Congress to create inferior federal courts "is evidently calculated to obviate the *necessity* of having recourse to the supreme court, in every case of federal cognizance."); Federalist 82 ("The evident aim of the plan of the convention is that all the causes of the specified classes, shall for weighty public reasons receive their *original or final* determination in the courts of the union." (emphasis added)); *see also* 1 ANNALS OF CONGRESS 831-32 (J. Gales ed. 1789) (Rep. Smith, in debates over Judiciary Act, stating Art. III allows "no discretion, then, in Congress to vest the judicial power of the United States in any other tribunal than in the Supreme Court and the inferior courts of the United States.") *See generally* Clinton, 132 U. Pa. L. Rev. 741.

[17]    *See United States v. Klein*, 80 U.S. (13 Wall.) 128, 147-48 (1871) (disregarding unconstitutional statute that divested court of jurisdiction and reinstating judgment obtained under prior statutory scheme); *Armstrong v. United States*, 80 U.S. (13 Wall.) 154 (1871) (same); Henry M. Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362, 1387 (1953) ("If the court finds that what is being done is invalid, its duty is simply to declare the jurisdictional limitation invalid also, and then proceed under the general grant of jurisdiction."); *see also Boumediene v. Bush*, 476 F.3d 981, 1011 (D.C. Cir. 2007) (Rogers, J., dissenting) (stating that habeas repeal was unconstitutional, and that proper outcome was to hold that "on remand the district courts shall follow the return and traverse procedures of" the preexisting habeas statute); *Bartlett v. Bowen*, 816 F.2d. 695, 707-11 (D.C. Cir. 1987) (voiding broad jurisdictional strip for benefits claims below $1000 as to constitutional claims, in face of dissenting opinion arguing that jurisdictional provision should be viewed as modifying sovereign immunity waiver allowing any damages claims in the first place).

[18]    The two polar ends of the academic debates have been staked out by Justice Story and Professor Henry Hart, but each would actually reach a result close to what Plaintiffs advocate here. Story opined that the "whole judicial power" set forth in Section 2 "must … be vested in some [federal] court, by congress," "at all times, … either in an original or appellate form." *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 329, 331 (1816); *see also* 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833) § 1589 ("One of two courses only could be open for adoption,—either to create inferior courts under the national authority, to reach all cases fit for the national jurisdiction, which either constitutionally or conveniently could not be of original cognizance in the Supreme Court; or to confide jurisdiction of the same cases to the State courts, with a right of appeal to the Supreme Court."). That view is broader than what Plaintiffs set forth here; the above account differs in distinguishing the six sets of "controversies" included in Section 2 as non-mandatory subjects of federal jurisdiction.

Professor Hart's famous dialogue, included in his standard Federal Jurisdiction casebook, opines that Congressional restrictions under the Exceptions Clause "must not be such as will destroy the essential role of the Supreme Court in the constitutional plan," whereas Congress has plenary, unlimited power to wrest jurisdiction from

never uphold a complete preclusion of all federal judicial fora for constitutional claims,[19] and has applied the strongest of presumptions against preclusion of such claims.[20] *See Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 681 n.12 (1986); *see also Webster v. Doe*, 486 U.S. 592, 603 (1988) (interpreting jurisdiction review preclusion provision of National Security Act of 1947 to preserve constitutional challenges to employment decisions, as "serious constitutional question[s] would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim"); *Johnson v. Robison*, 415 U.S. 361, 366-67 (1974). Article III demands some federal court review—whether original or appellate—over all federal-question claims. Because MCA Section 7 purports to eliminate all such review, it is unconstitutional and void.[21]

### D. The Due Process Clause Also Limits Congress' Power to Restrict Jurisdiction

The Fifth Amendment to the Constitution post-dates Article III and contains further limitations on Congress' ability to modify federal jurisdiction. The Court of Appeals for the D.C. Circuit has repeatedly confirmed "that, 'to the extent that the provisions of Article III are inconsistent with the due process clause of the fifth amendment, those provisions of Article III

---

the inferior federal courts. *See* Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362 (1953). MCA Section 7 removes the Supreme Court entirely from considering fundamental claims, including constitutional claims, over issues of unique federal importance, and thus violates Hart's conception of the limits on Congressional power as well.

[19] *See, e.g.*, *Felker v. Turpin*, 518 U.S. 651 (1996) (upholding provisions depriving district courts of jurisdiction over "second or successive" habeas petition because Supreme Court retained original jurisdiction); *Reno v. AADC*, 525 U.S. 471 (1999) (upholding severe but not complete restriction of federal judicial review).

[20] *See* Ronald M. Levin, *Understanding Unreviewability in Administrative Law*, 74 Minn. L. Rev. 689, 730-31 (1990) (courts apply a "a superstrong presumption against preclusion of constitutional claims").

[21] *See supra* note 17. At the very least, "'the Court should use every possible resource of construction to avoid the conclusion that [Congress intended to effectuate an unconstitutional withdrawal of jurisdiction].'" David Cole, *Jurisdiction and Liberty: Habeas Corpus and Due Process as Limit on Congress's Control of Federal Jurisdiction*, 86 Geo. L.J. 2481, 2509 (1998) (quoting Hart, 66 Harv. L. Rev. at 1399). Here, constitutional avoidance would be served by an interpretation presuming that subsection (e)(2) was exclusively intended (in the absence of a "superstrong" clear statement to the contrary from Congress, *see supra* note 20) as a means of barring back-door routes to challenge *detention* in some civil action other than habeas. Of course, logically, such an interpretation would lead to the same outcome the Supreme Court has already reached—striking all of MCA section 7. *See* Part I.A.

14

must be considered modified by the amendment.'" *Bartlett v. Bowen*, 816 F.2d 695, 706 (D.C. Cir. 1987) (quoting MARTIN REDISH, FEDERAL JURISDICTION: TENSIONS IN THE ALLOCATION OF JUDICIAL POWER 25 (1980)).[22] As an initial matter, the Due Process Clause

> suggests that there must be some *federal* judicial forum for the enforcement of federal constitutional rights. However, "since restrictions on federal courts ordinarily leave state courts as available forums, curtailments of federal jurisdiction do not typically require confrontation of the difficult and unsettled problem of access to *some* judicial forum." In other words, courts and legal scholars routinely assume that there is a due process right to have the scope of constitutional rights determined by some independent judicial body—and the Supreme Court has never held or hinted otherwise. On the contrary, although it is undisputed that Congress has some leeway to affect the jurisdiction of the lower federal courts, Congress may not deny to a person attacking a statute "the independent judgment of a court on the ultimate question of constitutionality." *St. Joseph Stock Yards Co. v. United States*, 298 U.S. at 84 (Brandeis, J., concurring).

*Bartlett*, 816 F.2d at 706; *see also American Coalition for Competitive Trade v. Clinton*, 128 F.3d 761, 765 (D.C. Cir. 1997) ("a statute that totally precluded judicial review for constitutional claims would clearly raise serious due process concerns"); *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 681 n.12 (1986); *Webster v. Doe*, 486 U.S. 592, 603 (1988).[23] Section 7 of the MCA must then at a minimum be interpreted to preserve jurisdiction to decide Plaintiffs' constitutional claims.

The Due Process Clause incorporates equal protection principles identical to those contained in the Fourteenth Amendment against the federal government;[24] both protect the rights

---

[22]     Reconsideration en banc was granted and then withdrawn, reinstating the panel opinion. *See Bartlett v. Bowen*, 824 F.2d 1240, 1241-42 (1987).

[23]     *See also Bataglia v. General Motors*, 169 F.2d 254, 257 (2d Cir. 1948) ("A few of the district court decisions sustaining section 2 of the Portal-to-Portal Act [withdrawing jurisdiction of federal courts to issue injunctions in labor disputes] have done so on the ground that since jurisdiction of federal courts other than the Supreme Court is conferred by Congress, it may at the will of Congress be taken away in whole or in part. … We think, however, that the exercise of Congress of its control over jurisdiction is subject to compliance with at least the requirements of the Fifth Amendment. That is to say, while Congress has the undoubted power to give, withhold, and restrict the jurisdiction of courts other than the Supreme Court, it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law or to take private property without just compensation.").

[24]     The Supreme Court has recognized that the Fifth Amendment's Due Process Clause embraces the "concept of equal justice under law." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976). Accordingly, the Fourteenth

of aliens "within the territorial jurisdiction" of the United States as well as citizens.[25]  Again, the overwhelming weight of judicial and scholarly opinion is that Congress may not exercise its power to restrict access to the courts in a discriminatory manner that violates the Equal Protection clause.  No one seriously argues that Congress could constitutionally withdraw access to the appellate jurisdiction of the Supreme Court for all black or women litigants, for instance.[26]  Courts have applied equal protection principles to read around Congressional restrictions on jurisdiction which seemed absolute on their face.  For instance, in *Czerkies v. United States DOL*, 73 F.3d 1435 (7th Cir. 1996) (en banc), a statute stated that the Secretary of Labor's determinations regarding workers' compensation benefits were "not subject to review by another official of the United States or by a court by mandamus or otherwise." 5 U.S.C. § 8128(b).  The court held that if the language were to be read literally to bar all review, the Department of Labor could "discriminate with impunity against compensation claimants on grounds of race and

---

Amendment's Equal Protection Clause and the Fifth Amendment's Due Process Clause "require the same type of analysis." *Id.*; *see Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) ("the equal protection obligations imposed by the Fifth and the Fourteenth Amendments [are] indistinguishable"); *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

[25]     The Equal Protection Clause of the Fourteenth Amendment applies to all "persons" regardless of citizenship "within [a state's] jurisdiction." *See* U.S. CONST., Amend. XIV, § 1. As *Plyler v. Doe*, 457 U.S. 202, 210 (1982) directs, "an alien is surely a 'person' in any ordinary sense of that term," and is entitled to equal protection of the laws. *Cf. Dred Scott v. Sandford*, 60 U.S. 393, 449 (1857) (due process guarantees are "privileges of the citizen."), *abrogated by* Fourteenth Amendment.

     Due process and habeas are inextricably intertwined, *see Hamdi v. Rumsfeld*, 542 U.S. 507, 555-57 (2004) (Scalia, J., dissenting), and to the extent habeas jurisdiction has been recognized at Guantanamo the Due Process clause also reaches there. *See* Part II.A.1, *infra*. *See also Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. ...[Its] provisions are universal in their application to all persons within the territorial jurisdiction ..."); *Rasul v. Bush*, 542 U.S. 466, 487 (2004) (Kennedy, J., concurring) ("Guantanamo Bay is in every practical respect a United States territory" where our "unchallenged and indefinite control … has produced a place that belongs to the United States, extending the 'implied protection' of the United States to it").

[26]     There appears to be complete consensus on this point from all commentators across the ideological spectrum. *See, e.g., Constitutional Restraint upon the Judiciary: Hearings before the Senate Subcom. on the Const., Senate Judiciary Comm.*, 97th Cong., 1st Sess. (1981) at 132 (statement of William Van Alstyne); ERWIN CHEMERINSKY, FEDERAL JURISDICTION 195 (5th ed. 2007); *cf. Bartlett v. Bowen*, 816 F.2d 695, 711 (D.C. Cir. 1987) ("If we follow the reasoning of the dissent to its logical conclusion, Congress would have the power to enact, for example, a welfare law authorizing benefits to be available to white claimants only and to immunize that enactment from judicial scrutiny by including a provision precluding judicial review of benefits claims. We have difficulty understanding how such a law could ever be thought to be beyond judicial scrutiny because of sovereign immunity. To preclude judicial review in such a situation would be just as unconstitutional as the underlying governmental action.").

religion." *Czerkies*, 73 F.3d at 1442. Finding that result both absurd and likely unconstitutional, the court interpreted the statute to preserve review of substantial constitutional claims.

MCA Section 7 by its terms applies only to aliens. By drawing categorical distinctions between citizens and aliens even when each is properly determined to have acted in the very same way, the MCA violates the Equal Protection component of the Due Process Clause of the Fifth Amendment. *See Graham v. Richardson*, 403 U.S. 365, 371 (1971) ("[C]lassifications based on alienage . . . are inherently suspect and subject to close judicial scrutiny."). Citizenship is no bar to belligerency, *see Ex Parte Quirin*, 317 U.S. 1, 37 (1942), and the Authorization for the Use of Military Force, 115 Stat. 224 (2001) draws no such distinction. But Section 7 deprives only "an alien" enemy combatant of the right of access to the courts.

Were this Court to read the MCA to remove this Court's jurisdiction over Plaintiffs' claims, the statute would violate the Equal Protection component of the Fifth Amendment because it discriminates in the allocation of fundamental rights, and, in particular, the fundamental right of access to the courts. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 217 (1982); *see also* 152 Cong. Rec. H7,940 (daily ed. Sept. 29, 2006) (statement of Rep. Nadler: "If you pick up two people in New York, one of them is a citizen, they go to the Federal court, and you accuse them of being unlawful enemy combatants, they go to the regular American system of justice. One is awaiting citizenship but is a permanent resident, he goes through this other. He has no rights…. That is clearly unconstitutional. It is a denial of equal protection."). The Supreme Court has applied heightened review to government efforts to discriminate in access to courts, even based on non-suspect classifications. *See, e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 522-23 (2004) (stating that "the right of access to the courts" is subject to "more searching judicial review" under equal protection).

Moreover, a jurisdiction stripping provision that was intended to apply only to Muslims violates Equal Protection principles. No non-Muslim has been detained by the United States government as an "enemy combatant" anywhere to our knowledge—by the time of the passage of the MCA, or since then. Even a facially neutral law applied in so uniformly discriminatory a manner triggers strict scrutiny. *See, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). Moreover, Congress was clearly aware of this fact. *See* 152 Cong. Rec. S.10,395 (daily ed. Sept. 28, 2006) (statement of Sen. Cornyn: "Let me just say a word about who that enemy is. … it is an enemy that has hijacked one of the world's great religions, Islam"); *Id*. at S.10,403 (statement of Sen. McConnell: "We are a Nation at war, and we are at war with Islamic extremists."). In such circumstances, courts have applied strict scrutiny to overturn legislation motivated in part by desire to disfavor members of a suspect class. *Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 265 (1977).[27]

E.     **Application of MCA Section 7 Would Violate the Separation of Powers**

The D.C. Circuit has also held—correctly—that "a congressional enactment" that "seeks to limit the jurisdiction of all *federal* courts" and eliminate access to any "independent judicial forum … would be flatly inconsistent with the doctrine of separation of powers implicit in our constitutional scheme." *Bartlett v. Bowen*, 816 F.2d at 706.

> The delicate balance implicit in the doctrine of separation of powers would be destroyed if Congress were allowed not only to legislate, but also to judge the constitutionality of its own actions. [Congress presumably exercises its independent judgment about the constitutionality of its own Acts, and] the courts arguably may, in their discretion, elect to avoid certain "political" questions that appear to be better left for resolution in the legislative or executive branch.

---

[27]     The Supreme Court "does not require a plaintiff to prove that [legislative] action rested *solely* on … discriminatory purposes …[if] discriminatory purpose has been *a* motivating factor in the decision … judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 264-65. The "historical background of the decision is [another] evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." 429 U.S. at 267. Finally, "legislative or administrative history" including especially "contemporary statements," 429 U.S. at 268, are a third factor. All are present here.

> However, it is quite another matter to suggest that Congress may, as it sees fit, act to bar all courts from considering the constitutionality of a legislative act. If Congress attempts to go this far, it has "passed the limit which separates the legislative from the judicial power." [*United States v. Klein*, 80 U.S. 128, 147 (1871).] The Supreme Court has never upheld such an enactment, and we will not do so here.

*Bartlett*, 816 F.2d at 707.   Again, at a minimum, Congress is prohibited from eliminating jurisdiction over constitutional claims—here, on grounds of constitutional structure rather than due process.

Moreover, *Klein* stands for the proposition that Congress may not use jurisdictional statutes to direct the substantive outcome of litigation.  In *United States v. Klein*, 80 U.S. 128 (1871), Congress had passed a law withdrawing jurisdiction in cases where a presidential pardon to a Confederate had been used as the proof of loyalty required to win a recovery in the Court of Claims.  *See* 80 U.S. at 145-46 (statutory text "shows plainly that [Congress] does not intend to withhold appellate jurisdiction except as a means to an end….[thereby] allowing one party to a controversy to decide it in its own favor").   *Klein* holds that Congress may not intrude on the pardon power committed to the President, but it also stands for the proposition that Congress may not direct the outcome of cases—even over a group of claims (in the Court of Claims, thus involving waivers of sovereign immunity) that Congress would have been entitled to manage extra-judicially had it so chosen.  Section 7 of the MCA nominally forecloses claims for a tiny subset of individuals, identified by executive whim; the jurisdictional limitation was clearly a "means to an end" designed to foreclose independent judicial scrutiny of specific past executive actions that were unconstitutional and illegal.  As such, even more so than the statute in *Klein*, it violates the structural principle of separation of powers.

**F.       Section 7 Is an Invalid Bill of Attainder**

MCA Section 7 is invalid because it violates the prohibition on Bills of Attainder. U.S. Const. Art. I, § 9, cl. 3 ("No Bill of Attainder…shall be passed.").  Laws violate the Attainder Clause when they constitute "legislative punishment, of any form or severity, of specifically designated persons or groups." *United States v. Brown*, 381 U.S. 437, 447 (1965); *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003).

