## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Talal AL-ZAHRANI | ) |
| | ) |
| and | ) |
| | ) |
| Ali Abdullah Ahmed AL-SALAMI | ) |
| In their individual capacities; | ) |
| | ) |
| and | ) |
| | ) |
| Talal AL-ZAHRANI, | ) |
| As the representative of the estate of | ) |
| Yasser AL-ZAHRANI; | ) |
| | ) Civ. No. 1:09-cv-00028 (ESH) |
| and | ) |
| | ) |
| Ali Abdullah Ahmed AL-SALAMI, | ) |
| As the representative of the estate of | ) |
| Salah Ali Abdullah Ahmed AL-SALAMI | ) |
| | ) |
| **Plaintiffs,** | ) |
| vs. | ) |
| | ) |
| Donald H. RUMSFELD et al. | ) |
| | ) |
| and | ) |
| | ) |
| UNITED STATES | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

## UNITED STATES' REPLY TO PLAINTIFFS' OPPOSITION TO UNITED STATES' MOTION FOR SUBSTITUTION AND MOTION TO DISMISS

### INTRODUCTION

In the United States' Motion For Substitution (Doc. 14), the United States moved this

Court for an Order substituting the United States of America for the individually named

defendants for Claims I to IV ("the ATS claims") of Plaintiffs' Amended Complaint, in which

they bring causes of action pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.  The

United States also filed a motion to dismiss (Doc. 15) on the grounds that the United States has

not waived its sovereign immunity with respect to the ATS claims; the ATS claims and Claims

VII to XIII are barred by the foreign country exception to the Federal Tort Claims Act ("FTCA"),

28 U.S.C. § 2680(k); and Plaintiffs failed to file jurisdictionally adequate administrative claims.

In their opposition (Doc. 21, cited herein as "Pl. Opp."), Plaintiffs argue that the United

States should not be substituted for the ATS claims because the individual defendants were not

acting within the scope of employment, and the Westfall Act provides an exception for

"egregious misconduct."  Plaintiffs also argue that their claims should not be dismissed because

the ATS claims are cognizable under the FTCA, Guantanamo is not a foreign country, and their

administrative claims meet this Circuit's "minimal notice" requirement.[1]  Plaintiffs' arguments

lack merit, and the United States' motions should be granted.

## ARGUMENT

## I.  THE UNITED STATES MUST BE SUBSTITUTED FOR THE INDIVIDUAL DEFENDANTS FOR THE ATS CLAIMS

### A.  The Individual Defendants Were Acting Within the Scope of Employment

The Westfall Act provides that a claim against the United States under the FTCA is the

exclusive remedy for persons seeking recovery of damages for any "negligent or wrongful act or

---

[1]  Plaintiffs also challenge the constitutionality of the Military Commissions Act of 2006 (MCA).  As the Individual Defendants explained in their Reply, Plaintiffs have not properly challenged the constitutionality of the MCA.  Ind. Defs.' Reply at 4-6.  Nor does this Court need to reach the MCA's constitutionality to resolve Plaintiffs' claims against those Defendants.  Id. at 6 n.4.  But if the Court determines that it should reach the constitutionality of the MCA, the United States respectfully requests the opportunity to fully brief this issue.

omission of any employee of the Government while acting within the scope of his office or

employment."  28 U.S.C. §2679(b)(1).  This Circuit has applied District of Columbia law to

determine whether an employee has acted within the scope of employment.  The District of

Columbia follows the Restatement (Second) of Agency, which provides:

> Conduct of a servant is within the scope of employment if, but only if: (1) it is of the kind he is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the master; and (4) if force is intentionally used by the servant against another, the use of force is not unexpected by the master.

Restatement (Second) of Agency § 228 (1958).

In their opposition, Plaintiffs do not argue that the first three requirements of this section

of the Restatement have not been met, and thus concede the point.[2]  Instead, Plaintiffs focus

---

[2] *See In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85, 114 (D.D.C. 2007) (failure to invoke challenge to other factors of the Restatement results in waiver of such arguments).  Even if Plaintiffs did challenge the scope of employment certification on these grounds, it would fail.  Obviously, the alleged conduct in the ATS claims was "of the kind" that the individual defendants were employed to perform, considering that the very purpose of the mission at Guantanamo is to detain and extract information from suspected terrorists.  *Cf.  Rasul v. Myers,* 512 F.3d 644, 656-57 (D.C. Cir. 2008), *vacated by Rasul v. Myers*, 129 S. Ct. 763 (2009), *reinstated by Rasul v. Myers*, 563 F.3d 527, 528-29 (D.C. Cir. 2009) (allegations of arbitrary detention, torture and cruel, inhuman, or degrading treatment of detainees at Guantanamo held to be "of the kind" the government officials were employed to perform); *In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d at 114 ("As military officials commanding Armed Forces serving our country during a war, there can be no credible dispute that detaining and interrogating enemy aliens would be incidental to their overall military obligations."); *Harbury v. Hayden*, 444 F. Supp. 2d 19, 33-36 (D.D.C. 2006), *aff'd Harbury v. Hayden*, 522 F.3d 413 (D.C. Cir. 2008) (alleged acts of torture incidental to CIA's mission to interrogate and obtain intelligence).  Equally obvious is that the conduct alleged in the ATS claims took place while the U.S. military was authorized to detain and interrogate suspected terrorists at Guantanamo.  Finally, as in *Harbury*, Plaintiffs have "proffered no evidence that would lead this Court to believe that [the individual defendants] had any motive divorced from . . . advancing the policy of the United States at that time[.]" *Id*. at 36.  Indeed, the intent to serve one's master is "broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf," *id*. at 34 (quoting *Stokes v. Cross*, 327 F.3d

(continued...)

entirely on the fourth requirement that the use of force must not be "unexpected by the master." Plaintiffs argue that "serious crimes" are never expected by the master, and because "torture" is a serious crime, as a matter of law it falls outside the scope of employment.  Pl. Opp. at 57-58. However, Plaintiffs do not –  indeed cannot – distinguish the conduct alleged in the ATS claims from the conduct at issue in the cases cited throughout the United States' Motion For Substitution, all of which held that the government officials were acting within the scope of employment.[3]  Indeed, the D.C. Circuit expressly rejected this exact argument in *Rasul*, holding that conduct of an identical nature to that alleged here, even if "seriously criminal," was foreseeable.  *Rasul*, 512 F.3d at 660;[4] *see also Harbury*, 522 F.3d at 417 (rejecting the argument that "acts of torture can never fall within the scope of employment").  Simply put, the seriousness or egregiousness of the alleged conduct alone does not warrant a finding that it was outside the scope of employment.[5]

_____

[2](...continued)
1210, 1216 (D.C. Cir. 2003)), even "if the tort is committed partially because of a personal motive."  *Id*. (quoting *Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C. 1986)).

