# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **Talal AL-ZAHRANI, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 09-0028 (ESH)** |
| | ) | |
| **Donald RUMSFELD, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

## MEMORANDUM OPINION

Plaintiffs Talal Al-Zahrani ("Al-Zahrani, Sr.") and Ali Abdullah Ahmed Al-Salami ("Al-Salami, Sr."), in their individual capacities and as the representatives of the estates of their sons, Yasser Al-Zahrani ("Al-Zahrani") and Salah Ali Abdullah Ahmed Al-Salami ("Al-Salami"), have sued the United States and a host of government officials under the Alien Tort Claims Act ("ATCA" or "ATS"), 28 U.S.C. § 1350 (2006); the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680; and the Fifth and Eighth Amendments to the United States Constitution. Al-Salami and Al-Zahrani were detainees at the United States Naval Base in Guantanamo Bay, Cuba from 2002 until their deaths on June 10, 2006. Currently before the Court are the individual defendants' motion to dismiss plaintiffs' constitutional claims, the government's motion for substitution for plaintiffs' ATCA claims, and the government's motion to dismiss plaintiffs' claims under the ATCA and FTCA. For the reasons set forth herein, the Court will grant defendants' motions.

**FACTUAL BACKGROUND**

Plaintiffs allege the following in their amended complaint.  Yasser Al-Zahrani, Jr., a citizen of Saudi Arabia, and Salah Ali Abdullah Ahmed Al-Salami, Jr., a citizen of Yemen, were among nearly 800 individuals deemed to be "enemy combatants" by the United States government and transferred to Guantanamo beginning in January 2002.  (Am. Compl. ¶¶ 11, 13, 43-44.)  Al-Zahrani was apprehended in Afghanistan in late 2001 and was moved to Guantanamo in January 2002, when he was 17 years old.  (*Id.* ¶ 83.)  Al-Salami was arrested by local forces in Pakistan in March 2002.  (*Id.* ¶ 125.)  He was held in Pakistani custody until May 2002, when he was turned over to U.S. authorities.  (*Id.*)  Following detention in one or more U.S.-controlled sites in Afghanistan, Al-Salami was transferred to Guantanamo in June 2002. (*Id.*)

After two and a half years of confinement, in the fall of 2004, Combatant Status Review Tribunals ("CSRTs") were convened to review the detentions of Al-Zahrani and Al-Salami. During the proceedings before the CSRTs, Al-Zahrani and Al-Salami were presumed to be enemy combatants, denied the right to an attorney, and denied the right to see all of the evidence used against them.  The CSRTs confirmed earlier findings that both detainees were enemy combatants and that they were therefore subject to continued detention at Guantanamo.  (*Id.* ¶¶ 85, 128.)  Administrative Review Boards ("ARBs") were convened in 2005 and 2006 to review Al-Zahrani's and Al-Salami's detentions and after a hearing, the ARBs affirmed the conclusions of the CRSTs.  (*Id.* ¶¶ 86, 129.)  As a result, Al-Zahrani and Al-Salami remained in U.S. custody at Guantanamo until their deaths, though neither man was ever charged with a crime.  (*Id.* ¶ 41.)

Plaintiffs further allege that during the years in which Al-Zahrani and Al-Salami were imprisoned at Guantanamo, they endured inhumane and degrading conditions of confinement

and violent acts of torture and abuse.  (*Id.* ¶¶ 51-70.)  Conditions at Guantanamo included detention in six-by-six foot cages and exposure to the elements, followed by near-constant enclosure in sealed, concrete cells with 24-hour camera monitoring, continuous florescent lighting, and no air conditioning; isolation and confinement with little human contact, exercise, or access to soap, toilet paper, toothbrushes, or other basic items; and little or no communication with family members or the outside world.  (*Id.* ¶¶ 53, 56-59.)  Plaintiffs also allege that Al-Zahrani and Al-Salami were subjected to "specific methods and acts of physical and psychological torture and abuse," including sleep deprivation, exposure to prolonged temperature extremes, invasive body searches, beatings, threats, inadequate medical treatment and withholding of necessary medication, and religious abuse, such as forced shaving and desecration of the Qur'an.  (*Id.* ¶¶ 61, 93, 138-140.)  The amended complaint also alleges that Al-Zahrani and Al-Salami were among the hundreds of detainees at Guantanamo who participated in hunger strikes for weeks or months at a time to protest their conditions and continued detention.  (*Id.* ¶¶ 66, 96, 142-44.)  As a result of these hunger strikes, Al-Zahrani and Al-Salami were strapped into "restraint chairs" and force-fed formula using painful, humiliating, and unsanitary procedures.  (*Id.* ¶¶ 69, 96, 144.)  Plaintiffs contend that defendants devised, recommended, approved, sanctioned, and/or implemented many of these acts of torture, issued and updated the procedures governing the conditions at Guantanamo, and introduced, approved of, supervised, and implemented the procedures by which plaintiffs were force-fed.  (*Id.* ¶¶ 60-62, 69-70.)

Plaintiffs further allege that the brutal acts and conditions that Al-Zahrani and Al-Salami endured for over four years had damaging effects on their physical and psychological heath, effects that defendants intended, knew of, and/or should have anticipated but failed to prevent.

(*Id.* ¶¶ 97-100; 146-164.)  After months of hunger strikes and, for Al-Salami, multiple medical evaluations evidencing depression and suicidal thoughts, Al-Zahrani and Al-Salami were found dead on June 10, 2006.  (*Id.* ¶¶ 101, 146-164, 165.)  A final report from the Naval Criminal Investigative Service ("NCIS") issued in 2008 concluded that the deaths were suicides by hanging.  (*Id.* ¶ 4.)  The government did not notify the families of Al-Zahrani or Al-Salami of their deaths, nor did they return the bodies to their families in time for proper burial under Islamic law.  (*Id.* ¶¶ 116-117, 174-175.)  Moreover, the government performed autopsies on the bodies without seeking the consent of the detainees' families, and when returned, the bodies were damaged and missing certain organs.  (*Id.* ¶¶ 118-19, 176-77.)  Al-Zahrani, Sr. and Al-Salami, Sr. also allege that government and military spokespersons, including some defendants, made a number of derisive comments about Al-Zahrani and Al-Salami after their deaths.  (*Id.* ¶¶ 121, 179.)