By prohibiting the punishment of disfavored persons or groups identified by past acts or other criteria beyond the control of the targets of the legislation, the Attainder Clause acts as a bulwark against congressional interference with the prerogatives of the judiciary.  The Clause was thus "intended not as a narrow … prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function." *Brown*, 381 U.S. at 442.  The prohibition against bills of attainder was prompted by "the fear that the legislature, in seeking to pander to an inflamed popular constituency, will find it expedient openly to assume the mantle of judge—or, worse still, lynch mob." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 480 (1977).  The MCA violates the constitutional prohibition on attainders because it (1) singles out non-citizens whom the Government may unilaterally and extra-judicially label "enemy combatants," and then (2) punishes them by stripping them of any right of access to the Courts.

An attainder need not apply to individuals by name.  *See Brown*, 381 U.S. at 461 ("It was not uncommon for English acts of attainder to inflict their deprivations upon relatively large groups of people, sometimes by description rather than [name].").  "[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them *without a judicial trial* are bills of

attainder." *United States v. Lovett*, 328 U.S. 303, 315 (1946) (emphasis added). The CSRT process in no way resembles a judicial trial, lacking as it does the most elementary aspects of due process. *See* Part I.B, *infra*. The CSRT process also applied a definition of "enemy combatant" having no basis in the laws of war, and so open-ended as to effectively render any determination made under it arbitrary.

The second prong of the Attainder Clause analysis requires the Court to examine whether the law in question imposes punishment on the identified group. Because of the creativity with which Congress may devise punishment, criminal sanctions are not the only punishments that qualify as attainders. Courts look to a three part inquiry to evaluate whether a law imposes punishment and so is unconstitutional:

> (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of the burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish."

*Selective Serv. Sys. v. Minnesota PIRG*, 468 U.S. 841, 852 (1984) (citing *Nixon*, 433 U.S. at 473, 475-76, 478). The Supreme Court has opined that "deprivation of any rights, civil or political, previously enjoyed, may be punishment" and constitute a bill of attainder. *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 320 (1867).

More specifically, for at least the past 140 years the Supreme Court has recognized that the deprivation of full and complete access to the courts qualifies as "punishment." In *Pierce v. Carskadon*, 83 U.S. 234, 238-39 (1873), the Supreme Court held that it was an unlawful attainder for the West Virginia legislature to limit access to the courts by refusing to allow petitioners to reopen a judgment attaching property in that State's courts solely because the petitioners refused to swear an oath disavowing allegiance to the Confederacy. *Id*. at 237-38. In

*Pierce*, non-residents of West Virginia were required to swear the loyalty oath, but no such restriction applied to residents. *Id*. at 236. The petitioners were denied review of a judgment attaching their property, based solely on their non-resident status and inability to take the loyalty oath. *Id*. Relying on *Cummings* and *Ex Parte Garland*, 71 U.S. (4 Wall.) 333 (1867), the Court summarily declared this lack of access to the courts an unlawful attainder. *Id*. at 239. Since that time, the Supreme Court has continued to read *Pierce* for the proposition that denying complete access to the courts qualifies as an attainder.[28]

There simply is no "nonpunitive legislative purpose," *Selective Serv. Sys.*, 468 U.S. at 852, to the civil jurisdiction-stripping provisions of Section 7. The legislative history of the MCA makes clear that Congress created it based on a desire to punish individuals that Congress viewed—without a basis in law or fact—as terrorists.[29] No other rational motivation is evident other than the desire to further attaint a small, unpopular group of individuals already arbitrarily tarred with the "enemy combatant" label.

## II. THE INDIVIDUAL DEFENDANTS DO NOT HAVE QUALIFIED IMMUNITY FROM SUIT

Where officials "violate clearly established … constitutional rights of which a reasonable person would have known," they are not entitled to qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Harlow*, the Supreme Court adopted a two-part test to determine

---

[28]  *See Brown*, 381 U.S. at 449 n.21 ("[In *Pierce*] the Court voided as a bill of attainder a West Virginia statute *conditioning access to the courts* upon the taking of an oath similar to those involved in *Cummings* and *Garland*.") (emphasis added); *Flemming v. Nestor*, 363 U.S. 603, 615 n.8 (1960) (same); *cf. Bellsouth Corp. v. FCC*, 162 F.3d 678, 683 (D.C. Cir. 1998) (citing *Pierce* as an example of the Court striking down an attainder).

[29]  *See, e.g.*, 152 Cong. Rec. H7538 (Sept. 27, 2006) (statement of Rep. McHugh) ("Why should an accused terrorist enjoy protections that exceed what the Constitution provides to every one of us as United States citizens?"); Hearing Before the Senate Judiciary Committee (Sept. 25, 2006) (statement of Sen. Cornyn) ("It is important to remember, and sometimes I think some forget, these are enemies of the United States, captured on the battlefield. These are not individuals who have been arrested for committing crimes and then who are entitled to all of the process an American citizen would in an Article III court."); 152 Cong. Rec S10,238-01 (Sept. 27, 2006) (Statement of Sen. Lott) ("Bring on the lawyers. What a wonderful thing we can do to come up with words like this. Our forefathers were thinking about citizens, Americans. They were not conceiving of these terrorists who are killing these innocent men, women, and children.").

**Deleted:** S10,238-01 at S10239 (Sept. 27, 2006) (statement of Sen. Lott), *supra* n.32; 152 Cong. Rec.

whether qualified immunity applied. First, the court must determine whether the facts alleged, "[t]aken in the light most favorable to the [plaintiffs] … show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (holding that the two parts must be examined in that order). Second, if no such violation occurred, the defendant must demonstrate that the constitutional right was not "clearly established." *Id.* When "plaintiffs' allegations state a claim of a violation of clearly established law" defendants are not "entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

In *Pearson v. Callahan*, the Supreme Court revisited its decision in *Saucier* and held that the order in which the two prongs of the test are examined is within the sound discretion of the court. 129 S.Ct. 808, 817 (2009). The Court nevertheless recognized that the traditional *Saucier* sequencing is often preferable. *Id.* at 818 (describing the *Saucier* protocol as "often appropriate" and "often beneficial"). This Court has itself has repeatedly relied on the traditional sequencing. *See Navab-Safavi v. Broad. Bd.*, 2009 U.S. Dist. LEXIS 79579, *22 (D.D.C. 2009); *Pearson v. District of Columbia*, 2009 U.S. Dist. LEXIS 63556 (D.D.C. 2009).

In particular, the *Pearson* Court observed that requiring resolution of the constitutional issue first "is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Pearson*, 129 S.Ct. at 818. The issues here are likewise largely, if not entirely, "dependent on cases in which the defendant may seek qualified immunity." *Id.* at 821-22.

In addition, none of the concerns set out in *Pearson* that might counsel against reaching the constitutional issue is present here. For one, there would be "little if any conservation of judicial resources" in circumventing the constitutional question. The constitutional prohibition

against torture and arbitrary detention is clearly established, *see, e.g., Brown v. Mississippi*, 297 U.S. 278 (1936), and the Supreme Court has indicated that constitutional rights apply at Guantanamo. *Boumediene*, 128 S.Ct. 2229. Adhering to the *Saucier* sequencing may actually aid this Court's analysis, as it "may be difficult to decide whether a right is clearly established without deciding precisely what that right happens to be." *Pearson*, 129 S.Ct. at 818 (quoting *Lyons v. Xenia*, 417 F.3d 565, 581 (6th Cir. 2005)).

Nor would a decision on both immunity prongs be "so fact-bound that the decision [would] provide[] little guidance for future cases." *Pearson*, 129 S.Ct. at 819. In many respects, Guantanamo detainees unfortunately have a shared experience of prolonged arbitrary detention and cruel treatment. Relying on traditional *Saucier* sequencing is therefore crucial for "the development of constitutional precedent." *Id.* at 818. The government argues that little guidance would be gained from such a decision given the Administration's current plans to close the detention center, overlooking the fact that a permanent U.S. military installation has been constructed at Guantanamo, which has long been used for detention purposes other than the "war on terror"[30] and will likely continue to be used in years to come. Even if the base at Guantanamo is closed, Fifth and Eight Amendment claims arising from abuses committed there will very likely continue in this Circuit.

Finally, the issue of whether detainees have constitutional rights will not "soon be decided by a higher court," nor has the Supreme Court "just granted certiorari." *Pearson*, 129 S.Ct. at 819. Given the general preferable nature of the *Saucier* order and the absence of factors counseling against it here, this Court should first address whether the acts alleged by Plaintiffs constitute a violation of constitutional rights.

---

[30] Even now, the Coast Guard continues to detain Haitian and Cuban refugees at Guantanamo. *See* Americans for Legal Immigration, *Guantanamo to be Readied for Expected Influx of Cuban Refugees*, Feb. 15, 2007, *available at* http://www.alipac.us/article1942.html.

**A.** **Decedents' Prolonged Arbitrary Detention, Torture and Cruel and Degrading Treatment Violated Their Fifth and Eighth Amendment Rights**

Deleted: Plaintiffs'

**1.** **Guantanamo Detainees Have Constitutional Rights**

Defendants' sole argument against Plaintiffs' Due Process claims is that "[t]his Court is bound" by the Court of Appeals' decision in *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009) ("*Kiyemba-I*"), *petition for cert. filed*, 77 U.S.L.W. 3577 (U.S. Apr. 3, 2009) (No. 08-1234), Def's' Const. Mot. at 20, that "the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States." 555 F.3d at 1026-27 & n.9. Cert is pending in *Kiyemba-I*, and it may well be vacated for mootness or overturned by the time the instant case is decided. Even so, the basis for the Court of Appeals' decision in *Kiyemba* was unequivocally rejected by the Supreme Court in *Boumediene*. Defendants posit an analytical distinction between the Suspension Clause, which inarguably applies to Guantanamo detainees, and other fundamental rights. Yet nothing in the Supreme Court's decision supports any such distinction, and in its own *Boumediene* decision, the Court of Appeals itself flatly declared that, as to the claim that "the Suspension Clause is a limitation on congressional power rather than a constitutional right," "this is no distinction at all." *Boumediene* v. *Bush,* 476 F. 3d 981, 993 (D.C. Cir. 2007). To the extent that *Kiyemba* addresses the power of the Judiciary to order the Executive to bring an alien into the United States, it is irrelevant to the instant case. To the extent that *Kiyemba* maintains a categorical rule that aliens without property or presence can be tortured because they have no constitutional rights (other than the specific right to habeas corpus), it is fundamentally in conflict with *Boumediene* and analytically unsound for reasons

that the Court of Appeals recognized in its colloquy with the dissent in *Boumdiene*.  *See id*. at 991-94.[31]

Applying a functional test to the detentions at Guantánamo,[32] the Supreme Court held there is nothing about the citizenship of the detainees, the characteristics of Guantánamo, or the nature of the rights at issue that should deprive them of the constitutional right to habeas corpus review.  The Supreme Court's reasoning mandates the same result with respect to the Fifth Amendment due process rights at issue here.  Indeed, the *Boumediene* Court expressly applied the standards of the Due Process Clause as well as the Suspension Clause in evaluating the legal sufficiency of Guantánamo's CSRT processes.  *Boumediene*, 128 S. Ct. at 2269-70.

Even if one were to limit the ultimate holding of *Boumediene* to the Suspension Clause, the functional test adopted in *Boumediene* compels the same result with respect to the Fifth Amendment due process clause.  The Supreme Court has already applied the first two factors of the test to Guantánamo detainees, holding that neither their citizenship nor their incarceration at Guantánamo deprives them of constitutional rights.  Therefore, under *Boumediene*, detainees can be denied Fifth Amendment rights only if (i) the right to be free from torture is not fundamental; or (ii) application of such a right at Guantánamo would be impractical.  Plainly neither is the case.


Deleted: Plaintiffs

---

[31]      The Court of Appeals has itself repeatedly held that there is no analytic distinction between a constitutional right to habeas corpus and the extension of other constitutional rights to Guantánamo detainees.  *See, e.g., Al Odah v. United States*, 321 F.3d 1134, 1141 (D.C. Cir. 2003), *rev'd on other grounds sub nom., Rasul v. Bush*, 542 U.S. 466 (2004); *Boumediene*, 476 F.3d at 981 ("There is the notion that the Suspension Clause is different from the Fourth, Fifth, and Sixth Amendments because it does not mention individuals and those amendments do (respectively, 'people,' 'person,' and 'the accused'). That cannot be right").

[32]      This test is fully consistent with a century's worth of the Supreme Court's established due process jurisprudence, extending fundamental constitutional protections to unincorporated federal territories. *See* Brief of Professors of Constitutional Law and Federal Jurisdiction as Amici Curiae in Support of Petitioners, *Boumediene v. Bush*, No. 06-1195/96 (U.S. 2007) at 16-30, *available at* http://www.mayerbrown.com/public_docs/ probono_Brief_Professors_Constitutional.pdf..

26

As long ago as 1936, the Supreme Court held that the right not to be tortured was "fundamental" for the purpose of imposing it on the States under the due process clause of the Fourteenth Amendment. *Brown v. Mississippi*, 297 U.S. 278, 286 (1936) (torture inconsistent with "fundamental principles of liberty and justice which lie at the base of all of our civil and political institutions."). This Court held in *United States v. Karake*, "[t]he use of torture … clearly contravenes 'principles of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." 443 F. Supp. 2d 8, 51 (D.D.C. 2006) (quoting *Brown*, 297 U.S. at 285-87). It has long been established that there is an irreducible constitutional minimum that government officials owe to individuals under their control, whether citizen or non-citizen, which necessarily includes the prohibition of torture. *Zadvydas v. Davis*, 533 U.S. 678, 704 (2001) (Scalia, J., dissenting) (even as to aliens, it is certain that "they cannot be tortured").

There is nothing about Guantánamo that would make enforcement of the Fifth Amendment rights more "impracticable and anomalous" than the right of habeas corpus. *Boumediene,* 128 S. Ct. at 2255. Guantánamo remains, as it was in *Boumediene*, "an isolated and heavily fortified military base." *Id.* at 2261. As in *Boumediene*, there can be no suggestion that recognition of Fifth Amendment rights could cause "friction with the host government." *Id.* Recognition of the right to habeas corpus, which, as the Supreme Court acknowledged in *Boumediene*, may entail cost to the government and require compliance with judicial process, is far more impracticable than recognition of the right at issue here. Torture is already prohibited at Guantánamo by the Uniform Code of Military Justice, U.S. Army Regulation 190-8, U.S. criminal law, and jus cogens norms; thus, enforcement of constitutional limitations imposes no additional, practical burden on the government.

*Finally*, *Verdugo-Urquidez* does not stand for the proposition that constitutional rights are not available to foreign nationals who lack a "substantial connection" with the United States. As Justice Kennedy stated, "the Court has not decided, that persons in the position of the respondent have no constitutional protection." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 278 (1990) (Kennedy, J. concurring).[33] Cases decided both before and after *Verdugo-Urquidez* have rejected the argument defendants make here. *El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1352 (Fed. Cir. 2004), *cert. denied*, 545 U.S. 1139 (Takings Clause of Fifth Amendment applies to property interests of foreign nationals "located abroad even where there is no demonstrable connection between them or their property and the United States"); *Ralpho v. Bell*, 569 F.2d 607, 618-19 (D.C. Cir. 1977) (Due Process Clause binds commission established by United States to address foreign nationals' claims in Micronesia).

\*   \*   \*

Defendants argue, Def's Const. Mot. at 19-20, that the Eighth Amendment does not protect those not convicted of crimes. Whether stated in terms of the Fifth Amendment's right to substantive due process or the Eighth Amendment's right to be free from cruel and unusual punishment, it is indisputable that a person in government custody has the right not to be tortured. *Brown v. Mississippi*, 297 U.S. 278, 285 (1936); *Rochin v. California*, 342 U.S. 165, 172 (1952). Such conduct violates the Fifth Amendment because it "shocks the conscience." *Rochin*, 342 U.S. at 172. It has long been held that any conduct that would violate the Eighth Amendment if visited upon a convicted person violates the Fifth Amendment if visited upon a

---

[33] Application of the *Fourth* Amendment's protections in Mexico would have been "impracticable and anomalous" due to the "absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials." *Verdugo-Uquidez*, 494 U.S. at 278 (Kennedy, J., concurring). As the Supreme Court acknowledged in *Boumediene*, recognizing constitutional rights at Guantánamo does not require this Court to apply U.S. law in a jurisdiction in which it would not otherwise apply or where there is an incompatible overlapping legal regime. *Id.* at 2262-63.

person held in detention.  *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (detained man had Due Process rights "at least as great as the Eighth Amendment protections available to a convicted prisoner"); *Hamm v. DeKalb County*, 774 F.2d 1567, 1573-74 (11th Cir. 1985) ("states may not impose on pre-trial detainees conditions that would violate a convicted person's Eighth Amendment rights").