[3] *See* United States' Motion for Substitution (Doc. 14) at 7-9; *see also Gonzalez-Vera v. Kissinger*, 2004 WL 5584378, *5-6 (D.D.C. Sep. 17, 2004), *aff'd* 449 F.3d 1260 (D.C. Cir. 2006); *Majano v. Kim*, 545 F. Supp. 2d 136, 146-47 (D.D.C. 2008).

[4] This section of the D.C. Circuit's opinion, in which nearly identical instances of alleged abuse at Guantanamo were held to be within the scope of employment, was specifically reinstated after being vacated by the Supreme Court.  *See Rasul*, 563 F.3d at 528-29.

[5] *See Council on Am. Islamic Relations v. Ballenger,* 444 F.3d 659, 664 (D.C. Cir. 2006), ("[T]he proper inquiry ... 'focuses on the underlying dispute or controversy, not on the nature of the tort.'") (quoting *Weinberg v. Johnson,* 518 A.2d 985, 992 (D.C. 1986)); *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 265 (D.D.C. 2004) ("Defining an employee's scope of employment is not a judgment about whether alleged conduct is deleterious or actionable; rather, this procedure merely determines who may be liable for that conduct, an employee or his boss.");

(continued...)

Plaintiffs also argue that this Court should apply federal common law to determine whether the individual defendants should enjoy immunity.  Pl. Opp. at 60-63.  Specifically, Plaintiffs argue that federal common law requires the application of a two-part test, whereby a government official should not be granted absolute immunity unless he or she acted within the "outer limits" of authorized conduct and the "official function would suffer under the threat of prospective litigation."  Pl. Opp. at 62 (quoting *Westfall v. Erwin*, 484 U.S. 292, 296 n.3 (1988)).  However, for claims brought under the FTCA, Congress expressly supplanted this test through the Westfall Act.  Therefore, the *only* issue is whether the government official acted within the scope of employment, which is a much narrower inquiry than the pre-Westfall Act test for absolute immunity.  Accordingly, to the extent federal common law would play a role here at all, it would be confined to answering the narrower question of whether the individual defendants

---

[5](...continued)

*Gonzalez-Vera*, 2004 WL 5584378 at *6 ("Plaintiffs assertions that [the government employee's] conduct was wrongful, even very wrongful, is of no legal moment.").  Plaintiffs acknowledge that the District of Columbia provides a very expansive scope of employment test that encompasses the conduct alleged in the ATS claims, but argue that this Court should not allow substitution when, as here, the ultimate consequence of that substitution would be the dismissal of the claims.  This Court and the D.C. Circuit certainly were aware of the consequences of applying the District of Columbia's scope of employment law when deciding the above-mentioned cases in which nearly identical claims of abuse were levied against government officials, *see, e.g., Harbury* 522 F.3d at 422 n.4, yet nonetheless correctly held that those government officials were acting within the scope of employment.  Plaintiffs cannot cite to any supervening case law that supports such a radical departure from this Circuit's precedent.  Indeed, Plaintiffs recognize that their arguments fail in light of prior precedent, and therefore resort to asking this Court to "depart from these holdings."  Pl. Opp. at 58 n.51.  However, "[t]he doctrine of stare decisis compels district courts to adhere to a decision of the Court of Appeals of their Circuit until such time as the Court of Appeals or the Supreme Court of the United States sees fit to overrule the decision."  *Lee v. United States*, 570 F. Supp. 2d 142, 150 (D.D.C. 2008) (quoting *Owens-Ill., Inc. v. Aetna Cas. & Sur. Co.*, 597 F.Supp. 1515, 1520 (D.D.C. 1984)); *see also Rasul*, 563 F.3d at 529 (courts "must adhere to the law of our circuit unless that law conflicts with a decision of the Supreme Court) (citation omitted).

were acting within the scope of employment.  However, because federal common law in this

instance does not set forth a different test for scope of employment, the result would be the same.

*See Skeen v. Federative Republic of Brazil*, 566 F. Supp. 1414, 1417 n.6 (D.D.C. 1983) ("There

does not appear to be a federal common law defining 'scope of employment' in the context of

respondeat superior. . . . If such a federal common law definition did exist, however, it would

presumably be the same as that currently prevailing in most states and the District of

Columbia.").[6]

Finally, Plaintiffs argue that the legislative history of the Westfall Act demonstrates that

Congress did not intend for "wrongful acts" to include "egregious misconduct," even if that

conduct falls within the scope of employment.  Pl. Opp. at 59-60.  In other words, Plaintiffs

argue that Congress intended that there be a third exception to the Westfall Act for "egregious

---

[6] The cases relied on by Plaintiffs – which either pre-date the Westfall Act or do not involve suits brought pursuant to the FTCA – provide no support for Plaintiffs' argument that the pre-Westfall test for immunity should apply here.  Moreover, these cases do not address the term "scope of employment" as it is defined under the Westfall Act, but focus instead on the scope of a foreign official's "authority" as defined by the Foreign Sovereign Immunities Act (FSIA).  There is no evidence that "scope of authority" in the FSIA means the same thing as "scope of employment" under the Westfall Act.  Accordingly, case law interpreting legislation governing foreign officials is inapplicable to determining whether the alleged arbitrary detention and torture of detainees at Guantanamo was within the scope of employment.  *See Rasul v. Rumsfeld*, 414 F. Supp. 2d 26, 34 n.7 (D.D.C. 2006), *aff'd* 512 F.3d 644 (D.C. Cir. 2008) (rejecting exact argument and case law put forth here by Plaintiffs); *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 868 (9th Cir. 1992) (improper to apply "narrow 'scope of authority' test" instead of the "broader 'scope of employment' test" when considering scope challenges under the FTCA); *see also* 2A Norman J. Singer, STATUTES AND STATUTORY CONSTRUCTION, 110 (6th ed. 2000) (noting limited value of comparing language in two distinct statutes).  Finally, even in the FSIA context, there is no general exception to immunity based on alleged violations of *jus cogens* principles of international law.  *See Princz v. F.R.G*, 26 F.3d 1166, 1173-75 (D.C. Cir. 1994); *Ye v. Zemin*, 383 F.3d 620, 625-27 (7th Cir. 2004).  Therefore, Plaintiffs cannot demonstrate that the individual defendants would not be entitled to such immunity.