Based on these claims, plaintiffs claim compensation and punitive damages for physical, psychological, and emotional injuries; loss of earnings and earning capacity; loss of interfamilial relations; and medical expenses.  (*Id.* ¶ 198.)

### PROCEDURAL BACKGROUND

Plaintiffs filed their complaint against the government, twenty-four named individuals, and one hundred unnamed military, medical, and civilian personnel members on January 7, 2009.[1]  (Compl. ¶ 6.)  That complaint was amended on January 29, 2009, and includes fourteen

---

[1] The twenty-four individual defendants named in the amended complaint include: Donald Rumsfeld; Gen. Richard Myers; Gen. Peter Pace; Gen. James T. Hill; Gen. Bantz Craddock; various military personnel stationed or formerly stationed at Guantanamo; and numerous medical professionals allegedly involved in the treatment of detainees at Guantanamo and/or the creation of policies and procedures used at the base.  The amended complaint also includes unnamed

claims for relief.  (Am. Compl. ¶¶ 199-325.)  Claims I through IV seek damages under the

ATCA against the individual defendants for arbitrary detention, torture, and cruel and inhuman

treatment of Al-Zahrani and Al-Salami, as well as violation of various Geneva Conventions.  (*Id.*

¶¶ 199-234.)  Claims V and VI are also against the individual defendants and allege that the

detention and treatment of Al-Zahrani and Al-Salami constituted cruel and unusual punishment

and deprived them of their life and liberty interests in violation of their constitutional rights

under the Eighth and Fifth Amendments.  (*Id.* ¶¶ 235-253.)  The amended complaint alleges that

the individual defendants are liable for these violations in that defendants "participated in, set the

conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided

and abetted, and/or conspired together" in the detention and treatment of Al-Zahrani and Al-

Salami.  (*Id.* ¶¶ 240, 251.)  Claims VII though XIV are against the United States under the FTCA

for negligence, medical negligence, medical malpractice, intentional infliction of emotional

distress, battery, and wrongful death.  (*Id.* ¶¶ 254-325.)

On June 26, 2009, defendants filed three motions that are now before the Court.  The

individual defendants have moved to dismiss plaintiffs' constitutional claims under Federal

Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that this Court lacks subject

matter jurisdiction over these claims and that plaintiffs have failed to state a claim upon which

relief can be granted.  (Mem. of P. & A. in Supp. of the Individual Defs.' Mot. to Dismiss Pls.'

Constitutional Claims ["Constitutional Mem."] at 1-2.)  The government has also filed a motion

to substitute itself for the individual defendants with respect to plaintiffs' claims under the

ATCA.  The United States contends that the Federal Employees Liability Reform and Tort

Compensation Act of 1988 ("*Westfall* Act"), 28 U.S.C. § 2679(b)(1), provides that a claim

---

military, medical, and civilian personnel, who are listed as John Does 1-100.  (Am. Compl. ¶¶
15-39.)

against the United States under the FTCA is the exclusive remedy for persons seeking damages

for any "negligent or wrongful act or omission of any employee of the Government while acting

within the scope of his office or employment."  (Mem. of P. & A. in Supp. of United States'

Mot. for Substitution for Claims I to IV of the Am. Compl. ["Substitution Mem."] at 6.)  Finally,

the United States has filed a motion to dismiss all of plaintiffs' claims under the FTCA,

including the ATCA claims for which it has sought substitution, on the grounds that this Court

lacks subject matter jurisdiction over these claims.  (Mem. of P. & A. in Supp. of the United

States' Mot. to Dismiss Claims I to IV and VII to XIV of the Am. Compl. ["FTCA Mem."] at 5.)

## ANALYSIS

### I.      MOTION BY THE INDIVIDUAL DEFENDANTS TO DISMISS CONSTITUTIONAL CLAIMS IN COUNTS V AND VI

The individual defendants have moved to dismiss plaintiffs' constitutional claims under

the Fifth and Eighth Amendments on the grounds that: 1) this Court lacks jurisdiction to hear

these claims under Section 7 of the Military Commissions Act of 2006 ("MCA"), Pub. L. No.

109-366, 20 Stat. 2600 (2006); 2) special factors preclude the Court from implying a remedy for

plaintiffs under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388

(1971); and 3) even if the Court has jurisdiction and plaintiffs could invoke *Bivens*, the

individual defendants are entitled to qualified immunity.  (Constitutional Mem. at 3-28.)

#### A.  The Military Commissions Act

Defendants seek dismissal of plaintiffs' constitutional claims based on § 7 of the MCA,

which amends 28 U.S.C. § 2241 and deals with the right of detainees to bring habeas corpus

petitions and to seek relief related to the conditions of their detention.  Section 7 states in

pertinent part:

> [n]o court . . . shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e)(2).  Plaintiffs respond that the Supreme Court in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), invalidated § 7 in its entirety and, therefore, the Court is not divested of jurisdiction.  This very argument has been addressed by many courts in this jurisdiction and it has been uniformly rejected.

Although *Boumediene* did not specify which portion of § 2241(e) survived its holding, the Court expressly declined to "discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement." *Id.* at 2274.  Given the Court's unwillingness to consider the issue, there is no basis upon which to argue that the Court invalidated § 2241(e)(2), which clearly strips courts of jurisdiction over claims relating to "any aspect of . . . treatment . . . or conditions of confinement."  28 U.S.C. § 2241(e)(2).  Moreover, "there is a presumption that when a court invalidates a statute as unconstitutional, it does so on grounds drawn as narrowly as possible." *Al-Adahi v. Obama*, 596 F. Supp. 2d 111, 118 (D.D.C. 2009) (citing *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006)).  As such, courts must "refrain from invalidating more of [a] statute than is necessary." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion)).  For this reason, every court in this circuit to consider the issue has found that *Boumediene* did not invalidate § 2241(e)(2). *See*, *e.g.*, *Kiyemba v. Obama*, 561 F.3d 509, 512 n.1 (D.C. Cir. 2009) (*Boumediene* "referred to § 7 without specifying a particular subsection of §