2.    **The Conduct Alleged in the Complaint Violated the Fifth and Eighth Amendments**

"Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty [the Due Process] Clause protects."  *Zadvydas*, 533 U.S. at 690 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).  "The touchstone of due process is protection of the individual against arbitrary action of government."  *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).  Prolonged detention for no legitimate reason can be said to shock the conscience.  *Rashad Ahmad Refaat El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249, 270 (D. Conn. 2008) (citing *County of Sacramento*, 523 U.S. at 846-47 (equating arbitrary conduct with conscience-shocking conduct)).  Arbitrary detention is "sufficient to state a due process claim."  *Id.*at 269 (citing *Zadvydas*, 533 U.S. at 690; *Kansas v. Hendricks*, 521 U.S. 346).  Applying these long-standing rules, Messrs. Al-Zahrani and Al-Salami's detention for four years without any or adequate process clearly constitutes a violation of the Due Process Clause of the Fifth Amendment.

It is equally established that a person in state custody has a fundamental right not to be tortured for any purpose, in any circumstance, whether under the Due Process Clause of the Fifth Amendment or the Eighth Amendment.  *See supra* Part II.A.1.

29

Plaintiffs describe prolonged arbitrary detention, torture, and cruel and degrading treatment in U.S. custody in Guantanamo in their Amended Complaint. *See, e.g.*, Am. Compl. ¶¶ 88-95, 98, 99, 101, 104-107, 123-144, 159, 160, 170, 235, 236, 244-248. Virtually all of the specific acts Plaintiffs allege have been held to be illegal and to violate the Fifth and/or Eighth Amendments in a variety of judicial decisions. *See, e.g., Hope,* 536 U.S. at 737-38 (shackling in painful positions, exposure to sun, deprivation of water and access to toilet facilities); *Austin v. Hopper*, 15 F. Supp. 2d 121 0, 1248 (M.D. Ala. 1998) (shackling in painful positions, severe chafing of handcuffs); *Gates v. Collier*, 501 F.2d 1291, 1306 (5th Cir. 1974) (forced nakedness, isolation in darkness, deliberate exposure to cold, withholding hygienic items, shackling in painful positions); *Merritt v. Hawk*, 153 F. Supp. 2d 121 6, 1223 (D. Colo. 2001) (beating while shackled); *Evicci v. Baker*, 190 F. Supp. 2d 233, 238-39 (D. Mass. 2002) (same); *Marcos Human Rights Litig.*, 910 F. Supp. 1460, 1463 (D. Haw. 1995) (beating while shackled and blindfolded, exposure to extreme cold, forced nakedness, solitary confinement); *Harper v. Wall*, 85 F. Supp. 783, 785-86 (D.N.J. 1949) (attacks with dogs); *Lane v. Carpinello*, 2009 U.S. Dist. LEXIS 88345 (N.D.N.Y Aug. 31, 2009) (involuntary confinement as deprivation of liberty interest).

**B.    Defendants Were on Notice of the Illegality of Their Conduct**

The individual Defendants again turn to this Circuit's opinion in *Kiyemba-I* to conclude that Messrs. Al-Zahrani and Al-Salami's Due Process rights could not have been clearly established at the time of their detention, since *Kiyemba-I* held that the Due Process Clause does not extend to Guantanamo detainees. As argued *supra*, at 25-26, the Supreme Court unambiguously rejected this Circuit's rigid "person or property" rule in lieu of a functional approach to questions of constitutional extraterritoriality rooted in over a century of jurisprudence. *See, e.g.*, *Boumediene*, 128 S. Ct. at 2258. The Circuit's reasoning in *Rasul*, upon

which the individual Defendants also rely, was similarly abrogated by the Supreme Court in this respect. *Id*. The individual Defendants further argue that *Boumediene*'s "novel" holding in 2008 underscores that Plaintiffs' rights could not have been clearly established from 2002 to 2006, which, again, is wholly at odds with the historical line of precedent that formed the basis for Court's decision. *Id*. at 2254.

Contrary to Defendants' argument, this Court has made clear that the lack of directly applicable precedent does not insulate egregious conduct: the "'clearly established prong' does not mean that 'the very action in question has previously been held unlawful.'" *Navab-Safavi v. Broad. Bd.*, 2009 U.S. Dist. LEXIS 79579, *51 (D.D.C. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Furthermore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

Rather, as this Court correctly recognized, "the relevant, dispositive inquiry is whether it would be clear to a reasonable [official] that his conduct was unlawful." *Navab-Safavi*, 2009 U.S. Dist. LEXIS at *51 (quoting *Saucier*, 533 U.S. at 202). For a right to be clearly established, it is enough that "the contours of the right" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right. … [I]n the light of pre-existing law, the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)*; see Hope*, 536 U.S. at 745 (rejecting qualified immunity defense because the "obvious cruelty inherent" in shackling prisoners to a hitching post on a hot day was sufficient to put defendants on notice of a constitutional violation despite the absence of a decision establishing the unconstitutionality of the conduct); *United States v. Lanier*, 520 U.S. 259, 271 (1997) (rejecting qualified immunity defense because the illegality, if not the unconstitutionality, of the conduct (sexual assault) was obvious). Indeed, a lack of precedent prohibiting certain conduct may be a sign of the

obviousness of its illegality.  *See Al-Kidd v. Ashcroft*, 2009 U.S. App. LEXIS 20000, *59 (9th Cir. 2009) ("[W]hile there may be no published cases holding similar policies [un]constitutional, this may be due more to the obviousness of the illegality than the novelty of the legal issue." ) (internal citations omitted).

There can be no doubt that the unlawfulness of torture and arbitrary detention was obvious to the Secretary of Defense and the senior officials named in Plaintiffs' amended complaint.  From the *Insular Cases* to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 277-78 (1990) (Kennedy, J. concurring), to *Rasul*, to *Boumediene*, the Supreme Court has for more than a century adopted a functional analysis in determining the extraterritorial reach of the Constitution.  *See supra* at 26.  That analysis has never been premised on rigid territorial lines but on the concept that "fundamental" rights apply where they can practicably be enforced.  As *Brown* teaches, few if any rights are more "fundamental" than the right of a prisoner not to be tortured.  297 U.S. at 285.  And "[f]reedom from bodily restraint has always been at the core of the liberty interest protected by the Due Process Clause from arbitrary governmental action." *Foucha*, 504 U.S. at 80.

As a signatory to the Convention Against Torture. 2 U.S. Dep't of State, Treaties in Force at 182 (2007), *available at* http://www.state.gov/documents/organization/89668.pdf, the U.S. government has also repeatedly, officially, and publicly condemned torture in any and all circumstances and acknowledged that "the prohibition on torture applies to the U.S. military … a commanding officer who orders such punishment would be acting outside the scope of his or her position and would be *individually liable* for the intentional infliction of bodily and emotional harm."  Initial Report of the United States to the United Nations' Committee Against Torture

(Oct. 15, 1999), App. 246a, 249a (emphasis added).  The U.S. government could also not have been more clear in articulating the scope of its own obligations:

> "[a]ll components of the United States Government are obligated to act in compliance with the law, including all United States constitutional, statutory and treaty obligations relating to torture and cruel, inhuman or degrading treatment or punishment.  The U.S. Government does not permit, tolerate or condone torture, or other unlawful practices, by its personnel or employees under any circumstances.  U.S. laws prohibiting such practices apply both when the employees are operating in the United States *and in other parts of the world.*"

Second Periodic Report of the United States to the United Nations Committee Against Torture (May 6, 2005), App. 255a-56a (emphasis added).

Defendants knew that torture, deliberate abuse and arbitrary detention are wrong and violate fundamental rights wherever they occur.  They brought detainees to Guantanamo rather than to a detention facility within the United States in a calculated attempt to circumvent the constitutional provisions that forbid torture.  They requested and wrote memoranda detailing the various ways in which their conduct and orders were violations of applicable law, and then sought post hoc rationalizations and concocted defenses.  Defendants' gamble that Guantanamo might be recognized as a haven for torture—where their conduct was concededly illegal but possibly out of the jurisdictional reach of the courts – is not the kind of conduct that the doctrine of qualified immunity is intended to protect.

**C.  Defendants Were Personally Involved in the Violations of Decedents' Rights**

In a last attempt to evade responsibility under qualified immunity, the individual Defendants argue that Plaintiffs have not properly alleged that the individual Defendants were personally involved in the violation of any clearly established constitutional rights of Plaintiffs.  Defendants apply a heightened pleading standard not required by *Twombly* or *Ashcroft v. Iqbal*,

33

129 S. Ct. 1937, 1951 (2009), which can be distinguished from this case. Defendants' proposed standard is particularly inappropriate here, where vital information is in the exclusive possession and control of the government.

### 1. The *Twombly* Plausibility Standard

In *Twombly*, the Supreme Court articulated a "plausibility" standard for pleadings in *Bivens* actions, requiring allegations that "plausibly suggest" the involvement of federal officials in a constitutional deprivation. *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007). Plausibility, however, is not probability. *Twombly* "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence." *Id.* at 556; *see also Al-Kidd*, 2009 U.S. App. LEXIS at *76 (9th Cir. Sept. 4, 2009) (citing *Twombly*). A well-pleaded complaint may proceed "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 127 S. Ct. at 556 (quoting *Scheuer* v. *Rhodes*, 416 U.S. 232, 236 (1974)).

While *Twombly* supplanted the "no set of facts" standard in *Conley v. Gibson*, 355 U.S. 41 (1957), it did not overrule *Conley* and still comports with the flexibility of Rule 8 notice pleading. *See Twombly*, 127 S. Ct. at 555; *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (affirming that Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'") (citing *Twombly* and *Conley*).

This Circuit has similarly read *Twombly and Iqbal* as consistent with the traditional pleading standard under Rule 8. *See Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). "*Twombly* leaves the longstanding fundamentals of notice pleading intact."

*Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009) (citing *Aktieselskabet AF 21 November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008)).[34]

More is not required in cases involving qualified immunity. "There is no heightened pleading standard for qualified immunity cases." *Bosely v. Lemmon (In re Mills)*, 287 Fed. Appx. 273, 280 (4th Cir. 2008); *Padilla v. Yoo*, 2009 U.S. Dist. LEXIS 50154 (N.D. Cal. June 12, 2009) ("because qualified immunity … puts the court in the difficult position of deciding far-reaching constitutional questions on a non-existent factual record, [it] must be cautious not to eviscerate the notice pleading standard.").

The individual Defendants argue that *Iqbal* requires not only that allegations be plausible, but more likely than alternative explanations that might justify the challenged conduct. Def's' Const. Mot. at 23. In *Iqbal*, the Court construed the detention and interrogation of Arab and Muslim men in November 2001 as legitimate governmental investigation of terrorist links, inferring a more plausible, if hypothetical, interpretation of "neutral facts" than the discriminatory purpose posited by plaintiffs. *Iqbal*, 129 S. Ct. at 1948-49. Even if this Court

---

[34]     A broad reading of *Twombly* and *Iqbal* could also implicate the Seventh Amendment right to trial by jury. In order for the right to be preserved, modern alterations to civil pleading standards may not conflict with the substantive English common law of 1791. *See Galloway v. United States*, 319 U.S. 372, 388-92 (1943). In 1791, a motion to dismiss required the moving party to admit all facts as true, and the judge made no inferences therefrom. *See Gibson v. Hunter*, (1793) 126 Eng. Rep. 499, 510 (H.L.). *Twombly* and *Iqbal* undermine the right in three discrete ways.

     First, the judge now retains the power to dismiss certain allegations as legal and conclusory, rather than factual, and thereby to deny them the assumption of truth. *Iqbal*, 129 S. Ct. at 1951. This raises the possibility of erroneous dismissal of facts before a jury has seen them, contrary to the first clause of the Amendment. Second, the judge now possesses the power to dismiss even concededly factual claims as implausible. *Twombly*, 127 S. Ct. at 570. This denies the allegation the presumption of truth while simultaneously denying the plaintiff an inference in her favor. Third, *Iqbal* implies that where any other "more likely explanations" exist to contradict the plaintiff's claim, allegations relating to those claims should be dismissed by the judge as well. *Iqbal*, 129 S. Ct. at 1951. These alternative explanations may even be hypothetical—concocted from outside the pleadings and then established as proven. *Id*. at 1950 ("On the facts respondent alleges the arrests Mueller oversaw were *likely* lawful . . . ." (emphasis added)); *cf. Tooley*, 556 F.3d 836, 839 (refusing "to defend the hypothetical scenarios that led the district court to conclude that [plaintiff]'s alleged injuries may not have been caused by the defendants.")

     None of the above bases for dismissal—that certain allegations are conclusory, implausible or unlikely—was contemplated at English common law in 1791. Indeed, "[w]hether probable or not, [was] for the jury to decide." *Cocksedge v. Fanshaw*, (1779) 99 Eng. Rep. 80, 88 (K.B.). Under *Gibson v. Hunter*, the moving party lost the motion unless it admitted *all* facts to be true, not merely the plausible ones. 126 Eng. Rep. at 510 (H.L.).

accepts the broadest reading of *Iqbal*, Plaintiffs' Amended Complaint should proceed. There are no "neutral" facts here from which a more plausible alternative explanation can be drawn. While Guantanamo's stated purpose was to gather intelligence, the system was none other than "an intentional system of cruel, unusual and degrading treatment and a form of torture." Neil A. Lewis, *Red Cross Finds Detainee Abuse at Guantanamo*, N.Y. TIMES, Nov. 30, 2004 (citing confidential Red Cross report) *available at* http://www.nytimes.com/2004/11/30/politics/ 30gitmo.htm?pagewanted=1. Moreover, "indefinite detention for the purpose of interrogation is not authorized" by the AUMF or laws of war. *Hamdi v. Rumsfeld*, 542 U.S. 507, 537 (2004)..
Defendants' actions thus cannot more likely be explained as lawful conduct.

<div style="border:1px solid red">Deleted: [wa]</div>

<div style="border:1px solid red">Deleted: '</div>

2.      **Exclusive Government Control of Vital Evidence Militates against a Heightened Pleading Standard**

The *Twombly* dissent recognized the difficulty of the majority's standard in cases where critical evidence is under the exclusive control of the opposing party. *Twombly*, 127 S. Ct. at 1983 (Stevens, J., dissenting) ("This case is a poor vehicle for the Court's new pleading rule, for we have observed that … where 'the proof is largely in the hands of the alleged conspirators,' … dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.") (internal quotations and citations omitted). In *Kartseva v. Dep't State*, the D.C. Circuit addressed this issue in the qualified immunity context, holding that where the resolution of a "threshold question … requires information on the nature and effects of the government action that is exclusively within the domain of the government, limited discovery may be appropriate in order to determine that threshold issue." 37 F.3d at 1530 (D.C. Cir. 1994); *see also Davis v. Grant Park Nursing Home LP*, 2009 U.S. Dist. LEXIS 68302, *42 (D.D.C. Aug. 5, 2009); *District Council 47 v. Bradley*, 795 F.2d 310, 315 (3rd Cir. 1986) ("To require more at this stage of the proceedings would impose on civil rights plaintiffs an impossible burden of

knowledge of the internal workings of state institutions – knowledge which can only be discerned through the discovery process"); *Pullium v. Ceresini*, 221 F. Supp. 2d 600, 603 (D. Md. 2002) ("Plaintiff cannot be faulted for failing to detail [defendant's] specific role in her complaint when the information related to that role is in the exclusive control of Defendants.").

In the context of Plaintiffs' *Bivens* claims, critical information about Decedents' detention and Defendants' roles in the complaint is within the exclusive custody and control of the government. Of the information the government has produced – compelled in response to FOIA litigation in 2006 for information about the military's investigation into their deaths – a significant proportion is classified and redacted, including the names and titles of relevant military personnel involved in their custody and care. In light of the fact that Decedents died in custody years before this action was brought, before they were able to meet with attorneys or pursue habeas cases, the government's control of evidence is effectively a complete bar to Plaintiffs' counsel's ability to know critical facts and information since counsel cannot rely on Decedents themselves or their habeas cases as independent sources of information. Plaintiffs maintain that the allegations in their Amended Complaint satisfy the *Twombly* standard, but any shortcomings are fully attributable to the government's exclusive possession and control of vital facts and information and the unique circumstances of this case. If the Court chooses not to deny dismissal of Plaintiffs' claims at this stage, Plaintiffs should have the opportunity for discovery.

3.      *Iqbal* **Does Not Preclude the Liability of the Individual Defendants**

Relying on *Iqbal*, Defendants assert that *Bivens* claims cannot rest on *respondeat superior* or "supervisory liability." Def's' Const. Mot. at 19. It is uncontroversial that *respondeat superior* cannot serve as an appropriate basis for liability in *Bivens* claims, and Plaintiffs do not rely on it. *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather,

they seek to hold the individual Defendants responsible for their *own* misdeeds and misconduct – creating and implementing policies that resulted in Decedents' Fifth and Eighth Amendment harms of prolonged arbitrary detention and cruel treatment – which *Iqbal* does not preclude. The particular theory of "supervisory liability" argued and rejected in *Iqbal* can be distinguished from this case.