misconduct."[7]

If a statutory term is not ambiguous, then there is no reason to turn to the legislative history for guidance on its meaning. *See United States v. Gonzales*, 520 U.S. 1, 6 (1997); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Because the term "wrongful acts" in the Westfall Act is not ambiguous, it is not necessary to turn to the legislative history to decipher the meaning of "wrongful acts." *See In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d at 110. By its plain meaning, the term "wrongful acts" encompasses the conduct alleged in the ATS claims. *See id.* at 111 (allegations of torture and other abuses within plain meaning of "wrongful acts"); *see also Duffy v. United States*, 966 F.2d 307, 313 (7th Cir. 1992) ("We are unwilling to accept that intentional torts do not fall under the rubric of wrongful acts.").

While the excerpts from the legislative record selected by Plaintiffs might indicate that some individual members of Congress were of the view that the United States should not be substituted for "egregious misconduct," that view was not incorporated into the text of the Westfall Act.[8] There are two express exceptions to the Westfall Act. If Congress intended that there be a third exception – i.e., for acts of egregious misconduct that are nonetheless within the

---

[7] The Westfall Act provides two exceptions to the rule that the FTCA is the exclusive remedy for claims against federal employees: (1) claims brought "for a violation of the Constitution of the United States;" or (2) claims brought "for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2).

[8] Indeed, Plaintiffs rely on the exact same passages from the legislative record that this Court found unpersuasive in *Harbury*. *See Harbury*, 444 F. Supp. 2d at 32-33 (citing H.R. Rep. No. 700, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.C.C.A.N. 5945, 5949) (noting that the plaintiffs overlooked other, contradictory passages evincing Congress' intent that substitution was to occur, regardless of whether the applicable law would permit "egregious conduct" to fall within the scope of employment).

scope of employment – then it would have stated so expressly.  *See TRW v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent."); *see also United States v. Smith*, 499 U.S. 160, 167 (1991) ("Congress' express creation of these two exceptions [to the Westfall Act] convinces us that the Ninth Circuit erred in inferring a third exception.").

## B.  No Evidentiary Hearing Is Warranted

When dismissal is sought based on the facts alleged in the complaint, scope of employment presents a purely legal question.  *See Haddon v. United States*, 68 F.3d 1420, 1423 (D.C. Cir. 1995); *Hoston v. Silbert*, 681 F.2d 876, 879 (D.C. Cir. 1982) ("Whether given acts are within the scope of employment is ultimately a legal question.").  Because Plaintiffs challenge the government's certification on purely legal grounds and do not put forth any factual evidence that the individual defendants acted outside the scope of their employment, neither discovery nor an evidentiary hearing is warranted.[9]  Plaintiffs' argument that discovery is needed to determine whether such factual evidence exists is "nothing more than a fishing expedition for facts that *might* give rise to a viable scope-of-employment claim."  *Wuterich*, 562 F.3d at 386 (emphasis in original).  To grant discovery or an evidentiary hearing in this instance would circumvent the very purpose of immunity, which is "to spare a defendant not only unwarranted liability, but

---

[9] *See Rasul*, 512 F.3d at 662 (denying discovery and evidentiary hearing because the plaintiffs "failed to allege any facts that, if proven, would establish that the defendants were acting outside the scope of their employment"); *Schneider*, 310 F. Supp. 2d at 264 n.14 ("Given that the Court accepts as true plaintiffs' factual assertions . . . there is no need for an evidentiary hearing to resolve this [scope of employment] legal issue."); *see also Wuterich v. Murtha*, 562 F.3d 375, 387 (D.C. Cir. 2009) ("[T]here is no right to even 'limited discovery' unless a plaintiff has made allegations sufficient to rebut the Government's certification.").

unwarranted demands customarily imposed upon those defending a long drawn out lawsuit."

*Siegert v. Gilley*, 500 U.S. 226, 232 (1991) (citation omitted).

### C.  The ATS Claims Do Not Fall Within The Statutory Exception To The Westfall Act

Plaintiffs argue that the ATS is a statute of the United States that was violated by the

conduct alleged in the ATS claims, and therefore the second exception to the Westfall Act

applies.  Pl. Opp. 64-66.  Based on the Supreme Court's decision in *Sosa v. Alvarez-Machain*,

542 U.S. 692 (2004),[10] this very same argument has been rejected repeatedly by this Court.[11]

Plaintiffs argue that the D.C. Circuit's recent decision in *Saleh v. Titan,* 580 F.3d 1 (D.C. Cir.

2009) supplants this prior precedent.  Contrary to Plaintiffs' assertion, there is nothing in *Saleh*

that stands for the proposition that the ATS is a statute that "is violated when the law of nations

are violated."  Pl. Opp. at 65.

---

[10] In *Sosa*, the Supreme Court held that the ATS is "only jurisdictional" and simply "enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." 542 U.S. at 712; *see also id*. at 729 ("All Members of the Court agree that § 1350 is only jurisdictional."). Stated another way, "the ATS gave the district courts 'cognizance' of certain causes of action, and the term [cognizance] bespoke a grant of jurisdiction, not power to mold substantive laws." *Id*. at 713. The Court also noted that "the ATS was placed in § 9 of the Judiciary Act, a statute otherwise exclusively concerned with federal-court jurisdiction, is itself support for its strictly jurisdictional nature," and observed that "[i]t is unsurprising, then, that an authority on the historical origins of the ATS has written that 'section 1350 clearly does not create a statutory cause of action,' and that the contrary suggestion is 'simply frivolous.'" *Id*. (quoting Casto, The Federal Courts' Protective Jurisdiction over Torts Committed in Violation of the Law of Nations, 18 Conn. L. Rev. 467, 479-80 (1986)).