2241(e) but its discussion of the Suspension Clause clearly indicates it was referring only to that part of § 7 codified at § 2241(e)(1)"); *Al-Adahi*, 596 F. Supp. 2d at 119 (Kessler, J.) (concluding that "the Supreme Court's direct disavowal of reaching any conclusion about the validity of § 2241(e)(2) [in *Boumediene*]" overcomes any ambiguity in that opinion); *Khadr v. Bush*, 587 F. Supp. 2d 225, 235-36 (D.D.C. 2009) (Bates, J.) ("*Boumediene* invalidated only section 2241(e)(1), but not section 2241(e)(2)."); *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 312, 314 (D.D.C. 2008) (Hogan, J.) ("Cognizant of the long-standing rule of severability, this Court, therefore, holds that [§ 2241(e)(2)] remains valid . . . ."); *In re Guantanamo Bay Detainee Litig.*, 570 F. Supp. 2d 13, 18 (D.D.C. 2008) (Urbina, J.) ("[T]his court interprets *Boumediene* to invalidate only 28 U.S.C. § 2241(e)(1)."); *see also Tumani v. Obama*, 598 F. Supp. 2d. 67, 69 (D.D.C. 2009) (Urbina, J.) (denying detainee petitioner's requests regarding "transfer, access and interrogations" for lack of jurisdiction under § 2241(e)(2)).  This Court joins the chorus in concluding that *Boumediene* did not invalidate § 2241(e)(2).

Plaintiffs next attack the applicability of § 2241(e)(2) by arguing that the procedure used to determine that Al-Zahrani and Al-Salami were "enemy combatants" lacked due process and was therefore facially invalid.  (Opp'n at 7-10.)  Section 2241(e)(2) bars claims relating to the conditions of detention of any alien who "has been determined by the United States to have been properly detained as an enemy combatant."  28 U.S.C. § 2241(e)(2).  Plaintiffs concede that in 2004, CSRTs convened and determined that each detainee was an "enemy combatant."  (Am. Compl. ¶¶ 84-85, 127-28.)  However, they contend that because the CSRTs did not allow detainees to present evidence to challenge the cases against them, denied detainees access to counsel, relied extensively on hearsay, and did not provide a right to an appeal, the proceedings lacked the fundamental elements of due process and were so inadequate that Congress could not

have meant for CSRT determinations to preclude federal court review of detainee claims. (Opp'n at 8-10.)  In making this novel argument, plaintiffs rely on *Boumediene*'s criticisms of the CSRT process.  (Opp'n at 8.)

Although the Supreme Court in *Boumediene* found that the CSRT review process was not an adequate substitute for habeas corpus review, *see* 128 S. Ct. at 2269-70, nothing in the language of § 2241(e)(2) suggests that Congress intended for the statute's jurisdictional bar to apply only to those individuals who had access to habeas corpus review.  The plain language of the statute precludes jurisdiction over claims by aliens who "ha[ve] been determined" to be enemy combatants by the United States.  28 U.S.C. § 2241(e)(2).  Nothing in the statute qualifies the necessary determination or suggests that it must be conducted in a particular way.  The argument that because CSRT review has been found to be an inadequate substitute for habeas review, it is also inconclusive for "purposes of application of MCA Section 7" is baseless. (Opp'n at 9.)  Indeed, Congress enacted § 2241(e)(2) alongside § 2241(e)(1), which precluded detainee habeas claims, intimating that an enemy combatant determination for purposes of § 2241(e)(2) was intended as something far short of habeas review.  "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there," and "[w]hen the statutory language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (citations and internal quotation marks omitted).  Here, Al-Zahrani and Al-Salami were determined by properly constituted CSRTs to be enemy combatants, and as such, the plain language of § 2241(e)(2) precludes this Court from hearing their claims.

In an attempt to salvage their claims against the individual defendants, plaintiffs launch an attack on the constitutionality of the MCA.  (Opp'n 10-22.)  The Court need not reach these

arguments because, even assuming *arguendo* that the Court has jurisdiction, plaintiffs' *Bivens*

claims cannot survive defendants' 12(b)(6) motion to dismiss.[2]  It is therefore unnecessary for

the Court to pass judgment on the constitutionality of § 2241(e).  *See Karriem v. Barry*, 743 F.2d

30, 38-39 (D.C. Cir. 1984) ("[I]t is the general policy of the federal courts to avoid addressing

broad constitutional issues unless their resolution is imperative in the context of the case at

hand.").[3]  Moreover, it "conforms to common sense" to avoid the expenditure of considerable

time and legal resources to brief and argue, on the part of the parties, and to analyze, on the part

of the Court, the jurisdictional issues raised by plaintiffs for claims that are clearly barred for

other reasons.  *Chalabi*, 543 F.3d at 729 (affirming district court's dismissal on grounds with

"merits characteristics" despite unresolved statutory jurisdictional questions where claims at

issue were "plainly barred").   Therefore, the Court need not resolve the constitutionality of §

---

[2] The Court's conclusion that special factors counsel against the inference of a damages remedy for plaintiffs' constitutional claims under *Bivens* constitutes a ruling on the merits for failure to state a claim upon which relief can be granted.  *See, e.g.*, *Kim v. United States*, 618 F. Supp. 2d 31, 38 (D.D.C. 2009) (argument that plaintiffs failed to state claim for *Bivens* action because no *Bivens* remedy exists for plaintiffs' injuries "is better understood as seeking dismissal under 12(b)(6)"); *see also Bell v. Hood*, 327 U.S. 678, 682 (1946) ("[I]t is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.").

[3] The Court understands that plaintiffs' constitutional challenges to § 2241(e) concern this Court's jurisdiction over plaintiffs' claims and is mindful that courts should generally proceed with analysis of jurisdictional issues under Rule 12(b)(1) before proceeding to a resolution of a 12(b)(6) motion.  *See United States ex rel. Settlemire v. Dist. of Columbia*, 198 F.3d 913, 920-21 (D.C. Cir. 1999) (citing *Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155-56 (2d Cir. 1993)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) (requiring federal courts to resolve Article III jurisdiction prior to deciding cause of action).   However, a court may choose to give priority to a merits question over a question of statutory, as opposed to Article III, jurisdiction.  *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 728 (D.C. Cir. 2008).  Indeed, the Supreme Court has "explicitly recognized the propriety of addressing the merits where doing so made it possible to avoid a doubtful issue of *statutory* jurisdiction." *Kramer v. Gates*, 481 F.3d 788, 791 (D.C. Cir. 2007) (citing *Steel Co.*, 523 U.S. at 96-97 & n.2). Here, plaintiffs' constitutional attacks on § 2241(e) create questions as to the Court's statutory jurisdiction (or lack thereof).  The Court's decision to forego analysis of these vexing questions in favor of analyzing defendants' motion to dismiss under Rule 12(b)(6) is therefore proper.