In *Iqbal*, the Supreme Court rejected the plaintiff's particular theory of "supervisory liability" because the plaintiff's First and Fifth Amendment claims of religious and racial discrimination required defendants Ashcroft and Mueller themselves to have acted with discriminatory animus in adopting and implementing the detention policies at issue. 129 S. Ct. at 1948-49. The defendants' "knowledge and acquiescence" in their subordinates' discriminatory purpose, as the plaintiff alleged, was alone not sufficient to hold the defendants liable because of the intent required by the plaintiff's specific claims. *Id*. at 1949

The *Iqbal* Court was careful to limit its holding to the particular intent-based constitutional claims at issue in that case, 129 S.Ct. at 1948 ("The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue. Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted *with discriminatory purpose*." (emphasis added)). Post-*Iqbal*, courts have similarly cabined the decision to intent-based claims.[35]

---

[35]     In *Chao v. Ballista*, the court specifically distinguished *Iqbal*, asserting that "the state of mind required to make out a supervisory claim under the Eighth Amendment– i.e., deliberate indifference–requires less than the discriminatory purpose or intent that Iqbal was required to allege in his suit against Ashcroft and Mueller." 630 F.Supp. 2d 170, 178 n.2 (D. Mass. July 1, 2009) (citing *Iqbal,* 129 S.Ct. at 1951-52). In *Banks v. Montgomery*, the court endorsed a test for liability in an Eighth Amendment denial of medical relief claim on the basis of a supervisor's knowledge or deliberate indifference and not intent. *Banks*, 2009 U.S. Dist. LEXIS 49349, *5-4 (N.D. Ind. June 11, 2009).

Similarly, Plaintiffs' Fifth Amendment due process and Eighth Amendment claims, which do not require intent or purpose, *see Kartseva v. Dep't State*, 37 F.3d 1524 (D.C. Cir. 1994) (no intent required for Fifth Amendment due process *Bivens* claim); *Farmer v. Brennan*, 511 U.S. 825 (1994) (no intent required for Eighth Amendment cruel and unusual punishment *Bivens* claim), can be distinguished from *Iqbal* and the basis for qualified immunity in that case. Under the Due Process Clause of the Fifth Amendment as well as under the Eighth Amendment, a plaintiff in state custody need only show that a defendant knew or was deliberately indifferent to as serious risk of harm.[36] *See Farmer*, 511 U.S. at 834 (1994); *Banks v. York*, 515 F. Supp. 2d 89, 102-3 (D.D.C. 2007); *FOP Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1145-46 (D.C. Cir. 2004); *Butera v. District of Columbia*, 235 F.3d 637, 651-2 (D.C. Cir. 2001).

Separate from the specific elements of the Fifth Amendment due process clause and the Eighth Amendment, this Circuit has also established a standard for the liability of supervisors in *Bivens* claims. In *International Action Center v. United States*,[37] a government official must merely "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."[38] 365 F.3d 20, 28 (D.C. Cir. 2004) (citing *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (Posner, J.)).[39]

---

[36] Where prisoners commit suicide, serious risk is proven "by virtue of the suicide itself." *Powers-Bunce*, 479 F. Supp. 2d at 156.

[37] While *Int'l Action Center* was a § 1983 claim, and not a *Bivens* claim, the law of immunity is the same in both contexts. *See Butz v. Economou*, 438 U.S. 478, 504 (1978) ("[W]e deem it untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.").

[38] The Second and Ninth Circuits have expanded on similar tests for personal involvement. *See Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (liability of government official: (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional deprivation by subordinates; or (4) for conduct that shows a reckless or callous indifference to the rights of others); *see also Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 255 (2d Cir. N.Y. 2001).

[39] This standard comports with the doctrine of command responsibility in international law, under which a higher official may be held liable for the human rights violations of her subordinates if the following are established: "(1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime;

Applying the requirements of the Fifth Amendment due process clause, the Eighth Amendment, and the more general standard for liability for supervisors established in *International Action Center*, Plaintiffs have adequately alleged the personal involvement of the individual Defendants in their Amended Complaint. Plaintiffs allege far more than that the individual Defendants knew and were deliberately indifferent to the suffering of Messrs. Al-Zahrani and Al-Salami. Rather, they allege that Defendants affirmatively created, facilitated and implemented policies and practices they knew were wrongful and that resulted in the violations of Decedents' rights. At a minimum, they knew or should have known of the harms occurring and turned a blind eye.

### 4. Plaintiffs Adequately Alleged the Personal Involvement of the Individual Defendants

Plaintiffs allege that Defendant Rumsfeld and each of the other named individual Defendants were responsible for creating and implementing the detention and interrogation policies that resulted in Plaintiffs' arbitrary detention and torture for over four years in Guantanamo. *See, e.g.,* Am. Compl. ¶¶ 15-40, 44, 55, 57, 60-63, 68-73, 80, 97-100, 146, 160, 182-197. In over 155 paragraphs of factual allegations, they detail those policies and their own tragic experience. Am. Compl. ¶¶ 41-197. They allege that each individual Defendant played a central role in designing and operating the cruel system in which Decedents suffered and

---

(2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes." *Ford ex rel. Estate of Ford v. Garcia,* 289 F.3d 1283, 1288 (11th Cir. 2002); *see also In Re Yamashita,* 327 U.S. 1, 14-16 (1946); *Hilao v. Estate of Marcos,* 103 F.3d 767, 777 (9th Cir. 1996) ("The principle of 'command responsibility' that holds a superior responsible for the actions of subordinates appears to be well accepted in U.S. and international law."). This doctrine is further affirmed in the legislative history to The Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73, codified at 28 U.S.C.S. § 1350: "[A] higher official need not have personally performed or ordered the abuses in order to be held liable. Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts - anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them." S. REP. NO. 102-249, at 9 (1991). The U.S. military has similarly recognized this principle. *See, e.g.,* U.S. Dep't of Army, Field Manual 10 1-5, *Staff Organization and Operations,* 1 - 1 (May 1997) (a commander assumes "the legal and ethical obligation …for the actions, accomplishments, or failures of a unit").

ultimately died, and that each knew or should have known of the illegality of his conduct, the violations occurring and/or the grave risks to Decedents' health and safety, but continued to defend and maintain the policies or at least willfully disregarded what he knew Am. Compl. ¶¶ 182-197. Plaintiffs allege that each individual Defendant was thus necessarily and integrally involved in the constitutional injuries they allege. Am. Compl. ¶¶ 236-242, 245-252.

Deleted: Plaintiffs'

a.      **Defendants Rumsfeld, Myers and Pace: Senior Officials**

Beginning at the top of the chain of command, Plaintiffs allege that Defendant Rumsfeld authorized and directed the seizure and transfer of Decedents to Guantanamo, which he selected precisely because he believed foreign citizens like Decedents would be outside the reach of U.S. law and international obligations, and where he intended to hold Decedents indefinitely without process. Am. Compl. ¶ 44. For over two years, until *Rasul v. Bush* (2004), Decedents remained in incommunicado detention without charge, review, access to counsel, or notice of the reasons for their detention, under the direction of Rumsfeld. Am. Compl. ¶¶ 45, 82, 124. Decedents' detention continued for two more years pursuant to an "enemy combatant" determination by a sham Combatant Review Status Tribunal authorized by Rumsfeld, until their deaths in June 2006. Am. Compl. ¶¶ 48, 85, 128. Decedents never had the chance to meet with attorneys or pursue habeas cases prior to their deaths in large part because of delays caused by the Department of Defense's refusal to disclose any identifying information about Guantanamo detainees (until compelled by FOIA litigation in 2006). Am. Compl. ¶¶ 46, 88, 132.

Deleted: Plaintiffs
Deleted: Plaintiffs
Deleted: Plaintiffs
Deleted: Plaintiffs'
Deleted: Plaintiffs

Plaintiffs allege that Decedents' torture and abuse in Guantanamo were also pursuant to directives from Rumsfeld that were implemented through individual Defendants, Am. Compl. ¶ 61, and that Rumsfeld and other Defendants created and sanctioned a system that was designed to break detainees physically and psychologically as a means of obtaining intelligence. Am.

Compl. ¶ 72.  Plaintiffs specifically allege that Rumsfeld authorized a series of illegal interrogation methods in December 2002 and April 2003, which included the use of prolonged solitary confinement; hooding; 20-hour interrogations; forced nudity; forced shaving; the use of dogs.  Am. Compl. ¶¶ 62, 63.  Plaintiffs also allege that Rumsfeld opposed the application of the Geneva Conventions to Guantanamo and initially opposed the involvement of the ICRC, Am. Compl. ¶ 55, which created an environment for rampant abuse.  Plaintiffs also allege that the ICRC repeatedly put Rumsfeld and the other individual Defendants on notice that their tactics amounted to torture and would have damaging consequences for detainees.  Am. Compl. ¶ 74.

Defendants Myers and Pace, as Chairmen of the Joint Chiefs of Staff during the period of Decedents' detention and the principal military advisors to the President and the Secretary of Defense, were by virtue of their positions necessarily involved in developing and approving detention and interrogation policies that resulted in the harms Plaintiffs allege.  Am. Compl. ¶¶ 16, 17.  Plaintiffs specifically allege that Defendant Myers joined in recommending the use of the interrogation methods mentioned above, Am. Compl. ¶ 62, and discouraged the application of the Geneva Conventions to Guantanamo.  Am. Compl. ¶ 55.

**b.**     **Defendants Hill and Craddock: Commanders of SOUTHCOM**

Defendants Hill and Craddock, as Commanders of the U.S. Southern Command (USSOUTHCOM) during the relevant period and the senior military officers with authority over Guantanamo, were responsible for issuing, authorizing and implementing policies for all detention and interrogation operations, including implementation at the level of individual detainees.  Am. Compl. ¶¶ 18, 19, 62 (referencing December 2002 interrogation memo, which "requests authorization for the Commander of USSOUTHCOM to employ, in his discretion" the requested interrogation techniques).  Hill and Craddock were the link in the chain of command

between Rumsfeld and the subordinate commanders of the special task force charged with the day-to-day operations of Guantanamo (Joint Task Force Guantanamo or "JTF-GTMO").

Plaintiffs allege that Defendant Hill was directly involved in the approval and implementation of illegal interrogation tactics used under his command. Am. Compl. ¶ 62. During his leadership, the ICRC reported that the military was intentionally using psychological and physical coercion "tantamount to torture" on prisoners and that their treatment was increasingly "refined and repressive," and described the system in Guantanamo as one designed to break the will of the men through "humiliating acts, solitary confinement, temperature extremes [and] use of forced positions." *See* Am. Compl. ¶¶ 51, 64 (referring to ICRC findings following its June 2004 visit).

Plaintiffs allege that defendant Craddock, in addition to maintaining the same basic policies as his predecessor, approved a harsh new policy of using "restraint chairs" to force-feed hunger striking detainees as a tactic to deter strikes. Am. Compl. ¶ 69. Plaintiffs allege that Decedents were subjected to the policy. Am. Compl. ¶ 70.

  **c. Defendants Lehnert, Dunlavey, Miller, Hood, Harris, Carrico, McQueen, Cannon, Bumgarner, Dennis, and Rodriguez: Commanders or Directors at Guantanamo**

Defendants Lehnert, Dunlavey, Miller, Hood, Harris, Carrico, McQueen, Cannon, Bumgarner, Dennis, and Rodriguez, as commanders or directors of all or part of the operations of JTF-GTMO during the period of Decedents' detention, had responsibilities for issuing, implementing and enforcing policies that touched every aspect of Guantanamo detainees' daily existence. As the front-line commanders of the prison, they were also regularly apprised of the ICRC's observations and recommendations. Am. Compl. ¶ 74.

Defendants Dunlavey, Lehnert and Carrico took command in January and February 2002 when the first detainees were arriving in Guantanamo. Defendant Dunlavey initially headed interrogation operations, Am. Compl. ¶ 21, and personally requested permission for the harsh interrogation techniques Defendant Rumsfeld approved in December 2002. *See supra* Part II.C.4.a. Defendants Lehnert and Carrico were responsible for detention operations, including the custody, care and conditions of detainees in the infamous outdoor cages of Camp X-Ray, where Yasser Al-Zahrani was held for approximately three months, Am. Compl. ¶¶ 20, 25, 53, 55, 90.

Defendants Miller, Hood and Harris served as the commanders of JTF-GTMO in successive periods from October 2002 through the period of Plaintiffs' deaths, and were responsible for all detention and interrogation operations in Guantanamo. Am. Compl. ¶¶ 22-24. Plaintiffs allege that Defendant Miller pushed for more aggressive interrogation techniques and headed the prison during a period of particular brutality. Am. Compl. ¶ 62. During his command, the ICRC described the system of holding detainees indefinitely without allowing them to know their fate "unacceptable" and warned of the impact on detainees' mental health. Am. Compl. ¶ 74. The first suicide attempts were also reported during Miller's watch, involving nearly two dozen prisoners who tried to hang themselves. By the end of his term in 2004, there had been over 400 reported incidents of self harm. Am. Compl. ¶¶ 77, 79. Military medical personnel themselves reported during this period that depression was the most common ailment among detainees and that over one-fifth of prisoners were taking anti-depressants. Am. Compl. ¶ 62.

The abuses persisted through the command of Defendant Hood, who was in charge of the prison until a few months before Decedents' deaths. During his command, the ICRC charged that the military was intentionally using physical and psychological coercion "tantamount to

Deleted: Plaintiffs'

torture" on detainees.  Am. Compl. ¶ 74.  In 2005, in response to one of the largest hunger strikes in Guantanamo, Plaintiffs allege that Hood and other Defendants introduced and implemented restraint chairs to force-feed detainees on hunger strike, as mentioned above.  Am. Compl. ¶ 69.

Deleted: Plaintiffs'

Decedents' deaths occurred on the watch of defendant Harris.  Plaintiffs allege that he and other individual Defendants knew or should have known that Plaintiffs faced serious risks harm, Am. Compl. ¶ 78, but failed to adequately protect them.  Am. Compl. ¶¶ 80, 98, 159,

Deleted: CITE

Defendant Harris publicly called the deaths "not an act of desperation, but an act of asymmetric warfare aimed at us here in Guantanamo."  Am. Compl. ¶ 121.

Defendants Miller, Hood and Harris were also responsible for issuing "Standard Operating Procedures" ("SOPs"), which served as the primary policy manual for all aspects of the day-to-day custody, care, treatment, and conditions of Guantanamo detainees, and which were implemented in conjunction with subordinate commanders McQueen, Cannon, Bumgarner, and Dennis.  Am. Compl. ¶ 60.  While the SOPs are classified and within the exclusive control of the Department of Defense, the 2003 and 2004 manuals were leaked to the public in 2007. The 2003 SOP, issued and implemented by Defendants Miller and McQueen, includes provisions authorizing isolation for up to 30 days without access to the ICRC, and beyond 30 days for "military necessity" with approval; the use of pepper spray, physical force and deadly force to control detainees; leaving detainees in three-point restraints for two or more continuous hours; and providing for a plan for incoming detainees that aimed to "exploit" their disorientation, isolate them and create dependence on their interrogators.  Am. Compl. ¶ 73. The  SOP also details detainees' conditions and weekly regimen, including providing for five-minute showers and 20-minute "recreation" two times per week; and allowing for religious items to be used as "incentives."

### d. Defendants Winkenwerder, Tornberg, Cowan, Arthur, Edmondson, Sollock, Cullison, and Burkhard: Medical Officers

Defendant physicians Winkenwerder, Tornberg, Cowan, Arthur, Edmondson, Sollock, Cullison, and Burkhard were each senior officials and military officers within the Department of Defense whose mandates included authorizing, developing and implementing healthcare policies and overseeing healthcare operations and facilities in Guantanamo. Am. Compl. ¶¶ 31-38 Each had a duty to ensure the adequate and ethical provision of services and to protect the health and safety of detainees. In their Amended Complaint, Plaintiffs allege in detail the denial of adequate medical and psychiatric care to address Decedents' health needs, both during their detention and at the point of their deaths, and the substantial risk of harm they faced. *See* Am. Compl. ¶¶ 58, 59, 61, 63, 65, 69, 70. They allege that Defendants were aware of this risk, including through the reports of the ICRC, their own personnel and the acts of detainees themselves, but failed in their duty to protect Decedents' health and safety, to devastating effect. Am. Compl. ¶¶ 74-80. Plaintiffs also allege that Decedents suffered severe physical and psychological injuries as a result of deliberate policies, including force-feeding using restraint chairs, as approved and supervised by Defendants Winkenwerder, Edmondson and Sollock. Am. Compl. ¶¶ 69, 70.

*     *     *

Despite each Defendant's central role in creating and operating the illegal system in which Decedents ultimately lost their lives, they argue that Plaintiffs have failed to show that any of them were personally involved in any misconduct. Under *Twombly*, Defendants' argument would mean that Plaintiffs have shown no more than the "mere possibility" that any defendant engaged in any wrongdoing.

Defendant Rumsfeld argues that while Plaintiffs allege that he approved illegal interrogation methods for use in Guantanamo, they fail to allege that Messrs. Al-Zahrani and Al-Salami were subjected to any of those particular methods. Def's' Const. Mot. at 26. Rumsfeld argues for a level of specificity not required under *Twombly*. Plaintiffs allege that Messrs. Al-Zahrani and Al-Salami were subjected to methods of physical and psychological torture that were approved by Defendants including Rumsfeld for use in connection with their interrogations in Guantanamo. Am. Compl. ¶¶ 61, 93-94, 136-137. Even if greater specificity were required, Plaintiffs detail the tactics to which they were subjected, which were in line with the interrogation techniques Rumsfeld approved in December 2002 and April 2003. Am. Compl. ¶¶ 62-63.