[11] *See Harbury,* 444 F. Supp. 2d at 38-39; *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26, 38 (D.D.C. 2006), *aff'd on other grounds, Rasul v. Myers*, 512 F.3d 644 (D.C. Cir. 2008); *In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d at 112-113; *Bancoult v. McNamara*, 370 F. Supp. 2d 1, 9-10 (D.D.C. 2004); *Schneider*, 310 F. Supp. 2d at 266; *see also Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 175 n.4 (D.D.C. 2005) ("[T]he Supreme Court recently declared [in *Sosa*] that the ATS is jurisdictional."); *Bieregu v. Ashcroft*, 259 F. Supp. 2d 342, 353 (D.N.J. 2003) (citation omitted).

In *Sosa*, the Supreme Court held that when the ATS was passed by the first Congress as part of the Judiciary Act of 1789, three limited causes of action under binding customary international law were contemplated: piracy, infringement of ambassadorial rights, and violation of safe conducts. *Sosa*, 542 U.S. at 720. However, the Court held that the ATS was not "fallow," meaning that further legislation was not required for a cause of action to be cognizable under the ATS, and recognized that, in modern times, causes of action cognizable under the ATS are not necessarily limited to those recognized in 1789. The Court explained that federal courts could recognize additional causes of action, but "should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Id*. at 725.[12]

In *Saleh*, the D.C. Circuit was simply recognizing these principles in stating that "the Court opened the door a crack to the possible recognition of new causes of action under

---

[12] The Court also held that for a cause of action to be cognizable under the ATS, federal courts must exercise "judicial caution," *see Sosa*, 542 U.S. at 725-28, and "should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." *Id*. at 732; *see also In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir. 1994) ("Actionable violations of international law must be of a norm that is specific, universal, and obligatory."); *In re Xe Services Alien Tort Litigation*, 2009 WL 3415129, *7 (E.D. Va. October 21, 2009) (there must be sufficient agreement among nations as to the "*precise* conduct that would constitute an *enforceable* rule" and that "[t]o constitute an actionable violation of the 'law of nations' within the meaning of the ATS, plaintiffs must allege violations of international law norms that (i) are universally recognized, (ii) have specific definition and content, and (iii) are binding and enforceable, rather than merely aspirational.") (emphasis in original)). The Court also added that "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Sosa*, 542 U.S. at 732-733.

international law (such as, perhaps, torture) if they were firmly grounded on an international

consensus."  Pl. Opp. at 65 (quoting *Saleh*, 580 F.3d at 14).  There is absolutely nothing in this

passage relied on by Plaintiffs  – or the entire *Saleh* opinion, for that matter –  to suggest that the

D.C. Circuit has now adopted a fundamentally different view, whereby the ATS is a statute of the

United States that is violated when customary international law is violated.  Rather, the D.C.

Circuit still views the ATS as the statutory vehicle that simply confers federal question

jurisdiction over claims based on violations of customary international law, much like the FTCA

is the statutory vehicle that confers subject matter jurisdiction over claims based on conduct

deemed tortious under state law.  To say that acts of torture, prolonged arbitrary detention, or

cruel, inhuman, or degrading treatment violate the ATS is as inaccurate as saying that a federal

employee's act of negligence under state law violates the FTCA.[13]

---

[13] It is worth noting that there is a profound lack of support for Plaintiffs' argument that the conduct alleged in their claims of prolonged arbitrary detention (Claim I) and cruel, inhuman, or degrading treatment (Claim III) and are actionable under the ATS.  *See Chowdhury v. WorldTel Bangladesh Holding, Ltd.*, 588 F. Supp. 2d 375, 382-83 (E.D.N.Y. 2008) (Neither claim has a "consensus definition [and] thus suffers from the very danger of a 'high level of generality' referred to in *Sosa*.").  Moreover, Plaintiffs have not cited to any cases from this Circuit to support their argument that the particular conduct they have labeled as "torture" in Claim II would be actionable under the ATS pursuant to the very high bar set by *Sosa*.  In *Saleh*, the D.C. Circuit affirmed the district court's dismissal of ATS claims stemming from abuses at Abu Grhaib – described in greater detail in the district court's opinion at *Ibrahim v. Titan Corp. et al.*, 391 F. Supp. 2d 10, 12-13 (D.D.C. 2005) – that are nearly identical to those alleged here. Noting how difficult it would be to articulate, with the required precision, an international consensus regarding the treatment of prisoners, the Court stated "it is doubtful that we can discern a U.S. national standard of treatment of prisoners short of the Eighth Amendment." *Saleh*, 580 F.3d at 14-15 (footnote omitted).  It should also be remembered that Congress may "shut the door to the law of nations entirely . . . explicitly, or implicitly by treaties or statutes that occupy the field." *Sosa*, 542 U.S. at 731; *see also Munoz v. Ashcroft*, 339 F.3d 950, 958 (9th Cir. 2003) ("'In enacting statutes, Congress is not bound by international law; if it chooses to do so, it may legislate contrary to the limits posed by international law,' so long as the legislation is constitutional.") (quoting *United States v. Aguilar*, 883 F.2d 662, 679 (9th Cir. 1989)); *In re Xe*

(continued...)

## II.  THE UNITED STATES HAS NOT WAIVED SOVEREIGN IMMUNITY

### A.  Congress Has Not Waived Sovereign Immunity For Violations of International Law

Claims based on violations of international law or federal law – e.g., the Constitution, federal statutes and regulations, or federal common law – clearly are not cognizable under the FTCA.[14]  Therefore, even if the international laws allegedly violated by the conduct in the ATS claims are so universally recognized that they have been incorporated into federal common law, Plaintiffs' ATS claims still would not be cognizable under the FTCA.