2241(e), but rather, it will proceed to the issue of whether a *Bivens* cause of action should be implied on behalf of the plaintiffs.

### B.    *Bivens* Remedy

In *Bivens*, the Supreme Court held that under certain circumstances a plaintiff may be entitled to recover money damages for injuries suffered as a result of a government actor's violation of the Constitution. *See Bivens*, 403 U.S. at 397. In determining whether to recognize a remedy under *Bivens*, courts engage in a two-step process. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). The first step looks to "whether any alternative, existing process for protecting the interest [at issue] amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.* Where no such "alternative" process protects the interest at issue, courts must then "weigh[] reasons for and against the creation of a new cause of action" and decide whether the benefits of implying a new remedy offset the disadvantages associated with doing so. *Id.* at 554. In making such a determination, courts must "pay[] particular heed . . . to any special factors counseling hesitation before authorizing a new kind of federal litigation." *Bush v. Lucas*, 462 U.S. 367, 378 (1983). Since *Bivens* was announced, the Supreme Court has identified multiple "special factors" to discourage courts from implying a remedy under *Bivens* and "in most instances [has] found a *Bivens* remedy unjustified." *Wilkie*, 551 U.S. at 549-50 (noting since *Bivens*, Court has recognized only two additional nonstatutory damages remedies); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009) ("Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability 'to any new context or new category of defendants.'") (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)); *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (declining to extend *Bivens* cause of action "in the context of extraordinary rendition, [because]

such an action would have the natural tendency to affect diplomacy, foreign policy, and the security of the nation, and that fact counsels hesitation").

Despite judicial reluctance to imply *Bivens* remedies, plaintiffs argue that their claims should proceed because they do not threaten the Executive Branch's foreign policy and national security functions, interfere or contradict Congress' involvement in this area, or implicate other special factors.  (Opp'n at 51-53.)  Moreover, plaintiffs argue that if the government can shield defendants' conduct under the rubric of foreign policy and national security considerations, it would offend U.S. treaty obligations and amount to a condonation of torture.  (*Id.* at 52-53.)

Plaintiffs' position collapses in the face of the Circuit's decision in *Rasul v. Myers*, 563 F.3d 527 (D.C. Cir. 2009) ("*Rasul II*"), *cert. denied*, 78 U.S.L.W. 3099 (U.S. Dec. 14, 2009) (No. 09-227).  Plaintiffs in that case, former detainees at Guantanamo, sued various military officers alleging, *inter alia*, that their treatment while in U.S. custody violated their rights under the Fifth and Eighth Amendments to the Constitution.  *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26, 28-29, 39 (D.D.C. 2006).[4]  The district court dismissed these claims on the ground that defendants were entitled to qualified immunity under *Bivens*.  *Id.* at 39.  The D.C. Circuit affirmed this holding on two occasions, once in *Rasul v. Myers*, 512 F.3d 644, 665-67 (D.C. Cir. 2008) ("*Rasul I*"), and then again in *Rasul II*, 563 F.3d at 530-32.  In *Rasul II*, the D.C. Circuit also addressed defendants' argument that special factors counseled against extending a *Bivens* remedy to plaintiffs.  *Rasul II*, 563 F.3d at 532 n.5.  The Court, relying on its opinion in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985), and a concurrence by Judge Brown in *Rasul I*, held that "[t]he danger of obstructing U.S. national security policy" is a special factor

---

[4] Many of plaintiffs' allegations in *Rasul* are identical to plaintiffs' allegations in the instant case. *Compare Rasul*, 414 F. Supp. 2d at 28-29, *with* Am. Compl. ¶¶ 61-63, 65, 93, 136, 138.

counseling against the extension of a *Bivens* remedy to Guantanamo detainees.  *Id.*  As the Court

explained:

> *Sanchez-Espinoza* held that "the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad."  We see no bases for distinguishing [*Rasul*] from *Sanchez-Espinoza*. Plaintiffs' *Bivens* claims are therefore foreclosed on this alternative basis, which is . . . unaffected by the Supreme Court's *Boumediene* decision.

*Id.* (internal citations omitted); *see also Rasul I*, 512 F.3d at 673 (Brown, J., concurring)

("Treatment of detainees is inexorably linked to our effort to prevail in the terrorists' war against

us, including our ability to work with foreign governments in capturing and detaining known and

potential terrorists.  Judicial involvement in this delicate area could undermine these military and

diplomatic efforts and lead to 'embarrassment of our government abroad.'") (quoting *Sanchez-

Espinoza*, 770 F.2d at 209).

The D.C. Circuit's conclusion that special factors counsel against the judiciary's

involvement in the treatment of detainees held at Guantanamo binds this Court and forecloses it

from creating a *Bivens* remedy for plaintiffs here.  Moreover, in the face of *Rasul II*, plaintiffs'

argument that *Sanchez-Espinoza* is somehow distinguishable from the case at hand is simply

untenable.  (Opp'n at 52.)  Accordingly, the individual defendants' motion to dismiss plaintiffs'

constitutional claims is granted.[5]

---

[5] Even if plaintiffs' claims were not foreclosed under the *Bivens* special factors analysis, their claims would fail because under *Rasul II*, defendants would be entitled to qualified immunity. 563 F.3d at 530 (holding that "qualified immunity insulates the defendants from plaintiffs' *Bivens* claims" because "[n]o reasonable government official would have been on notice [before the Supreme Court's ruling in *Boumediene*] that plaintiffs had any Fifth Amendment or Eighth Amendment rights").  As the Court in *Rasul II* explained,