Rumsfeld further argues that Plaintiffs fail to allege that he authorized, or that any other of the named Defendants were personally involved in, other abuses Plaintiffs allege, such as beatings by the Emergency Force Reaction units. Def's' Const. Mot. at 26. But Plaintiffs allege that Rumsfeld created and approved policies that were designed to increase detainees' physical and psychological duress and ultimately to break them down for the purposes of gathering intelligence. Am. Compl. ¶ 72. As for the ERF units, their use was specifically part of policy in Guantanamo, as set forth in the Standard Operating Procedures issued by the commanders of JTF-GTMO. Am. Compl. ¶ 60. The SOPs implemented Department of Defense policy. Am. Compl. ¶ 60. As head of DOD, defendant Rumsfeld necessarily authorized, either directly or through delegated authority, the policies being carried out in the name of his agency.

Rumsfeld concedes that Plaintiffs adequately plead his involvement in the decision to detain Decedents, but argues that Messrs. Al-Zahrani and Al-Salami's detention did not violate any clearly established constitutional rights. Rumsfeld claims that the right of detainees to

47

receive adequate process was not made clear until *Hamdi v. Rumsfeld* in 2004, that the inadequacy of the CSRTs was not established until *Boumediene v. Bush* in 2008, and that Plaintiffs fail to allege that Rumsfeld was connected to the CSRTs in any event. Def's' Const. Mot. at 27. But as Plaintiffs argue in Part II.C.4.a, *supra*, Rumsfeld was on clear notice before Decedents were transferred to Guantanamo that holding detainees indefinitely, without process, was against U.S. law and treaty obligations, which is precisely why he chose Guantanamo as the site for detention. The basic deficiencies in the CSRT process were similarly obvious, even before *Boumediene*: detainees were afforded no counsel, the government's evidence was presumed valid with the detainee given little or no opportunity to rebut, and continued detention could be justified on the basis of evidence resulting from torture.

Defendants Craddock, Winkenwerder and Hood similarly argue that the allegations of their involvement in force-feeding detainees with restraint chairs do not allege a violation of any clearly established right. As an initial matter, Plaintiffs allege the personal involvement of these Defendants beyond the acts of approving and implementing the force-feeding policy, and allege that Defendants Edmondson and Sollock supervised and implemented the process. Defendants rely on two cases for their contention, one of which, *In re Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998) (*per curiam*), is distinguishable given the particularly aggressive nature of the force-feeding Plaintiffs allege. The health consequences and dangerous conditions of the force-feeding described here, combined with the mockery, humiliation, and other abuse detainees suffered in connection with the process, rises to the level of a violation of a clearly established right. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' … when they have a mutually enforcing effect that produces the deprivation of a

single, identifiable human need.") (emphasis in original).  The practice alleged "involved the unnecessary and wanton infliction of pain," *Rhodes v. Chapman*, 452 U.S., 346 (1981), and the inherent cruelty in these acts was obvious.  As the World Medical Association notes, "[e]ven if intended to benefit, feeding accompanied by threats, coercion, force *or use of physical restraints* is a form of inhuman and degrading treatment."[40]  World Medical Association, *Declaration on Hunger Strikers (Declaration of Malta)*, 1991, as revised 2006, at ¶ 21 (emphasis added); *cf. Abdullahi v. Pfizer*, 562 F.3d 163 (2d Cir. 2009) (giving authoritative weight to a WMA declaration).

Citing *Iqbal*, Defendants Lehnhert, Hood, Harris, McQueen, Cannon, Bumgarner, and Dennis argue that the specific allegations against them are "factually neutral" and could only support a theory of supervisory liability.  Def's' Const. Mot. at 26.  But Plaintiffs allege that each of the individual Defendants named in the complaint, including these Defendants, were personally involved in creating and implementing policies that resulted in Decedents' prolonged arbitrary detention, torture and cruel treatment.  Am. Compl. ¶¶ 20, 23, 24, 26-29, 60, 69.  These seven Defendants, as front-line commanders in charge of detention and/or interrogation operations in Guantanamo, had central roles in issuing and carrying out those policies.  Am. Compl. ¶ 60.  For instance, as Plaintiffs specifically allege, each Defendant was responsible for issuing comprehensive SOPs that governed virtually every aspect of detainees' custody and care, *id.*, and there was nothing "neutral" about the regime set forth by the SOPs that might suggest a more plausible explanation of lawful conduct.  The misconduct of these Defendants themselves,

**Deleted:** Plaintiffs'

---

[40] A group of experts from the United Nations indeed concluded "that health professionals in Guantánamo Bay have systematically violated widely accepted ethical standards set out in the United Nations Principles of Medical Ethics and the Declaration [of the WMA forbidding force-feeding]."  U.N. Econ. & Soc. Council [ECOSOC], Comm'n on Human Rights, Situation of Detainees at Guantanamo Bay, P 82, U.N. Doc. E/CN.4/2006/120 (Feb. 27, 2006) (prepared by Leila Zerrougui, Leandro Despouy, Manfred Nowak, Asma Jahangir, & Paul Hunt).

not their subordinates, is the basis for Plaintiffs' theory of liability, as alleged with respect to all of the individual named Defendants in the complaint.

Lastly, Defendants Pace, Carrico, Rodriguez, Tornberg, Cowan, Arthur, Burkhard, and Cullison claim that Plaintiffs have made no plausible allegations against them. Govt. Mot. at 25. Yet Plaintiffs have alleged with specificity the harms they suffered in Guantanamo, and that each of the individual Defendants, including these eight, had central roles in creating, advising and implementing the policies that resulted in those injuries. *See, e.g.,* Am. Compl. ¶¶ 17, 25, 30, 32-34, 37, 38, 61, 63, 68, 71-73, 183-197. Plaintiffs have at least met the plausibility threshold of pleading "enough facts to raise a reasonable expectation that discovery will reveal evidence." *Twombly*, 550 U.S. at 556.

A fair reading of Plaintiffs' complaint, in light of the fact that vital evidence remains within the control of the government, shows that Plaintiffs' allegations have at least plausibly suggested that each Defendant acted unlawfully. *Iqbal*, 129 S. Ct. at 1941 (whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense).

## III.  SPECIAL FACTORS DO NOT PRECLUDE THE COURT FROM RECOGNIZING PLAINTIFFS' *BIVENS* CLAIMS

"*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Carlson v. Green*, 446 U.S. 14, 18 (1980). A *Bivens* action is available for constitutional violations unless "defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective," or there are "special factors counseling hesitation in the absence of affirmative action by Congress." *Id.* at 18-19; *Bivens*, 403 U.S. at 396. Defendants do

not point to any substitute recovery scheme set forth by Congress, but instead seek to immunize themselves by arguing that four "special factors" counsel against recognizing recovery here.

As indicated in the cases cited by Defendants, special factors have previously been invoked by the courts to reject relief under *Bivens* where there are "comprehensive procedural and substantive provisions giving meaningful remedies against the United States" to plaintiffs. *Bush v. Lucas*, 462 U.S. 367, 368 (1983).[41] Here, the government does not argue that any such substitute scheme exists.

The cases cited by Defendants for the proposition that this case is an "extension" of *Bivens* are irrelevant. *FDIC v. Meyer*, 510 U.S. 471 (1994), and *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001), involved defendants who are not federal officials (agencies and private contractors, respectively). *Bush v. Lucas*, 462 U.S. 367 (1983), and *Schweiker v. Chilicky*, 487 U.S. 412 (1988) involved elaborate administrative remedial procedures with which a *Bivens* action could interfere.

Similarly, *Chappell v. Wallace*, 462 U.S. 296 (1983), and *United States v. Stanley*, 483 U.S. 669 (1987), were *Bivens* actions brought by active duty members of the military who were entitled to invoke an elaborate remedial scheme to adjudicate claims of wrongdoing. Active duty members of the military accept the obligations and restrictions that come with such status voluntarily or as a duty of citizenship; in contrast, Yasser al-Zahrani and Salah al-Salami did not

---

[41]     *Bush* obviously does not stand for the proposition that only Congress has sufficient expertise to determine the appropriate remedial scheme, as the government implies, Gov't Br. at 7; *Bivens* recognizes an implied remedy in the absence of affirmative Congressional action.
        *FDIC v. Meyer*, 510 U.S. 471, 486 (1994), also cited by the government as an example of the courts discovering "new special factors" in the years since *Bivens*, Gov't Br. at 7, is nothing of the sort. The *Meyer* Court refused to extend *Bivens* to encompass claims against agency defendants (as opposed to individuals), as there was a particular risk to the public treasury in implying a remedy against agencies under *Bivens*; those factors are not present here, as the *Bivens* claims here are not made against agencies and the small number of similarly situated plaintiffs cannot pose a mortal threat to the public fiscally.

freely assume such burdens when they were brought to Guantanamo against their will,[42] and the recognition of their *Bivens* claims will not "harm military decision-making and discipline" in the way recognition of the claims in *Chappell* or *Stanley*—claims brought by enlisted soldiers against their superiors[43]—might have.

Defendants' argument that permitting plaintiffs' *Bivens* action to go forward threatens the Executive Branch's foreign policy function merits only brief mention (as it relies almost entirely on one case, *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985)). Plaintiffs' *Bivens* action seeks redress for Decedents' prolonged arbitrary detention, and the physical and psychological torture, degradation and abuse inflicted upon them by the defendants and others under defendants' control and direction while they were in the custody of the U.S. military. Such claims do not call into question decisions about U.S. government support for foreign political entities like the Nicaraguan Contra rebels, as was the case in *Sanchez-Espinoza*. Nothing about a decision in favor of the Plaintiffs here would cause "'embarrassment of our government abroad' by 'multifarious pronouncements by various departments on one question,'" as the government claims. Gov't Br. at 9 (quoting *Baker v. Carr*, 369 U.S. 186, 226 (1962)). Indeed, given the total de facto control over the base noted by the Supreme Court in *Rasul* and *Boumediene*, for all practical purposes the actions here did not take place abroad at all.[44]

---

[42]    The *Stanley* Court characterized the general rule of these cases as excluding on "special factors" grounds claims for activity "incident to service," 483 U.S. at 680-83, which both necessarily implies a limitation to claims from plaintiffs who are *serving*, and an acknowledgment that the *factual predicate* of a link between the claims and military service must be established (as it was in *Stanley, id.* at 679-80). (Notably, Defendants here have not even established conclusively that, as a factual matter, the deceased men in question were properly military detainees.)

[43]    Military officer defendants are not exempt from liability under *Bivens, see Willson v. Cagle*, 711 F. Supp. 1521, 1525-26 (N.D. Cal. 1988), *aff'd*, 900 F.2d 263 (1990), and the courts have recognized *Bivens* actions by civilians against military officers, *see, e.g., Saucier v. Katz*, 533 U.S. 194 (2001).

[44]    *See Rasul v. Bush*, 542 U.S. 466, 487 (2004) (Kennedy, J., concurring) ("Guantanamo Bay is in every practical respect a United States territory" where our "unchallenged and indefinite control … has produced a place that belongs to the United States"); *Boumediene v. Bush*, 128 S. Ct. 2229, 2252-53, 2258-59 (2008) (same).

Defendants' argument that they should be immune from suit because their conduct occurred as part of the exercise of the Executive's powers to wage war, protect national security, and conduct foreign policy comes perilously close to being an *apologia* for the torture and degradation experienced by Decedents. This argument flies in the face of express U.S. treaty obligations that "no exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture." U.N. Torture Convention, Part I, Article 2, Sec. 2; s*ee also* Department of State, *Initial Report of the United States of America to the U.N. Committee* at ¶ 100, Ex. 3 ("Torture cannot be justified by exceptional circumstances, nor can it be excused on the basis of an order from a superior officer.").

The government also argues that Congress' attention to questions of the treatment of detainees and the jurisdiction of Article III courts over their claims somehow comprises a "special factor" demanding that this court not recognize Plaintiffs' *Bivens* claims. Gov't Bt. at 14-17. In support, the government can only cite two cases—*Chilicky* and *Stanley*—where Congress had in fact created remedies that were adequate in an absolute sense (if not as favorable as might have been available under *Bivens*). For those plaintiffs, it was not "damages or nothing." *Davis v. Passman*, 442 U.S. 228, 245 (1979); *Bivens*, 403 U.S. at 410 (Harlan, J., concurring). The statutes cited by the government are all irrelevant to the special factors analysis as set forth by the Supreme Court. The Reagan Act and the McCain Amendment in the DTA reiterate longstanding obligations to treat detainees humanely, all of which already bound the government prior to passage; they "did not create a new private right [of] action" (Def't's Const. Mot at 16 (quoting Sen. McCain)) nor create a new obligation to cease the acts complained of here.

Finally, the government argues that the existence of Section 7 of the MCA militates against implying a *Bivens* remedy for anyone the United States determined was properly detained as an enemy combatant. Def't's Const. Mot. at 16. That category does not include the detainees whose abuse is at issue here for the reasons set forth in Part I.B, *supra*. Moreover, one cannot infer that Congress intended to preclude direct *constitutional* actions for Guantanamo detainees. The Congress that passed the MCA wrongly believed that such litigants had no constitutional rights. *See* Part I.A at n.5, *supra*. Since Congress did not even think constitutional actions a possibility, one cannot attribute any particular intent to Congress regarding the availability of direct constitutional actions under *Bivens*.[45] As an invalid jurisdictional statute, MCA Section 7 is simply void,[46] as the Supreme Court has already held, *see* Part I.A. *supra*, but even if it were not, it should be given no effect in regard to the availability of a *Bivens* action.[47]

\* \* \*

In a footnote, Gov't Br. at 4 n.5, Defendants attempt to dismiss the *Bivens* claims against eight military medical officials under the Gonzalez Act, 10 U.S.C. § 1089. As this argument was raised cursorily in a footnote the Court may consider it waived.[48] More problematically, these

Deleted: 5

Deleted: the government

Deleted: s

---

[45] The government does not distinguish why an individual plaintiff who was *not* properly determined to be an "enemy combatant," but merely "was detained [and] … is awaiting such determination" (nominally triggering § 2241(e)(2)), should also not have any *Bivens* claims, if indeed Section 7 evinced Congressional intent as to *Bivens*. There would seem to be no limiting principle to the elimination of *Bivens* on such a theory. Indeed, to the extent the availability of *Bivens* claims (or some adequate substitute) is *required* by the constitution, *see Bush v. Lucas*, 462 U.S. 367, 378 n.14 (1983) (reserving question), such a broad-brush elimination of all otherwise-available direct constitutional actions would be unconstitutional. *Cf. Malesko*, 534 U.S. at 75 (Scalia, J., dissenting).

[46] *See supra* note 17.

[47] Courts have voided jurisdictional statutes and allowed cases to go forward in contexts where doing so required a waiver of sovereign immunity. *See United States v. Klein*, 80 U.S. 128 (1871) (voiding jurisdiction-stripping provision even though it cut off access to Court of Claims for actions predicted on waiver of federal sovereign immunity); *Bartlett v. Bowen*, 816 F.2d. 695, 707-11 (D.C. Cir. 1987) (voiding broad jurisdiction preclusion, in face of dissenting opinion arguing that jurisdictional provision should be viewed as modifying sovereign immunity waiver allowing any damages claims in the first place).

[48] *See Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) ("We need not consider cursory arguments made only in a footnote"); *Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 142 (D.D.C. 2009) ("As this argument was raised in a footnote and nowhere in the text of the motion [to dismiss], the Court need not consider it.").

eight defendants have cited no authority directly relevant to the question of whether the Gonzalez Act bars *Bivens* claims. *See* Gov't Br. at 4 n.5 (citing *contradictory* authority in two foreign circuits as to whether a supposedly-related statute bars *Bivens* claims). The fact that Defendants cite no relevant (or conclusive) authority, and do not further develop their footnoted argument, leaves Plaintiffs unable to determine what line of reasoning to respond to and constitutes further grounds for considering these arguments waived. *SEC v. Banner Fund Int'l*, 211 F.3d 602, 614 (D.C. Cir. 2000) ("half-hearted effort … insufficient to put … objection before this court"); *United States v. Watson*, 171 F.3d 695, 699 n.2 (D.C. Cir. 1999) (declining to address "asserted but unanalyzed" argument). In any event, the FTCA claims made the "exclusive" remedy by the Gonzalez Act do not provide a "comprehensive" scheme "giving meaningful remedies against the United States,"[49] and Defendants identify no "special factors" barring *Bivens* relief, nor are any readily apparent. Moreover, the eight defendants have not established that their participation in torture qualifies as legitimately within "the performance of medical, dental, or related health care functions" or that such acts were "within the scope of … [their] duties or employment," 10 U.S.C. § 1089(a), within the terms of the Act.

## IV. PLAINTIFFS' INTERNATIONAL LAW CLAIMS ARE PROPERLY ASSERTED AGAINST THE INDIVIDUAL DEFENDANTS

Defendants' violations are universally and expressly prohibited in law, including in the United States Constitution, U.S. criminal statutes, U.S. military law, and U.S. treaty obligations. Torture in particular goes against the legal and moral grain of this country, as this Court rightly noted in *United States v. Karake*: "[t]he use of torture … clearly contravenes 'principles of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" 443 F.Supp.2d 8, 51 (D.D.C. 2006) (quoting *Brown v. Mississippi*, 297 U.S. 278, 284 (1936)).

---

[49] *Cf. Castaneda v. United States*, 546 F.3d 682, 701 (9th Cir. 2008) (cited in Def's Br. at 4 n.5).