Plaintiffs attempt to get around this inescapable conclusion by arguing that the ATS

---

[13](...continued)
*Services Alien Tort Litigation*,  2009 WL 3415129 at *7 ("Only in cases where Congress has not spoken on the content of the law of nations is it appropriate for federal courts to consider the conclusions contained in the decisions of international tribunals and in widely-accepted treatises of international law.").  In *Saleh*, the D.C. Circuit seemed to acknowledge that because Congress has enacted extensive legislation addressing torture but has declined to expressly provide a civil tort remedy for victims of torture at the hands of U.S. officials, it has evinced an intent to preclude any such claims, regardless of whether they would otherwise be violations of customary international law.  *Saleh*, 580 F.3d at 13 n.9 ("Congress has created an extensive body of law with respect to allegations of torture.  But Congress has declined to create a civil tort cause of action that plaintiffs could employ."); *see also Mohamad v. Rajoub*, 2009 WL 3127206 (D.D.C. Sept. 30, 2009) ("The fact that Congress has provided at least one statute that provides such a cause of action (the Torture Victim Protection Act) cautions against the construction of another by judicial fiat.") (citation omitted).  Therefore, *Saleh* casts serious doubt on Plaintiffs' argument that the conduct they have alleged in their claim of "torture" would be viewed as actionable under the ATS in this Circuit.  However, because the United States should be substituted as the proper party for the ATS claims, which in turn should be dismissed for lack of subject matter jurisdiction (see *infra*), there is no need for this Court to decide whether the conduct alleged in the ATS claims is actionable under the ATS.

[14]  *FDIC v. Meyer*, 510 U.S. 471, 478 (1994) (rejecting applicability of FTCA to a tort based on a constitutional violation, because "federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right"); *Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 510 (D.C. Cir. 2009) (violation of federal statute not cognizable under FTCA); *Art Metal-USA, Inc. v. United States*, 753 F.2d 1151, 1157 (D.C. Cir. 1985) ("[T]he violation of a federal statute or regulation by government officials does not of itself create a cause of action under the FTCA.").

claims are cognizable under the FTCA because they are analogous to causes of action under District of Columbia tort law.  Pl. Opp. at 66-72.[15]   Plaintiffs are confused as to when a court should inquire into whether "the duties set forth in the federal law are analogous to those imposed under local tort law."  *Hornbeck*, 569 F.3d at 510 (emphasis omitted).  Engaging in such an inquiry is not necessary unless (1) the United States argues that the uniquely governmental nature of the conduct at issue precludes finding that the government employee could be liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674,[16] or (2) a plaintiff seeks to hold the United States liable under State or local tort law based on an employee's erroneous application of a federal statute or regulation or failure to perform a duty that has arisen under federal law.[17]  Regarding the former, no such argument has been made here by the United States, so there is no need to search for a "private person analogue" to the government function performed at Guantanamo – i.e., the detainment and interrogation of suspected terrorists.  The latter scenario is inapposite in that Plaintiffs quite clearly seek to hold the United States liable under international law, rather than State or local law.  The fact that some loose analogy can be drawn between the ATS claims and causes of action under District of Columbia tort law does not transform them into cognizable causes of

---

[15]  The United States does not agree with Plaintiffs' argument that the "law of the place" is District of Columbia tort law or that the United States would be liable under such such law.  However, for purposes of this reply, it is not necessary to address such arguments.

[16]  *See, e.g., Olson v. United States*, 546 U.S. 43, 46 (2005); *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955).

[17]  *See, e.g., Hornbeck*, 569 F.3d at 508-09 (seeking to hold the United States liable under District of Columbia law based on misapplication of federal statute); *Art-Metal USA*, 753 F.2d at 1152 (seeking to hold the United States liable under District of Columbia law based on failure to follow federal regulations and due process).

action under the FTCA.[18]

## B.  Plaintiffs' Claims Are Barred By The Foreign Country Exception

Based on *Boumediene v Bush*, 128 S. Ct. 2229 (2008), Plaintiffs argue that the foreign country exception does not apply to Guantanamo because the United States has "de facto sovereignty" over it.  Pl. Opp. at 72-78.[19]  However, Plaintiffs simply cannot square their interpretation of *Boumediene* with *United States v. Spelar*, 338 U.S. 217 (1949).  Plaintiffs make much out of the indefinite nature of the lease between the United States and Cuba and the degree to which the United States exercises control and jurisdiction over the base.  What Plaintiffs fail to appreciate is that these same factors were considered in *Spelar*.  Not only was the air base leased for 99 years (which is, practically speaking, an "indefinite" term), the terms of the lease gave the United States total control and jurisdiction over that base.  In fact, in comparing the lease at issue in *Spelar* to the lease pertaining to Guantanamo, the Court noted that the United States "was granted by the Cuban lease *substantially the same rights* as it had in [the New Foundland air base

---

[18] *Cf. Hornbeck,* 569 F.3d at 509 (in characterizing government's failure to follow a federal statute as a violation of a general duty of care, the plaintiffs "merely re-labeled a violation of a federal statute as common law claims"); *Art Metal-USA, Inc.*, 753 F.2d at 1160 ("The FTCA's local law requirement may not be circumvented merely by casting the alleged constitutional wrong as negligence.").  Moreover, analogizing the alleged conduct to "assault and battery" and "false imprisonment" is of no use to Plaintiffs since such claims are excluded by the FTCA.  *See* 28 U.S.C. § 2680(h).

[19] In *Boumediene*, the issue was whether a provision in the Military Commissions Act, Pub. L. No. 109-366, 120 Stat. 2600 (2006) (codified in relevant part at 28 U.S.C. § 2241(e)(1)), depriving federal courts of habeas corpus jurisdiction over petitions filed by Guantanamo detainees, violated the clause of the Constitution governing suspension of the writ, ART. 1, § 9, cl. 2. ("the Suspension Clause").  *Id*. at 2237.  The Court struck down section 2241(e)(1) of the Military Commissions Act as an unconstitutional suspension of the writ.  *Id*.  The Court held that this clause of the Constitution extended to Guantanamo, because "the United States, by virtue of its complete jurisdiction and control over the base [at Guantanamo], maintains *de facto* sovereignty over this territory."  *Id*. at 2252.

lease]." *Vermilya-Brown Co., Inc., v. Connell*, 335 U.S. 377, 384 (1948) (emphasis added).[20]

Thus, even though the United States had what would later be referred to as "de facto

sovereignty"[21] over the New Foundland air base, the Court held that the foreign country

exception applied, thereby repudiating the very argument being made by Plaintiffs.[22]

Therefore, Plaintiffs essentially are arguing that *Boumediene* does no less than overturn

*Spelar* by making "de facto sovereignty" the proper test.  This interpretation of *Boumediene* not

only is precluded by the Court's express limitation on the applicability of its holding and

principles of stare decisis,[23] it defies logic.  There is no constitutional right to bring an FTCA

---

[20] As the Court explained in *Spelar*, "[t]his airbase is one of the areas leased for ninety-nine years by Great Britain to the United States pursuant to the same executive agreement and leases discussed at length in *Vermilya-Brown Co., Inc., v. Connell*, 335 U.S. 377[.]" *Spelar*, 338 U.S. at 218.  Among other things, Article I of the lease stated that "[t]he United States shall have all the rights, power and authority within the Leased Areas which are necessary for the establishment, use, operation and defence thereof, or appropriate for their control . . .", *Vermilya-Brown*, 335 U.S. at 382 n.4 (quoting 55 Stat. 1560), and Article XXIX stated "[d]uring the continuance of any Lease, no laws of the Territory which would derogate from or prejudice any of the rights conferred on the United States by the Lease or by this Agreement shall be applicable within the Leased Area, save with the concurrence of the United States." *Id.* (quoting 55 Stat. 1560).