## II.     MOTION FOR SUBSTITUTION

The government has moved to substitute the United States as defendant for the individually named defendants in plaintiffs' claims under the ATCA.  (Substitution Mem. at 6.) The *Westfall* Act "provides that a claim against the United States under the [FTCA] is the exclusive remedy for persons seeking recovery of damages for any 'negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.'" (*Id.* at 6 (quoting 28 U.S.C. § 2679(b)(1)).)  The government argues that the individual defendants were acting within the scope of their employment with respect to the conduct alleged in the amended complaint and has provided a certification from the Director of the Torts Branch of the Civil Division of the U.S. Department of Justice in support of that

---

> [a]t the time of their detention, neither the Supreme Court nor this court had ever held that aliens captured on foreign soil and detained beyond sovereign U.S. territory had any constitutional rights-under the Fifth Amendment, the Eighth Amendment, or otherwise. The Court in *Boumediene* recognized just that: "It is true that before today the Court has never held that noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty have any rights under our Constitution."

*Id.* (quoting *Boumediene*, 128 S. Ct. at 2262).  As such, the Court held that "there was no authority for-and ample authority against-plaintiffs' asserted rights at the time of the alleged misconduct" and "[t]he defendants are therefore entitled to qualified immunity against plaintiffs' *Bivens* claims."  *Id.* at 532.

Although the events alleged in support of plaintiffs' constitutional claims occurred between January 2002 and June 2006, at least two years after the plaintiffs in *Rasul* were released from U.S. custody, all of the conduct at issue occurred well before the Supreme Court's decision in *Boumediene*.  Since courts "do not require government employees to anticipate future developments in constitutional law," *id.* at 530 n.2 (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)); *Butera v. District of Columbia*, 235 F.3d 637, 652 (D.C. Cir. 2001), the individual defendants in this case are also protected by the doctrine of qualified immunity.

argument.[6]  (*Id.* Ex. A at 2.)  Based on this certification, the government contends that plaintiffs

cannot sue any of the individuals under the ATCA and that plaintiffs' sole remedy lies against

the government under the FTCA.  (*Id.* at 6.)  Plaintiffs respond that the individual defendants'

conduct was not properly within the scope of their employment and that even if it had been,

plaintiffs' claims under the ATCA fall within the statutory exception to the *Westfall* Act.  (Opp'n

at 56.)  Specifically, plaintiffs contend that defendants' alleged conduct constitutes torture and

that the law defining "scope of employment" as it is used in the *Westfall* Act does not extend to

such "egregious conduct."  (*Id.* at 56-60.)

   As was the case with the *Bivens* special factors analysis, plaintiffs' attempt to defeat

defendants' motion to substitute is foreclosed by binding precedent in this Circuit which rejects

the argument posited by plaintiffs that torture or seriously criminal conduct does not fall within

the scope of a government actor's employment.  *See Rasul I*, 512 F.3d at 660; *Harbury v.*

*Hayden*, 522 F.3d 413, 422 (D.C. Cir. 2008).  In *Rasul I*, the Court found that defendants'

allegedly torturous and abusive conduct was "foreseeable" and "'motivated or occasioned by . . .

the conduct then and there for the employer's business' even though it was seriously criminal."

*Rasul I*, 512 F.3d at 660 (quoting *Lyon v. Carey*, 533 F.2d 649, 655 (D.C. Cir. 1976)).  As

explained by the Court,

> [t]he plaintiffs concede that the torture, threats, physical and
> psychological abuse inflicted on them, which were allegedly
> approved, implemented, supervised and condoned by the
> defendants, were intended as interrogation techniques to be used

---

[6] While the government's scope-of-employment certification "does not conclusively establish as
correct the substitution of the United States as defendant in place of the employee," it constitutes
*prima facie* evidence that the individual defendants were acting within the scope of their
employment.  *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006)
(internal citation omitted).  "'[A] plaintiff challenging the government's scope-of-employment
certification bears the burden of coming forward with specific facts rebutting the certification.'"
*Id.* (quoting *Stokes v. Cross,* 327 F.3d 1210, 1214 (D.C. Cir. 2003)).

> on detainees. . . . While the plaintiffs challenge the methods the
> defendants used to perform their duties, the plaintiffs do not allege
> that the defendants acted as rogue officials or employees who
> implemented a policy of torture for reasons unrelated to the
> gathering of intelligence. Therefore, the alleged tortious conduct
> was incidental to the defendants' legitimate employment duties.

*Id.* at 658-59 (internal citations and quotation marks omitted); *see also Harbury*, 522 F.3d at 422

(applying D.C. law, holding that CIA defendants' allegedly torturous conduct in managing

informants and gathering intelligence was within their scope of employment, and converting

claims against individual defendants to a FTCA claim against the government). Because it found

defendants' conduct in detaining and interviewing plaintiffs at Guantanamo fell within the scope

of their employment, the Court in *Rasul I* held that plaintiffs' ATCA claims were "properly

'restyled as [claims] against the United States that [are] governed by the [FTCA].'" *Rasul I*, 512

F.3d at 660 (quoting *Ballenger*, 444 F.3d at 662); *see also Rasul II*, 563 F.3d at 528-29

(reinstating judgment on ATCA claims from *Rasul I*).

Buried in a footnote, plaintiffs recognize that the D.C. Circuit in *Rasul I* has rejected their

position. (Opp'n at 58 n.51.) Despite this concession, plaintiffs urge the Court to "depart" from

the holdings in *Rasul I* and *Harbury*. (*Id.*) Yet, the Court is not at liberty to disregard clearly

established, controlling precedent. *See*, *e.g.*, *United States v. Torres*, 115 F.3d 1033, 1036 (D.C.