These acts are never legitimate, certainly not by cabinet members and senior officers of the military, as U.S. courts and the military itself have recognized. *See Nuru v. Gonzalez*, 404 F.3d 1207, 1222-23 (9th Cir. 2005) (torture violates *jus cogens* norms and can never be authorized by a government); *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1472 (9th Cir. 1994) ("[A]cts of torture, execution and disappearance were clearly outside of his authority as President."); Army Field Manual, Ch 1, 34-52 ("The use of force, mental torture, threats, insults, or exposure to unpleasant and inhumane treatment of any kind is *prohibited by law and is neither authorized nor condoned* by the U.S. Government."); *see also* Article 93 of the Uniform Code of Military Justice, *codified at* 10 U.S.C. § 893. Art. 93.

These acts are repugnant to the law, as they were to the drafters of the Westfall Act. Yet pursuant to that act, the government has certified that the challenged conduct of each Defendant was properly within the scope of his employment, with the aim of fully immunizing him from personal liability, and moves to be substituted as the sole defendant for Plaintiffs' claims I to IV under the Alien Tort Statute ("ATS").

The government's motion should be denied. First, even if state law is used to define Defendants' scope of employment, as Defendants suggest, Defendants would still be held accountable because D.C. *respondeat superior* law does not extend to "egregious conduct" and the Westfall Act was not intended to cover abhorrent acts such as torture. Second, this Court should depart from the use of state law to determine scope of employment regardless and instead rely on federal common law given the distinctly federal interests at stake. Third, even if such conduct is concluded to be within the scope of employment, this matter should proceed to an evidentiary hearing and should not be dismissed at this stage. Finally, in any event, Plaintiffs' ATS claims fall squarely within the statutory exception to the Westfall Act. Plaintiffs' right to

an effective remedy for their deprivations should not be infringed though creative use of the Westfall Act.

### A. Defendants' Conduct Is Not within the Scope of Their Employment Even if State Law Applies

The government argues that law of the District of Columbia is the applicable law for determining whether the individual Defendants were acting within the scope of their employment. Even if "state[50]" law is applied, Defendants must be held accountable. D.C. law follows the Restatement (Second) of Agency ("Restatement") in determining whether a government official acted within the scope of employment. *See Haddon v. United States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995). Under the Restatement, conduct is within the scope of employment if it is authorized or "incidental to" authorized conduct. Restatement (Second) of Agency § 228 ("if force is intentionally used by the servant against another, the use of force [must be] unexpectable by the master" to fall within the scope of employment); *Harbury v. Hayden*, 522 F.3d 413, 422 (D.C. Cir. 2008) (conduct is considered "incidental" if it is "foreseeable" by the master or a "direct outgrowth" of the officials' responsibilities); *Haddon v. United States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995) (quoting Restatement (Second) of Agency § 229). In determining the scope of employment or whether conduct was incidental thereto, the Restatement directs court to examine, *inter alia*, whether the conduct is "seriously criminal." Restatement (Second) of Agency § 239. Consciously criminal or intentionally tortious acts may be potentially within the scope of employment, but

> [t]he fact that the servant intends a crime, especially if the crime is of some magnitude, is considered in determining whether or not the act is within the scope of employment since the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result. The master can reasonably anticipate that servants may commit minor crimes in the prosecution of the business, but *serious crimes are not only unexpectable but*

---

[50] *See infra* note 55.

Deleted: 1

> *in general are in nature different from what servants in a lawful occupation are expected to do.*

Restatement (Second) of Agency, § 231, cmt. a (emphasis added).

As stated above, torture, cruel, inhuman and degrading treatment, and prolonged arbitrary detention are among the most egregious acts recognized in law. It is undisputed that they are "serious crimes," *see Rasul v. Myers*, 512 F.3d 644, 659 (D.C. Cir. 2008) ("[T]he plaintiffs have plainly alleged 'seriously criminal' conduct."), and thus "unexpectable" within the meaning of D.C. law. It is an understatement that Defendants' acts of issuing and implementing policies that resulted in the torture and four-year detention of Messrs. Al-Zahrani and Al-Salami without process were "in nature different from what servants in a lawful occupation are expected to do." As such, these acts were not "foreseeable" and could not have been incidental to any authorized activity. Shielding Defendants from responsibility for their conduct would render the "seriously criminal" prong of § 239 meaningless, and would extend the scope of the D.C. *respondeat superior* doctrine beyond its proper limits.[51]

Granting the government's argument would also pervert the intended use of *respondeat superior* doctrine. The District of Columbia, and many states, apply the scope of employment test expansively to "allow[] an injured tort plaintiff a chance to recover from a deep-pocket employer rather than a judgment-proof employee." *Harbury v. Hayden*, 522 F.3d 413, 422 n.4

---

[51]    Plaintiffs are aware that several decisions from this Circuit have held that torture and arbitrary detention are within the scope of employment for federal officials. *See Rasul v. Myers*, 512 F.3d 644 (D.C. Cir. 2008) (concerning acts of torture at Guantanamo); *Harbury v. Hayden*, 522 F.3d 413 (D.C. Cir. 2008) (concerning acts of torture); *see also Bancoult* v. *McNamara*, 370 F. Supp. 2d 1, 7 (D.D.C. 2004) (concerning acts of genocide, torture, forced relocation, and cruel, inhuman, and degrading treatment). For the above-mentioned reasons, this Court should depart from these holdings. In particular, *Rasul and Harbury* transplanted several outlier cases from the District of Columbia regarding *respondeat superior* to a context that the doctrine was never intended to cover. *See Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976) (employee raped and stabbed customer in dispute over payment); *Weinberg v. Johnson*, 518 A.2d 985 (D.C. 1986) (employee at laundromat shot customer while fighting over missing shirts). The D.C. Circuit itself noted in *Lyon* that this holding was "perhaps at the outer bounds of respondeat superior." *Lyon*, 533 F.2d at 651.

(D.C. Cir. 2008). Assuming D.C. law should apply, it should not be applied to limit, rather than

expand, avenues of redress for heinous acts of violence and arbitrary detention.[52]

While Plaintiffs submit that it is clear that D.C. law, properly interpreted, would not

extent immunity to serious crimes such as torture, the plain language of the Westfall Act itself

arguably is ambiguous. In particular, in authorizing substitution only for "negligent or wrongful

acts" committed by U.S. officials, 28 U.S.C. § 2679(b)(1), the scope of conduct covered by

"wrongful acts" is ambiguous. Given this lack of clarity, the Court should turn to the legislative

history of the Westfall Act for guidance. *See United States v. Villanueva-Sotelo*, 515 F.3d 1234,

1237 (D.C. Cir. 2008); *cf. Laird v. Nelson*, 406 U.S. 797, 798-799 (1972) (turning to legislative

history to interpret "wrongful" in the context of the similarly-drafted FTCA).

The legislative history unquestionably demonstrates that Congress never intended the

Westfall Act to immunize officials for egregious conduct such as torture and prolonged arbitrary

detention. Congress expressed as much when it noted that "[i]f an employee is accused of

egregious misconduct, rather than mere negligence or poor judgment, then the United States may

not be substituted as the defendant, and the individual employee remains liable." H.R. Rep. No.

---

[52]    The Westfall Act should also be interpreted in light of international law providing Plaintiffs with a right to an effective remedy for torture and similar crimes. *Port Auth. of N.Y. & N.J. v. DOT*, 479 F.3d 21, 31 (D.C. Cir. 2007) (quoting *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.")). The right to an effective remedy is universally recognized as a non-derogable right in international law, and is provided for, *inter alia*, in the Universal Declaration of Human Rights, art. 8, G.A. Res. 217A (III), U.N. GAOR, 3d Sess., 1st plen. Mtg., U.N. Doc. A/810 (Dec. 12, 1948), as well as several treaties to which the United States is a party, including the Third and Fourth Geneva Conventions, the Convention Against Torture ("CAT"), and International Covenant on Civil and Political Rights, Dec. 16, 1966, S. Ex. Rep. No. 23, 102d Cong., 2d Sess., 999 U.N.T.S. 171 ("ICCPR") ( entered into force Mar. 23, 1976) (*ratified* by U.S. on Sept. 8, 1992), arts. 2(3), 9(5) and 14(6). In particular, as a party to CAT, the United States is obligated to "ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation including the means for as full rehabilitation as possible." U.N. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85, art. 14. *See also* Human Rights Committee (HRC), General Comment 20, Article 7, Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.1 (1994) General Comment 20, Article 7 9Forty-fourth sessions, 1992), at para. 15 ("Amnesties are generally incompatible with the duty of States to investigate such acts [of torture]."). *See generally* Jordan J. Paust, *Civil Liability of Bush, Cheney et al. for Torture, Cruel, Inhumane, and Degrading Treatment and Forced Disappearance* (Sep. 14, 2009), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458638.

**Deleted:** *on* SSRN

100-700, at 5 (1988), reprinted in 1988 U.S.C.C.A.N. 5945, 5949. The egregiousness of the alleged conduct distinguishes Plaintiffs' claims from the type of conduct the Westfall Act was intended to cover. *See* H.R. Rep. No. 100-700, at 5 (1988), reprinted in 1988 U.S.C.C.A.N. 5945, 5949 (giving "a government maintenance worker's failure to place a caution sign on a wet floor" as an example of the Westfall Act's intended scope).

In particular, the Congressional record indicates that Westfall was not meant to provide immunity for the crime of torture. In an amicus brief submitted to the Court of Appeals for the District of Columbia, Representative Barney Frank, drafter of the bill that became the Westfall Act, wrote of Westfall's reach that "[a]n official engaged in torture … was to stand alone in facing the legal consequences of his or her actions." Brief of Amicus Curiae-United States Representative Barney Frank In Support of Appellant at 7, *Harbury v. Harden*, 522 F.3d 413, 422 (D.C. Cir. 2008) (No. 06-cv-5282); *see also* 134 Cong. Rec. H4718 (June 27, 1988) (wherein Representative Frank says of the bill, "we are not talking about intentional acts of harming people"). The first sponsor of the bill, Representative Dante Fascell, agreed: "Torture is an insidious practice of brutality which is the most egregious example of man's inhumanity toward man. Torture is antithetical to our respect for the rights and dignity of the individual – it is violent; it is abhorrent; and it is illegal." 130 Cong. Rec. 24,858 (1984); *see also* 130 Cong. Rec. 24,861 (1984) (statement of Rep. Brown) ("[A] fair and just legal system … has no room for torture."); 130 Cong. Rec. 24,861 (1984) (statement of Rep. Broomfield) ("[T]he U.S. Government has always taken a strong stand against the practice of torture.").

**B.      Federal Common Law Applies to Scope of Employment Determinations**

Even if this Court determines that D.C. *respondeat superior* law mandates that defendants be granted immunity, the Court should depart from the use of state law and instead refer to federal common law to determine whether Defendants acted within the scope of

employment. While courts generally use state law to determine scope of employment, *see Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006), such an application in this instance is inappropriate given that claims I to IV allege egregious violations of international law.[53] Instead, this Court should apply a "functional" approach under federal common law, which has traditionally been used to decide cases of absolute immunity. Under such a federal common law analysis, the conduct Plaintiffs allege would not fall within the scope of Defendants' employment.

International law is a matter of federal interest, and "should not be left to divergent and parochial state interpretations." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964) (citing with approval Phillip C. Jessup on this point). Given the federal nature of Plaintiffs' ATS claims, this Court should abide by the principle that "[w]hen federal law is the source of the plaintiffs' claim, there is a federal interest in defining the defenses to that claim, including the defense of immunity." *Ferri v. Ackerman*, 444 U.S. 193, 198 n.13 (1979). The federal government has a strong interest in ensuring that its international obligations to punish those responsible for torture - for instance, under the Convention Against Torture ("CAT") - are performed in a uniform manner, and that the law governing the liability of federal officers under statutes such as the ATS is interpreted consistently.

This Court should therefore adopt the "functional" approach in federal common law long used to determine absolute immunity for U.S. officials. *See Van de Kamp v. Goldstein*, 129 S. Ct. 855, 860-1 (2009). Prior to the enactment of the Westfall Act, it was this approach that governed scope of employment determinations in such cases. *See Westfall v. Ervin*, 484 U.S. 292 n.3 (1988); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 810-11 (1982) ("[I]n general our

---

[53] For a detailed discussion of the merits of using federal common law to determine scope of employment, *see* Elizabeth A. Wilson, *Is Torture All in a Day's Work? Scope of Employment, the Absolute Immunity Doctrine, and Human Rights Litigation Against U.S. Federal Officials*, 6.1 Rutgers J.L. & Pub. Pol'y 178 (2008).

cases have followed a 'functional' approach to immunity law."). Under a "functional" approach, courts look to "the nature of the function performed, not the identity of the actor who performed it," to determine whether the conduct at issue should be immunized. *Burns v. Reed*, 500 U.S. 478, 506 (1991). Courts will also look to "the degree to which the official function would suffer under the threat of prospective litigation." *Westfall v. Ervin*, 484 U.S. 292, 296 n.3 (1988). Defendants are accused of prolonged arbitrary detention and torture – egregious, unconstitutional conduct. As noted above, federal courts have consistently held that such acts cannot, as a matter of law, be within the scope of employment for government officials.[54] *See, e.g., In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1472 (9th Cir. 1994) ("[A]cts of torture, execution, and disappearance were clearly acts outside of his authority as President."). The threat of potential litigation is thus irrelevant here; the "official function" of defendants could not, as a matter of law, include commission or authorization of torture, cruel, inhuman or degrading treatment, or prolonged arbitrary detention. Pursuant to the "functional" federal common law determination of scope of employment, defendants must therefore be held accountable.

Even if D.C. law would place torture within the scope of employment, state law should be preempted given the federal interests involved. The Supreme Court has held that "[t]he authority of a federal officer to act derives from federal sources … No subject could be one of more peculiarly federal concern [than the authority of a federal officer to act], and it would deny

---

[54]     This common sense principle was clearly articulated in *Filartiga v. Pena-Irala*, 630 F.2d 867, 889 (2d Cir. 1980) (the Second Circuit doubted whether an action by a state official, such as torture "in violation of the Constitution and laws of the Republic of Paraguay, and wholly unratified by that nation's government, could properly be characterized as an act of state."), as well as subsequent litigation against Ferdinand Marcos. *See In re Estate of Marcos Human Rights Litig.*, 978 F.2d 493, 497-98 & n.10 (9th Cir. 1992); *In re Estate of Marcos Human Rights Litig.*, 910 F.Supp. 1460, 1463 (D. Haw. 1995); *see also Nuru v. Gonzalez*, 404 F.3d 1207, 1222-23 (9th Cir. 2005) (torture can never be authorized by a government); *Xuncax v. Gramajo*, 886 F. Supp. 162, 175-76 (D. Mass. 1995) (Guatemala's Minister of Defense was not acting within scope of official duties when he ordered and directed campaign of kidnapping, torture, and execution). *Cf. Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980) (foreign state had no discretion to commit illegal acts that were "contrary to the precepts of humanity as recognized in both national and international law").

the very considerations which give the rule of privilege its being to leave determination of its extent to the vagaries of the laws of the several States." *Howard v. Lyons*, 360 U.S. 593, 597 (1959). The federal interest in ensuring that federal officials do not engage in torture is significant and should preempt any allegedly contradictory state law. *Cf. Garrett v. Jeffcoat*, 483 F.2d 590 (4th Cir. 1973) (holding that the Federal Drivers Act's release of individual liability had no effect on the liability of the United States, despite contradictory state law); *Moschetto v. United States*, 961 F.Supp. 92, 95 (S.D.N.Y. 1997) (holding that the United States was not liable for a tort under the FTCA despite New York law that would impose liability, because the FTCA does not waive sovereign immunity for state law claims of strict liability). A federal interest in preventing federal officials of the United States from engaging in torture, detention without due process, and cruel treatment should thus preempt any state law that would provide otherwise. Brief of Amicus Curia United States Representative Barney Frank In Support of Appellant at 12, *Harbury v. Harden*, 522 F.3d 413, 422 (D.C. Cir. 2008) (No. 06-cv-5282).

C. **Plaintiffs Are Entitled to Discovery Because the United States' Certification Raises a Factual Issue in Dispute**

Even if this Court does not hold that Defendants acted outside the scope of employment, this issue should proceed to discovery. Scope of employment analysis is an issue of fact, *e.g., Brown v. Argenbright Sec.*, 782 A.2d 752, 757 (D.C. 2001), which is best decided at an evidentiary hearing. *Majano v. United States*, 469 F.3d 138, 140 (D.C. Cir. 2006). "On the infrequent occasions when courts have resolved scope of employment questions as a matter of law … it has generally been to hold that the employee's action was not within the scope of her employment and thus to absolve the employer of any liability." *Id.* at 141.

Discovery is particularly appropriate given Plaintiffs' burden in challenging the government's certification. Certification creates a rebuttable presumption that an official acted

within the scope of employment, and the burden then shifts to the plaintiff to rebut the presumption. "[T]he plaintiff cannot discharge this burden without some opportunity for discovery." *Stokes v. Cross*, 327 F.3d 1210, 1214 (D.C. Cir. 2003). In cases such as this, when "there is a material dispute as to the scope issue[,] the district court must resolve it at an evidentiary hearing." *Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994). This is particularly vital here given the unique limitations on Plaintiffs' counsels' access to information by virtue of the government's exclusive possession and control of evidence regarding Guantanamo operations and Decedents' deaths.