[21] Use of this term, in the context of FTCA actions, to describe areas that were not official territories or possessions of the United States, but nevertheless were under the United States' complete and total control, first appeared in *Cobb v. United States*, 191 F.2d 604 (9th Cir. 1951) to describe the United States' relationship with the Island of Okinawa in the aftermath of World War II.

[22] *See also Pedersen v. United States*, 191 F. Supp. 95, 100 (D. Guam 1961) (tort arising on military base in the Phillippines barred by foreign country exception because the rights of control over the areas obtained by the United States from the Republic of the Philippines are "quite similar to those obtained over" the lease at issue in *Vermilya-Brown*).

[23] The Court explicitly confined its holding only to the extraterritorial reach of the Suspension Clause.  *See Boumediene*, 128 S.Ct. at 2275; *see also Rasul*, 563 F.3d at 529 ("[T]he Court in *Boumediene* disclaimed any intention to disturb existing law governing the

(continued...)

action, as there is for a habeas petition.  On the contrary, bringing a tort action against the United

States is possible only because of Congress' statutory waiver of sovereign immunity, which must

be construed narrowly.[24]  It is therefore a tremendous leap for Plaintiffs to argue that "de facto

sovereignty" is the proper test for whether the foreign country exception should not apply simply

because it was used to determine whether one particular provision of the Constitution applies to

detainees abroad.  *Cf. Spelar*, 338 U.S. at 222 (simply because Congress intended for one

statutory scheme (the Fair Labor Standards Act) to extend to an air base in New Foundland did

not mean that Congress intended another (the FTCA) to extend there as well).[25]

---

[23](...continued)
extraterritorial reach of any constitutional provisions, other than the Suspension Clause.").  Even
without this express limitation, lower federal courts cannot imply that recent Supreme case law
overturns prior precedent.  *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not
acknowledge, and we do not hold, that other courts should conclude our more recent cases have,
by implication, overruled an earlier precedent."); *Rodriguez de Quijas v. Shearson/American
Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a
case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals
should follow the case which directly controls, leaving to this Court the prerogative of overruling
its own decisions." ).

[24] Under the doctrine of sovereign immunity, "the United States . . . is immune from suit
save as it consents to be sued," and "the terms of its consent to be sued in any court define that
court's jurisdiction[.]"  *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  Congress, in
granting a waiver of sovereign immunity, may define the exact conditions of such waiver.  *See
Honda v. Clark*, 386 U.S. 484, 501 (1967).  Although the FTCA "creates an express limited
waiver of the United States' sovereign immunity[,]" *Macharia v. United States*, 238 F. Supp. 2d
13, 20 (D.D.C. 2002), that waiver is expressly limited and must be strictly construed.  *See
Department of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999); *Cadwalder v. United States*, 45
F.3d 297, 300 (9th Cir. 1995).

[25] Following *Spelar* – which remains controlling until the Supreme Court expressly states
otherwise – courts have consistently held that exclusive control and jurisdiction of the same
degree, if not greater, than the United States has over Guantanamo does not represent a passing
of sovereignty to the United States.  In *Cobb*, the Ninth Circuit held that Okinawa was a foreign
country, even though the island "had no independent legislative, executive or judicial

(continued...)

Plaintiffs also argue that sovereignty over Guantanamo has passed to the United States based on the fact that certain U.S. laws, such as the Endangered Species Act, extend to Guantanamo. This argument runs directly counter to the principle that "Congress has power in certain situations, to regulate the actions of our citizens outside the territorial jurisdiction of the United States [which] does not depend upon sovereignty in the political or any sense over the territory." *Vermilya-Brown*, 335 U.S. at 381 (quoting U.S. CONST., Art. IV, § 3, cl. 2).

Plaintiffs also mistakenly assert that jurisdiction exists over claims arising at Guantanamo because it is analogous to the U.S. territories of the Virgin Islands, Guam, and Puerto Rico, and Native American reservations. These comparisons are inapposite. These particular U.S. territories have been officially annexed by Congress, thus effecting a passing of "de jure

---

[25](...continued)
government except the United States Military Government," 191 F.2d at 606, "a congressional committee ha[d] expressed a purpose of the United States to maintain [its military bases on Okinawa] indefinitely," *id.*, the United States had yet to demonstrate an "intention to annex the island, to return it to Japan, or to establish it as an independent state," *id.*, and the United States "now governs, and will continue indefinitely to govern, the island of Okinawa, free from interference by other powers," *id.* at 608, thus evincing "de facto sovereignty" over the island. *Id.* Likewise, in *Burna v. United States*, 240 F.2d 720 (4th Cir. 1957), it was held that Okinawa was a foreign country even though under the United Nations trusteeship over the island "the United States [had] the right to exercise any and all powers of administration, legislation and jurisdiction." *Id.* at 721. The court further noted that "[t]hough the absence of any United States sovereignty was a sufficient answer in *Spelar*, the transfer temporarily of a measure of sovereignty here is not sufficient to dissolve Okinawa's status as a foreign country. . . That the United States could at any time set aside Japanese laws does not, as we see it, signify that Okinawa has lost its foreign character." *Id.* at 722; *see also Callas v. United States*, 253 F.2d 838, 840 (2d Cir. 1958) (Pacific Island of Kwajalein, though governed by United States as trustee under the United Nations, was a foreign country within statutory meaning); *Parrish v. United States*, 425 F. Supp. 2d 1283, 1286 (M.D. Fla. 2006) ("[T]he ordinary meaning of 'foreign country' under the FTCA includes Iraq, even if Iraq was under military occupation by the United States or other nations at the time of the alleged accident and even if Iraq had no recognized government at that time.")