Cir. 1997) ("[D]istrict judges, like panels of this court, are obligated to follow controlling circuit

precedent until either we, sitting en banc, or the Supreme Court, overrule it."). The individual

defendants' conduct in this case, like the conduct in *Rasul*, was "pursuant to standard operating

procedures" and was "use[d] in connection with interrogations at Guantanamo." (Am. Compl ¶¶

57, 61.) Their conduct was therefore foreseeable and incidental to the defendants' positions as

military, medical, or civilian personnel in connection with Guantanamo and accordingly falls within the scope of their employment.[7]

As a fallback, plaintiffs argue in the alternative that their ATCA claims fall within the statutory exception to the *Westfall* Act (*id.* at 64), which states that the Act does not apply to actions against a government employee "which [are] brought for . . . violation[s] of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(B). Plaintiffs contend that the ATCA is a "violable federal statute" that "is violated when the laws of nations are violated." (Opp'n at 64-65.) However, this argument was rejected by the Supreme Court in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004) ("[Plaintiff] says that the ATS was intended not simply as a jurisdictional grant, but as authority for the creation of a new cause of action for torts in violation of international law. We think that reading is implausible."). *See also In re Iraq and Afghanistan Detainees Litig.*, 479 F. Supp. 2d 85, 112 (D.D.C. 2007) ("The question whether the [ATS] falls within the statutory exception to the Westfall Act was answered by the Supreme Court's decision in *Sosa v. Alvarez-Machain* . . . where it held that 'the ATS is a jurisdictional statute creating no new causes of action.' Accordingly, the plaintiffs cannot rely on the [ATS] to waive the Westfall Act because the plaintiffs have no claim for a violation of that statute itself.") (quoting *Sosa*, 542 U.S. at 724); *Harbury v. Hayden*, 444 F. Supp. 2d 19, 38-39 (D.D.C. 2006) ("As the Supreme Court noted in

---

[7] Plaintiffs urge this Court to proceed with an evidentiary hearing regarding scope of employment. (Opp'n at 63.) However, neither a hearing nor "discovery is . . . warranted [since] 'plaintiff[s] [have] not allege[d] any facts in [their] complaint or in any subsequent filing . . . that, if true, would demonstrate that [the defendants] ha[ve] been acting outside the scope of [their] employment.'" *Rasul I*, 512 F.3d at 662 (quoting *Stokes*, 327 F.3d at 1216 (internal quotations and citations omitted)). Here, as in *Rasul*, the individual defendants were "employed to detain and interrogate suspected enemy combatants" and the alleged torturous conduct and arbitrary detention was a function of that employment. *Id.* Plaintiffs have not provided any facts to buttress a claim that defendants were acting outside of their employment, and therefore, no purpose would be served by having an evidentiary hearing.

*Sosa,* the ATCA is a 'jurisdictional grant . . . best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time' that the ATCA was enacted in 1789." (quoting *Sosa*, 542 U.S. at 724)); *Rasul*, 414 F. Supp. 2d at 38 ("The plain language of the ATCA, however, does not confer rights nor does it impose obligations or duties that, if violated, would trigger the Westfall Act's statutory exception.").

Despite the clear holding of these cases, plaintiffs argue that the D.C. Circuit's recent opinion in *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), should be read as holding that the ATCA falls within the statutory exception to the *Westfall* Act. (Opp'n at 65.)  The Court disagrees.  In *Saleh*, the D.C. Circuit noted that the Supreme Court in *Sosa* "opened the door a crack to the possible recognition of new causes of action under international law (such as, perhaps, torture) if they were firmly grounded on an international consensus."  580 F.3d at 14. To the extent that this language suggests that the Supreme Court in *Sosa* contemplated substantive rights, those rights are "under international law," not the ATCA.  Plaintiffs argue that "[t]he ATS is violated when the laws of nations are violated" (Opp'n at 65), but the Supreme Court rejected as "implausible" a reading of the ATS as "[a] creation of a new cause of action for torts *in violation of international law*."  *Sosa*, 542 U.S. at 713 (emphasis added).  As Judge Urbina explained in *Rasul*,

> [a] review of *Sosa* shows that the ATCA facilitates the bringing of an action for violations of the law of nations. The plain language of the ATCA, however, does not confer rights nor does it impose obligations or duties that, if violated, would trigger the Westfall Act's statutory exception. For the Westfall Act's statutory exception to apply, the ATCA would have to create substantive rights or duties that can be violated for purposes of the Westfall Act.  A claim brought pursuant to the ATCA, therefore, is based on a violation of rights conferred under international law, not the

> ATCA itself.   Accordingly, the court concludes that the plaintiffs
> fail to satisfy the exception under 28 U.S.C. § 2679(b)(2)(B).

*Rasul*, 414 F. Supp. 2d at 38 (internal citations omitted).[8]

Consistent with *Sosa* and its progeny, the Court concludes that the ATS is not a violable statute for purposes of the *Westall* Act statutory exception.   Therefore, because defendants' conduct falls within the scope of their employment, the government is properly substituted as defendant in plaintiffs' claims, which are governed by the FTCA.   *Ballenger*, 444 F.3d at 662. Accordingly, the government's motion to substitute itself as defendant as to plaintiffs' Claims I-IV is granted.

## III.   MOTION TO DISMISS CLAIMS UNDER FTCA IN COUNTS I-IV and VII-XIV

The government's final motion seeks dismissal of plaintiffs' claims under the FTCA. Although the United States raises a host of arguments in favor of dismissal, it is not necessary to address these many arguments, since the Court concludes that all of plaintiffs' non-constitutional claims are barred by the FTCA's express exception to its waiver of sovereign immunity for "any claim arising in a foreign country." (FTCA Mem. at 8-12 (quoting 28 U.S.C. § 2680(k)).)

"The [FTCA] is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment."   *United States v. Orleans*, 425 U.S 807, 813 (1976).   The statute includes certain express exceptions to its waiver of sovereign immunity; by its own terms, the government's consent to be sued does not apply to certain types of claims.   28 U.S.C. § 2680.   In particular, the government's waiver of sovereign immunity does not apply to

---

[8] Indeed, this Circuit has rejected the argument that international law is precedential or binding on the courts.   *See Al-Bihani v. Obama*, 590 F.3d 866, 871 (D.C. Cir. 2010) ("The international laws of war as a whole have not been implemented domestically by Congress and are therefore not a source of authority for U.S. courts.").