Thorough review of certification is also particularly necessary in cases where, as here, the government moves to dismiss a plaintiff's FTCA claims as well as claims against individual officials, thereby purportedly closing all doors to redress. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 427 (1995) ("When the United States retains immunity from suit, certification disarms plaintiffs."). The "impetus [on the Attorney General or her designee] to certify becomes overwhelming" in cases where nothing is at stake for the United States as it will suffer no liability under the FTCA. *Id.* at 427-428.

**D.      Plaintiffs' ATS Claims Fall within the Statutory Exception to the Westfall Act**

Since the claims for which the defendants seek substitution are brought under the ATS – a violable federal statute – they fall squarely within the statutory exception and defendants are not entitled to immunity. 28 U.S.C. § 2679(b)(2).

The government cites *Sosa v. Alvarez-Machain* for the proposition that "the ATS is a jurisdictional statute creating no new causes of action," and is thus incapable of being violated. 542 U.S. 692, 724 (2004). The government ignores crucial language in *Sosa*'s holding, however, in which the Court goes on to say that "although the ATS is a jurisdictional statute creating no *new* causes of action, the reasonable inference from the historical materials is that the statute was

64

intended to have practical effect the moment it became law," without the need for "further legislation." *Id.* at 724 (emphasis added). "The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." *Id.*

This Circuit itself recently interpreted *Sosa* to hold that the ATS grants a cause of action:

> Sosa and the U.S. government argued that the ATS was only a jurisdictional grant; it did not create any substantive law, but the Court disagreed, concluding that when the statute was passed by the first Congress as part of the Judiciary Act of 1789, three limited causes of action were contemplated: piracy, infringement of ambassadorial rights, and violation of safe conduct … the Court opened the door a crack to the possible recognition of new causes of action under international law (such as, perhaps, torture) if they were firmly grounded on an international consensus.

*Saleh v. Titan Corp.*, No. 08-7008 Consolidated with 08-7009, 2009 U.S. App. LEXIS 20337, *38-39 (D.C. Cir. 2009). The analysis in *Saleh* thus supplants the earlier district court decisions cited by the government in its argument that the ATS does not fall within this exception, namely *Harbury v. Hayden*, 444 F. Supp. 2d 19 (D.D.C. 2006), and *Bancoult v. McNamara*, 370 F. Supp. 2d 1 (D.D.C. 2004).

The ATS is violated when the laws of nations are violated. Through its incorporation of preexisting rights under international law, the ATS creates a viable cause of action and the statutory exception covers such statutes. *Cf. Timberline Northwest, Inc. v. Hill*, No. 96-35763, 1998 U.S. App. LEXIS 5453, *5 (9th Cir. 1998) (holding that the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, which incorporates principles of state substantive law to define prohibited activity, falls under the statutory exception to the Westfall Act). In light of the recent holding in *Saleh* and the proper interpretation of *Sosa*, as well as the

breadth of § 2679(b)(2)'s coverage, the government's motion should be denied as Plaintiffs' claims fall within the statutory exception to the Westfall Act.

## V.     THE GOVERNMENT'S MOTION TO DISMISS CLAIMS I TO IV AND VII TO XIV PURSUANT TO THE FTCA SHOULD BE DENIED

The government's motion to dismiss claims I through IV and claims VII through XIV should be denied because this Court retains subject matter jurisdiction over these claims pursuant to the FTCA, 28 U.S.C. §§ 1346(b), 2671-80.  This motion misstates the proper scope of the FTCA, and the exceptions thereto, as well as the correct jurisdictional status of Guantanamo Bay.  Claims I to IV and VII to XIV are cognizable under the FTCA, and therefore the government's motion should be denied.

### A.     The United States Has Waived Sovereign Immunity with Respect to Plaintiffs' ATS Claims

As Plaintiffs argue above, the motion to substitute the United States as sole Defendant should be denied as certification pursuant to the Westfall Act was improper.  Even if this motion is granted, this Court retains subject matter jurisdiction over these claims pursuant to the FTCA because they allege wrongdoing for which "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

The government is incorrect when it argues that claims under the ATS – namely those brought pursuant to international law – cannot form the basis of a cognizable FTCA claim.  U.S. FTCA Mot. at 7-8.  The government mainly argues that since the "law of the place" referenced in § 1346(b) refers to local law – often interpreted as state law[55] – claims brought for violations

---

[55]     Some courts have interpreted this reference to "law of the place" as state law.  *See, e.g., FDIC v. Meyer*, 510 U.S. 471, 477 (1994).  The plain language of § 1346(b), however, makes no reference "state" law in particular, and given the FTCA's application in non-states, such as the District of Columbia, many courts have held that the proper interpretation is actually "local" law.  *See, e.g., United States v. Olson*, 546 U.S. 43, 44 (2005); *Hornbeck*

of international law do not fall within the scope of the FTCA. The brief discussion of the requirements of the FTCA in the government's motion, however, ignores the proper interpretation of the FTCA, as well as the plain language of § 1346(b).

The United States waives sovereign immunity under the FTCA for any claim for which a private person, under like circumstances, would be liable under local tort law. 28 U.S.C. § 1346(b), 2674. "The pertinent inquiry is whether the duties set forth in the federal law [which forms the basis for the FTCA claim] are *analogous* to those imposed under local tort law." *Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 510 (D.C. Cir. 2009) (emphasis added) (quoting *Art Metal-USA, Inc. v. United States*, 753 F.2d 1151, 1158 (D.C. Cir. 1985)); *Price v. United States*, 228 F.3d 420, 422 (D.C. Cir. 2000); *see also Gray v. DOJ*, 275 Fed. Appx. 679, 681 (9th Cir. 2008) (liability of the United States under FTCA "turns on whether a private person would be liable for analogous behavior under [local] law."). The plain language of § 1346(b) confirms that the United States need not, as the government contends, be liable as "a private person" in accordance with the law pursuant to which the claim was brought, but rather "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Local law thus serves as "the source of substantive liability under the FTCA." *FDIC v. Meyer*, 510 U.S. 471, 477 (1994).

In finding local law analogs, courts look to the "law of the place where the act or omission occurred," 28 U.S.C. § 1346(b), and "[a] prerequisite to deciding where the act or omission occurred is determining which was the relevant act or omission." *Hitchcock v. United States*, 665 F.2d 354, 359 (D.C. Cir. 1981) (citation omitted); *see also Richards v. United States,* 369 U.S. 1, 9 (1962) (applying the "law of the place" where the negligence took place, not where

*Offshore Transp., LLC v. United States*, 569 F.3d 506, 510 (D.C. Cir. 2009). Still other courts have held that it refers to both state and local law. *Williams v. United States,* 242 F.3d 169, 172-73 (4th Cir. 2001) ("'[L]aw of the place,' as used in the FTCA, refers to state and local law.").

it had its "operative effect"); *Tri-State Hospital Supply Corp. v. United States*, 2007 U.S. Dist. LEXIS 48609, *9 (D.D.C. 2007); *Raflo v. United States*, 157 F. Supp. 2d 1, 9-10 (D.D.C. 2001) ("The D.C. Circuit applies the … law of the place where the 'relevant' act or omission occurred.").[56]

Courts in this Circuit have repeatedly turned to several factors to determine where "the relevant act or omissions occurred" in cases where numerous acts or omissions led to the injury. For instance, courts have taken into account the site of the "primary government actor" in choosing the relevant local law. *Raflo*, 157 F. Supp. 2d at 9 ("In *Hitchcock*, in reaching its conclusion that the relevant acts and omissions took place in the District of Columbia, the district court treated the Department of State, rather than the United States of America, as the primary government actor.") (citing *Hitchcock*, 665 F.2d at 360); *see also Tri-State Hospital Supply Corp. v. United States*, 2007 U.S. Dist. LEXIS 48609, *12-13 (D.D.C. 2007). The Court of Appeals in *Hitchcock* "analogize[d] the Government … to a corporation of national scope, headquartered in Washington, with a clinic under similar circumstances in [another state] … [i]mmediate supervision of [which] was exercised from Washington." *Hitchcock*, 665 F.2d at 360. In so doing, the Court noted that if a judgment was "sustained against the corporation, the financial burden would surely fall on the business as a whole, headquartered out-of-state, rather than on the individual clinic." *Id.*

Courts have also looked to the location where "critical decisions, employee instructions, and job assignments" were made, *Harbury v. Hayden*, 444 F. Supp. 2d 19, 31 (D.D.C. 2006) (in

---

[56]     The Supreme Court has held that "the law of the place" refers to the "whole law," including the choice-of-law rules of the place where the act or omission occurred. *Richards*, 369 U.S. at 11-13. In accordance with the *Richards* holding, courts must first decide which local law applies, looking to the situs of the "relevant acts or omissions," then apply that location's choice-of-law rules to decide what body of law will provide the local law analogs. *See Hitchcock v. United States*, 665 F.2d 354, 359-60 (D.C. Cir. 1981). D.C.'s interest analysis choice-of-law principle is substantially the same as the "relevant act or omission" standard, and their discussion is combined here for present purposes. *See Id.* at 360.

choosing scope-of-employment law), and where the "most substantial part of the [wrongful and negligent] acts or omissions occurred," *Raflo*, 157 F. Supp. 2d at 10 (D.D.C. 2001), as opposed to where the mere "operative effect" of those acts were felt. *Richards v. United States*, 369 U.S. 1, 10 (1962); *see also Hitchcock*, 655 F.2d at 359 (D.C. Cir. 1981) (internal citation omitted).

The relevant acts or omissions leading to the injuries alleged in the Amended Complaint occurred in the District of Columbia. First, the "primary government actor" was the DOD, located at the Pentagon in Washington, D.C. DOD had ultimate authority over the operations in Guantanamo, and Plaintiffs' injuries in Guantanamo were pursuant to systematic directives emanating from DOD that were implemented through the military chain of command. In addition, all tortious statements and decisions regarding the behavior of the government following the death of the detainees occurred at the Pentagon. While the "acts or omissions" challenged in the Amended Complaint occurred in several locations, ultimate command over Guantanamo was exercised from the DOD's center of operations at the Pentagon in Washington, D.C, and critical decisions regarding detention and interrogation policies were made there. That the injuries occurred at Guantanamo instead of a detention camp elsewhere was "fortuitous" and thus irrelevant for § 1346(b) purposes. *See Hitchcock*, 665 F.2d at 360. As such, D.C. law is the proper "law of the place" in which to find local cause of action analogs.[57] The government

---

[57] The application of D.C. law here should not be confused with an improper use of the headquarters doctrine exception to the foreign country exception, discussed in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). The headquarters doctrine had allowed plaintiffs to avoid the bar on any FTCA "claim arising in a foreign country," 28 U.S.C. § 2680(k), by alleging that the acts leading to foreign injuries occurred in the United States. In *Sosa*, the Court rejected this doctrine by holding that the language "arising in a foreign country" referred to the location of the injury, and not the negligent act. *Sosa*, 542 U.S. at 712; *see also Harbury*, 522 F.3d at 423. In contrast, the language in § 1346(b) regarding the "law of the place where the act or omission occurred" by its plain language refers to the location "where the negligence took place, not where it had its 'operative effect.'" *Hitchcock*, 665 F.2d at 359 (citing *Richards*, 369 U.S. at 9-10). Plaintiffs' look to D.C. law solely for the purposes of § 1346(b), and not to avoid the foreign country exception; their argument is thus not an application of the headquarters doctrine. As argued below, while Plaintiffs injuries were suffered at Guantanamo, they maintain that Guantanamo is not "foreign" territory for FTCA purposes.

admits as much in its motion to substitute by applying D.C. scope-of-employment law as the "law of the state where the tortious act occurred." Gov't Mot. for Substitution at 7.

Plaintiffs' ATS claims are clearly analogous to tortious causes of action under D.C. law for which a private person would be liable. Claim I, prolonged arbitrary detention, is clearly analogous to the tort of false imprisonment, the elements of which are, in the District of Columbia, "(1) the detention or restraint of one against his will, within boundaries fixed by the defendant, and (2) the unlawfulness of the restraint." *Faniel v. Chesapeake & Potomac Tel. Co.*, 404 A.2d 147, 150 (D.C. App. 1979). These elements are analogous to Plaintiffs' claims that (1) Messrs. Al-Salami and Al-Zahrani were detained against their will, within the fixed boundaries of the detention camp, and that (2) their detention was unlawful in that it violated customary international law prohibiting prolonged arbitrary detention.

Claims II and III are also analogous to local D.C. causes of action. Plaintiffs' claims of torture against Messrs. Al-Salami and Al-Zahrani are clearly analogous to the tort of battery. *Jackson v. District of Columbia*, 412 A.2d 948, 955 (D.C. 1980) ("A battery is an intentional act that causes a harmful or offensive bodily contact.") (citing Rest. (Second) of Torts § 18 (1965)). Claim III alleges cruel, inhuman and degrading treatment for, *inter alia*, "sleep deprivation for up to 30 days, beatings by the ERF squad, intentional exposure to extreme hot and cold temperatures, continued solitary confinement, forced feeding, desecration of their religion, denial of adequate medical care and being subjected to mockery and degrading comments." Am. Compl. at ¶ 219. Some of these allegations are analogous to battery (i.e., forced feeding and beatings), while others are analogous to intentional infliction of emotional distress (i.e., mockery and degrading comments and desecration of religion), false imprisonment (i.e., continued solitary confinement) and medical malpractice (i.e., denial of adequate medical care). Claim IV

70

similarly alleges the above-mentioned abuses, and thus also finds local cause of action analogs in the District of Columbia.

The government further argues that the United States could not be liable "if a private person" as required by the FTCA because treaties, providing one of the bases for claims I to IV, are generally construed not to be individually enforceable. The validity of their treaty construction aside, the government again misconstrues the requirements of the FTCA. As discussed above, the law pursuant to which FTCA claims are brought is not the same law under which a private person must be liable pursuant to § 1346(b)'s analogy test. Nor do the circumstances pursuant to which a private person would be liable need to be the same. Once a local cause of action analog is found, the United States will be deemed liable "in the same manner and to the same extent as a private individual under *like* circumstances."[58] 28 U.S.C. § 2674 (emphasis added). "[T]he words 'like circumstances' do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield." *United States v. Olson*, 546 U.S. 43, 46 (2005) (emphasis in original); *see also Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955).

The government relies on two out-of-circuit district court cases for the proposition that claims converted from ATS claims, which are necessarily based in violations of international law, are not cognizable under the FTCA. Gov't Mot. to Dismiss at 7-8 (citing *Bansal v. Russ*, 513 F.Supp.2d 264, 280 (E.D. Pa. 2007) and *Turkmen v. Ashcroft*, 2006 U.S. Dist. LEXIS 39170 (E.D.N.Y. July 14 2006)). A closer look at the holdings in these cases suggests, however, that they are not good law. The district court in *Turkmen* clearly relied on a misstated test for cognizance under the FTCA; the Court quotes § 1346(b) as saying " '[T]o be actionable under

---

[58]     The full sentence provides that the United States will be liable as a private person unlike like circumstances, except it "shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674.

the [FTCA], a claim must allege … that the United States would be liable to the claimant … in accordance with the law of the place where the act or omission occurred.'" *Turkmen*, 2006 U.S. Dist. LEXIS at \*150 (E.D.N.Y. July 14 2006) (ellipses in original).  This misstatement excludes through the use of ellipses the integral language "if a private person," thereby ignoring the analogy test created by § 1346(b).[59]  In addition, the *Turkmen* court mistakenly holds that an FTCA claim must be brought *pursuant* to local law, ignoring the clear language of the FTCA requiring merely that local law provide the basis for finding cause of action analogs.  To the extent that *Bansal*'s sole support for the claim that international law claims are not covered under the FTCA is *Turkmen*, it too should be ignored.  *Bansal*, 513 F. Supp. 2d at 280.   Given the foregoing concerns, as well as this Circuit's treatment of the FTCA noted above, this Court should not rely on *Turkmen* and *Bansal*.

**B.**     **Claims I to IV and VII to XIV Are Not Barred by the Foreign Country Exception**

The majority of the government's motion to dismiss Plaintiffs' FTCA Claims, including the "converted" ATS Claims, is devoted to the argument that the claims are barred by the foreign country exception to the FTCA, 28 U.S.C. § 2680(k).  Notably, this is the Government's sole argument in support of dismissing Claims VII to XIV.  The Government argues that Guantanamo is "foreign" for FTCA purposes, relying heavily on extraneous case law concerning the application of the FTCA to military bases in Europe, Asia and Antarctica, as well as several out-of-date, non-controlling district court decisions regarding the FTCA and Guantanamo.  In addition, the Government attempts to distinguish U.S. "control and jurisdiction" from "sovereignty" over Guantanamo, curiously ignoring recent Supreme Court decisions on point

---

[59]     *Cf.* 28 U.S.C. § 1346(b) (The Government is liable under the FTCA "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.").

and citing only the Third Circuit decision *Heller v. United States*, 776 F.2d 92, 96 (3d Cir. 1985), *cert. denied*, 476 U.S. 1105 (1986).  U.S. FTCA Mot. at 11.