sovereignty" over such lands.  Furthermore, federal district courts exist there, thus eliminating the "venue gap" problem that otherwise would be indicative of Congress' intent that there be no jurisdiction.  *See Smith v. United States*, 507 U.S. 197, 203 (1993).  With respect to Native American reservations, even if this Court were to accept Plaintiffs' characterization of "dual sovereignty" over them, dual sovereignty obviously means that complete sovereignty has not passed to the United States, as is necessary for the foreign country exception not to apply. Moreover, because the term "law of the place" in 28 U.S.C. § 1346(b)(1) refers to the locality of, rather than the political entity that has jurisdiction over, the site where the act or omission occurred, the law of the State in which a Native American reservation is located is applicable. *See LaFromboise v. Leavitt*, 439 F.3d 792, 795 (8th Cir. 2006) (citing *Hess v. United States*, 361 U.S. 314, 318 (1960)); *Brock v. United States*, 601 F.2d 976 (9th Cir. 1979).  By contrast, in the case at bar, Plaintiffs' claims arose at Guantanamo, the locality of which is the foreign country of Cuba.  Consequently, this suit raises the distinct possibility of liability being determined according to Cuban law, which is directly counter to Congress' intent.

Finally, Plaintiffs argue that the foreign country exception should not apply because liability would be determined based on the laws of the District of Columbia, rather than Cuban law.  Plaintiffs mistakenly believe that foreign law must actually be applicable in order for the foreign country exception to apply.  By the time *Sosa* was decided, it was observed that not all States still applied the traditional choice-of-law principles that would have led to the application of foreign law, and thus the concern that foreign law would be applied had somewhat subsided. *See Sosa*, 542 U.S. at 709.  Nevertheless, the Court held that the foreign country exception is to be applied regardless of whether the laws of the foreign jurisdiction actually would be applied,

noting that it was "a stretch to equate 'arising in a foreign country' with 'implicating foreign law,'" and that "jurisdictional variety" should not be created such that application of the exception varies based on each individuals state's choice-of-law rules.  *Id*. at 711.[26]

Furthermore, Plaintiffs overlook the fact that an additional concern of Congress was the difficulty in conducting discovery in distant locations with no district court.  As the Ninth Circuit explained in *Meredith v. United States*, 330 F.2d 9 (9th Cir. 1964), "other possible reasons for the exclusion by Congress from the Federal Tort Claims Act of claims 'arising in a foreign country'" include "the absence of United States courts in such countries, with resulting problems of venue, and the difficulty of bringing defense witnesses from the scene of the alleged tort to places far removed; and . . . a reluctance to extend the Act's benefits to foreign populations. . . ." *Id*. at 10-11 (quoting *Burna*, 240 F.2d at 722).  The obvious difficulties in conducting discovery in "far removed" places like Guantanamo, with no district court through which to facilitate discovery requests, as well as seeking witness attendance, further counsel against extending the waiver of sovereign immunity to claims arising at Guantanamo.

## C.  Plaintiffs' "Derivative Claims" Are Barred By The Foreign Country Exception

Plaintiffs argue that Claim XII (intentional infliction of emotional distress) and Claim XIII (negligent infliction of emotional distress), which they label as "derivative claims," are not

---

[26] Indeed, in *Smith,* the Court held that the foreign country exception applied even though there was absolutely no risk of foreign law applying.  *Smith*, 499 U.S. at 203.  Even without *Smith* and *Sosa*, Plaintiffs' argument would fail.  As the D.C. Circuit explained in *Beattie v. United States*, 756 F.2d 91 (D.C. Cir. 1985), which was abrogated by *Smith*, the foreign country exception would apply unless there was "no theoretical justification for application of foreign law."  *Id*. at 98.  Unlike when a tort occurs in a lawless region like Antarctica, it cannot plausibly be argued that there is not at least a "theoretical justification" of Cuban tort law applying to this suit.

barred by the foreign country exception because they occurred at Guantanamo, which is not a foreign country. Pl. Opp. at 77-78. Whether a claim is derivative depends not on the label given the claim, but on the underlying allegations. *See In re Sunrise Sec. Litig.*, 916 F.2d 874, 882 (3d Cir. 1990) ("Whether a claim is individual or derivative is determined from the body of the complaint rather than from the label employed by the parties."). Because these claims do not relate to the treatment of the detainees while they were alive, but to the damages suffered by the fathers based on how the bodies of the detainees were handled after their deaths, these claims are pled as independent torts. This is especially true of Claim XII, which alleges that the tortious conduct was intentionally directed toward the family of the detainees. However, this Court need not decide whether they are derivative or independent claims. If Plaintiffs are correct that these claims are derivative of those that arose at Guantanamo, they are barred by the foreign country exception for the reasons explained herein and in the United States' motion to dismiss. *See Harbury*, 522 F.3d at 423 (derivative claim of emotional distress by wife in United States deemed to be suffered in the foreign country where husband's tort claims arose).[27] On the other hand, if they are viewed as independent causes of action, the harm occurred in Yemen and Saudi Arabia, thus rendering them barred by the foreign country exception.

## IV. THE ADMINISTRATIVE CLAIMS ARE JURISDICTIONALLY INADEQUATE

Plaintiffs argue that their administrative claims meet this Circuit's "minimal notice" requirement. Pl. Opp. at 79-81. However, the administrative claims filed by Plaintiffs are

---

[27] Furthermore, if the Court views Claims XII and XIII as derivative claims, then they are also barred because, as explained *infra*, the administrative claims for what Plaintiffs characterize as their primary, independent tort claims are jurisdictionally deficient. *See Skees v. United States*, 107 F.3d 421, 426 (6th Cir. 1997) (viability of derivative claims are commensurate only with the viability of the primary claim).

plainly inadequate for all but Claims XII and XIII. [28]

First, the administrative claims were brought by the fathers of the deceased detainees solely for the injuries they (the fathers) suffered, not those allegedly suffered by the detainees while confined at Guantanamo.  In the introduction to the written attachments to the Standard Forms 95, each father states that the claim is "for damages *he* [the father] suffered as a result of the unlawful and tortious conduct of employees or agents of the DoD resulting in the death of his son." (Emphasis added.)  Similarly, in the section titled "Claim for Relief," the only damages being sought are for the "emotional distress" suffered by each father "as a result of the death of his son in the custody of the U.S. government at Guantanamo" and the "emotional distress as a result of the callous behavior of the government following his son's death."  Because the fathers clearly are seeking relief only for their damages, Plaintiffs fail to satisfy the administrative filing requirement for all but Claims XII and XIII.  *Cf. Jackson v. United States*, 730 F.2d 808, 809-10 (D.C. Cir. 1984) (administrative claim for wrongful death brought by parents of deceased federal inmate did not encompass wrongful death and survivorship claim by inmate's wife).