"[a]ny claim arising in a foreign country."  *Id.* § 2680(k); *see also Sosa*, 542 U.S. at 712 (holding

that "FTCA's foreign country exception bars all claims based on any injury suffered in a foreign

country, regardless of where the tortious act or omission occurred").  The government argues that

because plaintiffs' Claims I though IV and VII though XIV arose in foreign countries—namely,

Cuba, Yemen, and Saudi Arabia—the government has not consented to be sued, and as a result,

the Court lacks subject-matter jurisdiction over these claims.  (FTCA Mem. at 8-9.)   The

plaintiffs apparently concede that its remaining claims arose at Guantanamo and in Yemen and

Saudi Arabia, but they argue that Guantanamo is not a foreign country within the meaning of 28

U.S.C. § 2680(k), and that their claims of emotional distress are derivative of injuries that

occurred at Guantanamo.  (Opp'n at 73-78.)

      In arguing that Guantanamo is not a foreign country, plaintiffs rely solely on the Supreme

Court's ruling in *Boumediene*.  There, in deciding the issue of whether detainees at Guantanamo

are entitled to habeas corpus, the Court was faced with the argument that the writ did not apply

because under the common law, the writ "ran only to territories over which the Crown was

sovereign," and the United States does not claim sovereignty over Guantanamo.  *Boumediene*,

128 S. Ct. at 2251.  The Court held that "questions of sovereignty are for the political branches to

decide" and for that reason it "d[id] not question the Government's position that Cuba, not the

United States, maintains sovereignty, in the legal and technical sense of the term, over

Guantanamo Bay."  *Id.* at 2252.  The Court then stated that its finding with respect to sovereignty

did not end its inquiry, because for purposes of habeas, the Court was entitled to look to "the

objective degree of control the Nation asserts over foreign territory."  *Id.*  So while it deferred to

the government's position that the United States did not exercise "sovereignty" over

Guantanamo in the "narrow, legal sense of the term," it recognized that the "United States, by

virtue of its complete jurisdiction and control over the base, maintains *de facto* sovereignty over th[e] territory." *Id.* at 2252-53.  Invoking this *de facto* sovereignty analysis, plaintiffs argue that the base at Guantanamo is not "foreign" as that term is used in 28 U.S.C. § 2680(k).  (Opp'n at 73-74.)

Plaintiffs, however, mistakenly conflate the constitutional right to bring a habeas action with the right to bring an action against the United States under the FTCA.  There is no constitutional right to sue the United States under the FTCA's statutory waiver of sovereign immunity,[9] and under Supreme Court precedent, there is no basis for extending the *de facto* sovereignty test set forth in *Boumediene* to the FTCA.  As correctly argued by the government, the instant case is decided not by *Boumediene*, but by the Supreme Court's decision in *United States v. Spelar*.  In *Spelar*, the Court held that the district court did not have subject-matter jurisdiction over a wrongful death claim by the estate of a flight engineer killed on a U.S. air base in Newfoundland.  338 U.S. 217, 218-19 (1949).  The air base had been leased by the United States from Great Britain under terms that "effected no transfer of sovereignty with respect to the military bases concerned."  *Id.* at 221-22 (citing *Vermilya-Brown, Co. v. Connell*, 335 U.S. 377, 380 (1948) ("[T]he leased area is under the sovereignty of Great Britain and . . . it is not territory of the United States in a political sense, that is, a part of its national domain.")).  The Court, interpreting the language of the FTCA, held:

> [w]e know of no more accurate phrase in common English usage than "foreign country" to denote territory subject to the sovereignty of another nation.  By the exclusion of "claims arising

---

[9] Indeed, although the FTCA "creates an express limited waiver of the United States' sovereign immunity," *Macharia v. United States*, 238 F. Supp. 2d 13, 20 (D.D.C. 2002), that waiver is expressly limited and must be strictly construed.  *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999) ("We have frequently held . . . that a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign.")

> in a foreign country," the coverage of the Federal Tort Claims Act
> was geared to the sovereignty of the United States.  We repeat
> what was said in [*Vermilya-Brown*:]   "The arrangements under
> which the leased bases were acquired from Great Britain did not
> and were not intended to transfer sovereignty over the leased areas
> from Great Britain to the United States."  Harmon Field, where this
> claim "arose," remained subject to the sovereignty of Great Britain
> and lay within a "foreign country."  The claim must be barred.

*Id.* at 219 (internal citation omitted).  The lease terms of the base in *Spelar* are comparable to the

lease agreement entered into by the United States and Cuba regarding Guantanamo.  "Under

th[at] agreement, 'the United States recognizes the continuance of the ultimate sovereignty of the

Republic of Cuba over the [leased areas],' while 'the Republic of Cuba consents that during the

period of the occupation by the United States . . . the United States shall exercise complete

jurisdiction and control over and within said areas.'"  *Rasul v. Bush*, 542 U.S. 466, 471 (2004)

(quoting Lease of Lands for Coaling and Naval Stations, art. III, U.S.-Cuba, Feb. 23, 1903, T.S.

No. 418.)  As argued by the United States, the terms of its lease with Cuba and the Supreme

Court's finding in *Boumediene* that Cuba "maintains sovereignty, in the legal and technical sense

of the term, over Guantanamo Bay," 128 S. Ct. at 2252, coupled with *Spelar*'s holding that the

phrase "foreign country," as used in 28 U.S.C. § 2680(k), "denote[s] territory subject to the

sovereignty of another nation," 338 U.S. at 219, means that Guantanamo is a "foreign country"

for purposes of the FTCA.  (FTCA Mem. at 9-10; *see also* United States' Reply to Pls.' Opp'n to

United States' Mot. for Substitution and Mot. to Dismiss ["FTCA Reply"] at 14-15.)