The foreign country exception excludes from the scope of the FTCA any claim alleging injuries "arising in a foreign country."  28 U.S.C. § 2680(k); *Sosa*, 542 U.S. at 712 (interpreting § 2680(k) as barring claims where the injuries, not acts or omissions, arose in foreign countries). In defining "foreign" for FTCA purposes, the Supreme Court has recognized that Congress "identified the coverage of the Act with the scope of United States sovereignty."  *United States v. Spelar*, 338 U.S. 217, 220-21 (1949); *see also Id.* at 219 ("By the exclusion of claims 'arising in a foreign country,' the coverage of the Federal Tort Claims Act was geared to the sovereignty of the United States.").

Courts dealing with the issue of foreignness also frequently cite the purpose behind § 2680(k), namely to "codif[y] Congress's 'unwilling[ness] to subject the United States to liabilities depending upon the laws of a foreign power.'"  *Sosa*, 542 U.S. at 707 (citation omitted); *see also see also Spelar*, 338 U.S. at 221 ("[T]hough Congress was ready to lay aside a great portion of the sovereign's ancient and unquestioned immunity from suit, it was unwilling to subject the United States to liabilities depending upon the laws of a foreign power."); *Heller*, 776 F.2d at 98, *cert. denied*, 476 U.S. 1105 (1986); *Sami v. United States*, 617 F.2d 755, 762-63 (D.C. Cir. 1979).

While reference to Congressional intent will not save an FTCA claim arising in an location otherwise deemed "foreign," *Sosa*, 542 U.S. at 711-12 (discussing the language of § 2680(k) as barring an FTCA claim for injuries arising in Mexico), this intent remains an important component in determining foreignness for FTCA purposes.[60]

---

[60]        The Government may argue that Congressional intent is irrelevant, relying on *Smith v. United States*, 507 U.S. 197 (1993), in which the Supreme Court held that the foreign country exception applied to Antarctica, even

73

The Government's effort to distinguish between "sovereignty" and "control and jurisdiction" exercised by the United States over Guantanamo is precluded by Supreme Court precedent. In *Boumediene v. Bush*, the Court held that "the United States, by virtue of its complete jurisdiction and control over the base [at Guantanamo], maintains *de facto* sovereignty over this territory." 128 S. Ct. at 2253. The Court focused on the "narrow, legal sense of the term [sovereignty], meaning a claim of right" to the exclusion of control exercised by other countries. *Id.* at 2252 (citing 1 Restatement (Third) of Foreign Relations, § 206, Comment b, at 94) (sovereignty "implies a state's lawful control over its territory generally to the exclusion of other states, authority to govern in that territory, and authority to apply law there")). "[T]he United States is, for all practical purposes, answerable to no other sovereign for its acts on the base." *Id.* at 2261. The *Boumediene* Court's findings with respect to the U.S.' relationship to Guantanamo affirmed its holding in *Rasul v. Bush*, 542 U.S. 466 (2004), where the Court noted that "[b]y the express terms of its agreements with Cuba, the United States exercises 'complete jurisdiction and control' over the Guantanamo Bay Naval Base, and may continue to exercise such control permanently if it so chooses." *Id.* at 481.

To the extent the government argues that Cuba retains some residual sovereignty over Guantanamo pursuant to the lease, thus rendering Guantanamo "foreign," Plaintiffs respond with two points. First, the Supreme Court held in *Boumediene* that, given the indefinite nature of the lease over the base, "Cuba effectively has *no rights as sovereign* until the parties agree to modification of the 1903 Lease Agreement or the United States abandons the base." *Boumediene*, 128 S. Ct. at 2251-52 (emphasis added). The Supreme Court and this Circuit have both repeatedly recognized that the "lease [between the United States and Cuba over

---

though no foreign law would be implicated. In *Smith*, however, the Court focused on numerous other reasons for deeming a "desolate and extraordinarily dangerous land such as Antarctica" foreign. *Id.* at 205.

Guantanamo] is no ordinary lease. Its term is indefinite and at the discretion of the United States." *Id.* at 487 (Kennedy, J., concurring); *see also*, *Boumediene*, 128 S. Ct. at 2260; *Rasul v. Myers*, 563 F.3d 527, 530 n.3 (D.C. Cir. 2009) (recognizing the "indefinite" nature of the lease). The indefinite nature of the Guantanamo lease distinguishes the case at hand from foreign military bases, and, as *Boumediene* holds, effectively leaves Cuba "no rights as sovereign."

Second, Plaintiffs note that courts have repeatedly allowed FTCA claims in cases where injuries arose in areas for which sovereignty is a complex question, or where dual sovereignty exists. *See Cheromiah v. United States*, 55 F.Supp.2d 1295, 1308 (D.N.M. 1999) (allowing an FTCA claim arising on a Native American Reservation) ("While 'Indian tribes and the federal government are dual sovereigns,' … the tribes are not foreign countries under any definition of the term."); *see also Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 537 (1st Cir. 1997) (allowing an FTCA claim arising in the Virgin Islands); *Taber v. Maine*, 67 F.3d 1029, 1033 (2d Cir. 1995) (allowing an FTCA claim arising in Guam); *Soto v. United States*, 11 F.3d 15, 17 (1st Cir. 1993) (allowing an FTCA claim arising in Puerto Rico). Indeed, Guantanamo does not exhibit the foreign nature required to fall within the scope of § 2680(k). "In every practical sense Guantanamo is not abroad." *Boumediene v. Bush*, 128 S. Ct. 2229, 2261 (2008). The Supreme Court has soundly precluded the government's contention that cases holding that the foreign country exception covers military bases in Europe, Asia and Antarctica are somehow "dispositive" of the issue at hand. Gov't Mot. to Dismiss at 9. Justice Kennedy, for instance, has written that "Guantanamo Bay is in every practical respect a United States territory … From a practical perspective, the indefinite lease of Guantanamo Bay has produced a place that belongs to the United States." *Rasul v. Bush*, 542 U.S. 466, 487 (2004) (Kennedy, J., concurring). In addition, no foreign law applies at Guantanamo – indeed, only U.S. law has

applied there since 1903[61] – and no foreign law could be applied to the United States through an FTCA claim for injuries arising there. *See* Treaty Defining Relations with Cuba, May 29, 1934 U.S. – Cuba, art. III, 48 Stat. 1682, 1683, T.S. No. 866. Allowing FTCA claims for injuries arising at Guantanamo, therefore, would not offend the Congressional intent behind the foreign country exception.

Apart from this clear precedent holding that Guantanamo is not "foreign" to the United States, the government's comparison of Guantanamo to military bases in foreign countries is misplaced. Courts have long recognized that the legal status of Guantanamo, particularly with respect to its jurisdictional relationship to the continental United States, is unique. *Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008) (noting that cases emerging from Guantanamo "lack any precise historical parallel."); *Id.* at 2279 (Roberts, C.J., dissenting) ("I regard the issue as a difficult one, primarily because of the unique and unusual jurisdictional status of Guantanamo Bay."); *Gherebi v. Bush*, 374 F.3d 727, 738 (9th Cir. 2003) ("[W]e view Guantanamo as unique … because the United States' territorial relationship with the Base is without parallel today."); *United States v. Gatlin*, 216 F.3d 207, 214 n.8 (2nd Cir. 2000) ("[W]e stressed in *McNary* that the 'status of the territory' is 'unique.'") (citing *Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1340 (2d Cir. 1992)). The determination of whether § 2680(k) covers claims arising in Guantanamo should therefore be determined by reference to the Supreme Court holdings in *Boumediene* and *Rasul*, as well as the well-recognized interpretation of the foreign country exception as applied to the unique circumstances surrounding Guantanamo.

The recent Supreme Court holdings in *Boumediene* and *Rasul* clearly overrule the out-of-date, non-controlling district court decisions the Government cites concerning the foreign

---

[61]     U.S. law has even protected animals at Guantanamo. *See* Endangered Species Act, 16 U.S.C. §§ 1536(a)(2), 1538(a)(1)(F); 50 C.F.R. §§ 17.11 (protecting the Cuban iguana), 17.21(f), 1731(a).

country exception's applicability to Guantanamo, namely *Bird v. United States*, 923 F. Supp. 338 (D.Conn. 1996) and *Colon v. United States*, 1982 U.S. Dist. LEXIS 16071 (S.D.N.Y. Nov. 24, 1992).  The holding in *Bird* that an FTCA claim arising in Guantanamo is barred by the foreign country exception relies on a rejection of the notion of *de facto* sovereignty, an approach overruled by *Boumediene*.  *Bird v. United States*, 923 F. Supp. 338, 343 (D. Conn. 1996) ("[T]his Court need not speculate whether the United States is the de facto sovereign over the area."); *see also Rasul v. Bush*, 215 F. Supp. 2d 55, 71 (D.C. Cir. 2002) ("While *Bird* dealt with the foreign country exemption to the FTCA, it expressly disavowed a *de facto* sovereignty test.").  *Colon* is similarly overruled by the holdings in *Rasul* and *Boumediene* regarding U.S. control and sovereignty over Guantanamo.  *Colon v. United States*, 1982 U.S. Dist. LEXIS 16071, *2-3 (S.D.N.Y. Nov. 24, 1992) (holding that the United States does not have any sovereignty over Guantanamo).

The government argues that claims XII and XIII - Plaintiffs' claims for intentional and negligent infliction of emotional distress - are similarly barred by the foreign country exception as they "arose" in Yemen and Saudi Arabia, the respective homes of Decedents' fathers.  These claims, however, are merely derivative of the root injuries suffered at Guantananmo, and thus the location of the harm to the detainees is imputed on these claims for foreign country exception purposes.  *See Sosa v. Alvarez-Machain,* 542 U.S. 692, 701 (2004) (determining the scope of the foreign country exception by looking to "the kernel of a 'claim arising in a foreign country'"); *Harbury v. Hayden*, 522 F.3d 413, 423 (D.C. Cir. 2008) (holding that "injuries such as 'emotional distress' that are derivative of the foreign-country injuries at the root of the complaint" were similarly "foreign"); *Harbury v. Hayden*, 444 F. Supp. 2d 19, 43 (D.D.C. 2006) ("Plaintiff's personal claims [including emotional distress] are entirely derivative of claims

77

'based on . . . injury suffered in a foreign country.'") (citing *Sosa*, 542 U.S. at 701); *Doe v. State of Israel*, 400 F. Supp. 2d 86, 107 (D.D.C. 2005) ("[T]he direct effect is still the injury and loss of life inflicted upon Jane Doe II's relatives overseas. Any emotional distress suffered in the United States is derivative.").

## C.     Venue in the District of Columbia is Proper

The government contends that there is no proper venue for claims I through IV, arguing that the injuries Plaintiffs allege occurred in Cuba, Yemen and Saudi Arabia, [62] thereby creating a "venue gap" for Plaintiffs' ATS and FTCA claims. Similar to § 1346(b), the statute governing venue for FTCA claims provides that venue is proper "only in the judicial district where the plaintiff resides or *wherein the act or omission complained of occurred.*" 28 U.S.C. § 1402(b) (emphasis added). Again, the government misinterprets the phrase "where the act or omission occurred." As discussed above, the relevant acts and omissions raised in Plaintiffs' Amended Complaint occurred in Washington, D.C. According to the plain language of § 1402(b), therefore, venue in this Court is proper.

The government cites *Smith v. United States* in an attempt to show that this alleged "venue gap" evidences the fact that the FTCA was not meant to apply to Guantanamo. *Smith* is not applicable to the case at hand. In that case, the Supreme Court did hold that the lack of venue in Antarctica provided evidence of the continent's foreignness for § 2680(k) purposes. Unlike in the present case, however, the "petitioner's claim [was] based exclusively on acts or omissions occurring in Antarctica." *Smith v. United States*, 507 U.S. 197, 199 (1993). As the relevant "acts and omissions" alleged by Plaintiffs occurred in Washington, D.C., and not

---

[62]     As discussed in Part V.B, *supra*, even if the government was correct that the relevant acts or omissions occurred at the base at Guantanamo, it would be incorrect that the base is "in Cuba" for FTCA purposes. The same is true for Plaintiffs emotional distress claims, which were derivative of these root claims are therefore similarly "arose" at Guantanamo for foreign country exception purposes.

Guantanamo, this Court need not decide whether venue exists at Guantanamo to hear FTCA claims.

**D.** **Plaintiffs Have Properly Exhausted Their Remedies As Required by the FTCA**

The government argues that Plaintiffs did not exhaust their administrative remedies for their allegedly-converted ATS Claims as required by 28 U.S.C. § 2675(a). A claim is not cognizable under the FTCA "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." 28 U.S.C. § 2675(a). Fulfilling this "presentment" requirement, Plaintiffs filed their claims with the DOD, the agency in charge of detention at Guantanamo, on June 10, 2008. Exs. A & B to Am. Compl.. There is no disagreement that this claim was properly and timely filed and was subsequently denied by the DOD on July 8, 2008, before Plaintiffs filed suit. The government's argument that Plaintiffs' administrative claims do cover the treatment of Messrs. Al-Zahrani and Al-Salami during their detention ignores the proper definition of presentment for FTCA purposes, as well as a common sense reading of the claims.

Administrative claims are "presented" for FTCA purposes when Plaintiffs file with the relevant agency "an executed Standard Form 95 or other written notification of an incident," with sufficient detail such that the agency may conduct its own investigation. 28 C.F.R. § 14.2(a); *Bembenista v. United States*, 866 F.2d 493, 499 (D.C. Cir. 1989); *GAF Corp. v. United States*, 818 F.2d 901, 905 & 920 (D.C. Cir. 1989) ("[C]laimants providing the agencies notice of a claim need provide no more information than the regulations specify for the initial presentment of a claim."); *see also Adams v. United States*, 615 F.2d 284, 289 (5th Cir. 1980) (holding that presentment merely requires that plaintiff provide Government with sufficient notice of an

incident with enough detail that it may conduct its own investigation); *Drew v. United States*, 217 F.3d 203 (4th Cir. 2000) (same).  This incident description must be "accompanied by a claim for money damages."  28 C.F.R. § 14.2(a).

This Circuit has held that such presentment merely burdens the prospective-Plaintiff with providing "minimal notice" of an incident to the government.  *GAF Corp. v. United States,* 937 F.2d 625, 640 (D.C. Cir. 1991) ("Congress understood these claims presentation statutes as requiring only *minimal notice*.") (citations omitted) (emphasis in original); *GAF Corp. v. United States*, 818 F.2d 901, 918-19 (D.C. Cir. 1989) ("Congress identified private litigants as the primary beneficiaries of the [presentment] amendments … the presentment requirement imposes on claimants a burden of notice, not substantiation, of claims.").  Claims are considered "exhausted" upon the denial of a claim or, at the option of the Plaintiffs, upon "[t]he failure of an agency to make a final disposition of a claim within six months after it is filed."  28 U.S.C. § 2675(a).

The government relies on inapplicable case law for support on the issue of exhaustion of remedies.  In each of the cases the government cites, the plaintiff had filed no administrative claim at all, leading to a dismissal of their FTCA claims.  *See In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85, 115 (D.D.C. 2007); *Bancoult v. McNamara*, 370 F. Supp. 2d 1, 11 (D.D.C. 2004); *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 269-70 (D.D.C. 2005), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 547 U.S. 1069 (2006).

Plaintiffs Al-Zahrani Sr. and Al-Salami Sr. each filed an administrative claim with the DOD on a Standard Form 95 and an accompanying attachment on June 10, 2008.  The respective claims included, *inter alia*, Messrs. Al-Zahrani and Al-Salami's Internment Serial Numbers

("ISNs"), the approximate dates of their detention, brief biographies, synopses of the progress in challenging their detention and the circumstances surrounding their deaths. Exs. A & B to Am. Compl..  In addition, Plaintiffs expressly "reserve[d] [the] right to claim for an award of damages that reflects any pain and suffering suffered by" their sons, Messrs. al-Zahrani and al-Salami.  *Id.* Mr. Al-Salami Sr. and Mr. Al-Zahrani Sr. included in their filings "claims for money damages." *Id.*

The DOD was clearly provided with the requisite "minimal notice" of Plaintiffs' claims and was presented with claims for money damages.  Enough detail was presented such that the DOD could undertake its own investigation into the matter.  As is uncontested, the claims were properly and timely filed, and were subsequently denied by the DOD prior to Plaintiffs filing suit.  Plaintiffs have thus exhausted their administrative remedies pursuant to 28 U.S.C. § 2675(a).[63]

## CONCLUSION

For the foregoing reasons, the individual Defendants' and the United States' motions to dismiss and the United States' motion to substitute should be denied.

Dated: October 5, 2009
        New York, NY


                                        Respectfully submitted,


                                        _____/s/_____
                                        Pardiss Kebriaei (pursuant to LCvR 83.2(g))
                                        Shayana Kadidal (D.C. Bar No. 454248)
                                        Josh Rosenthal (pursuant to LCvR 83.2(g))
                                        Taina Gomez (law graduate)
                                        Somil Trivedi (law graduate)
                                        CENTER FOR CONSTITUTIONAL RIGHTS

---

[63]    The government erroneously argues that Plaintiffs seek declaratory relief pursuant to the FTCA, which is prohibited pursuant to 28 U.S.C. § 1346(b).  At no point in the Amended Complaint do Plaintiffs seek declaratory relief under their FTCA claims.  Therefore, the relief Plaintiffs seek pursuant to the FTCA is proper.

666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6452
Fax: (212) 614-6499

*Counsel for Plaintiffs*