Second, to be jurisdictionally adequate, the claim must at least include "a written statement sufficiently describing the injury to enable the agency to begin its own investigation." *GAF Corp. v. United States*, 818 F.2d 901, 905 (D.C. Cir. 1987).[29]   The administrative claims

---

[28] Although the United States' Motion to Dismiss focused on the inadequacy of the administrative claims related to Claims I to IV (the ATS claims), it is clear that the administrative claims are inadequate for all claims in the Amended Complaint, except Claims XII and XIII.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); *Eisenbeiser v. Chertoff*, 448 F. Supp. 2d 106, 108-109 (D.D.C. 2006).

[29] *See also Dynamic Image Technologies, Inc. v. United States*, 221 F.3d 34, 40 (1st Cir. 2000) ("[A]s long as the language of an administrative claim serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought, it fulfills the notice-of-claim requirement."); *Palay v. United States*, 349 F.3d 418, 425 (7th Cir. 2003) (citation omitted) (a claimant need not set forth the

(continued...)

allege absolutely no facts whatsoever relating to the abuses suffered by the detainees (Claims I to IV, XI, and IV), the inadequate medical treatment they received (Claims VII to IX and XIV), or the emotional distress suffered by the detainees (Claim X).  Rather, the facts alleged in the administrative claims relate solely to the so-called "callous behavior" of the government *after* the deaths of the detainees – i.e., the manner in which the families were notified of their sons' deaths, the manner in which the detainees' deaths were investigated, the derogatory comments allegedly made about the detainees, the delay in returning the bodies of the detainees, and the condition of the bodies upon return.  Administrative claims that are completely devoid of pertinent facts obviously do not meet this Circuit's "minimal notice" requirement.[30]

The level of detail in the administrative claims relating to Claims XII and XIII does not render the remaining claims in the Amended Complaint jurisdictionally adequate.  When the elements of the torts alleged in a complaint "demand markedly different factual evidence" than the torts alleged in an administrative claim, then even "the fairly liberal standard announced in *GAF*" has not been met.  *Murphy v. United States*, 121 F. Supp. 2d 21, 27 (D.D.C. 2000); *see also Williams v. United States*, 932 F. Supp. 357, 361 (D.D.C. 1996) (claimant may not "present one claim to the agency and then maintain suit on the basis of a different set of facts") (quoting *Deloria v. Veterans Admin.*, 927 F.2d 1009, 1012 (7th Cir. 1991)).  Because Claims I to IV, VII

---

[29](...continued)
legal theories upon which recovery is sought, but "bear[s] the burden of pleading the pertinent facts"); *Trentadue v. United States*, 397 F.3d 840, 853 (10th Cir. 2005) (claim must provide "notice of the facts and circumstances underlying a claim") (citations omitted).

[30] *See Palay*, 349 F.3d at 426 (medical malpractice claim dismissed because administrative claim "stated no facts suggesting that the prison medical staff had treated him inappropriately"); *Bansal v. Russ*, 513 F. Supp. 2d 264, 285 (E.D. Pa. 2007) (a list of statutes and constitutional provisions allegedly violated in lieu of "identify[ing] a specific injury" not adequate); *Donahue v. U.S. Transp. Sec. Admin.*, 457 F. Supp. 2d 137, 141 (E.D.N.Y. 2006) (Dismissing lawsuit because "[t]here [was] no information in the Notice of Claim as to how [the plaintiff] was injured, the cause of the injury, how that injury is related in any way to the [allegedly negligent conduct], or the nature of the alleged injury.").

to XI, and XIV of the Amended Complaint require proof of an entirely different set of facts than those alleged in the administrative claims, Plaintiffs failed to meet the notice requirement.  *See Bembenista v. United States*, 866 F.2d 493, 498-99 (D.C. Cir. 1983) (administrative claim setting forth factual allegations related to sexual assault by medical provider did not encompass claim for medical malpractice that occurred during same visit to provider).

## CONCLUSION

For the foregoing reasons, the United States' Motion for Substitution and Motion to Dismiss should be granted.

Dated:  December 4, 2009                    Respectfully submitted,

                                            TONY WEST
                                            Deputy Assistant Attorney General
                                            Civil Division

                                            CHANNING D. PHILLIPS
                                            Acting United States Attorney for
                                            the District of Columbia

                                            PHYLLIS J. PYLES
                                            Director, Torts Branch

                                            MARY MCELROY LEACH
                                            Assistant Director, Torts Branch

                                             /s/ Philip D. MacWilliams

                                            PHILIP D. MACWILLIAMS
                                            (D.C. Bar No. 482883)
                                            Trial Attorney, Torts Branch
                                            Civil Division
                                            U.S. Department of Justice
                                            P.O. Box 888
                                            Benjamin Franklin Station
                                            Washington, DC.  20044
                                            (202) 616-4285
                                            (202) 616-5200 (facsimile)

                                            Attorneys for the United States

**CERTIFICATE OF SERVICE**

        I hereby certify that on December 4, 2009, I caused a copy of the foregoing United States'
Reply to Plaintiffs' Opposition to United States' Motion for Substitution and Motion to Dismiss
to be served on counsel of record via ECF and electronic mail as follows:

    Pardiss Kebriaei
    Shayana Kadidal
    CENTER FOR CONSTITUTIONAL
    RIGHTS
    666 Broadway, 7th Floor
    New York, NY 10012
    pkebriaei@ccrjustice.org
    *Counsel for Plaintiffs*

    Meetali Jain
    International Human Rights Law Clinic
    American University
    WASHINGTON COLLEGE OF LAW
    4801 Massachusetts Ave., NW
    Washington, DC 20016
    mjain@wcl.american.edu
    *Counsel for Plaintiffs*

                                        /s/ Philip D. MacWilliams
                                        
                                        Philip D. MacWilliams

24