      The Supreme Court's unequivocal position in *Boumediene* is that Cuba maintains *de jure*

sovereignty over Guantanamo, and *Spelar* stands for the proposition that "foreign country"

includes any place subject to the sovereignty of another country.[10]  *Boumediene* was concerned

---

[10] The designation of "foreign country" as it is used in the FTCA includes more than just
"sovereign states."  *See Smith v. United States*, 507 U.S. 197, 201 (1993) (meaning of "foreign

with detainees' habeas rights under the Constitution, not the government's waiver of sovereign immunity under the FTCA, and thus, it provides no basis for rejecting the many cases that have refused to apply a "*de facto*" sovereignty test to the FTCA, *see*, *e.g.*, *Cobb v. United States*, 191 F.2d 604, 608 (9th Cir. 1951) (fact that United States was "supreme will" in Okinawa and retained "de facto sovereignty" over island did not determine whether Okinawa was "foreign country" under FTCA); *Bird v. United States*, 923 F. Supp. 338, 343 (D. Conn. 1996) ("Because the 1903 Lease of Lands Agreement clearly establishes Cuba as the *de jure* sovereign over Guantanamo Bay, this Court need not speculate whether the United States is the *de facto* sovereign over the area."); *see also Colon v. United States*, No. 82-Civ-34, 1982 U.S. Dist. LEXIS 16071, at *6 (S.D.N.Y. Nov. 24, 1982) (Guantanamo "remains a 'foreign country' within § 2680(k)'s express exception to the waiver of sovereign immunity by the United States in the FTCA"), or that have declined to adopt plaintiffs' suggestion that "control and jurisdiction" is the functional equivalent to sovereignty. *See Cuba Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1425 (11th Cir. 1995) ("The district court here erred in concluding that Guantanamo Bay was a 'United States territory.' We disagree that 'control and jurisdiction' is equivalent to sovereignty.") (internal citation omitted); *Heller v. United States*, 776 F.2d 92, 96 (3d Cir. 1985) (rejecting argument that Philippine sovereignty was "merely formal" and drawing distinction between "sovereignty, or the legal personhood of the nation, and jurisdiction, or the rights and powers of the nation over its inhabitants").[11]

---

country" includes Antarctica, "even though it has no recognized government"); *see also Parrish v. United States*, 425 F. Supp. 2d 1283, 1285 (M.D. Fla. 2006) ("[F]ederal courts have interpreted the foreign country exception to bar claims arising in a variety of locations outside the territory of the United States, even when those locations were not in 'sovereign' nations.").

[11] The Court also finds persuasive the cases cited by defendants that hold that FTCA claims arising from acts or omissions on U.S. military bases located outside the continental United

Plaintiffs insist that Guantanamo is not a "foreign country" under the FTCA because only U.S. law applies there.  (Opp'n at 75-76.)  As such, plaintiffs argue that allowing their FTCA claims to proceed would not "offend the Congressional intent behind the foreign country exception"—that is, the desire not to subject the United States to liabilities based on the laws of a foreign power.  (Opp'n at 73, 76 (citing *Sosa*, 542 U.S. at 707).)  However, even if this point were uncontested (*but see* FTCA Reply at 17-18), the Supreme Court has made clear that a claim need not "implicat[e] foreign law" in order to be considered as "arising in a foreign country." *Sosa*, 542 U.S. at 711 (rejecting headquarters doctrine even where its application would not implicate foreign tort law); *see also Meredith v. United States*, 330 F.2d 9, 10-11 (9th Cir. 1964) (noting possible reasons for FTCA foreign country exception other than implication of foreign law, including "the absence of United States courts in such countries, with resulting problems of venue, and the difficulty of bringing defense witnesses from the scene of the alleged tort to places far removed; and a reluctance to extend the Act's benefits to foreign populations") (quoting *Burna v. United States*, 240 F.2d 720, 722 (4th Cir. 1957)).  Moreover, the Court cannot ignore the undisputed fact, so clearly enunciated by *Boumediene*, that Cuba, and *not* the United States, retains *legal* sovereignty over Guantanamo, regardless of the extent of the authority exercised by the United States over its military base.  *Boumediene*, 128 S. Ct. at 2252.

This Court may not disregard the unambiguous language in *Spelar*, which relied on the plain language of 28 U.S.C. § 2680, when holding that "the coverage of the [FTCA] was geared

---

States and its territories are barred by the foreign country exception.  (*See* FTCA Mem. at 10.) These cases stand for the proposition that "it is reasonable that torts occurring on American military bases are barred by the foreign country exception, despite the fact that the enforcement authority on base is American."  *Heller*, 776 F.2d at 97; *see also Broadnax v. U.S. Army*, 710 F.2d 865, 866-67 (D.C. Cir. 1983); *Rafftery v. United States,* 150 F.Supp. 618, 618  (E.D.La. 1957) ("[J]urisdiction in [FTCA] cases [is] confined to areas over which the United States ha[s] complete sovereignty.").

to the sovereignty of the United States." *Spelar*, 338 U.S. at 219.  The United States does not have sovereignty over Guantanamo in the "legal and technical sense," *Boumediene*, 128 S. Ct. at 2252, and as such, FTCA claims arising there are barred by the foreign country exception.  This holding also bars plaintiffs' claims for intentional and negligent infliction of emotional distress, regardless of whether those claims are found to have arisen in Yemen and Saudi Arabia or are derivative of claims that arose at Guantanamo.  Accordingly, the Court grants the government's motion to dismiss plaintiffs' Claims I to IV and VII to XIV. [12]

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motions to dismiss and the United States' motion to substitute.  A separate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   February 16, 2010

---

[12] Defendant also argues that the majority of plaintiffs' claims are barred because plaintiffs failed to adequately "present[] the claim to the appropriate Federal agency" before filing suit (FTCA Mem. at 12-13; *see also* FTCA Reply at 21 n.28), which is "a mandatory jurisdictional prerequisite" to filing an FTCA claim against the government.  *Jackson v. United States*, 730 F.2d 808, 809 (D.C. Cir. 1984).  The Court agrees that plaintiffs' administrative claims are deficient because they are focused on the emotional distress suffered by the detainees' fathers, not the claims on behalf of the detainees' estates.  The claims include no allegations regarding the inhumane conditions and torturous practices alleged in plaintiffs' amended complaint, save a passing reference to forced-feeding (Am. Compl. Ex. A at 4, Ex. B at 4), and there is no suggestion that plaintiffs would be seeking damages for "physical injuries," "death," "loss of interfamilial relations," or "medical expenses."  (Am. Compl. ¶ 198.)  As a result, the administrative claims failed to include factual allegations that could form the basis of any of plaintiffs' claims other than XII and XIII, concerning intentional and negligent infliction of emotional distress on Al-Zahrani, Sr. and Al-Salami, Sr.  Accordingly, plaintiffs failed to exhaust their administrative remedies with respect to claims I-IV, VII-XI, and XIV.